No. 23-4331

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

C. P., by and through his parents, Patricia Pritchard and
Nolle Pritchard; and PATRICIA PRITCHARD, *et al.*,

*Plaintiff-Appellee,*

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:20-cv-06145-RJB
Hon. Robert J. Bryan

---

## APPELLANT'S OPENING BRIEF

---

Robert N. Hochman
Sam Gorsche
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, WA 98101
(206) 626-7714
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Attorneys for Appellant Blue Cross Blue Shield of Illinois*
[Additional Counsel Listed on Inside Cover]

Adam H. Charnes
Kilpatrick Townsend &
  Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

Stephanie Bedard
Kilpatrick Townsend &
  Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6039
sbedard@ktslaw.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioner Blue Cross Blue Shield of Illinois, by and through its under-signed counsel, states that it is an unincorporated division of Health Care Service Corporation ("HCSC"); that HCSC is not publicly held; and that no publicly held corporation owns 10% of the stock in HCSC.

Date: April 12, 2024

*/s/ Robert N. Hochman*
Robert N. Hochman

*Attorney for Appellant Blue Cross Blue Shield of Illinois*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES...................................................................iv

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 5

ISSUES PRESENTED ........................................................................ 5

STATUTORY AND REGULATORY AUTHORITIES .............................. 6

STATEMENT OF THE CASE .............................................................. 6

    A.    BCBSIL's Third-Party Administrator Business............ 6

    B.    BCBSIL Applies Plan Exclusions to C.P.'s Claims for Puberty Blocker and Mastectomy. ................................... 9

    C.    Regulatory Background ................................................. 14

    D.    This Suit ........................................................................ 18

SUMMARY OF THE ARGUMENT ....................................................24

STANDARD OF REVIEW..................................................................27

ARGUMENT ...................................................................................28

I.    BCBSIL did not discriminate within the meaning of Section 1557.........................................................................28

    A.    Plaintiffs Have Sued BCBSIL for Adhering to Fiduciary Duties Required by ERISA..........................28

ii

B.    Section 1557 Does Not Make BCBSIL Liable for Its Application of the Clear Written Terms of the ERISA Plan. ................................................................. 33

    1.    Section 1557 Implies a Cause of Action Against Only Intentional Discrimination. ....................... 34

    2.    BCBSIL Is Not Liable Under Agency Principles 36

    3.    Legally Binding Regulations Foreclose TPA Liability ............................................................... 38

C.    The District Court's Reasons for Allowing TPA Liability Are Unavailing. ............................................... 41

II.    Third-Party Administered Health Insurance Plans Are Not Federally Funded "Health Programs or Activities" Subject to Section 1557. ........................................................... 47

III.    The District Court Wrongly Disregarded the Religious Freedom Restoration Act. ..................................... 56

IV.    The Plan Exclusions Direct BCBSIL to Consider Medical Diagnosis, Not to Discriminate on the Basis of Sex. ........... 65

CONCLUSION ............................................................ 72

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Integrative Med. Scis. Inst., PLLC v. Garland,*
24 F.4th 1249 (9th Cir. 2022) .............................................................. 49

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................................ 34

*Am. Fed'n of Gov't Emps., AFL-CIO Loc. 2152 v. Principi,*
464 F.3d 1049 (9th Cir. 2006) ............................................................ 54

*Apache Stronghold v. United States,*
95 F.4th 608 (9th Cir. 2024) .............................................................. 62

*Bose v. Bea,*
947 F.3d 983 (6th Cir. 2020) .............................................................. 37

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ...................................................................... *passim*

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ........................................................ 57, 58, 59, 60

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979) ............................................................................ 33

*Cannon v. Univ. of Chi.,*
648 F.2d 1104 (7th Cir. 1981) ............................................................ 35

*Chevron U.S.A., Inc. v. NRDC, Inc.,*
467 U.S. 837 (1984) ...................................................................... 45, 52

*Collins v. Giving Back Fund,*
No. 18-cv-8812 (CM), 2019 WL 3564578 (S.D.N.Y. Aug. 6,
2019) .................................................................................................... 51

*Cornhusker Cas. Ins. Co. v. Kachman,*
553 F.3d 1187 (9th Cir. 2009) ............................................................ 27

*Curtiss-Wright Corp. v. Schoonejongen,*
  514 U.S. 73 (1995) ..................................................... 30, 36, 40

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ............................................................ 70

*Doe v. CVS Pharmacy, Inc.,*
  982 F.3d 1204 (9th Cir. 2020) ............................................ 33

*Doe v. Mercy Cath. Med. Ctr.,*
  850 F.3d 545 (3d Cir. 2017) ............................................... 49

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) .............................................. 65

*EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles,*
  450 F.3d 476 (10th Cir. 2006) ............................................ 38

*EEOC v. Cath. Univ. of Am.,*
  83 F.3d 455 (D.C. Cir. 1996) .............................................. 63

*Fed. Express Corp. v. Holowecki,*
  552 U.S. 389 (2008) ............................................................ 47

*Franciscan All., Inc. v. Azar,*
  414 F. Supp. 3d 928 (N.D. Tex. 2019) ................................ 15

*Gebser v. Lago Vista Indep. Sch. Dist.,*
  524 U.S. 274 (1998) ............................................................ 37

*Gen. Elec. Co. v. Gilbert,*
  429 U.S. 125 (1976) ............................................................ 70

*Goffney v. Becerra,*
  995 F.3d 737 (9th Cir. 2021) .............................................. 46

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ............................................................ 59

*Guam v. Guerrero,*
  290 F.3d 1210 (9th Cir. 2002) ............................................ 61

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ................................................................. 53

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
  649 F. Supp. 3d 104 (D. Md. 2023), *appeal filed*, No. 23-
  1452 (4th Cir. Apr. 26, 2023) .............................................. 30

*Hankins v. Lyght*,
  441 F.3d 96 (2d Cir. 2006) ......................................... 63, 64

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
  571 U.S. 99 (2013) ................................................................. 29

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013), *aff'd sub nom. Burwell v.
  Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ................... 63

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ............................................................... 59

*Horner v. Ky. High Sch. Athletic Ass'n*,
  206 F.3d 685 (6th Cir. 2000) ................................................ 34

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ............................................................... 34

*Kadel v. Folwell*,
  620 F. Supp. 3d 339 (M.D.N.C. 2022) ................................. 31

*Karasek v. Regents of Univ. of Cal.*,
  956 F.3d 1093 (9th Cir. 2020) .............................................. 35

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) .............................................. 69

*King v. Blue Cross & Blue Shield of Ill.*,
  871 F.3d 730 (9th Cir. 2017) ................................................ 28

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ........................................................... 46

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ............................................................ 63

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ............................................................ 35, 36, 37

*Little Sisters of the Poor Saints Peter & Paul Home v.*
    *Pennsylvania,*
    140 S. Ct. 2367 (2020) ............................................................ 59, 64

*Lockhart v. United States,*
    577 U.S. 347 (2016) ............................................................ 54

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) ............................................................ 48

*Maner v. Dignity Health,*
    9 F.4th 1114 (9th Cir. 2021) ............................................................ 53

*Martin v. Nat'l Bank of Alaska,*
    828 F. Supp. 1427 (D. Alaska 1992) ............................................................ 44

*Momeni v. Chertoff,*
    521 F.3d 1094 (9th Cir. 2008) ............................................................ 32

*Morton v. Mancari,*
    417 U.S. 535 (1974) ............................................................ 44, 45

*Navajo Nation v. HHS,*
    285 F.3d 864 (9th Cir. 2002), *vacated on other grounds,*
    307 F.3d 977 (9th Cir. 2002) ............................................................ 55

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ............................................................ 57

*Reese v. Jefferson Sch. Dist. No. 14J,*
    208 F.3d 736 (9th Cir. 2000) ............................................................ 37

*Religious Sisters of Mercy v. Azar*,
    513 F. Supp. 3d 1113 (D.N.D. 2021), *aff'd in part,
    remanded in part sub nom. Religious Sisters of Mercy v.
    Becerra*, 55 F.4th 583 (8th Cir. 2022)................................. 60

*Religious Sisters of Mercy v. Cochran*,
    No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19,
    2021), *aff'd in part, remanded in part on other grounds
    sub nom. Religious Sisters of Mercy v. Becerra*, 55 F.4th
    583 (8th Cir. 2022) .............................................. 15

*Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v.
    United States*,
    215 F.3d 1005 (9th Cir. 2000)....................................... 32, 44

*Scanlon v. Cnty. of Los Angeles*,
    92 F.4th 781 (9th Cir. 2024) ....................................... 28

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
    965 F.3d 945 (9th Cir. 2020)........................................ 34, 40

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ................................................. 43

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ............................................... 46, 47, 52

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011) ................................................ 38

*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard Coll.*,
    600 U.S. 181 (2023) ............................................... 69

*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999)........................................ 61

*The Comm. Concerning Cmty. Improvement v. City of
    Modesto*,
    583 F.3d 690 (9th Cir. 2009)........................................ 35

*T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*,
    43 F.4th 737 (7th Cir. 2022) ........................................................ 30, 49

*United States v. Bauer*,
    84 F.3d 1549 (9th Cir. 1996)................................................................ 63

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ............................................................................ 46

*Walker v. Azar*,
    480 F. Supp. 3d 417 (E.D.N.Y. 2020) ................................................ 17

*Whitman-Walker Clinic, Inc. v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ........................................................ 17

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023), *cert. dismissed in part sub
    nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023) .......................... 66, 68, 69

*Wit v. United Behav. Health*,
    79 F.4th 1068 (9th Cir. 2023) ............................................................ 22

*Worldwide Church of God v. Philadelphia Church of God,
    Inc.*,
    227 F.3d 1110 (9th Cir. 2000)............................................................ 64

*In re Young*,
    141 F.3d 854 (8th Cir. 1998).............................................................. 63

## Statutes and Regulations

5 U.S.C. § 5371(a) ...................................................................................... 52

20 U.S.C. § 1681.................................................................................... 14, 33

20 U.S.C. § 1687................................................................................25, 49, 50, 51

28 U.S.C. § 1292(a)(1).................................................................................. 5

28 U.S.C. § 1331............................................................................................ 5

29 U.S.C. § 1002(16)(B) ........................................................................ 29, 40

29 U.S.C. § 1102(a) ................................................................ 30

29 U.S.C. § 1102(b)(3) ........................................................... 30

29 U.S.C. § 1104 ............................................................. *passim*

29 U.S.C. § 1132 .................................................................... 29

29 U.S.C. § 1144(d) ............................................................... 43

42 U.S.C. § 2000bb .............................................................. 62

42 U.S.C. § 2000bb-1 ......................................... 2, 56, 60, 62

42 U.S.C. § 2000bb-3 ....................................................... 62, 64

42 U.S.C. § 2000e(b) ............................................................. 36

42 U.S.C. § 18116 .................................................................... 5

42 U.S.C. § 18116(a) ...................................................... *passim*

42 U.S.C. § 18116(c) ............................................................. 14

45 C.F.R. § 92.3 ..................................................................... 25

45 C.F.R. § 92.3(b) .................................................. 26, 47, 48, 51

45 C.F.R. § 92.3(c) ................................................................ 48

Nondiscrimination in Health Programs and Activities, 81
    Fed. Reg. 31,375 (May 18, 2016) ............................... 14, 15, 39

Nondiscrimination in Health and Health Education Pro-
    grams or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) .......... *passim*

Notification of Interpretation and Enforcement of Section
    1557, 86 Fed. Reg. 27,984 (May 25, 2021) ........................................ 17

Nondiscrimination in Health Programs and Activities, 87
    Fed. Reg. 47,824 (Aug. 4, 2022) ................................ 3, 18, 25, 39, 41, 42

**Rules**

Fed. R. App. P. 4(a)(1)(A) ................................................................ 5

**Legislative Materials**

S. Rep. No. 100-64 (1987) ........................................................... 51

## INTRODUCTION

As one part of its business, Blue Cross Blue Shield of Illinois ("BCBSIL") performs certain administrative functions for self-insured employer health plans. In a self-insured health plan, the employer chooses what benefits to include and pays for covered claims. The employer sometimes hires a third-party administrator (or "TPA") such as BCBSIL to evaluate whether the employer's plan covers the services sought in claims submitted by patients or providers.

Some self-insuring employers that use BCBSIL as a third-party administrator have chosen to exclude from coverage certain gender-affirming medical services used as treatments for gender dysphoria, sometimes for religious reasons. The exclusions vary in design and scope, but all of the exclusions are in the plans because the employers chose them. TPAs such as BCBSIL cannot and do not dictate the design, including the scope of coverage, for their self-insured customers' plans.

In a first-of-its-kind ruling, the district court has ordered BCBSIL to administer the health plans of its customers in a manner that *contradicts* the unambiguous terms of those plans. Applying Section 1557 of the Affordable Care Act, which forbids discrimination by certain recipients of

federal funds, the district court concluded that *BCBSIL* discriminated on the basis of sex when it followed the terms of its customers' plans to deny claims for gender-affirming care services that BCBSIL's *customers* had excluded from coverage. The court has thus ordered BCBSIL to administer its customers' health plans as if they did not exclude coverage for gender-affirming care. That judgment applies even if the customer is a religious institution that chose the exclusion for reasons of religious conscience.

The trial court's novel ruling thus places three significant federal statutes at odds with each other: the Employee Retirement Income Security Act, the Religious Freedom Restoration Act, and Section 1557. ERISA expressly imposes a fiduciary duty on TPAs to administer the plan "in accordance" with its language. 29 U.S.C. § 1104(a)(1)(D). RFRA prevents the application of federal law in a manner that substantially burdens a person's exercise of religion. 42 U.S.C. § 2000bb-1. And Section 1557 is a nondiscrimination statute that implies a private cause of action against only a "health program or activity … receiving Federal financial assistance." *Id.* § 18116(a).

In truth, these three statutes and their salutary purposes can be readily harmonized. The court-created discord between them is unnecessary. It is neither a valid nor intuitive application of the law. Indeed, HHS regulations with the force of law have successfully reconciled all three statutes.

There are several ways to interpret and apply the three statutes so that Section 1557 can effectively deter discrimination, *and* TPAs can faithfully discharge their duties under ERISA, *and* RFRA can protect free exercise of religion.

- For starters, TPA operations (including BCBSIL) are not a "health program or activity" subject to Section 1557 because they receive no federal funds. Since Section 1557 does not apply to these operations, it cannot require that TPAs deviate from their duties under ERISA.

- Likewise, as federal regulations spell out, TPAs discharging their fiduciary duties under ERISA are not subject to Section 1557 liability so long as the allegedly discriminatory policy "did not originate with the third-party administrator." Nondiscrimination in Health Programs and Activities, 87 Fed.

Reg. 47,824, 47,877 (Aug. 4, 2022). This approach follows naturally from Section 1557, which allows a cause of action only against intentional discriminators, does not allow agency principles to assign vicarious liability, and must be construed to avoid any unnecessary conflict with ERISA's fiduciary duties.

- In addition, RFRA affirmatively creates an exemption from any application of Section 1557 that violated a plan sponsor's religious conscience—that exemption protects many of BCBSIL's customers.

The district court chose none of these options. Instead, the court's interpretation of the statutes is rife with errors. It ignored a readily available harmonious reading of all the implicated federal statutes that excluded BCBSIL from liability for faithfully applying the coverage decisions of its customers. It strained to read BCBSIL as covered by a statute that applies only to programs receiving federal funds, even though it is undisputed that BCBSIL's TPA operations receive no federal funds. And it ignored RFRA entirely based on the false premise that RFRA does not apply in any cases between private parties. These errors of statutory

4

construction resulted in an interpretation at odds with binding regulations promulgated by three successive administrations. For these and other reasons, the judgment of the district court should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case because plaintiffs raise claims under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. *See* 28 U.S.C. § 1331. This court has jurisdiction over the district court's December 20, 2023, order granting plaintiffs injunctive relief. 1-ER-7–28; *see* 28 U.S.C. § 1292(a)(1). Defendant BCBSIL filed its notice of appeal on December 20, 2023. 8-ER-1839–41. The appeal is therefore timely. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Whether a third-party administrator that did not design an allegedly discriminatory ERISA plan exclusion and owes a fiduciary duty to apply the plan exclusion as written can be sued under Section 1557 for faithfully administering the plan.

2. Whether an insurer's third-party-administrator operations, which receive no federal funding, are subject to Section 1557 as

5

a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).

3. Whether, when the plan sponsor has a religious objection to funding gender-affirming care, the Religious Freedom Restoration Act permits a generally applicable federal law to require a third-party administrator to ignore the self-funded plan's exclusion of such care.

4. Whether a plan that covers certain treatments when prescribed for some conditions but does not cover those treatments if prescribed for gender dysphoria (no matter the sex or gender identity of the patient) constitutes discrimination "on the basis of sex."

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

### A. BCBSIL's Third-Party Administrator Business

Instead of paying premiums to a health insurer that assumes financial responsibility for the health care costs of employees and their

6

dependents, an employer can choose to sponsor a self-insured plan that assumes responsibility for those costs. 5-ER-1118. A self-insuring employer (called a "plan sponsor") often hires a third-party administrator to perform specified administrative tasks necessary to implement the plan. TPAs may assemble a network of providers, process claims, and handle various other administrative tasks, including communicating the self-insured plan's benefit decisions to plan beneficiaries. ERISA expressly requires the TPA performing these functions on behalf of the plan to follow the terms of the plan chosen by the employer. *See* 29 U.S.C. § 1104(a)(1)(D).

BCBSIL, a division of Health Care Service Corporation, is a health insurer that offers employers and individuals a wide variety of products, including TPA services. BCBSIL receives Federal financial assistance for its "Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and Medicare/Medicaid dual eligibility." 1-ER-59 (citation omitted). It does not receive Federal financial assistance for its TPA activities. *Id.*; *see also* 6-ER-1315–16.

As a general matter, plan sponsors "design their own coverage," meaning that the plan sponsor will choose "what it will cover for

employees." 5-ER-1118. Plan sponsors "can add or remove any benefits that they wish" and plan sponsors can "customize" the precise language governing those benefits. 7-ER-1527–28.

A typical plan will have a general exclusion of all services that are not "medically necessary" under the circumstances. 6-ER-1199. In addition, plan sponsors may choose to exclude from coverage many *categories* of health services. It is common, for instance, to exclude vision examinations and standard dental services. *E.g.*, 6-ER-1180–82. Plans also commonly exclude services that are merely ancillary to medical treatment, like "Personal Hygiene, Comfort, and Convenience Items." 6-ER-1181; 7-ER-1664. Some plan sponsors exclude certain medical services because they are too expensive or beneficiaries do not expect them. For example, a plan may exclude from coverage elective cosmetic surgery, hearing aids, kerato-refractive (Lasik) eye surgery, or weight loss prescription drugs. *E.g.*, 6-ER-1180–82; 7-ER-1664–66. Sometimes the plan sponsor opts to exclude certain treatments for reasons of religious conscience, such as abortions in non-life threatening situations, sterilization procedures, and certain contraceptives and abortifacients. *E.g.*, 6-ER-1180–82.

## B.    BCBSIL Applies Plan Exclusions to C.P.'s Claims for Puberty Blocker and Mastectomy.

This case was originally brought by a single named plaintiff, C.P., a transgender male who was a member of an ERISA-governed health plan designed and sponsored by CommonSpirit Health, formerly Catholic Health Initiatives ("CHI"). CHI contracted with BCBSIL to perform certain TPA services for the CHI Plan. *See* 8-ER-1758–1805.

In 2016, when he was ten years old, C.P.'s doctor diagnosed him with gender dysphoria, which is defined as an "incongruence" between one's gender identity and the sex one was assigned at birth that results in a "feeling of clinically significant stress and discomfort." 1-ER-59. The doctor prescribed a Vantas implant to treat his dysphoria. *Id.*

Surgically implanted beneath the skin, Vantas is one means of delivering the drug Histrelin, which causes the pituitary gland to secrete less of the luteinizing hormone (LH). 6-ER-1154. If LH is suppressed, ovaries will not produce estrogen and testes will not produce testosterone. *Id.* Thus, Histrelin can be used as a puberty blocker. Vantas was originally used for (and is still indicated for) the treatment of advanced prostate cancer. *Id.*; 6-ER-1357; 7-ER-1423. Supprelin LA is another surgically implanted means of delivering Histrelin. It was originally used

9

(and is indicated for) treatment of precocious puberty. 6-ER-1154, 1357. Use of Vantas and Supprelin LA for gender dysphoria is an "off label" use, as the FDA has not approved these drugs for this purpose. 6-ER-1357–58.

As relevant here, the CHI Plan stated that "[b]enefits shall not be provided for treatment, drugs, medicines, therapy, counseling services and supplies for, or leading to, gender reassignment surgery." 6-ER-1229. CHI has explained that it chose to exclude "gender reassignment surgery" from coverage because "this surgery has been determined not to align with the teachings and doctrine of the Catholic Church." 2-ER-205; *see also* 2-ER-321 (Benefit Program Application in which CHI represented that covering "gender identity dysphoria/gender reassignment … would violate … the Employer's religious freedom").

The CHI Plan contained this exclusion solely because it is a *self-insured* plan. Insurance policies offered by BCBSIL do not contain categorical exclusions of gender-affirming care. 5-ER-1033; 7-ER-1501–22. Rather, BCBSIL's own policies will cover gender-affirming care so long as it meets all general criteria for coverage, such as medical necessity. 7-ER-1501–22. Moreover, when plan sponsors design a plan from scratch

10

and ask for technical assistance from BCBSIL, BCBSIL provides them with a template that does not exclude gender-affirming care. *See* 7-ER-1609. Plan sponsors must affirmatively decide to exclude such services.

Claims for benefits under a health plan typically include both a diagnosis code that conveys the particular condition being treated and a procedure or "service" code that identifies the treatment. To administer the CHI Plan's exclusion of "treatment, drugs, therapy, counseling services and supplies for, or leading to, gender reassignment surgery," BCBSIL looks at both codes. First, BCBSIL identifies claims submitted with a diagnosis code for "gender dysphoria." 7-ER-1533–35; 8-ER-1715–16; *see also* 7-ER-1538–40. Then, BCBSIL denies claims with that diagnosis code if the procedure code fits the services described in the plan exclusion. 7-ER-1533–35, 1539. BCBSIL does not look at or otherwise take account of the patient's biographical information, such as sex and sex assigned at birth. And like other exclusions of gender-affirming care, the CHI Plan covers hormone treatments, hysterectomies, and mastectomies "when medically necessary for conditions other than gender dysphoria." 8-ER-1724; *see also* 3-ER-405.

Due to a mistake in the predetermination of benefits, C.P.'s 2016 claims for a Vantas implant were paid, despite the fact that the CHI Plan excluded the claims from its coverage. 2-ER-145–46, 148. A Vantas puberty blocker, which must be surgically implanted if prescribed to treat gender dysphoria, was excluded from coverage under the CHI Plan because it is a type of "treatment, drugs, therapy, counseling services and supplies for, or leading to, gender reassignment surgery." 6-ER-1229.

After catching the mistake, BCBSIL informed C.P. and his family in April 2017 that "any future claims" for such benefits would "not be covered as stated in the plan." 6-ER-1162. C.P.'s family appealed that decision, arguing that such services should have been covered under the Plan's terms. After an Appeals Specialist at BCBSIL reviewed the appeal, BCBSIL determined that its letter to C.P. was correct: the Vantas implant was not covered under the terms of the CHI Plan. 2-ER-169–71.

Used as a puberty blocker, a Vantas implant will typically last three to five years. 6-ER-1154. Consequently, in 2019, when C.P. was fourteen years old, he required a new Vantas implant. Around the same time, C.P. found a surgeon willing to perform a complete bilateral mastectomy to treat the dysphoria. 6-ER-1385.

12

C.P. thus submitted a preauthorization request to the CHI Plan for a new Vantas and a total mastectomy. As it had explained it would, BCBSIL denied the request due to the CHI Plan's categorical exclusion of "treatment, drugs, therapy, counseling services and supplies for, or leading to, gender reassignment surgery." 1-ER-59; 6-ER-1229; 6-ER-1306; 6-ER-1310. Thus, using her own funds, C.P.'s mother paid $12,122.50 for the surgery and puberty blocker. 1-ER-60.

BCBSIL has at some point during the period relevant to this litigation administered 398 ERISA self-insured plans with some form of an exclusion related to gender dysphoria, but the plans vary widely in the services excluded. Some plans exclude all such services, while others exclude only certain services or limit certain services to specific diagnoses and clinical situations. *See* 5-ER-1083–92. For example, some plans exclude "gender reassignment surgery" but cover hormonal treatments for gender dysphoria. Other plans cover such surgery only for adults who meet particular treatment criteria, like having twelve months of successful hormone therapy and twelve months of successful real-life experience in their new gender. Others exclude from coverage only the "*reversal* of gender reassignment surgery." 5-ER-1088 (emphasis added).

## C.    Regulatory Background

Section 1557 of the Affordable Care Act provides that

> an individual shall not, on the ground prohibited under title
> VI of the Civil Rights Act of 1964, title IX of the Education
> Amendments of 1972, the Age Discrimination Act of 1975, or
> section 794 of Title 29, be excluded from participation in, be
> denied the benefits of, or be subjected to discrimination under,
> any health program or activity, any part of which is receiving
> Federal financial assistance.

42 U.S.C. § 18116(a) (citations omitted). Title IX prohibits discrimination

"on the basis of sex." 20 U.S.C. § 1681. Section 1557 grants the Secretary

of Health and Human Services the authority to "promulgate regulations

to implement this section." 42 U.S.C. § 18116(c).

Since Section 1557 became law in 2010, multiple administrations

have issued rules that establish how Section 1557 applies (if at all) to

health insurers, to TPAs, to plans sponsored by religious employers, and

to exclusions related to gender-affirming care, among other issues. Three

successive presidential administrations have made clear that TPAs are

not liable for any "discrimination" in the design of a self-insured plan.

First, in 2016, the Obama administration's HHS prohibited "cate-

gorical coverage exclusion[s] or limitation[s] for all health services re-

lated to gender transition." Nondiscrimination in Health Programs and

Activities, 81 Fed. Reg. 31,375, 31,472 (May 18, 2016). However, HHS

14

recognized "that third party administrators are generally not responsible for the benefit design of the self-insured plans they administer and that ERISA … requires plans to be administered consistent with their terms." *Id.* at 31,432. HHS thus determined that a TPA's liability would depend on "whether responsibility for the decision or other action alleged to be discriminatory rests with the employer or with the third party administrator." *Id.* Where "the alleged discrimination relates to the benefit *design* of a self-insured plan—for example, where a plan excludes coverage for all health services related to gender transition"—only the employer could be liable, not the TPA. *Id.* (emphasis added). A district court later vacated other portions of the 2016 Rule, based in part on religious-liberty grounds. *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 941, 944, 947 (N.D. Tex. 2019).[1]

---

[1] Another injunction in a case initially brought under the 2016 Rule prohibits HHS from interpreting or enforcing Section 1557 in a manner that would require various Catholic organizations—or "any insurers or third-party administrators" of those organizations—to "perform or provide insurance coverage for gender-transition procedures." *Religious Sisters of Mercy v. Cochran*, No. 3:16-CV-00386, 2021 WL 1574628, at *1-2 (D.N.D. Feb. 19, 2021), *aff'd in part, remanded in part on other grounds sub nom. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022).

The Trump administration repealed the 2016 Rule and issued its own. *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule"). That rule eliminated the 2016 Rule's definition of "on the basis of sex" and removed the prohibition on categorical coverage exclusions related to gender transition. *See id.* at 37,177–92. In addition, the 2020 Rule determined that Section 1557 applies to "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." *Id.* at 37,244. However, "an entity principally or otherwise engaged in the business of providing health *insurance*" is not a "health program or activity" in its entirety and thus Section 1557 applies to a health insurer's operations "only to the extent any such operation receives Federal financial assistance." *Id.* at 37,172, 37,244–45 (emphasis added); *see also id.* at 37,173 ("[A] health insurer is principally engaged in the business of providing coverage for benefits consisting in healthcare, which is not the same as the business of providing healthcare."). Finally, HHS codified regulatory language forbidding any application of Section 1557 that "would violate, depart from, or

contradict" the Religious Freedom Restoration Act. *Id.* at 37,245 (codified at 45 C.F.R. § 92.6(b)); *see also id.* at 37,207.

The 2020 Rule remains largely in effect. After the Supreme Court issued its landmark decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), however, several district courts issued nationwide injunctions preventing HHS from enforcing aspects of the Rule. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020) (enjoining HHS from enforcing the repeal of the 2016 Rule's definition of discrimination "on the basis of sex" insofar as it includes discrimination on the basis of sex stereotyping and from enforcing the 2020 Rule's incorporation of the religious exemption contained in Title IX); *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020) (enjoining repeal of the 2016 Rule's definition of discrimination "on the basis of sex"); *see also* Notification of Interpretation and Enforcement of Section 1557, 86 Fed. Reg. 27,984 (May 25, 2021) (guidance explaining how HHS would construe the 2020 Rule in light of *Bostock*).

The Biden administration has proposed (but has not finalized) a rule substantially similar to the 2016 Rule. The proposal would again prohibit "categorical coverage exclusion[s] or limitation for all health

17

services related to gender transition or other gender-affirming care," and would again define the term "health program or activity" in Section 1557 to include all the operations of a health insurer. 87 Fed. Reg. at 47,871, 47,912. Like the Obama administration, the Biden administration's rule clarifies that TPAs are exempt from liability if "the alleged discrimination relates to the benefit design of a self-insured group health plan that did not originate with the third-party administrator, but rather with the plan sponsor." *Id.* at 47,877.

### D.    This Suit

C.P. brought suit against BCBSIL under Section 1557's implied private cause of action. 2-ER-138–41; 8-ER-1883–85. Choosing to sue BCBSIL alone and not CHI, the plan sponsor, C.P. alleged that BCBSIL's denial of his claim for coverage of a Vantas implant and mastectomy—a denial pursuant to the CHI Plan's exclusion—constitutes discrimination by BCBSIL "on the basis of sex" prohibited by Section 1557. 2-ER-140. C.P. requested a declaratory judgment stating the BCBSIL was in violation of C.P.'s rights under Section 1557, an injunction prohibiting BCBSIL from applying the CHI Plan's exclusion of certain care for gender dysphoria, damages, attorney's fees, and costs. 8-ER-1885–86.

18

A year into this litigation, C.P. converted the case into a purported class action, moved for class certification under Federal Rules of Civil Procedure 23(b)(1) and (b)(2), and, over BCBSIL's objection, was granted class certification. The class ultimately was defined to include those who:

> (1) have been, are, or will be participants or beneficiaries in an ERISA self-funded "group health plan" (as defined in 29 U.S.C. § 1167(1)) administered by [BCBSIL] during the Class Period and that contains a categorical exclusion of some or all Gender-Affirming Health Care services; and

> (2) were denied pre-authorization or coverage of treatment solely based on an exclusion of some or all Gender-Affirming Health Care services; and/or

> (3) are or will be denied pre-authorization or coverage of treatment solely based on an exclusion of some or all Gender-Affirming Health Care services.

1-ER-55. In addition to expanding the scope of the prospective injunction sought by the original complaint, the class action complaint sought a retrospective injunction that would require BCBSIL to reprocess all class members' claims that had been denied pursuant to a gender-affirming-care exclusion. 2-ER-141–42.

The district court decided the merits on cross-motions for summary judgment. As a threshold matter, the district court found that BCBSIL's

TPA activities "constitute the operation of a 'health program or activity'" and thus fell within the scope of Section 1557. 1-ER-66. It was undisputed that BCBSIL receives no federal funding for its TPA activities. And it was also undisputed that BCBSIL provides no healthcare services itself; it administers insurance coverage that pays for healthcare services offered by healthcare providers. Nonetheless, and contrary to HHS's 2020 rule, the district court declared that the "plain language" of Section 1557 includes TPAs and so the regulations were immaterial. 1-ER-70–71.

Next, the district court concluded that BCBSIL's administration of the plan exclusion was "discrimination 'on the basis of sex' contrary to Section 1557." 1-ER-68. The district court reached this conclusion by first deciding, based on the Supreme Court's decision in *Bostock*, that "Section 1557 forbids sex discrimination based on transgender status." 1-ER-67. And, according to the district court, the CHI Plan exclusion discriminated "based on transgender status," because "the trigger for application of the Exclusion and a denial of coverage was a diagnosis of 'gender dysphoria.'" *Id.* The district court thus concluded that Plaintiffs had proved all the elements of a Section 1557 claim.

The district court then concluded that BCBSIL could be held liable

even though it did not choose to have the exclusion in any of the plans. In the district court's view, and contrary to the consistent view of HHS since Section 1557 was enacted, it did not matter whether BCBSIL or one of its customers decided to add the exclusions to the plan. Even though BCBSIL had argued that ERISA and Section 1557 should be construed to *avoid* conflict, the district court conceived of that defense as premised on the notion that ERISA "supplant[s] Section 1557's antidiscrimination provisions." 1-ER-72. So the district court instead adopted the radically opposite notion: that *Section 1557* supplants *ERISA*. 1-ER-72–73.

Finally, the district court concluded that RFRA applies only where the government is a party to the suit, nullifying RFRA's protection of CHI's choices about the scope of benefits. 1-ER-74–75. The parties then briefed the issue of what remedies the court should order.

On September 21, 2023, after proceedings in the district court had nearly concluded, Plaintiffs informed the district court that C.P. was no longer a member of the CHI Plan. 2-ER-293–306. In an attempt to preserve standing to seek prospective relief, Plaintiffs' counsel added two new named plaintiffs, Emmett Jones and S.L. *Id.*; 2-ER-242–44.

21

Jones is a transgender man and a member of the CHI Plan. 1-ER-36, 2-ER-262–63. He paid for chest surgery out-of-pocket and then submitted a claim for reimbursement to the CHI Plan, which BCBSIL denied. 1-ER-36, 2-ER-263–64. Though Jones blames the plan exclusion, Jones's claims were denied for other reasons. 2-ER-257; 2-ER-135.

S.L. is a twelve-year-old transgender female who belongs to a different self-insured health plan that excludes some gender-affirming care services. 1-ER-34, 2-ER-265–67; *see also* 2-ER-250 (relevant exclusion). Her provider requested pre-authorization for puberty-blocking hormones, which BCBSIL denied pursuant to the exclusion in her plan. 1-ER-34, 2-ER-266–67.

On December 19, 2023,[2] the district court permanently enjoined BCBSIL, along with "its agents, employees, [and] successors," from "administering or enforcing exclusions … of 'gender-affirming health care'" in any self-insured health plans. 1-ER-27. The court's order defines

---

[2] The case was held in abeyance pending the Ninth Circuit's decision in *Wit v. United Behavioral Health*, 79 F.4th 1068 (9th Cir. 2023), which was relevant to the question of whether, and under what circumstances, the district court could order a class-wide reprocessing of class members' claims. 2-ER-307–09. After the mandate issued in *Wit*, the district court ruled on remaining remedial questions, including the injunction challenged here.

"gender-affirming health care" as "any health care service—physical, mental, or otherwise—administered or prescribed for the treatment of gender dysphoria" or "related diagnoses." 1-ER-25. The injunction also requires BCBSIL to reprocess the claims of any class members if BCBSIL had previously denied those claims "based solely on the exclusions of gender-affirming health care services." 1-ER-27. BCBSIL timely appealed one day later. 8-ER-1839–41.

At BCBSIL's request, the district court on January 22, 2024, stayed its injunction pending this appeal. 2-ER-57. Applying the stay factors, the district court acknowledged that the injunction would "substantially" and irreparably alter how BCBSIL processes claims and that a stay would allow the Ninth Circuit to "resolve the difficult issues raised by this case." 2-ER-99, 100. As to BCBSIL's likelihood of success on the merits, the district court explained that, although the court was "satisfied with the many rulings made in this case," BCBSIL had nonetheless raised "substantial and serious legal questions … on many critical issues decided in the case." 2-ER-98.

## SUMMARY OF THE ARGUMENT

ERISA requires BCBSIL to apply the written terms of its self-insured customers' ERISA plans. Here, that meant that ERISA required BCBSIL—which covers gender-affirming medical services when *it* is the insurer—to deny claims for gender-affirming services as instructed by the written terms of its customers' plans. Plaintiffs claim that these exclusions facially discriminate on the basis of sex. For strategic reasons, Plaintiffs chose not to bring suit against the employers and plan sponsors who chose to exclude the services (and whose RFRA rights were directly at stake). They sued only the plans' third-party administrator, BCBSIL.

The district court blessed that maneuver and entered summary judgment for the Plaintiffs. That ruling is based on a variety of legal errors, any one of which requires reversal here.

*First*, as a matter of law, the customer chooses what to include in the plan and ERISA stipulates that BCBSIL owes a duty to administer the plan as written. Plaintiffs sue under Section 1557's implied private cause of action against sex discrimination, but that cause of action does not lie against a TPA merely discharging its limited fiduciary duties under ERISA. Section 1557 provides a cause of action only against

24

intentional discrimination, and here BCBSIL lacked discriminatory intent. Further, in the analogous Title IX context, Supreme Court precedent forbids the use of agency principles to make fiduciaries and intermediaries vicariously liable for the misconduct of principals. And HHS rules with the force of law have consistently acknowledged that TPAs are not liable when the allegedly discriminatory policy "did not originate with the third party administrator." 87 Fed. Reg. at 47,877. The district court erred not only by disregarding these limits on Section 1557 liability but also by interpreting Section 1557's implied cause of action *so that* it conflicts with and displaces applicable provisions of ERISA.

*Second*, Section 1557 does not apply to BCBSIL's TPA operations. Section 1557 applies to a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). And the relevant "health program or activity" is the discrete operation of BCBSIL, not the company as a whole. The legal term-of-art "program or activity" is expressly defined in the Civil Rights Restoration Act, *see* 20 U.S.C. § 1687, and that definition has been transplanted into Section 1557 by binding HHS Rules, *see* 45 C.F.R. § 92.3. As the CRRA and HHS Rules mutually affirm, BCBSIL is not, in its entirety, a "health program or

25

activity" because it does not receive federal funds as a whole and is not a health care provider. So Section 1557 applies to BCBSIL's operations "only to the extent any such operation receives Federal financial assistance," 45 C.F.R. § 92.3(b), and BCBSIL's TPA operations receive no Federal financial assistance.

*Third*, the district court erred by ignoring how the Religious Freedom Restoration Act exempts religious customers of BCBSIL from federal laws mandating coverage of gender-affirming care. The district court adopted an overly narrow reading of RFRA that conflicts with its text and with guidance from the Supreme Court. Special provisions in RFRA make clear that RFRA acts as a "super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020). Thus, while RFRA's *cause of action* has no place in a suit between private parties, RFRA nonetheless plays an important role in interpreting and applying federal law, including in a Section 1557 suit between private parties.

*Finally*, the district court failed to draw the necessary link between the plan exclusions and Section 1557's prohibition on discrimination "on the basis of sex." The plan sponsor's design—and thus BCBSIL's

administration—of the plan exclusions depends on a medical diagnosis and not on transgender status. That is readily illustrated by the Vantas implant sought by C.P. The CHI Plan excluded coverage of that implant as a treatment for gender dysphoria, but covered it as a treatment for advanced prostate cancer, no matter the patient's sex or gender identity. So too with many other gender-affirming treatments that are indicated for other medical conditions. This case is thus distinct from *Bostock*, which held that employment discrimination against transgender individuals is necessarily sex discrimination. While *Bostock* reasoned that, in any act of employment discrimination against transgender individuals, the discriminator varies how he or she treats an individual's "traits or actions" based on the individual's sex assigned at birth, here the plans (as administered by BCBSIL) vary treatment only on the basis of medical diagnosis—without regard to sex assigned at birth. 590 U.S. at 659–60, 666–67.

## STANDARD OF REVIEW

This Court reviews *de novo* decisions on cross motions for summary judgment. *Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1191 (9th Cir. 2009). In reviewing the cross motions, this Court "must

determine if, viewing the evidence and drawing all inferences in the light most favorable to the non-moving party, any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law." *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 796–97 (9th Cir. 2024) (internal quotation marks omitted).

## ARGUMENT

### I. BCBSIL did not discriminate within the meaning of Section 1557.

Even accepting Plaintiffs' proposition that the exclusion of gender-affirming care is unlawful sex discrimination, BCBSIL—a TPA that dutifully applied its customers' written plans—did not engage in sex discrimination and cannot be sued under Section 1557. The district court's conclusion that a TPA can be sued for applying the plan as written finds no support in Section 1557, runs contrary to applicable regulations with the force of law, and creates an unnecessary conflict with ERISA. This Court should reject that conclusion and reverse the judgment.

#### A. Plaintiffs Have Sued BCBSIL for Adhering to Fiduciary Duties Required by ERISA.

When delegated responsibility by plan sponsors to administer claims, BCBSIL functions in a fiduciary capacity under ERISA. *King v.*

28

*Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 745–46 (9th Cir. 2017). As a limited fiduciary, BCBSIL owes duties to the plan, 29 U.S.C. § 1104, and may be held liable for a breach of those duties, *see, e.g.*, *id.* § 1132(a) (private actions for breach), § 1132(l) (authorizing Secretary of Labor to seek civil penalties for fiduciary's breach). Among those fiduciary duties, ERISA requires a TPA to administer plan claims strictly "in accordance with the documents and instruments governing the plan." *Id.* § 1104(a)(1)(D). Thus, when BCBSIL denied Plaintiffs' claims for gender-affirming care services pursuant to the relevant exclusions, it was satisfying its fiduciary obligation to administer the plan "in accordance with the documents and instruments" containing exclusions of gender-affirming care. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013) (noting "the particular importance of enforcing plan terms as written"). BCBSIL administered these exclusions as it would have administered any other exclusion: in strict compliance with its contractual and fiduciary duties to apply the plan as written.

Plan sponsors—not the TPA—have the ultimate authority over the content of the documents and instruments governing the plan. 29 U.S.C. § 1002(16)(B). "Employers or other plan sponsors are generally free

29

under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Consistent with that authority, TPAs hold their position at the will of the plan sponsor. 29 U.S.C. § 1102(a). In addition, every ERISA plan has a procedure for amending the plan and identifies "the persons who have authority to amend the plan." *Id.* § 1102(b)(3). Thus, BCBSIL could not lawfully remove the exclusions for which it is being sued in this case. *See* 8-ER-1769. A determination that excluded benefits were covered would have contravened BCBSIL's obligations to the plan under ERISA.

Yet Plaintiffs have nonetheless chosen to challenge the written plan exclusion by suing the TPA *instead* of the plan sponsors who choose what to exclude from the plan and hold the authority to alter the terms of the plan. Plaintiffs did not sue *both* the TPA and the plan sponsors. They simply did not sue the plan sponsors at all. That distinguishes this case from the handful of previous Section 1557 suits alleging discriminatory terms in ERISA plans in which plaintiffs sued the plan sponsors. *See, e.g.*, *T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 739 (7th Cir. 2022); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d

30

104, 111–17 (D. Md. 2023), *appeal filed*, No. 23-1452 (4th Cir. Apr. 26, 2023); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 388 (M.D.N.C. 2022). Plaintiffs' class action suit targeted solely at a TPA is completely unprecedented.

As Plaintiffs have acknowledged, Plaintiffs' decision to sue the TPA set up a conflict between ERISA and Section 1557, the nondiscrimination statute that is the basis of their action. ERISA imposes on TPAs a duty to resolve claims "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). There is no dispute here that the terms of the plans require denial of the relevant claims. Plaintiffs instead contend that TPAs merely discharging their fiduciary duties can nonetheless be sued under Section 1557 for discriminatory terms in the ERISA plan because the conflict they created between ERISA and Section 1557 must be settled in favor of Section 1557. *See, e.g.*, 5-ER-1020. The district court agreed. 1-ER-72.

The Plaintiffs and the district court erred by not pausing to see whether the alleged conflict between Section 1557 and ERISA could be avoided. They ignored the "well established axiom of statutory construction that, whenever possible, a court should interpret two seemingly

31

inconsistent statutes to *avoid* a potential conflict." *Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012 (9th Cir. 2000) (emphasis added); *see also Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008) ("Where an appellate court can construe two statutes so that they conflict, or so that they can be reconciled and both can be applied, it is obliged to reconcile them.").

Fortunately, there is no basis for finding ERISA and Section 1557 irreconcilable and there are clear bases for an interpretation that avoids any conflict. As discussed below, Section 1557 implies a private right of action with a limited scope. Like the implied right of action under Title IX, a Section 1557 sex-discrimination action lies only against intentional discriminators. *See infra* Section I.B.1. And, unlike Title VII actions, a Section 1557 sex-discrimination action cannot be brought against mere agents or intermediaries of the discriminator. *See infra* Section I.B.2. Those limitations have been made binding by the last three administrations' regulations. *See infra* Section I.B.3.

## B. Section 1557 Does Not Make BCBSIL Liable for Its Application of the Clear Written Terms of the ERISA Plan.

Section 1557 makes unlawful the denial of individual benefits or discrimination "on the ground prohibited" by any of four civil rights statutes, including Title IX, which prohibits discrimination "on the basis of sex." 42 U.S.C. § 18116(a); 20 U.S.C. § 1681. Section 1557 also incorporates the "enforcement mechanisms provided for and available" under those civil rights statutes. 42 U.S.C. § 18116(a).

Here, because Plaintiffs allege discrimination "on the basis of sex," the relevant enforcement mechanisms are those under Title IX. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1208–10 (9th Cir. 2020). Specifically, Plaintiffs sue under Title IX's implied right of action as incorporated in Section 1557. *Cf. Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979) (finding Title IX implies private right of action). There are multiple independent and mutually reinforcing reasons why that implied right of action does not lie against a TPA that merely discharged its fiduciary duties. That right of action thus does not conflict with ERISA.

### 1. Section 1557 Implies a Cause of Action Against Only Intentional Discrimination.

Title IX and Section 1557's implied right of action authorizes suits only for "intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005); *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020). At no point did Plaintiffs prove or did the district court conclude that BCBSIL had any discriminatory intent. Nor did the district court conclude that BCBSIL intentionally caused the plans to exclude gender-affirming care. To the contrary, BCBSIL adopted the facially neutral posture that it would, consistent with its duties under ERISA, apply the terms of the plans as written. According to the district court, BCBSIL's neutral policy was grounds enough for liability: "[T]hird party administrators can be liable under Section 1557 based on discriminatory terms in a self-funded plan" even where the plan sponsor "maintained control over its terms." 1-ER-73.

That was error. Even where a defendant's facially neutral policy has a clear disparate impact, that disparate impact cannot give rise to liability under Title VI, Title IX, or in the parallel Section 1557 actions. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI); *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 692 (6th Cir. 2000) (Title IX);

34

*Cannon v. Univ. of Chi.*, 648 F.2d 1104, 1109 (7th Cir. 1981) (Title IX). Rather, plaintiffs must "show that some invidious or discriminatory purpose underlies the policy." *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009). Here, the Plaintiffs did not—and could not—claim that BCBSIL adhered to its duties under ERISA because of "some invidious or discriminatory purpose." There is thus no basis for Section 1557 liability.

Plaintiffs also cannot evade the applicable limits on liability here by arguing that Section 1557 permits a suit against a TPA for "deliberate indifference" to the plan's allegedly discriminatory terms. Not only is such a theory about Section 1557 unsupported by precedent, but under Title IX, deliberate indifference "is a fairly high standard" to meet. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020). Usually invoked to hold universities or employers liable for discrimination in the form of "severe, pervasive" harassment or a hostile work environment, a deliberate indifference claim can apply only where the defendant "exercise[d] substantial control over both the harasser and the context in which the known harassment occurs." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645, 650 (1999). Whether the

defendant has "substantial control" is closely related to the question of the defendant's ability to take remedial action. A defendant "cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644.

BCBSIL exercises no control—let alone "substantial control"—over the allegedly discriminatory plan design. BCBSIL cannot take "remedial action" to correct the alleged discrimination. *Id.* at 644–45. BCBSIL cannot amend those plans without the involvement of the plan sponsors, *see Curtiss-Wright Corp.*, 514 U.S. at 78, and cannot decline to apply the plans as written without breaching its fiduciary duties under ERISA, *see* 29 U.S.C. § 1104(a)(1)(D). Were BCBSIL to flout these fiduciary duties, it would expose itself to private enforcement actions and potential civil penalties.

### 2. BCBSIL Is Not Liable Under Agency Principles

Title IX (and by extension Section 1557) does not authorize victims to bring discrimination claims against the discriminator's mere agents or intermediaries. While Title VII explicitly defines a liable "employer" to include "any agent," 42 U.S.C. § 2000e(b), Title IX does not. "Title IX contains no comparable reference to an educational institution's 'agents,' and

36

so does not expressly call for application of agency principles." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998). Because of that lack of authorization, the Supreme Court has held that plaintiffs may *not* use "agency principles to impute liability" under Title IX. *Davis*, 526 U.S. at 642. An entity can be held liable under Title IX "only for its own misconduct." *Id.* at 640. That means Title IX and Section 1557 cannot be used to impute an agent's sex discrimination to a principal. *E.g.*, *Gebser*, 524 U.S. at 283; *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739–40 (9th Cir. 2000). And it also means that Title IX and Section 1557 cannot be used to impute sex discrimination to a mere "conduit" like BCBSIL. *Bose v. Bea*, 947 F.3d 983, 991 (6th Cir. 2020). Title IX, and by extension Section 1557, target the *choice* to discriminate, not the obligatory execution of that choice by someone with the duty to follow legally binding instructions.

The Sixth Circuit has ruled that Title IX's absence of agency liability excludes even a "cat's paw" theory of liability. *See id.* at 989. That theory provides that in Title VII cases, an employer with discriminatory underlings cannot escape liability merely by claiming that it served "as a dupe in [the underling's] deliberate scheme to trigger a discriminatory

employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). The cat's paw theory aims at ensuring that employers, who typically divide authority among a number of agents, will not be "effectively shielded from discriminatory acts and recommendations of" biased agents. *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). While cat's paw liability holds principals responsible for discriminatory actions set in motion by agents, Plaintiffs here seek to hold an agent (BCBSIL) responsible for the policy of a principal (the plan sponsor). So, if even the cat's paw theory of liability is beyond the scope of Title IX, an agency theory that would extend to BCBSIL is all the more plainly excluded by Title IX.

### 3. Legally Binding Regulations Foreclose TPA Liability

Given that all the applicable legal principles point *away* from TPA liability here, it should come as no surprise that HHS has consistently adopted rules with the force of law that reject TPA liability for plan design decisions made by self-funded plan sponsors. Across all three administrations that have implemented Section 1557, HHS has taken the same view: where TPAs are merely discharging their fiduciary duties to their customers, they cannot be held liable under Section 1557. The 2016 Rule

stipulated that where "the alleged discrimination relates to the benefit design of a self-insured plan—for example, where a plan excludes coverage for all health services related to gender transition" HHS would consider the proper defendant to be the "employer" and not the TPA. 81 Fed. Reg. at 31,432. The 2020 Rule and currently pending proposed rule similarly state that TPAs will not be held liable "where the alleged discrimination relates to the benefit design of a self-insured group health plan that did not originate with the third party administrator, but rather with the plan sponsor." 87 Fed. Reg. at 47,877; *see also* 85 Fed. Reg. at 37,173.

HHS has taken this consistent position out of a recognition that ERISA "requires group health plans to be administered consistent with their terms, and, therefore, third party administrators are unable to change any discriminatory design features in the self-insured plans they administer to comply with Section 1557's requirements." 87 Fed. Reg. at 47,876; *see also* 81 Fed. Reg. at 31,432 ("[T]hird party administrators are generally not responsible for the benefit design of the self-insured plans they administer.").

HHS's interpretations correctly construe Section 1557 as a statute that applies to the party *actually responsible* for the alleged sex

39

discrimination, and not to agents acting on their behalf. The emphasis on what HHS calls plan "design" is likewise an appropriate application of Section 1557's "intentional discrimination" standard. An employer's choice to "desig[n] its plan benefits in a discriminatory way … inherently involves intentional conduct." *Schmitt*, 965 F.3d at 954.

Before rejecting HHS's standard, however, the district court misapplied it. The district court determined that there exists a genuine factual dispute as to "whether the [allegedly discriminatory] Plan design originated with Blue Cross." 1-ER-73. Under the consistent view put forward by binding HHS regulations, that material factual dispute should have precluded summary judgment. But the district court did not actually conclude that there was a genuine dispute as to the person with whom the plan design originated, meaning the person with "control" over the choice to exclude the benefits. 87 Fed. Reg. at 47,876. That was the plan sponsor, as it must be under ERISA. *See* 29 U.S.C. § 1002(16)(B); *Curtiss-Wright Corp.*, 514 U.S. at 78. The district court conflated the essential question of who chose to exclude the benefits with the meaningless question of who executed that choice by drafting technical language in a plan. *See* 1-ER-

73. A TPA may assist with technical language, but the design choice is always the plan sponsor's.[3]

## C. The District Court's Reasons for Allowing TPA Liability Are Unavailing.

The district court treated the statutory interpretation question before it as fundamentally a question of agency deference. To the district court, BCBSIL's liability turns essentially on whether "*Chevron* deference [is] owed here to the various iterations of the rules or proposed rules," all of which exempt a TPA from liability where the discriminatory

---

[3] Importantly, BCBSIL is not arguing that TPA operations receiving federal funding have been granted something akin to absolute immunity from discrimination lawsuits. For example, if such a TPA deviates from the written terms of the plan to discriminate against a beneficiary, the TPA will have violated both ERISA and Section 1557. For these reasons, the regulations consider a TPA that, without instruction from the plan, "denies a claim because the individual's name suggests that they are of a certain race or national origin," and explain that such a TPA would be liable. 87 Fed. Reg. at 47,876. In addition, the TPA otherwise subject to Section 1557 may be held liable under Section 1557 for applying a facially nondiscriminatory plan in a discriminatory way, such as interpreting a "medical necessity" criterion differently for different races. The key factor in these examples is that the discriminatory action "originated with the third party administrator," not the plan sponsor. *Id.* Here, Plaintiffs allege that the plans were all "facially discriminatory on the basis of sex"— i.e., that the discrimination is inherent to the plan. 5-ER-1035. Plaintiffs never assert—and have no facts to support the conclusion—that BCBSIL chose to impose the exclusions at issue, that BCBSIL departed from the terms of the plans in a discriminatory manner, or that BCBSIL applied any plan term in a discriminatory manner.

terms "did not originate with the TPA." 1-ER-72; 87 Fed. Reg. at 47,877. The district court erred in leaping past the initial step of applying settled principles of statutory interpretation to the relevant statutes, and then stumbled further by misapplying the doctrines governing agency interpretations of statutes.

*First*, as we have explained, BCBSIL's view is rooted in fundamental principles of statutory interpretation: Section 1557 incorporates Title IX's limited enforcement mechanisms, which require plaintiffs to prove "intentional discrimination"; Title IX and Section 1557 do not provide for agency liability; Supreme Court precedent requires that Title IX be used to hold actors liable "for their own misconduct" and forecloses the use of "agency principles" to assign liability; and, where possible, federal statutes are to be read in harmony with each other rather than as creating fundamentally conflicting obligations. The district court's attention to statutory interpretation focused only on ERISA's requirement that "benefit plan decisions are required to be made in 'accordance with the documents and instruments governing the plan.'" 1-ER-72 (quoting 29 U.S.C. § 1104(a)(1)(D)). It ignored the rest.

42

*Second*, having ignored all the reasons *not* to read Section 1557 to impose liability on TPAs as mere agents of plan sponsors' design decisions, the district court then purported to "harmoniz[e]" ERISA's fiduciary duty with its understanding that Section 1557 could apply here. *Id.* But the district court did not actually harmonize these two provisions. Instead, it determined, based on ERISA's savings clause, 29 U.S.C. § 1144(d), that Section 1557 supersedes ERISA and thus fiduciary duties must give way to Section 1557's prohibition on intentional discrimination. The district court reasoned that, because "ERISA's Section 1144(d) provides that '[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States,' … ERISA expressly provides that it is not to be construed to impair laws like Section 1557." 1-ER-72.

The district court's approach runs contrary to the Supreme Court's "caution against applying [§ 1144(d)] too expansively." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 104 (1983). As the district court saw matters, ERISA's fiduciary duty standards are a sort of second-class federal policy, one that yields at the first sign of conflict with any other federal statutory requirement. That is a dangerous overreading of § 1144(d).

43

Instead, the district court should have applied the axiom of statutory construction that, "when two statutes are *capable* of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (emphasis added). But the district court not only failed to examine whether ERISA and Section 1557 are "capable of coexistence"; the district court found Section 1557's *implied* right of action superseded ERISA's *express* commands. Title IX's private right of action cannot be an "inconsistent statut[ory]" provision creating a statutory conflict—it is not a provision at all. *Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist.*, 215 F.3d at 1012; *cf. Martin v. Nat'l Bank of Alaska*, 828 F. Supp. 1427, 1433 (D. Alaska 1992) ("[I]f ERISA prohibits an activity and the banking laws are silent on the point, then no conflict arises and ERISA will apply.").

The district court's haste to abandon ERISA's policy caused it to miss the readily available way to read both ERISA and Section 1557 harmoniously. Indeed, that harmonious reading has been adopted by HHS across administrations of different political orientations: Section 1557's implied private right of action lies only against the actor who made the

44

decision to discriminate. Thus a TPA will not be held liable for the mere discharge of its fiduciary duties and a plan sponsor will not be held liable for a TPA's discriminatory administration. The district court's reflexive decision to invoke ERISA's savings clause when the statutes are "capable of co-existence" was error. *Morton*, 417 U.S. at 551.

*Third*, the district court also failed to accord adequate deference to HHS's expertise when it rejected HHS's conclusion that a TPA cannot be liable in this situation. The court determined that "no *Chevron* deference [is] owed here to the various iterations of the rules or proposed rules because the statutory text is clear as is Congressional intent." 1-ER-72. Specifically, the district court reasoned that the "statutory text is clear" because Section 1557 does not explicitly provide an "*exclusion* for third party administrators who did not draft the exclusion at issue." *Id.* (emphasis added). That has *Chevron* backwards. *Chevron* deference depends on whether the statute is ambiguous. *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984). An explicit exclusion for TPAs would certainly clarify the relationship between responsibility and liability under Section 1557. But the absence of such an explicit exclusion merely fails

to clarify Section 1557; it cannot decisively resolve Section 1557's ambiguities.

Finally, even if *Chevron* deference does not apply, *Skidmore* deference should. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001) (*Skidmore* applies if *Chevron* does not); Pet'r's Reply Br. at 9, *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (U.S. Oct. 2, 2023) (arguing for reversing *Chevron* and adopting *Skidmore* for all agency interpretations).

The *Skidmore* factors strongly support deference to the Rules' view that TPAs are not liable for discrimination that does not originate with the TPA. First, this view is "consisten[t] with earlier and later pronouncements" across three distinct presidential administrations. *Skidmore*, 323 U.S. at 140. That consistent interpretation has been relied upon by TPAs and plan sponsors, among others. *Skidmore* deference "protects reliance interests associated with longstanding agency practices or interpretations." *Goffney v. Becerra*, 995 F.3d 737, 745 (9th Cir. 2021); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2421 (2019) (plurality opinion) ("[D]eference turns on whether an agency's interpretation creates unfair surprise or upsets reliance interests."). Second, the Rules' "thoroughness" is

46

"evident." *Skidmore*, 323 U.S. at 140. In each rulemaking, HHS considered numerous comments on the issue and devoted columns of the Federal Register to explaining the contours (if any) of TPA liability. And finally, the Rules' reasoning is "valid[]." *Id.*; *see supra* Section I.B.

## II. Third-Party Administered Health Insurance Plans Are Not Federally Funded "Health Programs or Activities" Subject to Section 1557.

Section 1557's nondiscrimination obligations apply only to a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Duly promulgated regulations define two categories of health programs or activities receiving federal funds. First, for "entities principally engaged in the business of providing healthcare" and receiving federal funds, "*all of the operations* of [such] entities" are considered to be health programs or activities subject to Section 1557. 45 C.F.R. § 92.3(b) (emphasis added). Second, "[f]or any entity not principally engaged in the business of providing healthcare," the term "health program or activity" refers "to such entity's operations *only to the extent any such operation receives Federal financial assistance.*" *Id.* (emphasis added). These regulations carry the force of law, and apply in suits brought by private parties. *See, e.g.*, *Fed. Express Corp. v. Holowecki*, 552

U.S. 389, 395, 397 (2008); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007).

The Rules clarify that BCBSIL's third-party administrator operations are not a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). In the first place, BCBSIL is not "principally engaged in the business of providing healthcare." 45 C.F.R. § 92.3(b). BCBSIL is not a health care "provider" like a hospital or a physician group; it is primarily in the insurance business. And, as the Rule explains, "an entity principally or otherwise engaged in the business of providing *health insurance* shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." *Id.* § 92.3(c) (emphasis added).

Because BCBSIL is not primarily in the business of providing healthcare, its individual operations could constitute a "health program or activity" subject to Section 1557 "only to the extent any such operation receives Federal financial assistance." 45 C.F.R. § 92.3(b). Plaintiffs do not dispute—and the district court acknowledged—that BCBSIL does not receive federal financial assistance for its administration of any self-funded ERISA plans. 1-ER-59; 6-ER-1315, ¶ 3. Instead, BCBSIL receives

48

federal assistance only for other aspects of its business not relevant here, "such as Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and Medicare/Medicaid dual eligibility." 1-ER-59 (citation omitted). BCBSIL's operation-specific federal funding thus does not subject its TPA operations to Section 1557.

The Rule's two-part definition is the most natural construction of "health program or activity" as used in Section 1557. Though the Affordable Care Act never defines that phrase, at the time the ACA was passed, "program or activity" was a "term of art with a clear meaning." *T.S. ex rel. T.M.S.*, 43 F.4th at 742 (citing 20 U.S.C. § 1687). The Civil Rights Restoration Act ("CRRA") defines the phrase "program or activity" in Title IX, itself the basis for Section 1557's prohibition on sex discrimination, and in other civil rights statutes. 20 U.S.C. § 1687(3)(A)(ii); *see Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 553 (3d Cir. 2017). Given that Section 1557 addresses the "same subject matter" and employs the "same … language," its use of the term "program or activity" should be "interpreted consistently" with the CRRA's and Title IX. *Advanced Integrative*

49

*Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006)).

Under the CRRA, there are two categories of private business that constitute programs or activities subject to the civil rights laws. First, an *entire* corporation or other entity can be a "program or activity," but only if federal assistance is provided to the entity "as a whole" or if the entity "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 20 U.S.C. § 1687(3)(A)(i)–(ii). Second, *part* of a corporation can be a "program or activity" but only the specific "plant or other comparable, geographically separate facility to which Federal financial assistance is extended." *Id.* § 1687(3)(B).

The 2020 Rule neatly carried over this two-part definition into Section 1557. Section 1557 applies only to a "*health* program or activity," so, following the CRRA, the Rule determined that Section 1557 would apply to all the operations of a corporation if that corporation "is principally engaged in the business of providing … *health care*," the only health-related service listed in 20 U.S.C. § 1687(3)(A)(ii). Next, HHS preserved the CRRA's rule that a corporation engaged in any business is subject to the

relevant civil rights statute if federal funding extends to the corporation "as a whole," meaning to *all* of an entity's operations. *See Collins v. Giving Back Fund*, No. 18-cv-8812 (CM), 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) ("[T]he phrase 'as a whole' means that federal assistance is extended to the organization otherwise than for some specific purpose – put differently, that the recipient of federal funds received those funds as general assistance."); S. Rep. No. 100-64 at 17 (1987) ("Federal aid which is limited in purpose … is not considered aid to the corporation as a whole."). For all other entities, the CRRA applies federal civil rights laws only to that portion of the corporation "to which Federal financial assistance is extended;" likewise, the Rule applies Section 1557 "only to the extent any such operation receives Federal financial assistance." 20 U.S.C. § 1687(3)(B); 45 C.F.R. § 92.3(b).

The Rule's explicit statement that health insurers are not "principally engaged in the business of providing healthcare" reflects common sense. The plain meaning of "providing healthcare" does not include providing health insurance, which is only a means to pay health care *providers*. *See* 85 Fed. Reg. at 37,173 ("[A] health insurer is principally engaged in the business of providing *coverage for benefits consisting in*

51

*healthcare*, which is not the same as the business of providing healthcare.") (emphasis added). That interpretation is consistent with the definition of "health care" in other federal statutes. *See, e.g.*, 5 U.S.C. § 5371(a) (defining "health care" to mean "direct patient-care services or services incident to direct patient-care services"). Just as one would not say that an auto insurer is "principally engaged in the business of providing automobiles," a health insurer is not "principally engaged in the business of providing health care."

HHS's interpretation—which correctly interprets Section 1557's text—is controlling. *Chevron*, 467 U.S. at 842–43. But even setting *Chevron* aside, the agency's interpretation harmonizing Section 1557 with the CRRA is persuasive and entitled to deference. *Skidmore*, 323 U.S. at 140. Yet the district court did not see it this way. The district court found HHS's construction to be unambiguously *foreclosed* by the plain text of Section 1557. According to the district court, "Section 1557's phrase 'health programs or activities' plainly includes 'all the operations' of Blue Cross including its involvement in 'contracts of insurance.'" 1-ER-71. The district court's reasoning was erroneous for at least two reasons.

*First*, the district court noted that Section 1557 prohibits discrimination in "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, *or contracts of insurance*." 42 U.S.C. § 18116(a) (emphasis added). According to the district court, "the plain language of the text includes insurance contracts and their administration as 'health programs or activities.'" 1-ER-70 (cleaned up). That is incorrect. The term "contracts of insurance" describes a type of "Federal financial assistance," not a type of "health program or activity." *See* 85 Fed. Reg. at 37,172.

This conclusion follows from the statute's pairing of "contracts of insurance" with "credits" and "subsidies," which are types of "Federal financial assistance" given *to* health programs and activities. Under the canon of *noscitur a sociis*, "a word is known by the company it keeps" to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (internal quotation marks omitted). "When a word appears in a list of similar terms, each term should be read in light of characteristics shared by the entire list." *Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021).

The statutory phrase "contracts of insurance" must be interpreted consistent with the neighboring terms "credits" and "subsidies." To read "contracts of insurance" as a type of "health program or activity" also requires reading "credits" and "subsidies" as types of health programs or activities. Those terms are most naturally read not as types of health programs or activities, but as types of "Federal financial assistance," a reading consistent with the federal regulations. *See* 85 Fed. Reg. at 37,172 ("The Department agrees that health programs or activities that receive contracts of insurance from the Federal government are covered entities under Section 1557. But this does not mean that health insurers, as such, are health programs or activities.").

Moreover, qualifying phrases such as "including credits, subsidies, or contracts of insurance" should be applied only to the last antecedent phrase. *See Am. Fed'n of Gov't Emps., AFL-CIO Loc. 2152 v. Principi*, 464 F.3d 1049, 1055 (9th Cir. 2006). Under this well-established rule, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (cleaned up). Here, the last antecedent is "Federal financial assistance." It was thus error for the district court to

54

conclude that "contracts of insurance" describes "any health program or activity."

*Second*, the district court appealed to vague notions of statutory purpose. According to the district court, the purpose of Section 1557 is "to increase access to services and insurance coverage." 1-ER-70. But, as its only support for this proposition, the district court cited a dictum describing the purpose of the Affordable Care Act as a whole, not Section 1557 in particular. *Id.* (citing *Schmitt*, 965 F.3d at 949). "[G]eneral pronouncements regarding the overall purpose of a complex statute do not constitute conclusive evidence that Congress has 'directly spoken' to the meaning of the 'precise' statutory phrase in dispute" and thus do not overcome other tools of statutory construction, including deference. *Navajo Nation v. HHS*, 285 F.3d 864, 869 (9th Cir. 2002) (quoting *NRDC, Inc. v. EPA*, 966 F.2d 1292, 1302 (9th Cir. 1992)), *vacated on other grounds*, 307 F.3d 977 (9th Cir. 2002).

The district court's interpretation of Section 1557 depended on these errors. The better interpretation is the one posited by the 2020 Rule: a careful effort to define "health program or activity" as including

55

categories that closely match the categories of "program and activity" defined in the CRRA.

## III. The District Court Wrongly Disregarded the Religious Freedom Restoration Act.

Under the Religious Freedom Restoration Act, "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" like Section 1557. 42 U.S.C. § 2000bb-1(a). If the rule of general applicability substantially burdens a person's exercise of religion, RFRA directs that the person is entitled to an exemption from the rule, unless the "application of the burden to the person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). For many of BCBSIL's customers, funding gender-affirming treatments—whether directly or indirectly—would violate religious conscience. Because requiring those customers to fund gender-affirming treatments is not the least restrictive means of furthering a compelling government interest, RFRA protects those employers' conscience rights by exempting their self-insured plans from the mandate to fund such treatments. Yet the district court adopted an

56

untenably narrow view of RFRA and ignored these protections. That error independently necessitates reversal.

A religious plan sponsor that chooses to exclude from coverage certain treatments that offend conscience engages in a religious exercise protected by RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) ("[E]xercise of religion" includes "[b]usiness practices that are compelled or limited by the tenets of a religious doctrine."). Here, both C.P. and Jones belonged to the Catholic Health Initiatives's self-funded plan. That plan excluded "gender reassignment surgery" from coverage because "this surgery has been determined not to align with the teachings and doctrine of the Catholic Church." 2-ER-205; *see also* 2-ER-321. RFRA protects CHI's choice to exclude coverage of such surgery and other gender-affirming treatments, just as it protects BCBSIL's many other religious customers' conscience-based exclusions.

The application of Section 1557 to prevent BCBSIL or any TPA from effectuating that religious exclusion "substantially burden[s]" customers' free-exercise right not to provide coverage. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (en banc) (coercion "to act contrary to their religious beliefs" imposes a substantial burden). In

the proceedings below, Plaintiffs did not argue otherwise. 5-ER-1062–63.

Nor could they. Courts discharge a "narrow function" when evaluating

whether a given action imposes a substantial burden: merely ensuring

that the customers' belief that it is "immoral for them to provide the cov-

erage" "reflects 'an honest conviction.'" *Hobby Lobby*, 573 U.S. at 724–25

(quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716

(1981)). Plaintiffs have never accused BCBSIL's religious customers of

lacking an honest conviction.

Plaintiffs instead argued that the application of Section 1557 to pro-

hibit the exclusion of gender-affirming care from ERISA self-insured

plans is the least restrictive means of furthering a compelling govern-

mental interest. 5-ER-1062–63. "The least-restrictive-means standard is

exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. Even assuming

*arguendo* that the government has a compelling interest in ensuring that

beneficiaries of ERISA self-funded plans can access gender-affirming

care, forcing TPAs to override exclusions to the objection of religious cus-

tomers is not the "least restrictive means" toward that end. As the Su-

preme Court acknowledged in *Hobby Lobby*, the "most straightforward

way" of guaranteeing access to a particular medical service "would be for

58

the Government to assume the cost of providing" the service. *Id.* Such a means "would certainly be less restrictive of [the customers'] religious liberty" than the mandate imposed by the district court. *Id.* In the context of the comprehensive Affordable Care Act, "the cost of such a program would be 'minor.'" *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2394 (2020) (Alito, J., concurring) (quoting *Hobby Lobby*, 573 U.S. at 729).

Plaintiffs attempted to overcome the clear viability of an alternative, less restrictive means of providing gender-affirming care by recasting the compelling interest at a higher level of abstraction. Plaintiffs framed the purported compelling interest as the government's interest in "eradicating invidious discrimination in health care." 5-ER-1062. But Supreme Court precedent forecloses that maneuver. When applying RFRA, courts are required to "look[] beyond broadly formulated interests justifying the general applicability of government mandates" and to instead scrutinize "the marginal interest in enforcing [the religion-burdening law] in these cases." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Hobby Lobby*, 573 U.S. at 727; *see also Holt v. Hobbs*, 574 U.S. 352, 363 (2015). The "marginal interest" in

59

enforcing Section 1557 here—and thus the only potentially cognizable compelling state interest—is in ensuring access to gender-affirming care with limited or no cost-sharing. *Cf. Hobby Lobby*, 573 U.S. at 726–27 (rejecting notion that relevant government interest was in promotion of "gender equality" rather than "ensuring that all women have access to all FDA-approved contraceptives without cost-sharing"); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1148 (D.N.D. 2021) (rejecting proposed interest "in ensuring nondiscriminatory access to healthcare" as too broad), *aff'd in part, remanded in part sub nom. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022). Plaintiffs' proposed anti-discrimination interest is too "broadly formulated" to be applied under RFRA, and the properly formulated interest can be accomplished by less restrictive means.

RFRA thus requires an exception to the generally applicable Section 1557. 42 U.S.C. § 2000bb-1(b). Even if Plaintiffs are correct in all their other arguments and Section 1557 prohibits the exclusion of gender-affirming care from ERISA plans' covered benefits, Section 1557 cannot be applied to mandate that plan sponsors effectively renounce their

60

religious objections. Simply put, there are less restrictive means of achieving any legitimate compelling government interest.

The district court, however, engaged in none of this analysis of substantial burdens, compelling interests, or least restrictive means. Instead, the district court declared RFRA immaterial to this case because RFRA "does not apply to disputes between private parties." 1-ER-74 (citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 839 (9th Cir. 1999)). In *Sutton*, however, this Court merely held that RFRA's *cause of action* did not enable suits against private parties not acting under color of federal law. 192 F.3d at 834–36. But RFRA is not just a cause of action; it is also a "super statute" or principle of interpretation that "carve[s] out a religious exemption from otherwise neutral, generally applicable laws." *Bostock*, 590 U.S. at 682; *Guam v. Guerrero*, 290 F.3d 1210, 1220 (9th Cir. 2002). And that super statute applies in cases between two non-governmental parties.

RFRA's dual functions as a super statute and as a cause of action follow from RFRA's two distinct but complementary purposes, each codified in law. First, RFRA seeks "to restore the compelling interest test … and to guarantee its application in *all cases* where free exercise of religion

61

is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (emphasis added). Second, RFRA "provide[s] a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* § 2000bb(b)(2). To effectuate the latter purpose, RFRA expressly creates a cause of action by which persons whose religious exercise has been burdened may "obtain appropriate relief against a government." *Id.* § 2000bb-1(c). This is the cause of action that is the focus of *Sutton*.

To effectuate the former purpose—*i.e.*, to restore the compelling interest test "in all cases" where free exercise is burdened—RFRA declares that its provisions "appl[y] to all Federal law, and the implementation of that law, whether statutory or otherwise" and whether adopted before or after RFRA. *Id.* § 2000bb-3(a). RFRA also creates a clear-statement rule for all laws enacted after it. Laws enacted after RFRA are "subject to" its limitations "unless such law explicitly excludes" those limitations by making "reference to this chapter." *Id.* § 2000bb-3(b).

The Supreme Court has interpreted these provisions applying RFRA "to all Federal law" and creating a clear-statement rule for all later legislation as meaning that RFRA "displac[es] the normal operation of other federal laws." *Bostock*, 590 U.S. at 682; *see also Apache Stronghold*

62

*v. United States*, 95 F.4th 608, 629 (9th Cir. 2024) (en banc) ("Congress also made clear its intent that RFRA operate as a framework statute, 'displacing the normal operation of other federal laws.'" (citation omitted)); *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013) ("RFRA is structured as a 'sweeping "super-statute," cutting across all other federal statutes (now and future, unless specifically exempted) and modifying their reach.'") (quoting Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code,* 56 Mont. L. Rev. 249, 253 (1995)); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1157 (10th Cir. 2013) (Gorsuch, J. concurring), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (similar).

Because RFRA is a "super statute," RFRA informs the interpretation and application of existing laws even when no party invokes the RFRA cause of action against the government. *See, e.g.*, *United States v. Bauer*, 84 F.3d 1549, 1558–59 (9th Cir. 1996) (RFRA modifies federal criminal law); *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) (RFRA amends the Age Discrimination in Employment Act); *In re Young*, 141 F.3d 854, 861 (8th Cir. 1998) ("RFRA is an appropriate means by Congress to modify the United States bankruptcy laws …."); *EEOC v. Cath.*

*Univ. of Am.*, 83 F.3d 455, 457 (D.C. Cir. 1996) (RFRA modifies Title VII of the Civil Rights Act); *see also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000) (assuming without deciding that RFRA modifies copyright law). Here, that means RFRA affects the understanding of Section 1557. *See Little Sisters*, 140 S. Ct. at 2383 (holding the ACA does not trigger RFRA's clear-statement rule).

The district court rejected BCBSIL's argument that "Section 1557 and RFRA must be read together" because "in this case RFRA does not apply, Section 1557 does." 1-ER-75. But that explanation addresses only whether RFRA's cause of action applies, not the important super-statute function RFRA also plays. *Bostock*, 590 U.S. at 682. Importantly, *Hankins*, *Young*, *Catholic University*, and *Worldwide Church of God* each considered RFRA in a "dispute[] between private parties." 1-ER-74. Contrary to the district court, RFRA does *not* allow federal law to substantially burden religion so long as private plaintiffs enforce that law; it applies to "all Federal law[s]." 42 U.S.C. § 2000bb-3(a); *see also Hankins*, 441 F.3d at 103 (applying RFRA in ADEA suit between private parties because "the substance of the ADEA's prohibitions cannot change

64

depending on whether it is enforced by the EEOC or an aggrieved private party").

The application of Section 1557 at issue here does not satisfy strict scrutiny and thus is displaced by RFRA. The district court erred by reducing RFRA's protections so that they apply only in lawsuits against the government.

## IV. The Plan Exclusions Direct BCBSIL to Consider Medical Diagnosis, Not to Discriminate on the Basis of Sex.

The Supreme Court held in *Bostock v. Clayton County* that discrimination based on transgender status is discrimination "on the basis of sex." 590 U.S. at 654; *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022). Here, because the injunction affects just those categorical exclusions of health care services "administered or prescribed for the treatment of gender dysphoria," 1-ER-25, the relevant question (which one reaches only if the Court rejects *all* of BCBSIL's other arguments on the merits) is whether a plan designer's exclusion of treatment for gender dysphoria discriminates based on transgender status in a way that matches the reason why the Supreme Court ruled that employment discrimination based on transgender status is employment discrimination based on sex.

The district court reasoned that such exclusions discriminate on the basis of sex because the "trigger for application of the [e]xclusion and a denial of coverage [i]s a diagnosis of 'gender dysphoria.'" 1-ER-67. Yet, as that remark demonstrates, the plan exclusions apply on the basis of *medical diagnosis* (i.e., whether the treatments are prescribed for gender dysphoria) not on the basis of *transgender status*. When BCBSIL applied these exclusions, the beneficiary's medical diagnosis was the only consideration, not the patient's sex or gender identity.

The district court leapt from medical diagnosis to transgender status because, according to the court, "gender dysphoria cannot be understood without referencing sex or a synonym." *Id.* But *Bostock* does not say that discrimination is sex-based whenever the distinction *references* sex or gender. *Cf. L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 482 (6th Cir. 2023) ("A law does not classify based on sex whenever it uses sex-related language.") (cleaned up), *cert. dismissed in part sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023). Rather, *Bostock* held that discrimination based on transgender status is sex discrimination because such discrimination "necessarily and intentionally applies sex-based *rules*." 590 U.S. at 667 (emphasis added). The Court in *Bostock* considered "an employer

66

who fires a transgender person who was identified as a male at birth but who now identifies as a female." *Id.* at 660. "If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* In other words, what makes employment discrimination on the basis of transgender status discrimination on the basis of sex is that discrimination on the basis of transgender status necessarily tolerates "traits or actions" from individuals of one sex but not from the other.

Denying certain treatments prescribed for a diagnosis of gender dysphoria lacks that necessary aspect of sex discrimination as the Supreme Court understood it in *Bostock*. The denial does not depend on the relationship between the individual's "traits or actions" and their sex assigned at birth. Rather, the denial depends entirely on the cited medical diagnosis. Take the Vantas implant sought by C.P. or the puberty blockers sought by S.L. Under their plan exclusions, hormone therapies including these can be provided to treat advanced prostate cancer, endometriosis, or central precocious puberty but not gender dysphoria. *See* 5-ER-1024 (acknowledging the plans "cover[] most services for gender-

67

affirming care *when provided for other conditions*") (emphasis added). Thus, BCBSIL will approve a medically necessary hormone therapy as a treatment for advanced prostate cancer regardless of whether the patient is cisgender or transgender, male, female, or nonbinary. All these classes can access the *same* treatments for the *same* set of qualifying medical indications. And BCBSIL will deny those therapies if prescribed as a treatment for gender dysphoria, no matter the individual's "traits or actions" or sex assigned at birth. In short, the exclusion for gender dysphoria diagnosis does not apply "sex-based rules" like those essential to rationale of *Bostock*. It is not sex discrimination.

That was the reasoning the Sixth Circuit applied in *L.W.* Relying in part on *Bostock*, the plaintiffs alleged that a Tennessee law prohibiting healthcare providers from performing gender-affirming care on minors discriminated on the basis of sex in violation of the Equal Protection Clause. The court distinguished *Bostock* because "[i]n *Bostock*, the employers fired adult employees because their behavior did not match stereotypes of how adult men or women dress or behave," but the Tennessee law "do[es] not deny anyone general healthcare treatment based on any such stereotypes." *L.W.*, 83 F.4th at 485. Rather, like here, the concern is

68

about a particular set of treatments (gender-affirming care) for a particular diagnosis (gender dysphoria). "A concern about potentially irreversible medical procedures for a child is not a form of stereotyping." *Id.*[4]

The district court's statement (albeit not based on evidence in the record) that "[a] person cannot suffer from gender dysphoria without identifying as transgender" does not salvage the court's reasoning. 1-ER-68 (quoting *Fain v. Crouch*, 618 F. Supp. 3d 313, 324–25 (S.D. W. Va. Aug. 2, 2022)). Even if true, the exclusions would still allow transgender individuals to access the excluded treatments under other diagnostic codes. The available treatment does not vary based on anyone's sex or

---

[4] Adopting the Sixth Circuit's reasoning distinguishing *Bostock* will not require this Court to agree with the Sixth Circuit as to the constitutional propriety of state laws limiting the provision of gender-affirming care to minors. In the first place, the Civil Rights Act's prohibitions on discrimination are distinct from the Equal Protection Clause's. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (comparing the text of Title VI and the Equal Protection Clause and concluding "[t]hat such differently worded provisions should mean the same thing is implausible on its face."). In addition, while the Sixth Circuit rejects the notion that transgender individuals are a quasi-suspect class, finding instead that the rational basis test applies to statutory classifications based on gender identity, *L.W.*, 83 F.4th at 486, the Ninth Circuit holds that "transgender status" is a "quasi-suspect class" meriting intermediate scrutiny, *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019).

gender identity. The district court's reasoning thus lacks the connection to sex-based discrimination identified by the Court in *Bostock*.

Further, as the Supreme Court has established, treating a medical condition differently is not intentional sex discrimination even if only one sex is susceptible to it. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976) ("[A]n exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination," except where the exclusion "is a mere pretext designed to effect an invidious discrimination against members of one sex or the other") (cleaned up) (discussing *Geduldig v. Aiello*, 417 U.S. 484, 496–97 & n.20 (1974)); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (limitations on "a medical procedure that only one sex can undergo" is not a "sex-based classification" subject to heightened scrutiny). For the same reasons, treating a medical condition differently is not intentional sex discrimination even if only one *gender identity* is susceptible to it.

The exclusion of treatment for gender dysphoria does not discriminate based on transgender status in a way that matches the "sex-based rules" essential to the decision in *Bostock*. Thus, *Bostock* (and Section

70

1557) does not prohibit plan sponsors from adopting exclusions that turn on the medical diagnosis of gender dysphoria.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed with instructions to enter summary judgment for the Defendant.

Date: April 12, 2024

/s/ *Robert N. Hochman*
Robert N. Hochman

Robert N. Hochman
Sam Gorsche
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, WA 98101
(206) 626-7714
gpayton@ktslaw.com
jneeleman@ktslaw.com

Adam H. Charnes
KILPATRICK TOWNSEND &
 STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

Stephanie Bedard
KILPATRICK TOWNSEND &
 STOCKTON LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309

72

(404) 815-6039
sbedard@ktslaw.com

*Attorneys for Appellant Blue Cross Blue Shield of Illinois*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1 because it contains 13,965 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 365 word processing system in 14-point Century Schoolbook font.

Date:April 12, 2024

_/s/ Robert N. Hochman_
Robert N. Hochman

_Attorney for Appellant Blue Cross Blue Shield of Illinois_

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the fore-going with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Date: April 12, 2024

*/s/ Robert N. Hochman*
Robert N. Hochman

*Attorney for Appellant Blue Cross Blue Shield of Illinois*

# ADDENDUM

20 U.S.C. § 1687...................................................................................ADD-1

29 U.S.C. § 1104...................................................................................ADD-3

29 U.S.C. § 1144...................................................................................ADD-4

42 U.S.C. § 2000bb.............................................................................ADD-11

42 U.S.C. § 2000bb-1 .........................................................................ADD-12

42 U.S.C. § 2000bb-3 .........................................................................ADD-13

42 U.S.C. § 18116...............................................................................ADD-14

45 C.F.R. § 92.3..................................................................................ADD-16

**Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687.**

**20 U.S.C. § 1687. Interpretation of "program or activity"**

For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of--

**(1)(A)** a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

**(B)** the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

**(2)(A)** a college, university, or other postsecondary institution, or a public system of higher education; or

**(B)** a local educational agency (as defined in section section1 7801 of this title), system of vocational education, or other school system;

**(3)(A)** an entire corporation, partnership, or other private organization, or an entire sole proprietorship--

**(i)** if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

**(ii)** which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

**(B)** the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

**(4)** any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.

ADD-2

**Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*.**

**29 U.S.C. § 1104. Fiduciary duties**

**(a) Prudent man standard of care**

**(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

    **(A)** for the exclusive purpose of:

        **(i)** providing benefits to participants and their beneficiaries; and

        **(ii)** defraying reasonable expenses of administering the plan;

    **(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    **(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

**(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

**(2)** In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

\* \* \*

## 29 U.S.C. § 1144. Other laws

### (a) Supersedure; effective date

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

### (b) Construction and application

**(1)** This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

**(2)(A)** Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

**(B)** Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

**(3)** Nothing in this section shall be construed to prohibit use by the Secretary of services or facilities of a State agency as permitted under section 1136 of this title.

**(4)** Subsection (a) shall not apply to any generally applicable criminal law of a State.

**(5)(A)** Except as provided in subparagraph (B), subsection (a) shall not apply to the Hawaii Prepaid Health Care Act (Haw.Rev.Stat. §§ 393-1 through 393-51).

**(B)** Nothing in subparagraph (A) shall be construed to exempt from subsection (a)--

**(i)** any State tax law relating to employee benefit plans, or

**(ii)** any amendment of the Hawaii Prepaid Health Care Act enacted after September 2, 1974, to the extent it provides for more than the effective administration of such Act as in effect on such date.

**(C)** Notwithstanding subparagraph (A), parts 1 and 4 of this subtitle, and the preceding sections of this part to the extent they govern matters which are governed by the provisions of such parts 1 and 4, shall supersede the Hawaii Prepaid Health Care Act (as in effect on or after January 14, 1983), but the Secretary may enter into cooperative arrangements under this paragraph and section 1136 of this title with officials of the State of Hawaii to assist them in effectuating the policies of provisions of

such Act which are superseded by such parts 1 and 4 and the preceding sections of this part.

**(6)(A)** Notwithstanding any other provision of this section--

**(i)** in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured (or which is a multiple employer welfare arrangement subject to an exemption under subparagraph (B)), any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides--

**(I)** standards, requiring the maintenance of specified levels of reserves and specified levels of contributions, which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and

**(II)** provisions to enforce such standards, and

**(ii)** in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, in addition to this subchapter, any law of any State which regulates insurance may apply

ADD-7

to the extent not inconsistent with the preceding sections of this subchapter.

**(B)** The Secretary may, under regulations which may be prescribed by the Secretary, exempt from subparagraph (A)(ii), individually or by class, multiple employer welfare arrangements which are not fully insured. Any such exemption may be granted with respect to any arrangement or class of arrangements only if such arrangement or each arrangement which is a member of such class meets the requirements of section 1002(1) and section 1003 of this title necessary to be considered an employee welfare benefit plan to which this subchapter applies.

**(C)** Nothing in subparagraph (A) shall affect the manner or extent to which the provisions of this subchapter apply to an employee welfare benefit plan which is not a multiple employer welfare arrangement and which is a plan, fund, or program participating in, subscribing to, or otherwise using a multiple employer welfare arrangement to fund or administer benefits to such plan's participants and beneficiaries.

**(D)** For purposes of this paragraph, a multiple employer welfare arrangement shall be considered fully insured only if the terms of the arrangement provide for benefits the amount of all of which the Secretary

ADD-8

determines are guaranteed under a contract, or policy of insurance, issued by an insurance company, insurance service, or insurance organization, qualified to conduct business in a State.

**(7)** Subsection (a) shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title), qualified medical child support orders (within the meaning of section 1169(a)(2)(A) of this title), and the provisions of law referred to in section 1169(a)(2)(B)(ii) of this title to the extent they apply to qualified medical child support orders.

**(8)** Subsection (a) of this section shall not be construed to preclude any State cause of action--

**(A)** with respect to which the State exercises its acquired rights under section 1169(b)(3) of this title with respect to a group health plan (as defined in section 1167(1) of this title), or

**(B)** for recoupment of payment with respect to items or services pursuant to a State plan for medical assistance approved under title XIX of the Social Security Act which would not have been payable if such acquired rights had been executed before payment with respect to such items or services by the group health plan.

**(9)** For additional provisions relating to group health plans, see section 1191 of this title.

**(c) Definitions**

For purposes of this section:

**(1)** The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

**(2)** The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

**(d) Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited**

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

ADD-10

**Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.**

**§ 2000bb. Congressional findings and declaration of purposes**

**(a) Findings**

The Congress finds that--

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are--

**(1)** to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## § 2000bb-1. Free exercise of religion protected

### (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

### (c) Judicial relief

ADD-12

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

\* \* \*

## § 2000bb–3. Applicability

### (a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

### (b) Rule of construction

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

### (c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

**Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.**

## 42 U.S.C. § 18116. Nondiscrimination

### (a) In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

### (b) Continued application of laws

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil

Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975, or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

**(c) Regulations**

The Secretary may promulgate regulations to implement this section.

**Nondiscrimination on the Basis of Race, Color, National Origin, Sex, Age, or Disability in Health Programs or Activities Receiving Federal Financial Assistance and Programs or Activities Administered by the Department of Health and Human Services Under Title I of the Patient Protection and Affordable Care Act or by Entities Established Under Such Title, 45 C.F.R. Part 92.**

**§ 92.3 Scope of application.**

**(a)** Except as otherwise provided in this part, this part applies to

**(1)** Any health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by the Department;

**(2)** Any program or activity administered by the Department under Title I of the Patient Protection and Affordable Care Act; or

**(3)** Any program or activity administered by any entity established under such Title.

**(b)** As used in this part, "health program or activity" encompasses all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance as described in paragraph (a)(1) of this section. For any entity not principally engaged in the business of providing healthcare, the requirements applicable to a "health program or activity" under this part shall apply to such entity's

ADD-16

operations only to the extent any such operation receives Federal financial assistance as described in paragraph (a)(1) of this section.

**(c)** For purposes of this part, an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare.

**(d)** Any provision of this part held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this part and shall not affect the remainder thereof or the application of the provision to other persons not similarly situated or to other, dissimilar circumstances.