No. 23-4331

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

C. P., by and through his parents, Patricia Pritchard and Nolle Pritchard; and PATRICIA PRITCHARD, *et al.*,

*Plaintiff-Appellee*,

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:20-cv-06145-RJB
Hon. Robert J. Bryan

## THE CATHOLIC BENEFITS ASSOCIATION'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT BLUE CROSS BLUE SHIELD OF ILLINOIS AND REVERSAL THE JUDGMENT BELOW

Andrew Nussbaum
L. Martin Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Ste 1430
Colorado Springs, CO 80903
(719) 428-4937
andrew@first-fourteenth.com
martin@first-fourteenth.com
*Attorneys for Amicus Curiae the Catholic Benefits Association*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, *amicus curiae* the Catholic Benefits Association is a nonprofit corporation. It does not issue stock and is neither owned by nor is it the owner of any other corporate entity, in part or in whole. It has no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities. It is directed by a volunteer board.

Date: April 19, 2024

*/s/ Andrew Nussbaum*
Andrew Nussbaum
*Attorney for the Catholic Benefits Association*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .......................................................... iii

QUESTION PRESENTED ............................................................. 2

ARGUMENT ....................................................................... 2

    I.    CBA MEMBERS, LIKE MANY RELIGIOUS EMPLOYERS, DESIGN HEALTH PLANS CONSISTENTLY WITH THEIR FAITH............................. 4

        A.    Healthcare and human dignity .................................. 4

        B.    Designing and implementing a health plan consistent with Catholic beliefs .......................................... 9

    II.    THE DISTRICT COURT ERRED BY CONFINING RFRA TO SUITS INVOLVING A GOVERNMENT PARTY......... 11

        A.    By its plain meaning, RFRA applies in all cases involving the application of federal law. ....................................... 11

        B.    Congress intended that RFRA apply in private-party suits...... 15

        C.    Not applying RFRA in this case would lead to absurd results.. 19

        D.    Caselaw confirms that RFRA should apply here. ................... 20

        E.    The United States has taken the position that RFRA applies in private-party suits. ................................................23

CONCLUSION...............................................................25

# TABLE OF AUTHORITIES

## Cases

*Apache Stronghold v. United States*, 95 F.4th 608 (9th Cir. 2024) ...................... 11, 15

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ................................... 13, 15

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ........................................ 13

*Cath. High Sch. Ass'n v. Culvert*, 753 F.2d 1161 (2d Cir. 1985) .............................. 16

*Christian Emps. All. v. U.S. Equal Opportunity Comm'n*, 2024 WL 935591 (D.N.D. Mar. 4, 2024) ................................................................................... 3, 10

*Cimijotti v. Paulsen*, 230 F.Supp. 39 (N.D. Iowa, 1964) ......................................... 16

*Crowder v. S. Baptist Convention*, 828 F.2d 718 (11th Cir. 1987) ............................ 17

*Dolter v. Wahlert High Sch.*, 483 F. Supp. 266 (N.D. Iowa 1980) ........................... 16

*Employment Division v. Smith*, 494 U.S. 872 (1990) .........................................15, 16

*Franciscan All., Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022) ................................3

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) .................10

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010) ................................................................................................... 22

*Gonzalez v. Roman Cath. Archbishop of Manila*, 280 U.S. 1 (1929).......................... 17

*Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla. 1989) ....................... 16

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) ................................................. 19, 23

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99 (2013).............................10

*Hutchison v. Luddy*, 606 A.2d 905 (Pa. Super. Ct. 1992) ........................................ 17

*Hutchison v. Thomas*, 789 F.2d 392 (6th Cir. 1986) .............................................. 17

*In re Grand Jury Empaneling*, 171 F.3d 826 (3d Cir. 1999).................................... 13

*In re Young*, 82 F.3d 1407 (8th Cir. 1996) ....................................................... 13, 23

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952).................................................................................................. 17

*Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015) ........... 22

*Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57 (E.D. Pa. 1991) ........................... 16

*Miller v. Cath. Diocese of Great Falls*, 728 P.2d 794 (Mont. 1986) .......................... 16

*Pickard v. Dep't of Just.*, 653 F.3d 782 (9th Cir. 2011) ........................................... 20

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ................................................................................. 17

*Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021) ................ 3, 9

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) ........................... 3

*Serbian Eastern Orthodox Diocese for USA and Canada v. Milivojevich*, 426 U.S. 696 (1976) .......................................................................................................... 17

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) .... 21, 23

*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871) ....................................................... 17

*Wheaton Coll. v. Sebelius*, No. 12-01169 (D.D.C. Aug. 20, 2012) ........................... 24

*Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018) .................. 13, 22, 23

*Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011) ................................ 24

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ............................................................................................................ 21, 22

**Statutes**

29 U.S.C. § 1104 .................................................................................................... 10

42 U.S.C. § 2000bb ........................................................................................... 15, 16

42 U.S.C. § 2000bb-1 ..................................................................................... 12, 13, 17

42 U.S.C. § 2000bb-2 .............................................................................................. 12

42 U.S.C. § 2000bb-3 .................................................................................... 12, 15, 22

**Regulations**

45 C.F.R. § 92.6 ..................................................................................................... 24

Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020 ..........................3

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375 (May 18, 2016)............................................................................................... 3, 24

Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824 (proposed Aug. 4, 2022) .......................................................................... 3, 24

**Other Authorities**

139 Cong. Rec. H8714 (daily ed. Nov. 3, 1993) .................................................15, 16

Black's Law Dictionary (11th ed. 2019) .................................................................. 14

Catechism of the Catholic Church ................................................................... 5, 6, 7

Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA-2 (Nov. 6, 2015) ........................................................................................................7

Dicastery for the Doctrine of the Faith, *Declaration on "Dignitas Infinita" on Human Dignity* (April 2, 2024) ....................................................................5

H.R. Rep. No. 103-88.............................................................................................. 17

*Laudato Si* (2015) .................................................................................................. 8

Religious Freedom Restoration Act of 1991: Hearings Before the Subcommittee on Civil and Constitutional Rights, 102nd Cong. (1992) ................................... 17

S. Rep. No. 103-111 ............................................................................................... 17

Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides A Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343 (2013) .............................. 14, 18

*USCCB Chairmen Respond to Administration's New Guidance Letter on Title IX Application*, USCCB (May 16, 2016) ............................................................7

USCCB, Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body (Mar. 20, 2023) ................................................................. 8, 9

USCCB, Health and Health Care: A Pastoral Letter of the American Catholic Bishops (Nov. 19, 1981).............................................................................. 5, 6

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae*, the Catholic Benefits Association ("CBA") is a religious ministry that exists to help Catholic organizations carry out their callings and operate their ministries and businesses in a way that is consistent with their Catholic faith. CBA members include over 84 Catholic dioceses and archdioceses. Its members total over 1,370 Catholic employers plus 7,100 Catholic parishes. Together, they provide health care benefits to over 160,000 employees and their families. CBA members also include hospitals, Catholic Charities, medical clinics, crisis pregnancy centers, mental health service providers, counseling centers, nursing homes, senior residence facilities, schools, colleges, religious orders, and other Catholic ministries and Catholic-owned businesses. All CBA members are Catholic ministries or Catholic-owned businesses that believe and practice the teachings of the Catholic Church regarding the dignity of the human person; the rights to life, fertility, and puberty; the rights of conscience and religious freedom, including opposition to covering and providing gender-transition services.

Many of CBA's members have self-funded health plans administered by third-party administrators or "TPAs". CBA members design their health plans to reflect

---

[1]    No counsel for a party authored this brief in whole or in part; no one, other than *amicus* and its counsel, made a monetary contribution for its preparation or submission; and all parties have consented to its filing.

the Catholic Church's teachings about the relationship between adequate medical care and human dignity. This includes Catholic beliefs regarding the immutable nature of biological sex and that healthcare should enhance, not harm, the natural functions of the body. To those ends, CBA members exclude so-called "gender-transition services" from their health plans.

## QUESTIONS PRESENTED

1.  Does the Religious Freedom Restoration Act ("RFRA") protect a religious employer's faith-based decision to exclude puberty blockers and related surgeries from their health plans?

2.  If so, does that protection extend to a religious employer's TPA, obligated by ERISA to administer the employer's health plan as written?

## ARGUMENT

This case is an attempt to circumvent RFRA's protections for religious employers. Rather than sue a *religious employer* conscientiously opposed to gender-transition procedures, plaintiff-appellees named as the defendant below a religious employer's, secular *TPA*. Plaintiff-appellees' theory goes that, while a religious employer might have easier recourse to constitutional and statutory religious-freedom protections like RFRA, defendant-appellant Blue Cross Blue Shield of Illinois, like many TPAs, is a secular organization that cannot raise a religious-

2

freedom defense. By removing the religious employer from the case, plaintiff-appellees wagered they could achieve indirectly what they could not directly: an injunction prohibiting the administration of health plans of religious organizations that exclude gender-transition procedures as a matter of conscience. The district court below approved this maneuver, holding that RFRA has no application in suits where the government is not a party. In doing so, the district court ignored a substantial body of precedent affirming that Section 1557 of the Affordable Care Act does not require conscientiously opposed religious employers to design their health plans to cover gender-transition procedures.[2] It also ignored the proposed and final regulations of three successive presidential administrations declaring that RFRA displaces the normal operation of Section 1557 to protect religious liberty.[3] Because

---

[2] *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588 (8th Cir. 2022); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 379 (5th Cir. 2022); *Christian Emps. All. v. U.S. Equal Opportunity Comm'n*, 2024 WL 935591, at *8–9 (D.N.D. Mar. 4, 2024); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1147–49 (D.N.D. 2021). The Catholic Benefits Association was a plaintiff in the consolidated *Religious Sisters of Mercy* cases cited in this footnote.

[3] Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,378 (May 18, 2016) (explaining that the 2016 Rule implementing Section 1557 "does not displace the protections afforded by provider conscience laws," including "the Religious Freedom Restoration Act"); Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,207 (June 19, 2020) ("[T]he Department is bound to enforce Section 1557 in compliance with RFRA."); Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,841 (proposed Aug. 4, 2022) (noting that RFRA applies to

3

the effect of the district court's decision is the same as if plaintiff-appellees had sued a conscientiously opposed religious employer—such employer can no longer provide health benefits consistent with their faith—the decision below is error and must be reversed.

## I. CBA MEMBERS, LIKE MANY RELIGIOUS EMPLOYERS, DESIGN HEALTH PLANS CONSISTENTLY WITH THEIR FAITH.

### A. Healthcare and human dignity

Catholic teaching has two important facets for this case: a belief that every person is entitled to adequate healthcare, and a belief that biological sex is a gift, written into God's creation. These teachings, like the Catholic Church's teachings about poverty, war, migrants, human trafficking, sexual abuse, violence against

---

Section 1557). *See also* 81 Fed. Reg. at 31,380 ("RFRA is the proper means to evaluate . . . whether a legal requirement substantially burdens the exercise of religion . . . ."), 31,388 ("[T]his rule does not displace existing protections afforded by . . . RFRA . . . ."), 31,378 (same), 31,435 ("[A]ny religious concerns are appropriately addressed pursuant to . . . RFRA . . . ."), 31,388 (describing how through RFRA "an individual's right to access health programs and activities free from discrimination" is balanced with "existing protections afforded by . . . RFRA").

4

women, surrogacy, euthanasia and suicide, and people with disabilities, is rooted the Church's teaching about the infinite dignity of the human person.[4]

> Every human person possesses an infinite dignity, inalienably grounded in his or her very being, which prevails in and beyond every circumstance, state, or situation . . . . This principle, which is fully recognizable even by reason alone, underlies the primacy of the human person and the protection of human rights. In the light of Revelation, the Church resolutely reiterates and confirms the ontological dignity of the human person, created in the image and likeness of God and redeemed in Jesus Christ. From this truth, the Church draws the reasons for her commitment to the weak and those less endowed with power, always insisting on "the primacy of the human person and the defense of his or her dignity beyond every circumstance."

*Id.* ¶ 1 (quoting Pope Francis, *Laudate Deum* (Oct. 4, 2023)).

*First*, the Catholic Church teaches that all people are entitled to adequate healthcare regardless of legal, social, or economic status. For the Church, health care "is a fundamental right of every human being."[5] This is because health is inextricably tied to the dignity of the human person. It is the Church's foundational belief that all people are created in the image and likeness of God and are thus imbued with human dignity.[6] The dignity of the person demands "utmost reverence,"

---

[4] Dicastery for the Doctrine of the Faith, *Declaration on "Dignitas Infinita" on Human Dignity* (April 2, 2024), *available at* https://bit.ly/49J3v4T (last visited Apr. 17, 2024).

[5] USCCB, Health and Health Care: A Pastoral Letter of the American Catholic Bishops, 5 (Nov. 19, 1981), https://bit.ly/4aWAJyt (last visited Apr. 14, 2024).

[6] Catechism of the Catholic Church ("CCC") 1701, available at https://bit.ly/49H51V7 (last visited Apr. 18, 2024).

which, as relevant here, requires "society to provide adequate health care" to all people.[7] "Health care is so important for full human dignity and so necessary for the proper development of life that it is a fundamental right."[8]

The Church believes that healthcare should be provided without discrimination. All persons are to be loved, respected, and cared for in their human freedom, even if they reject the Church's teaching on matters of sexual identity and sexual morality.[9] The United States Conference of Catholic Bishops ("USCCB") has applied this teaching to those with gender dysphoria. The USCCB has stressed that the Catholic Church "consistently affirms the inherent dignity of each and every human person and advocates for the wellbeing of all people, particularly the most vulnerable," and that people who struggle with their gender identity "deserve com-

---

[7] Health and Health Care, *supra* note 5 at 5 ("Because all human beings are created according to God's image, they possess a basic human dignity which calls for the utmost reverence. . . . On the societal level this calls for responsibility by society to provide adequate health care which is a basic human right.").

[8] *Id.*

[9] CCC 1738, 2358.

6

passion, sensitivity, and respect."[10] Similarly, all people, including transgender persons, "should have access to health care and health coverage."[11]

*Second*, the Church's teaching that all people are created in the image of God corresponds to its belief that biological sex is part of God's plan for creation. Catholic teaching on the nature of biological sex begins with the Book of Genesis, which teaches that "God created man in his own image . . . male and female he created them."[12] Catholics believe that "[b]y creating the human being man and woman, God gives personal dignity equally to the one and the other. Each of them, man and woman, should acknowledge and accept his sexual identity."[13] Pope Francis has reiterated this teaching in recent years, affirming that "'man too has a nature that he must respect and that he cannot manipulate at will.' . . . The acceptance of our bodies as God's gift is vital for welcoming and accepting the entire world as a

---

[10] *USCCB Chairmen Respond to Administration's New Guidance Letter on Title IX Application*, USCCB (May 16, 2016), *available at* https://bit.ly/4cYNk6d (last visited Apr. 11, 2024).

[11] Comments from USCCB et al. to U.S. Dept. of Health and Human Services Re: Nondiscrimination in Health Programs and Activities RIN 0945-AA-2, at 2 (Nov. 6, 2015), *available at* https://bit.ly/3vT3LjT (last visited Apr. 18, 2023).

[12] CCC 2331 (quoting Genesis 1:27).

[13] CCC 2393.

7

gift from the Father. . . . Learning to accept our body, to care for it and to respect its fullest meaning, is an essential element of any genuine human ecology."[14]

Applying these twin beliefs about the right of healthcare and biological sex to persons with gender dysphoria, the USCCB issued a "Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body" on March 20, 2023.[15] The Doctrinal Note first explains that, "[a] fundamental tenet of the Christian faith is that there is an order in the natural world that was designed by its Creator and that this created order is good." *Id.* ¶ 2 (citing Gen 1:31; Ps 19:1). This includes the fact of sexual differentiation: "Man and woman have been *created*, which is to say, *willed* by God: on the one hand, in perfect equality as human persons; on the other, in their respective beings as man and woman." *Id.* ¶ 5. (quoting CCC 369).

This reality, the Doctrinal Note explains, has implications for the treatment of gender dysphoria. "[T]he use of surgical or chemical techniques that aim to exchange the sex characteristics of a patient's body for those of the opposite sex or for simulations thereof" and, "[i]n the case of children, the exchange of sex characteristics . . . prepared by the administration of chemical puberty blockers, which arrest

---

[14] *Laudato Si*, No. 155 (2015) (quoting Pope Benedict XVI, Address to the German Bundestag (Sept. 22, 2011)), https://bit.ly/3Waawsp.

[15] USCCB, Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body (Mar. 20, 2023), *available at* https://bit.ly/4aZjEnH.

8

the natural course of puberty and prevent the development of some sex characteristics in the first place" to treat "gender dysphoria" and "gender incongruence" are not "morally justified either as attempts to repair a defect in the body or as attempts to sacrifice a part of the body for the sake of the whole." *Id.* ¶¶ 14-15. "First, they do not repair a defect in the body: there is no disorder in the body that needs to be addressed; the bodily organs are normal and healthy." *Id.* ¶ 15. "Second, the interventions do not sacrifice one part of the body for the good of the whole." *Id.* "Such interventions, thus, do not respect the fundamental order of the human person as an intrinsic unity of body and soul, with a body that is sexually differentiated." *Id.* ¶ 18. Catholics thus cannot cooperate with gender-transition services. *Id.*

### B. Designing and implementing a health plan consistent with Catholic beliefs

Because members of the CBA follow the Church's teachings that (1) healthcare is a fundamental right, and (2) that the created nature of the human body must be given reverence, they provide their employees with health benefits that conform to their religious beliefs. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d at 1147. This is true not only for the CBA's members, but also for other religious employers, including, for example, the Religious Sisters of Mercy, *id.*, the Christian Employers Alliance, *Christian Emps. All.*, 2024 WL 935591, at *8 ("CEA's sincerely

9

held religious belief is that male and female are immutable realities defined by biological sex and that gender reassignment is contrary to Christian Values."); and the Franciscan Alliance, *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 691 (N.D. Tex. 2016) ("[T]he Court finds that Private Plaintiffs' refusal to perform, refer for, or cover transitions or abortions is a sincere religious exercise.").

Many CBA members with self-funded health plans have adopted exclusions for gender-transition services like the exclusion within Catholic Health Initiatives' plan at issue below. *See* 6-ER-1229 ("Benefits shall not be provided for treatment, drugs, therapy, counseling services and supplies for, or leading to, gender reassignment surgery."). To administer their plans, CBA members often contract with a TPA, like defendant-appellant BCBSIL. CBA members rely on their TPAs to fulfill their function under ERISA as a fiduciary who must administer plan claims strictly "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). In non-religious contexts, the Supreme Court has emphasized the "particular importance of enforcing plan terms [of an employer's plan] as written." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013). But by-the-contract ERISA plan administration is even more important for religious employers like members of the CBA because their plan design is a matter of religious faith and practice.

10

## II.   THE DISTRICT COURT ERRED BY CONFINING RFRA TO SUITS INVOLVING A GOVERNMENT PARTY.

The district court below ruled that RFRA has no application to this case because RFRA only "provides relief against the government and does not apply to disputes between private parties." 1-ER-74. The district court rejected defendant-appellant's argument that "Section 1557 and RFRA [must] be read together" because "it is not wholly clear how that is to occur generally." 1-ER-74. In so holding, the district court ignored the text, legislative intent, implications, and caselaw interpreting RFRA that individually and together indicate that the best reading of RFRA is as "a framework statute, 'displacing the normal operation of other federal laws'" regardless of whether such laws are applied in a suit against the government or between private parties. *See Apache Stronghold v. United States*, 95 F.4th 608, 629 (9th Cir. 2024) (en banc) (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020)).

### A. By its plain meaning, RFRA applies in all cases involving the application of federal law.

Whether and when RFRA applies in private-party lawsuits requires the Court to answer two related questions. What right is created by RFRA? And how may that right be enforced?

11

The substantive right created by RFRA is a presumptive exemption granted to all persons whose religious exercise is substantially burdened by *any* actions of the federal government, whether by privately enforced statute, regulation, executive enforcement, or court order:

> **(a) In general**
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

42 U.S.C. § 2000bb-1(a). That this language includes all federal action, including privately enforced statutes, is confirmed by two additional provisions of RFRA. *First*, RFRA's section entitled "[a]pplicability" states in relevant part, "[t]his chapter applies to *all* Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a) (emphasis added). *Second*, the definition section of RFRA defines the term "government" to mean *all* governmental authority to "include[] a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2. Thus, the right provided by RFRA is equally applicable to a statute enacted by Congress,[16] a regula-

---

[16] *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020) (RFRA "might supersede Title VII's commands in appropriate cases.").

12

tion promulgated by the executive branch,[17] or court-enforced order such as a sub-poena.[18]

The remedy created by RFRA is similarly broad, allowing a party to assert RFRA as a claim or as a defense in a judicial proceeding:

> A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb-1(c). § 2000bb-1(c) allows "a person" to do two different things: (1) "assert [a RFRA] violation as a claim or defense in a judicial proceeding"; and (2) "obtain appropriate relief against a government." It is important to note that the power to assert RFRA "as a claim or defense in a judicial proceeding" is not limited to "a judicial proceeding" *against the government*; "a person whose religious exercise has been burdened a person" may assert his, her, or its rights in *any* "judicial proceeding" whether or not the government is a party. This is confirmed by the final clause of § 2000bb-1(c), which broadens RFRA's power so that

---

[17] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 736 (2014) (invalidating contraceptive mandate promulgated by Department of Health and Human Services).

[18] *See In re Grand Jury Empaneling*, 171 F.3d 826, 835 (3d Cir. 1999) ("Lest there be any confusion, we reiterate: in deciding whether to enforce a grand jury subpoena over a RFRA objection, the district court must satisfy itself that the witness's testimony is necessary to serve a compelling state interest."); *Whole Woman's Health v. Smith*, 896 F.3d 362, 371–72 (5th Cir. 2018) (applying RFRA to court-enforced, private-party subpoena); *In re Young*, 82 F.3d 1407, 1418–21 (8th Cir. 1996) (applying RFRA to the Bankruptcy Code as enforced by the Courts).

it waives sovereign immunity of the government. Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides A Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343, 351–52 (2013). The different meanings of "claim," "defense," and "relief" underscore this point. Only if a litigant successfully asserts a "claim," is the litigant entitled to "relief"; a successful "defense," by contrast, merely defeats liability, as should have occurred below.[19] If RFRA were only applicable against the government, § 2000bb-1(c) would instead read "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding ~~and obtain appropriate relief~~ against a government."

Together, RFRA's creation of a broad right of religious freedom coupled with the ability to enforce that right in any judicial proceeding is why this Court has recently described RFRA as a "framework statute," *Apache Stronghold*, 95 F.4th at

---

[19] *Compare* Relief, Black's Law Dictionary (11th ed. 2019) ("The redress or benefit, esp. equitable in nature (such as an injunction or specific performance), that a party asks of a court. — Also termed *remedy.*"); *and* Claim, Black's Law Dictionary (11th ed. 2019) ("A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for. — Also termed *claim for relief.*"); *with* Defense, Black's Law Dictionary (11th ed. 2019) ("A defendant's stated reason why the plaintiff or prosecutor has no valid case; esp., a defendant's answer, denial, or plea <her defense was that she was 25 miles from the building at the time of the robbery>.").

14

629, and the Supreme Court characterizes RFRA as a "super statute," *Bostock*, 590 U.S. at 682. Two facets of *Bostock*'s discussion of RFRA are worth emphasizing here. First, *Bostock*'s explanation, citing 42 U.S.C. § 2000bb-3, that RFRA "supersede[s]" federal anti-discrimination law "in appropriate cases" was made in the context of a case like this one in which the federal government was not a party. *Bostock*, 590 U.S. at 653–54. Second, *Bostock* addressed the bewilderment of the district court below about how RFRA would apply in a case like this, by explaining that RFRA "displac[es] the normal operation of other federal laws." *Id.* at 682.

### B. Congress intended that RFRA apply in private-party suits.

In the aftermath of the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), Congress enacted RFRA (1) "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)"; and (2) "to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb (b). As then-Congressman Schumer put it in support of the Act, broad legal protection for religious exercise reflects Congress's "belie[f] in the flower of religious freedom that so adorns America." 139 Cong. Rec. H8714 (daily ed. Nov. 3, 1993) (statement of Rep. Schumer). "It is so important to allow that freedom to flourish," he con-

tinued, "and not to come down on it unless we really have to. This bill [RFRA] does that." *Id.*

RFRA's legislative declaration specifically approved how pre-*Smith* courts applied the Free Exercise clause: "the compelling interest test as set forth in [pre-*Smith*] Federal court rulings [applying the Free Exercise Clause] is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb (a)(5). Among those pre-*Smith* Federal court rulings were suits between private parties, including employment lawsuits between a private religious employer and private employees,[20] church-autonomy cases involving intra-church disputes,[21] and discovery disputes between a private litigant and a private religious institution asserting privileges.[22] These cases were pre-

---

[20] *Miller v. Cath. Diocese of Great Falls*, 728 P.2d 794, 795 (Mont. 1986) (bad-faith employment dispute); *Lukaszewski v. Nazareth Hosp.*, 764 F. Supp. 57, 58 (E.D. Pa. 1991) (ADEA suit); *Cath. High Sch. Ass'n v. Culvert*, 753 F.2d 1161, 1163 (2d Cir. 1985) (labor dispute); *Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 267 (N.D. Iowa 1980)(Title VII sex-discrimination suit).

[21] *See, e.g.*, *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 774 (Okla. 1989) (First Amendment Free Exercise protect church's actions in disciplining a parishioner); *Cimijotti v. Paulsen*, 230 F.Supp. 39, 41 (N.D. Iowa, 1964) (First Amendment Free Exercise protects alleged defamatory statements made to confidential ecclesiastical tribunal); *Crowder v. S. Baptist Convention*, 828 F.2d 718, 718 (11th Cir. 1987) (adjudicating whether the chairman of a church convention properly exercised his parliamentary authority); *Hutchison v. Thomas*, 789 F.2d 392, 394 (6th Cir. 1986).

[22] *Hutchison v. Luddy*, 606 A.2d 905 (Pa. Super. Ct. 1992).

16

sented to Congress during debates about RFRA by Professor Laycock,[23] which were expressly incorporated into the House and Senate committee reports. H.R. Rep. No. 103-88, at 2 n.2; S. Rep. No. 103-111, at n.3. There are many more.[24] Congress thus intended that RFRA apply in private-party disputes like this one.

The drafting history of the judicial-relief provision of RFRA (codified at 42 U.S.C. § 2000bb-1(c)) also supports the view that Congress intended RFRA to apply in private-party suits. Congress redrafted this provision three times:

> 1990 Draft: A party aggrieved by a violation of this section may obtain appropriate relief (including relief against a governmental authority) in a civil action.

---

[23] *See* Religious Freedom Restoration Act of 1991: Hearings Before the Subcommittee on Civil and Constitutional Rights, 102nd Cong. 361-391 (1992) *available at* https://www.justice.gov/sites/default/files/jmd/legacy/2014/07/13/hear-99-1992.pdf.

[24] *See, e.g., Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 114–16 (1952) (Free Exercise Clause blocks corporation's statutory claim to take possession of Church's property); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1871) (as recognized in *Kedroff*, Free Exercise Clause bars a private claim which disputed determinations made by an ecclesial body); *Gonzalez v. Roman Cath. Archbishop of Manila*, 280 U.S. 1, 7–8 (1929) (relying on *Watson*'s free exercise foundation, held that private claim against Church barred as it was contrary to church law as interpreted by archbishop); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 446–47 (1969) (Free Exercise Clause blocks a private-property claim); *Serbian Eastern Orthodox Diocese for USA and Canada v. Milivojevich*, 426 U.S. 696, 724–25 (1976) (Free Exercise Clause bars a private claim which disputed determinations made by an ecclesial body).

17

> 1991 Draft: A person party [sic] aggrieved by a [sic] whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief (including relief against a governmental authority) in a civil action.

> 1993 Final Version: A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

Chaganti, *supra*, 99 Va. L. Rev. at 353–54 (citations omitted). This drafting history reflects two consistent concerns: (1) that persons could assert RFRA in a judicial proceeding, and (2) that RFRA must broaden that right to abrogate sovereign immunity. *Id.* at 353; *see also id.* at 351-52 (explaining the Supreme Court's contemporaneous case law on the language necessary to waive sovereign immunity). The former intention was expressed in the 1990 phrase, "obtain appropriate relief . . . in a civil action," which was later clarified in the 1991 and 1993 drafts in the phrase, "as a claim or defense in a judicial proceeding." This clarification, however, made redundant the vestigial phrase in the 1991 draft, "obtain appropriate relief," and the drafters eliminated it from the 1993 final version. This left a conundrum: how would RFRA abrogate sovereign immunity if the parenthetical phrase in 1990 and 1991 drafts, "(including relief against a governmental authority)," was eliminated as well? Congress addressed this issue by adding the sovereign-immunity-

abrogating clause ("obtain appropriate relief against a government") after the word "and" in the final version.

### C. Not applying RFRA in this case would lead to absurd results.

In *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006), the Second Circuit held that RFRA applied in an Age Discrimination in Employment Act case between two private parties because, "[t]he ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* Consider three potential suits involving identical facts that highlight the Second Circuit's reasoning:

> Suit A: HHS or EEOC sue a religious employer on behalf of an employee for violation of Section 1557;
>
> Suit B: HHS or EEOC sue a religious employer on behalf of an employee for violation of Section 1557, and the employee intervenes; and
>
> Suit C: the employee sues its religious employer for violation of Section 1557 directly after issuance of a right-to-sue letter.

According to the district court below, RFRA would apply fully in Suit A; partially in Suit B against the claims of the government, but not the private plaintiff; and not at all in Suit C. That kind of absurd result, which would reward gaming the right-to-sue process, must be avoided. *Pickard v. Dep't of Just.*, 653 F.3d 782, 788 (9th Cir. 2011) ("Courts avoid natural readings that would lead to irrational results." (alter-

19

ation omitted) (quoting *Ariz. St. Bd. For Charter Schools v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006))).

Yet that is precisely the result if the district court's decision is affirmed. Numerous religious employers, including the Catholic Benefits Association, have successfully obtained injunctions against the Department of Health and Human Services and the Equal Employment Opportunity Commission from interpreting Section 1557 to require conscientiously opposed religious employers to cover and provide gender-transition services. Those courts uniformly reasoned that RFRA shields objecting religious employers from any requirement of Section 1557 to cover and provide gender-transitions services.[25] But according to the district court, these religious employers have no ability to require their TPAs to administer their plans consistent with RFRA or the precedents favoring these employers.

### D. Caselaw confirms that RFRA should apply here.

The district court below cited this Court's decision in *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) for the sweeping proposition that RFRA can never apply in private-party suits as a claim or a defense. 1-ER-44.

---

[25] *See Christian Emps. All.*, 2024 WL 935591, at *8; *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153-54 (D.N.D. 2021), *aff'd in relevant part Religious Sisters of Mercy*, 55 F.4th at 609; *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 943-44 (N.D. Tex. 2019), *aff'd Franciscan All.*, 47 F.4th at 379–80.

But *Sutton* did not reach that far. *Sutton* only addressed the circumstances in which RFRA may be asserted as a *claim for relief* against a private-party defendant, and held that a RFRA claim lies against a private defendant when the defendant is acting under "color of law" and there is a "nexus" between the defendant and the government. *Id.* at 834, 838. *Sutton* did not address the situation here, whether RFRA may be asserted as a *defense* in a private-party suit.[26] On that score, the decisions of other circuits are highly persuasive.

---

[26] In *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000), this Court made a passing remark that RFRA might not be applicable as a defense in a copyright suit. *Id.* at 1121 ("It seems unlikely that the government action Congress envisioned in adopting RFRA included the protection of intellectual property rights against unauthorized appropriation."). But this comment was not even *dicta*, as the Court did not take a definitive position on the applicability of RFRA. Even if it had, however, *Worldwide Church* only concerned the intersection of copyright law and RFRA; it did not address a statute like Section 1557 that can be enforced by the government *and* private parties.

Further, the decisions of other circuits, holding that RFRA does not apply in private-party suits are unpersuasive for all the reasons stated in this brief. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (holding that RFRA does not apply to law that can only be enforced by private parties); *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015) (holding, contrary to its text, intent, and the real-world effects, that RFRA does not apply in private-party suits).

Consider first the decision of the Fifth Circuit in *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018), which applied RFRA to quash a subpoena in a private-party lawsuit. There, activists subpoenaed the communications of Texas's Catholic Conference of Bishops related to a pro-life, fetal remains law the Conference supported. *Id.* at 366. The Conference objected to the subpoena under RFRA, but the district court overruled the Conference's objection and ordered compliance. *Id.* at 366–67. The Fifth Circuit reversed on an expedited basis. The Fifth Circuit explained that the district court was "incorrectly dismissive of the seriousness of the issues raised by" the Conference. *Id.* at 370. It further explained that, "[h]ad the district court considered RFRA, it would have confronted authority that holds the law applicable to court-ordered discovery." *Id.* at 371. The court went on to apply RFRA and quash the subpoena. *Id.*

Similarly, the Eighth Circuit ruled in *In re Young*, 82 F.3d 1407 (8th Cir. 1996) that RFRA provides a defense against a bankruptcy trustee. *Id.* at 1420. The Eighth Circuit explained that RFRA applies to all Federal law and its implementation. *Id.* at 1416 (quoting 42 U.S.C. § 2000bb-3(a)). Because "[t]he bankruptcy code is federal law," which was being implemented in the case, the Eighth Circuit ruled that RFRA must be considered for purposes of determining the validity of the trustee's request. *Id.* at 1417. A similar conclusion was reached by the Second Circuit in

22

*Hankins* that, at a minimum, RFRA is available as a defense in private-party suits. 441 F.3d at 103.

Together with this Court's opinion in *Sutton*, these decisions offer a bifurcated approach to how RFRA applies in private-party disputes. On the one hand, to obtain *relief* against a private party under RFRA, that party must be acting under color of law. On the other hand, if a private party is merely attempting to enforce federal law, whether it be in the form of a subpoena or the Bankruptcy Code or Section 1557, RFRA may be raised a *defense* to defeat liability. RFRA creates a rule of interpretation that, in appropriate cases, puts a thumb on the scale in favor of religious exercise.

### E. The United States has taken the position that RFRA applies in private-party suits.

During the litigation over the contraceptive mandate issued by the Obama administration, the United States Department of Justice concluded that RFRA applies to suits between private parties. In response to the numerous suits challenging that mandate, the United States took the position that religious organizations can assert RFRA as a defense in lawsuits brought by private parties: "[I]f plaintiff were sued by a plan participant or beneficiary in the future, plaintiff, in its defense of such an action, would have an opportunity to raise its contention that the contraceptive coverage requirement violates the Religious Freedom Restoration Act."

23

Reply in Support of Motion to Dismiss at 3–4, *Wheaton Coll. v. Sebelius*, No. 12-01169 (D.D.C. Aug. 20, 2012). This interpretation of RFRA by the United States government is entitled to significant weight. *See, e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 331–33 (2011) (relying on the Department of Justice's interpretation of a federal law from an amicus brief).

It is also consistent with the statements of the United States in the 2016 and 2020 rules implementing Section 1557, and the 2022 notice of proposed rulemaking. In its 2016 rule implementing Section 1557, the Department of Health and Human Services explained that "application of RFRA is the proper means to evaluate any religious concerns about the application of Section 1557 requirements." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,380 (May 18, 2016). In its 2020 Rule, HHS expressly incorporated RFRA as a defense to any action enforcing Section 1557 or its implementing regulations. 45 C.F.R. § 92.6(b). And in its 2022 notice of proposed rulemaking, HHS once again explained that Section 1557 must be interpreted in conjunction with RFRA. Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47,841 (proposed Aug. 4, 2022).

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed

with instructions to enter summary judgment for the Defendant.

*/s/ Andrew Nussbaum*
Andrew Nussbaum
L. Martin Nussbaum
First & Fourteenth PLLC
2 N. Cascade Ave., Ste 1430
Colorado Springs, CO 80903
(719) 428-4937
andrew@first-fourteenth.com
martin@first-fourteenth.com
*Attorneys for Amicus Curiae the Catholic Bene-
fits Association*

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) as it contains 5,842 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Equity A, a proportionally spaced font.

Date: April 19, 2024

*/s/ Andrew Nussbaum*
Andrew Nussbaum
*Attorney for Amicus Curiae the Catholic Benefits Association*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Date: April 19, 2024

*/s/ Andrew Nussbaum*
Andrew Nussbaum
*Attorney for Amicus Curiae the Catholic Benefits Association*