**No. 23-4331**

---

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

PATRICIA PRITCHARD, as parent on behalf of minor C.P.; NOLLE PRITCHARD, as parent on behalf of minor C.P.; S.R.; R.L., as parent on behalf of minor S.L.; EMMETT JONES,

Plaintiffs-Appellees,

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Western District of Washington (Judge Robert J. Bryan)

---

**BRIEF OF *AMICI CURIAE* THE ERISA INDUSTRY COMMITTEE AND AMERICA'S HEALTH INSURANCE PLANS, INC. IN SUPPORT OF APPELLANT AND SUPPORTING REVERSAL**

JOANNE ROSKEY
  *Counsel of Record*
ANTHONY F. SHELLEY
Miller & Chevalier Chartered
900 Sixteenth Street NW
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 626-5800
ashelley@milchev.com
jroskey@milchev.com

*Counsel for Amici Curiae The ERISA Industry Committee and America's Health Insurance Plans, Inc.*

April 19, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, The ERISA Industry Committee ("ERIC") identifies its parent corporation and publicly held companies owning 10% or more of stock (if any) as follows: ERIC is a District of Columbia non-profit corporation with no parent company or subsidiaries and no publicly or privately issued stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, America's Health Insurance Plans, Inc. ("AHIP") identifies its parent corporation and publicly held companies owning 10% or more of stock (if any) as follows: AHIP is a Delaware non-profit corporation with no parent company or subsidiaries and no publicly or privately issued stock.

# **TABLE OF CONTENTS**

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF THE *AMICUS CURIAE* ...........................................................1

I.   THE DISTRICT COURT'S ORDERS SUBVERT CONGRESS'S
     INTENT IN ADOPTING ERISA BY IGNORING FUNDAMENTAL
     DISTINCTIONS BETWEEN PLAN DESIGN AND PLAN
     ADMINISTRATION................................................................................3

     A.   Employer Plan Sponsors Have Exclusive Authority Over
          ERISA Plan Design, Subject Only to Minimum Statutory
          Standards ....................................................................................4

     B.   TPAs Must Strictly Adhere to Plan and TPA Contract Terms or
          Face Liability and Other Adverse Consequences for Failing to
          Do So...........................................................................................7

          1.   TPAs provide services to ERISA plans in either a fiduciary or
               ministerial capacity ..................................................................7

          2.   TPAs face liability under ERISA and state law if they deviate
               from plan or TPA contract terms ..............................................8

II.  THE DISTRICT COURT'S ORDERS SIGNIFICANTLY DISRUPT
     EMPLOYER PLAN SPONSORS' AND THE TPA INDUSTRY'S
     ABILITY TO ADMINISTER SELF-FUNDED PLANS ...........................11

     A.   The District Court's Orders Create Business Disruptions and
          Litigation Risks That Will Interfere with Employers' Provision
          of Benefits Suitable for Their Workforces...........................................13

          1.   The district court's orders create conflicting legal obligations on
               TPAs and new liability exposure ..............................................13

          2.   The district court's orders will raise costs for plans,
               participants, beneficiaries, employers, and TPAs....................17

B.    The District Court's Orders Disrupt the Well-Settled Legal Landscape Under Which Employers and TPAs Administer Self-Funded Plans ......................................................................................19

III.   THE DISTRICT COURT'S DECISIONS CREATE UNCERTAINTY AND ADVERSE TAX CONSEQUENCES FOR PLAN PARTICIPANTS AND BENEFICIARIES AND ARE CONTRARY TO THE PUBLIC INTEREST ....................................................................23

CONCLUSION ........................................................................................28

CERTIFICATE OF COMPLIANCE....................................................*Post*

CERTIFICATE OF SERVICE .............................................................*Post*

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Acosta v. Brain*,
   910 F.3d 502 (9th Cir. 2018) ...................................................................9

*Acosta v. Saakvitne*,
   355 F. Supp. 3d 908 (D. Haw. 2019) ....................................................15

*Analytical Surveys, Inc. v. Intercare Health Plans, Inc.*,
   101 F. Supp. 2d 727 (S.D. Ind. 2000) ...................................................10

*Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.)*,
   125 F.3d 715 (9th Cir. 1997) ...................................................................8

*Arizona v. Tohono O'odham Nation*,
   818 F.3d 549 (9th Cir. 2016) .................................................................19

*Bafford v. Northrop Grumman Corp.*,
   994 F.3d 1020 (9th Cir. 2021) ...............................................................16

*Batchelor v. Oak Hill Med. Group*,
   870 F.2d 1446 (9th Cir. 1989) ...............................................................15

*Blue Cross of Cal. Inc. v. Insys Therapeutics Inc.*,
   390 F. Supp. 3d 996 (D. Ariz. 2019) .......................................................4

*Carlson v. Northrop Grumman Severance Plan*,
   67 F.4th 871 (7th Cir. 2023) ....................................................................5

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) ...............................................................................19

*Coppel v. SeaWorld Parks & Ent., Inc.*,
   No. 21-cv-1430, 2023 WL 2942462 (S.D. Cal. Mar. 22, 2023) ............15

*CSA 401(k) Plan v. Pension Professionals, Inc.*,
   195 F.3d 1135 (9th Cir. 1999) ...............................................................11

*Curtiss-Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995) ...................................................................................6

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) ............................................................16

*Donovan v. Dillingham*,
    688 F.2d 1367 (11th Cir. 1982) ......................................................18

*Duffy v. United States*,
    120 Fed. Cl. 55 (2015), *aff'd*, 626 F. App'x 792 (Fed. Cir. 2016)....................26

*Erpelding v. Del. Charter Guar. & Tr. Co.*,
    162 F. App'x 730 (9th Cir. 2006) ......................................................8

*Express Scripts, Inc. v. Wenzel*,
    102 F. Supp. 2d 1135 (W.D. Mo. 2000), *aff'd*, 262 F.3d 829 (8th
    Cir. 2001) ............................................................................3

*Faber v. Metro. Life Ins. Co.*,
    648 F.3d 98 (2d Cir. 2011) ...........................................................6

*FMC Corp. v. Holliday*,
    498 U.S. 52 (1990).....................................................................3

*Gobeille v. Librety Mut. Ins. Co.*,
    571 U.S. 312 (2016)...............................................................4, 5

*Green v. Comm'r*,
    507 F.3d 857 (5th Cir. 2007) .......................................................26

*Herdrich v. Pegram*,
    170 F.3d 683 (7th Cir. 1999) .........................................................6

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999)...................................................................5

*IT Corp. v. Gen. Am. Life Ins. Co.*,
    107 F.3d 1415 (9th Cir. 1997) ...................................................7, 10

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ......................................................15

*King v. Blue Cross & Blue Shield of Ill.*,
    871 F.3d 730 (9th Cir. 2017) .......................................................10

*Liberty Mut. Ins. Co. v. Donegan*,
746 F.3d 497 (2d Cir. 2014), *aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016).........................................................4

*Lockheed Martin Corp. v. Spink*,
517 U.S. 882 (1996)...........................................................5, 6

*LYMS, Inc. v. Millimaki*,
No. 08-CV-1210, 2013 WL 1147534 (S.D. Cal. Mar. 19, 2013).......................9

*M&G Polymers USA, LLC v. Tackett*,
574 U.S. 427 ................................................................6

*Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307 (1st Cir. 2023) ...............................................8, 27

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) ...........................................................5

*Pegram v. Herdrich*,
530 U.S. 211 (2000)...........................................................7

*Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*,
413 F.3d 897 (8th Cir. 2005) ...................................................4

*Tovar v. Essentia Health*,
857 F.3d 771 (8th Cir. 2017) ................................................21, 22

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
62 F.4th 517 (9th Cir. 2023) ...................................................7

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) ..................................................9

**Statutes**

26 U.S.C. § 105.................................................................25

Employee Retirement Income Security Act of 1974,
29 U.S.C. § 1001...........................................................5, 27
29 U.S.C. § 1102.......................................................6, 16, 18
29 U.S.C. § 1104....................................................8, 9, 11, 14
29 U.S.C. § 1105..............................................................14

29 U.S.C. § 1109 ........................................................................9
29 U.S.C. § 1132 ........................................................................9
29 U.S.C. § 1133 ......................................................................24
29 U.S.C. § 1140 ......................................................................12
29 U.S.C. § 1144 ........................................................................9
29 U.S.C. §§ 1181–1191d ...........................................................6
29 U.S.C. § 1182 ......................................................................12
29 U.S.C. § 1185d ....................................................................12
29 U.S.C. § 1191b ....................................................................18

Patient Protection and Affordable Care Act § 1557,
    42 U.S.C. § 18116 ..........................................................*passim*

Public Health Service Act,
    42 U.S.C. §§ 300gg *et seq.* ...................................................12

## Other Authorities

29 C.F.R. § 2509.75-8 .................................................................8

29 C.F.R. § 2560.503-1 .........................................................24, 25

119 Cong. Rec. 146 (1973) .........................................................5

119 Cong. Rec. 30,004 (1973) ....................................................5

Fed. R. App. P. 29 ......................................................................1

H.R. Rep. No. 93-533 (1973) ......................................................5

*Nondiscrimination in Health Programs and Activities*,
    81 Fed. Reg. 31,376 (May 18, 2016) ..................................20, 21

*Nondiscrimination in Health and Health Education Programs or
    Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19,
    2020) ...............................................................................20, 21

*Nondiscrimination in Health Programs and Activities*,
    87 Fed. Reg. 47,824 (Aug. 4, 2022) ...................................20, 21

Rev. Rul. 69-141, 1969-1 C.B. 48 ..............................................25

## STATEMENT OF THE *AMICUS CURIAE*[1]

ERIC is a national non-profit business trade association representing approximately 100 of the nation's largest employers in their capacity as sponsors of employee benefit plans for their workers and retirees and their families. ERIC member companies are leaders in every sector of the economy. ERIC serves as the voice of large employer plan sponsors regarding public policies that impact their ability to sponsor benefit plans for their nationwide workforces.

AHIP is the national trade association representing health insurers that provide coverage for hundreds of millions of Americans. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, equity, and innovation. That experience gives AHIP extensive first-hand and historical knowledge about the nation's health care and health insurance systems, and a unique understanding of how those systems work.

ERIC and AHIP are invested in enabling employers to provide high-quality health coverage to their employees, retirees, and their families in a cost-effective

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), ERIC and AHIP state that: (1) a party's counsel did not author this brief in whole or in part; (2) a party or party's counsel did not contribute money that was intended to fund preparing or submitting this brief; and (3) no person – other than ERIC or AHIP, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

and non-discriminatory manner. They are committed to the principle that every American deserves access to high-quality, affordable health care, regardless of race, color, national origin, sex, gender identity, sexual orientation, age, or disability. With those shared commitments, they have a substantial interest in court proceedings that impact the role and responsibilities of employer plan sponsors in offering and designing employee benefit plans for their employees and retirees and their families. They also have a substantial interest in legal cases that affect legal duties and potential liabilities of third-party administrators ("TPAs") of employer-sponsored health plans, as well as the legal and business environment in which the TPA industry operates and interacts with employer plan sponsors.

This case raises the specter of fundamentally altering and disrupting the relationships between employer plan sponsors and TPAs in the design and coverage of employee health benefits. If the district court's decision is upheld, it will create dramatically new legal responsibilities and liabilities on TPAs in this Circuit and elsewhere that will interfere with the provision of health benefits coverage and health plan administration. On this basis, ERIC and AHIP have a strong interest in this appeal.

Counsel for ERIC and AHIP has contacted counsel for Appellant and Appellees, and they indicated that Appellant and Appellees consent to the filing of this brief.

- 2 -

I.   **THE DISTRICT COURT'S ORDERS SUBVERT CONGRESS'S INTENT IN ADOPTING ERISA BY IGNORING FUNDAMENTAL DISTINCTIONS BETWEEN PLAN DESIGN AND PLAN ADMINISTRATION**

The District Court's December 19, 2022, Order on Cross Motions for Summary Judgment ("the Order"), *see* Appellant's Excerpt of Record ("ER") at ER-27–47, ignores fundamental distinctions between the roles and responsibilities of an ERISA employer plan sponsor and a TPA hired to administer the employer's plan according to its terms. The Order also ignores bedrock principals at the core of ERISA for almost fifty years that plan design is the exclusive province of employer plan sponsors and that TPAs, responsible only for administration of plans in accordance with ERISA, plan terms, and their contracts with plans, have no authority over how an employer designs its ERISA plan, like the group health plans at issue in this case.

ERISA employer-sponsored group health plans can be fully insured plans, where insurance funds the plan benefits, or self-funded plans, where employer plan sponsors are responsible for paying the benefits, with or without the assistance of employee contributions to the health plan to help pay for the insurance or fund plan benefits. *See generally FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990). With a self-funded plan, the employer sponsoring the plan assumes the financial risk of providing healthcare benefits to its employees. *See Express Scripts, Inc. v. Wenzel,* 102 F. Supp. 2d 1135, 1138 (W.D. Mo. 2000), *aff'd*, 262 F.3d 829 (8th Cir. 2001).

Fully insured plans are in most instances administered by the insurance companies that issue the insurance, whereas employer self-funded plans or their employer plan sponsors contract with TPAs to perform the plan's administrative services. *See Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 501-02 (2d Cir. 2014), *aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016).[2]

TPAs may perform a range of administrative services for employer self-funded health plans, including processing benefit claims and providing access to provider networks. *See Donegan*, 746 F.3d at 502; *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 902 (8th Cir. 2005). When a TPA contracts to process benefit claims for an employer self-funded plan, the TPA does not fund the benefits itself; the responsibility to fund the benefits remains with the employer plan sponsor. *Gobeille*, 571 U.S. at 317.

### A.   Employer Plan Sponsors Have Exclusive Authority Over ERISA Plan Design, Subject Only to Minimum Statutory Standards

ERISA was designed to strike a balance between the interests of employers and labor organizations "in maintaining flexibility in the design and operation" of employee benefit programs while protecting workers' need for adequate protection

---

[2] Some companies that issue insurance to group health plans also provide TPA services to self-funded plans using Administrative Services Only (ASO) agreements. *See, e.g., Blue Cross of Cal. Inc. v. Insys Therapeutics Inc.*, 390 F. Supp. 3d 996, 1000 (D. Ariz. 2019).

of their rights and expectations. H.R. Rep. No. 93-533, at 9 (1973); 119 Cong. Rec. 146 (1973). "ERISA does not guarantee substantive benefits [but instead] seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." *Gobeille*, 571 U.S. at 320-21 (citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995)). ERISA's legislative history makes clear that when striking this balance Congress gave employer plan sponsors the exclusive authority over ERISA plan design and decision-making subject only to certain minimum standards set forth in the statute. *See* 29 U.S.C. § 1001(a); 119 Cong. Rec. 30,004 (1973) (noting that the legislation's minimum standards were designed to be consistent with employer authority over plan "design, coverage, and benefits," which, subject to the minimum standards, "[are] a matter of free choice by employers"); *accord Carlson v. Northrop Grumman Severance Plan*, 67 F.4th 871, 874-75 (7th Cir. 2023) (stating that the terms of ERISA welfare benefit plans are "entirely in the control of the entities that establish them" and when making plan design decisions employers may act on their own interest) (citing *Lockheed Martin Corp. v. Spink*, 517 U.S. 882 (1996) and *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432 (1999)). Those minimum standards specific to group health plans, a form

of welfare benefit plan, are set forth in Part 7 of ERISA, 29 U.S.C. §§ 1181

through 1191d.[3]

     ERISA requires that every employee benefit plan it covers be established

and maintained pursuant to a written instrument that sets forth the design and terms

of the plan, including the funding policy, allocation of responsibilities for operation

and administration of the plan, procedures for amending the plan, and the basis on

which payments are made to and from the plan. *See* 29 U.S.C. § 1102(a), (b);

*M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434-35 (stating that welfare

benefit plans must be established and maintained pursuant to a written instrument

and that employers "have large leeway to design disability and other welfare plans

as they see fit"). To assist an employer plan sponsor when setting up their self-

funded plan, a TPA or other plan service provider may, as a specific service or

merely as a matter of convenience, offer the employer various templates to help

inform them about the plan design process. However, even when that convenience

---

[3] Under ERISA, an employer is not required to set up an employee benefit plan for its employees, "[n]or does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). The statute instead provides employers who elect to sponsor benefit plans wide latitude in designing those plans and does not create any substantive entitlement to employer provided health benefits or any other kind of welfare benefits. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Put another way, ERISA "does not tie the plan sponsor's hands on issues of plan design." *Herdrich v. Pegram*, 170 F.3d 683, 685 (7th Cir. 1999).

or service is available, it is the employer plan sponsors, not the TPA service
providers, who are solely authorized and responsible for ultimately deciding what
the plan design and terms will be. *See, e.g., Winsor v. Sequoia Benefits & Ins.
Servs., LLC*, 62 F.4th 517, 525 (9th Cir. 2023) (finding that even though plan
service provider provided employer plan sponsor with certain governing plan
documents to utilize when setting up the employer's plan, the employer was
required to make plan design decisions and was responsible for the plan's terms).

### B.     TPAs Must Strictly Adhere to Plan and TPA Contract Terms or Face Liability and Other Adverse Consequences for Failing to Do So

#### 1.     *TPAs provide services to ERISA plans in either a fiduciary or ministerial capacity*

In contrast to employer plan sponsors performing their ERISA plan design
activities in a "settlor" capacity outside the purview of ERISA, *see Pegram v.
Herdrich,* 530 U.S. 211, 226 (2000), the administration and operation of ERISA
plans by plan administrators and TPAs are performed in either a fiduciary or
ministerial capacity depending on their relationship with a plan.  ERISA plan
administrators, including some TPAs to employer-sponsored self-funded health
plans that serve in a fiduciary capacity, are subject to the fiduciary and other
provisions of Title I of ERISA. *See IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d
1415, 1417-22 (9th Cir. 1997). TPAs that expressly contract to take on ERISA
fiduciary responsibility charge a premium for their fiduciary services and the

increased liability exposure they face by serving in a fiduciary role. *See, e.g., Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 328-29 (1st Cir. 2023) (referencing the practice of employer plan sponsors paying TPAs additional "not insubstantial" fees to account for risk of fiduciary liability).

TPAs to employer-sponsored self-funded health plans may perform administrative functions for the plans in a "ministerial," non-fiduciary capacity. When doing so, they have no power to make decisions as to plan policy, interpretations, rules, practices, or procedures, but perform their services within a framework made by other persons, namely employer plan sponsors. 29 C.F.R. § 2509.75-8 at Q. D-2; *Erpelding v. Del. Charter Guar. & Tr. Co.*, 162 F. App'x 730, 731 (9th Cir. 2006); *Ariz. State Carpenters Pension Tr. Fund v. Citibank (Ariz.)*, 125 F.3d 715, 721-22 (9th Cir. 1997). Ministerial activities may include, among other things, processing claims; advising participants and beneficiaries of their rights; determining eligibility for participation or benefits; and preparing employee communications and reports concerning benefits or required by government agencies. 29 C.F.R. § 2509.75-8 at Q. D-2.

 2. *TPAs face liability under ERISA and state law if they deviate from plan or TPA contract terms*

Under ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), fiduciary TPAs face liability for failing to administer plans in accordance with their terms.

According to this statutory provision, a fiduciary must discharge its duties with respect to a plan "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." 29 U.S.C. § 1104(a)(1)(D); *see Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1100 (9th Cir. 2004) ("ERISA requires fiduciaries to comply with a plan as written unless it is inconsistent with ERISA"). Failure to adhere to plan terms subjects an ERISA fiduciary to personal liability and to equitable remedies that may include disgorgement of fees earned for services to a plan or removal from a position with the plan. *See* 29 U.S.C. § 1109(a); *Acosta v. Brain*, 910 F.3d 502, 522 (9th Cir. 2018). Other plan fiduciaries, participants, beneficiaries, and the Secretary of Labor are all authorized to assert ERISA claims against TPAs who perform services as fiduciaries. *See* 29 U.S.C. § 1132(a)(2), (3) and (5).

Whether serving in a fiduciary or ministerial capacity, TPAs are also bound by their contract terms with plans or employer plan sponsors when performing their services. They have no authority to administer the plans in a manner that departs from those contract terms, and they face liability for breach of contract and negligence if they do so.[4] *See, e.g., LYMS, Inc. v. Millimaki*, No. 08-CV-1210, 2013 WL 1147534, at *15-16 (S.D. Cal. Mar. 19, 2013) (finding breach of contract

---

[4] State law claims against TPAs may be preempted by ERISA, 29 U.S.C. § 1144(a), depending on the nature of the claim and the parties involved.

claim against ERISA plan TPA barred by statute of limitations, but holding TPA liable for damages resulting from negligence in performing TPA responsibilities); *Analytical Surveys, Inc. v. Intercare Health Plans, Inc.*, 101 F. Supp. 2d 727, 736 (S.D. Ind. 2000) (granting remand of employer plan sponsor's breach of contract and negligence claims alleging TPA violated administrative services agreement when processing health claims).

Moreover, if TPAs hired to perform ministerial services for employer-sponsored self-funded health plans deviate from the terms of their contracts and unilaterally exercise authority or control over plan administration or plan funds or other assets, they may unwittingly become ERISA fiduciaries by virtue of these activities and subject themselves to ERISA fiduciary accountability and liability, something they aim to avoid. *See, e.g., King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 745-46 (9th Cir. 2017) ("A plan's characterization of a claim administrator's duties as 'ministerial' is not determinative: [a court] look[s] past the plan's characterization to determine what duties the administrator actually performs."); *IT Corp.,* 107 F.3d at 1420 (reversing dismissal of claims against health plan administrator on the basis that its "discretionary authority and control may exceed what could properly be characterized as 'purely ministerial' activities"). This Court has made clear that TPAs that "step outside the scope of rendering administrative services" and exercise discretionary authority or control

over a plan face exposure to ERISA liability. *CSA 401(k) Plan v. Pension Professionals, Inc.,* 195 F.3d 1135, 1138-39 (9th Cir. 1999).

The district court's Order ignores the distinct roles, authorities, and responsibilities of employer plan sponsors and TPAs that Congress intended, and incorrectly assumes that TPAs can simply ignore plan terms without consequence. As discussed below, the district court did not demonstrate any awareness or attempt to address the profound and adverse legal and practical consequences of its decisions.

## II. THE DISTRICT COURT'S ORDERS SIGNIFICANTLY DISRUPT EMPLOYER PLAN SPONSORS' AND THE TPA INDUSTRY'S ABILITY TO ADMINISTER SELF-FUNDED PLANS

In the Order, the district court held that Blue Cross Blue Shield of Illinois ("BCBSIL"), as a TPA, is a covered entity under Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and discriminated against Appellees by denying them certain health care "services" under their "insurance policies."[5] ER-27–28, ER-46. The district court further held BCBSIL was in a legal position of determining how to deal with the conflict between Section 1557, prohibiting discrimination, and ERISA's command at 29

---

[5] In fact, according to the Order, Appellees' plan was a self-funded plan, not an insured plan funded through insurance policies, and what was denied was benefit coverage for certain services that were subject to a plan exclusion, not the services themselves. ER-27–28, ER-46.

- 11 -

U.S.C. § 1104(a)(1)(D) to administer plans according to their terms. *See* ER-46.

However, the district court did not articulate how BCBSIL was to accomplish that

conflict resolution. Apparently, because ERISA "is subservient to Section 1557,"

BCBSIL should have simply disregarded ERISA and complied with Section 1557.[6]

*Id.*

   Following the Order, the district court granted class-wide relief to Appellees,

including an injunction prohibiting BCBSIL from applying the subject plan

exclusion in the future. Order on Pls.' Mot. for Classwide Relief and for Nominal

Damages (Dec. 19, 2023) (ER-5–26) ("Remedies Order"). The district court also

certified the class to include all individuals who have been, are, or will be

participants or beneficiaries in an ERISA self-funded group health plan that

contain the subject exclusion, rendering the injunction nationwide in its reach. ER-

6–7. The Order, the Remedies Order, and the nationwide injunction arising from

them, if left to stand, will significantly disrupt how self-funded ERISA group

---

[6] *Amici* do not address the district court's holding that ERISA "is subservient to Section 1557," but note that unlike many other provisions of the ACA and of the Health Information Portability and Accountability Act ("HIPPA") that Congress expressly incorporated into ERISA, Section 1557 was not one of them. *See, e.g.,* 29 U.S.C. § 1185d (incorporating into ERISA the provisions of part A of title XXVII of the Public Health Service Act, 42 U.S.C. §§ 300gg *et seq.*, as amended by the ACA); 29 U.S.C. § 1182 ("Prohibiting discrimination against individual participants and beneficiaries based on health status," added to ERISA in 1996 as part of HIPAA). Further, ERISA has its own anti-discrimination provision, Section 510, 29 U.S.C. § 1140 ("Interference with protected rights"). Congress chose not to amend any of these ERISA provisions when enacting Section 1557.

health plans and their contracted TPAs are able to administer those plans for

participants and beneficiaries nationwide.

### A. The District Court's Orders Create Business Disruptions and Litigation Risks That Will Interfere with Employers' Provision of Benefits Suitable for Their Workforces

In holding that BCBSIL was under a legal obligation to disregard ERISA

and somehow comply with Section 1557, the district court clearly erred by failing

to appreciate the important division of roles and responsibilities that exist under the

law and in the employee benefits industry between employer plan sponsors who

establish and design employer-sponsored self-funded health plans and the plan

administrators and TPAs who administer them. The Order and Remedies Order do

not recognize or account for the fact that TPAs to self-funded plans have no legal

authority or practical ability to rewrite or disregard plan exclusions or other plan

provisions adopted by employer plan sponsors. Neither do the orders account for

the fact that TPAs are unable to ignore the terms of their TPA contracts, even if

one were to assume ERISA "is subservient to Section 1557."

### 1. The district court's orders create conflicting legal obligations on TPAs and new liability exposure

If, as the district court's Order and Remedies Order would compel, TPAs

disregard plan terms in violation of ERISA and their TPA contracts, their business

relationships with employer plan sponsors will be significantly impacted.

Employer plan sponsors contract with TPAs for the explicit purpose of having their

- 13 -

self-funded plans administered as the employers designed them in order to meet the needs of their workforces and within their own established cost containment parameters. If, instead, TPAs are required to ignore the terms of the self-funded plans they were contracted to administer, then they will face the irreconcilable problem of continuing to comply with both ERISA and any applicable and non-preempted state laws.

Administering plans to cover excluded benefits would expose fiduciary TPAs to ERISA liability to plan fiduciaries, participants, beneficiaries, and the Secretary of Labor for failing to adhere to plan terms. Significantly, ERISA fiduciaries are responsible for ensuring not only that a plan is administered in accordance with ERISA and plan terms, but also that plan assets are not spent on items other than benefits covered under the plan and reasonable plan administrative expenses. *See* 29 U.S.C. § 1104(a)(1)(A). Moreover, ERISA fiduciaries face potential liability arising from the fiduciary breaches of their co-fiduciaries who deviate from these mandates. *See* 29 U.S.C. § 1105(a). Plan fiduciaries who are not TPAs would, therefore, be highly motivated to challenge their plans' fiduciary TPAs who violate ERISA by approving and paying excluded benefits contrary to plan terms. The Secretary of Labor also has a strong interest in seeing that plans are administered in accordance with ERISA's fiduciary duties and has enforcement authority against all fiduciaries who breach those duties. Therefore, TPAs' ERISA

- 14 -

liability exposure resulting from the decisions below that compel them to violate ERISA is significant.[7]

TPAs may also be accountable to employer plan sponsors and plan fiduciaries under state law for negligence and breach of their ASO agreements, which universally require compliance with ERISA and plan terms. Failing to administer a plan as written and in accordance with an ASO agreement, including not adhering to plan exclusions and other coverage terms as the decisions below require, exposes a TPA to liability for state common law claims. The district court's orders do not address how TPAs are to navigate these conflicts, which put

---

[7] The ERISA liability exposure created by the district court is not limited to TPAs and ERISA co-fiduciaries. Persons who appoint fiduciary plan service providers (such as TPAs) have a duty under ERISA to monitor the latter's activities to ensure compliance with ERISA, contracts, and plan terms. *See Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) (citing *Batchelor v. Oak Hill Med. Group*, 870 F.2d 1446, 1448-49 (9th Cir. 1989); *Coppel v. SeaWorld Parks & Ent., Inc.*, No. 21-cv-1430, 2023 WL 2942462, at *9 (S.D. Cal. Mar. 22, 2023) (finding timely claim that defendants breached their continuing duty to monitor covered service providers); *id.* at *10 ("[i]mplicit within the duty to select and retain fiduciaries is a duty to monitor their performance") (internal quotation marks and citation omitted)); *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 923 (D. Haw. 2019). The Order and Remedies Order compel BCBSIL (and other TPAs who will abide by it if left to stand or risk similar litigation) to disregard plan terms, which will compel persons under a duty to monitor, which can include employer plan sponsors, to take action against non-compliant TPAs. Any failure to do so will expose those with a duty to monitor to liability for failing prudently to carry out their fiduciary monitoring obligations.

their business relationships with plans and employer plan sponsors at risk and makes it impossible for them to carry out their plan administration obligations.

Further, TPAs who are not ERISA fiduciaries by design risk becoming ERISA functional fiduciaries by deviating from plan coverage exclusions as the district court's injunction mandates, exposing them to ERISA liability for which they did not bargain when entering their ASO agreements and setting their fees. Even if not identified as an ERISA fiduciary in plan documents or contracts, one may become an ERISA fiduciary by virtue of exercising discretionary authority or control over plan administration or management or by exercising authority or control over plan assets. *See* 29 U.S.C. § 1002(16)(A), (21)(A); *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir. 2021) (citing *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653-54 (9th Cir. 2019)). Some might attempt to argue that a TPA's payment of benefit claims for healthcare services not covered under a plan in certain scenarios evidences an exercise of authority and control over plan administration and plan assets sufficient to put the TPA at risk of being identified as a fiduciary under ERISA. As a result, even TPAs who do not contract to serve in fiduciary roles could face new liability exposure under the fiduciary provisions of ERISA if the district court's decisions and injunction are left to stand.

- 16 -

TPAs cannot comply with both the district court's decisions compelling them to disregard plan terms and their duties and obligations under ERISA and state law. Those decisions place TPAs in the untenable position of having to violate one set of laws to comply with another. This conflict and the liability exposure TPAs will face will significantly disrupt their dealings with employer plan sponsors and their administration of employer-sponsored self-funded health plans.

> 2.      *The district court's orders will raise costs for plans, participants, beneficiaries, employers, and TPAs*

TPAs faced with new liability risks will encounter the need to raise their fees to account for this additional cost of doing business as ERISA self-funded plan service providers. Increased costs force employer plan sponsors to limit or eliminate benefits and shift plan expenses to participants and beneficiaries in the form of higher contribution rates, deductibles, and cost-sharing.

Plan and other costs will also be negatively impacted by the district court's failing to account for who will pay for the healthcare services at issue, acknowledging instead that "[w]ho pays such claims is not resolved in this litigation." Order Granting Defs.' Mot. to Stay Pending Appeal and Setting Other Deadlines (Jan. 22, 2024) (ER-50–58). TPAs administering self-funded plans are not responsible for funding benefits. Moreover, in cases like the instant one, where Appellees have not sued the employer plan sponsor, the employer plan sponsor

- 17 -

will not be liable for funding the services either, as there will be no finding of liability against the employer plan sponsor under Section 1557, ERISA, or otherwise. This confusion and uncertainty about who pays will only serve to foster litigation and compound the costs associated with sponsoring a self-funded health plan.[8]

The district court gave no consideration the foregoing sequelae of its decisions. The court's disregard of the practical and legal issues ensuing from its decisions creates havoc for plans, employers, TPAs, participants, and beneficiaries, exposing all involved to litigation, increased costs, and uncertainty. The insertion of a wedge between the decisions of employer plan sponsors and the ability of TPAs to execute those decisions created by the district court will disrupt plan administration and the delivery and payment of health care services. If left to stand,

---

[8] In the event employers are held responsible for paying the healthcare services at issue, they may unintentionally create new ERISA-covered benefit plans, raising a host of unintended compliance and reporting obligations. *See* 29 U.S.C. § 1191b(a)(1); 29 U.S.C. § 1002(1) (defining welfare benefit plan to include as any plan, fund, or program established or maintained by an employer to provide medical, surgical, or hospital care to participants and beneficiaries). In determining whether a plan, fund, or program has been established, a court looks to the surrounding circumstances for whether a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. *See Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982). Thus, if required to make payments to employees from employer assets for the healthcare services, employers may create new ERISA plans that will immediately be out of compliance with the myriad of legal requirements on health plans under the Internal Revenue Code, the Public Health Service Act, the ACA, and ERISA.

the district court's Order and Remedies Order will require widespread alteration of employer plan sponsor and TPA business practices to account for increased costs and liability exposure and will discourage employers from offering voluntary group health plans to their employees.

**B.    The District Court's Orders Disrupt the Well-Settled Legal Landscape Under Which Employers and TPAs Administer Self-Funded Plans**

The Order and Remedies Order impose new legal responsibilities on TPAs to disregard plan terms and new liability exposure that are contrary to the legal authorities and interpretations under which the TPA industry has developed and operated for decades. Further, the many legal and practical complications arising from the decisions below demonstrate how the district court erred when failing to give deference to the reasonable and consistent interpretation of Section 1557 by the U.S. Department of Health and Human Services ("HHS"). *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984); *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016) ("'If a statute is ambiguous, and if the implementing agency's construction of the statute is reasonable, *Chevron* requires a federal court to accept the agency's construction [of the statute], even if the agency's reading differs from what the court believes is the best statutory interpretation.'") (citation omitted).

Since the ACA was enacted, HHS has issued a regulatory interpretation of Section 1557 three times, with the most recent 2022 proposed rulemaking still pending. In the 2016 and 2020 final rules and the 2022 proposed rule, HHS has consistently interpreted the ACA's statutory scheme to mean that a TPA who is not responsible for plan design cannot be liable under Section 1557 for purported discrimination by a plan. *See Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) (the "2016 Rule"); *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule"); *Nondiscrimination in Health Programs and Activities*, 87 Fed. Reg. 47,824 (Aug. 4, 2022) (the "2022 Proposed Rule").

In the preamble to the 2022 Proposed Rule, HHS states:

> In the 2016 Rule, we clarified that third party administrators were generally not responsible for benefit designs of the self-insured group health plans they administer and that enforcing Section 1557 against a third party administrator for discriminatory benefit design could result in holding a third party administrator liable for plan design over which it had no control.

87 Fed. Reg. at 47,876. The agency further states that it is only in circumstances where TPAs "are responsible for the development of the group health plan document or other policy documents that are ultimately adopted by the self-insured plan" that they could be held liable for a discriminatory design feature under Section 1557. *Id.* "[W]here the alleged discrimination relates to the benefit

design of a self-insured group health plan that did not originate with the third party administrator," HHS will not exercise its enforcement authority against the TPA. *Id.* at 47,877; *accord* 81 Fed. Reg. at 31,432.[9]

The district court should have deferred to the agency's reasoned interpretation of Section 1557 as applied to TPAs. That interpretation appropriately recognizes the important distinctions between plan design and administration and the adverse consequences that would flow from holding TPAs that do not control plan terms liable under Section 1557. The district court's error in failing to defer to HHS's interpretation of Section 1557 is especially egregious given its finding that issues of fact exist as to whether the plan design at issue originated with BCBSIL. ER-46.

Moreover, the district court's reliance on *Tovar v. Essentia Health*, 857 F.3d 771, 778 (8th Cir. 2017) to reach its holding that BCBSIL is liable under Section 1557 based solely on its status as a TPA to a self-funded plan is misplaced. In *Tovar*, the Eighth Circuit reviewed the dismissal of a complaint alleging violations of Section 1557 against an employer, Essentia Health (Essentia), and the TPA of Essentia's health plan. According to the decision,

---

[9] The 2020 Rule did not amend this interpretation of Section 1557 as applied to TPAs and HHS stated in the preamble to the final rule that it "will accomplish the Department's goal of reducing regulatory burden." 85 Fed. Reg. at 37,173.

"[t]he plan corresponded to an insurance policy offered to employers by HealthPartners, Inc. and was administered either by HealthPartners, Inc. or by its subsidiary HealthPartners Administrators, Inc. (HPAI)." *Id.* at 773; *id.* at 778 ("the plan 'corresponds to an insurance policy offered to employers by HealthPartners and known by Policy No. G008HPC-03'") (quoting *Tovar* complaint). Drawing all inferences in favor of the plaintiff in its *de novo* review of a motion to dismiss, the Eighth Circuit found that the allegations in the complaint suggested that the plan terms at issue "originated with HealthPartners, Inc. and/or HPAI," not the employer plan sponsor. *Id.* at 778. On this basis, the *Tovar* court held that the TPA could be liable under Section 1557 and declined dismissal. According to the court, "[i]f HealthPartners, Inc. or HPAI provided Essentia with a discriminatory plan document, Tovar's alleged injuries could well be traceable to and redressable through damages by those defendants notwithstanding the fact that Essentia subsequently adopted the plan and maintained control over its terms." *Id.*

The district court below erred in applying the Eighth Circuit's non-binding holding related to a motion to dismiss to decide cross-motions for summary judgment on a factual record that failed to establish that BCBSIL was responsible for the plan terms at issue. This error, and its significant legal and practical implications, further warrant reversal of the Order and Remedies Order. The

- 22 -

district court should not be allowed to disrupt the law governing TPAs and self-funded plans based on one inapposite and non-precedential decision.

## III. THE DISTRICT COURT'S DECISIONS CREATE UNCERTAINTY AND ADVERSE TAX CONSEQUENCES FOR PLAN PARTICIPANTS AND BENEFICIARIES AND ARE CONTRARY TO THE PUBLIC INTEREST

The adverse impact the Order and Remedies Order will have on participants and beneficiaries of self-funded group health plans and on the public is significant but was not considered by the district court. If TPAs are required to override an employer's otherwise careful decision on how it designs its own self-funded plan, then it will create uncertainty around the scope and availability of plan coverage. For example, plan participants and beneficiaries will not be able to rely on plan documents to ascertain what coverage they have or make informed decisions about accessing care they may seek. This scenario is especially problematic when the funding for their healthcare services is unclear and undecided.

For example, if a TPA were to follow the district court's Order and Remedies Order and authorize coverage for an otherwise excluded healthcare product or service, but both the employer plan sponsor and TPA are uncertain about which entity is responsible for payment of the product or services at issue, the participant or beneficiary may be left financially responsible for services they were led to believe were covered by their plan. What would otherwise remain a clearly delineated set of parameters regarding the scope of coverage and attendant

- 23 -

payment responsibilities between an employer plan sponsor and TPA would instead become rife with confusion about where administrative and payment obligations rest. This will lead to costly and time-consuming delays and disputes and significantly strain relationships between and among employer plan sponsors, their TPAs, and other service providers tasked with administering or providing services to self-funded plans or the participants and beneficiaries of those plans.

Similar confusion might also impact claim administration and payment processes, potentially creating delays and uncertainty for all involved. These processes are normally governed by detailed regulatory procedures and strict deadlines, but they cannot function properly amidst the type of unsettled legal responsibilities and confused administrative framework the decisions below entail. *See generally* 29 C.F.R. § 2560.503-1 (Claims procedure). These outcomes will lead to more litigation and uncertainty, delays in the handling of claims, and increased costs on plans, employer plan sponsors, and TPAs, all to the ultimate detriment to participants and beneficiaries.

Moreover, ERISA Section 503, 29 U.S.C. § 1133, requires every employee benefit plan to establish and maintain a reasonable procedure for claims and review of benefit claims. The ERISA claims regulation sets forth minimum requirements for satisfaction of Section 503. *See* 29 C.F.R. § 2560.503-1(a). Subsection 2560.503-1(b)(5) provides, "[t]he claims procedures contain administrative

- 24 -

processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents." *Id.* § 2560.503-1(b)(5). Thus, a plan that is required to pay benefits not provided for in a plan document cannot satisfy Section 503.

In addition, participants and beneficiaries may face adverse tax consequences if employer plan sponsors or TPAs are liable for paying for healthcare services to employees outside of ERISA-covered group health plans. Benefits payable to an employee through an employer-sponsored benefit plan to reimburse the employee for expenses incurred for medical care are excluded from gross income. I.R.C. § 105(b). The Internal Revenue Service maintains that this exclusion does not apply to medical reimbursements not provided for in a plan. *See, e.g.,* Rev. Rul. 69-141, 1969-1 C.B. 48 (holding distributions made from a profit-sharing trust to pay for medical expenses did not qualify for Section 105(b) exclusion because they were not from an "accident or health plan").

The district court granted remedies that include prospective and retrospective injunctive relief in the form of "reprocessing" – "to remedy Blue Cross's discrimination." ER-13, ER-21 ("Reprocessing (a court order to 'perform the contract' and administer plans in a non-discriminatory way) is an available form of relief under the ACA."). The character of the payments to participants and beneficiaries resulting from these injunctions, both retrospectively and

- 25 -

prospectively, was not clearly addressed by the district court. Because the district court construes such payments not as ERISA plan benefit payments but as a form of equitable relief available under the ACA's discrimination provision, these payments may be deemed taxable income to the employee irrespective of who may be responsible for paying them. *See, e.g., Green v. Comm'r*, 507 F.3d 857, 867 (5th Cir. 2007) (the tax treatment of proceeds from a settlement or court order is determined by focusing on the origin and characteristics of the claims at issue); *Duffy v. United States*, 120 Fed. Cl. 55, 64-65 (2015), *aff'd*, 626 F. App'x 792 (Fed. Cir. 2016) (failure to show the payment was allocable to tort claims or tort-like damages for personal, physical injuries or sickness results in the entire amount being presumed non-excludable).

In addition, it was an error for the district court to grant injunctive relief in this matter without fully considering the public interest and the many harmful consequences to the public that will result from its decisions. The court did not consider the adverse impacts on participants and beneficiaries of employer-sponsored self-funded health plans, employer plan sponsors, or the TPA industry; the increased costs and litigation; the disruption to employer-TPA business relationships; the delays and confusion surrounding claims processing and payments; nor, perhaps most significantly, the interference with employer plan sponsors' ability to design employee benefit plans in a manner suitable for their

workforces and business needs. Encouraging employers to establish and maintain employer sponsored health plans, in a legal environment that discourages unnecessary litigation and increased costs, is very much in the public interest and should have been factored into the district court's analysis of whether the sweeping injunctive relief ordered was appropriate. *See generally* 29 U.S.C. § 1001(a) (stating Congress's finding and policy when enacting ERISA that the continued well-being and security of millions of employees and their dependents are directly affected by employee benefit plans; that those plans are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; and that they have become an important factor in commerce because of the interstate character of their activities). Indeed, one "aim of ERISA was to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 328 (1st Cir. 2023) (cleaned up).

## <u>CONCLUSION</u>

For the reasons set forth herein, the district court's Order and Remedies Order should be reversed.

April 19, 2024

Respectfully submitted,

  */s/ Joanne Roskey*
Joanne Roskey
   *Counsel of Record*
Anthony F. Shelley
Miller & Chevalier Chartered
900 Sixteenth Street NW
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email: jroskey@milchev.com
Email: ashelley@milchev.com

*Counsel for Amici Curiae The ERISA Industry Committee and America's Health Insurance Plans, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-4331

I am the attorney or self-represented party.

**This brief contains** <u>6,558</u> **words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *ized /s/ Joanne Roskey*      **Date** <u>April 19, 2024</u>

*(use "*s/[typed name]*" to sign electronically-filed documents)*

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 19, 2024, I electronically filed the foregoing

Brief of *Amici Curiae* The ERISA Industry Committee and America's Health

Insurance Plans, Inc. in Support of Appellant and Supporting Reversal with the

Clerk of Court using the CM/ECF System, which will send notice of such filing to

the following registered CM/ECF users:

Ms. Karen Loewy
LAMBDA Legal Defense & Education Fund, Inc.
111 K Street NE, 7th Floor
Washington, DC 20002-8105
Email: kloewy@lambdalegal.org

Jennifer C. Pizer
LAMBDA Legal Defense
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
Email: jpizer@lambdalegal.org

Omar Gonzalez-Pagan
LAMBDA Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
Email: ogonzalez-pagan@lambdalegal.org

Eleanor Hamburger
Sirianni Youtz Spoonemore Hamburger PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Email: ehamburger@sylaw.com

*Counsel for Appellees*

Gwendolyn C. Payton
John R. Neeleman
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Email:  gpayton@ktslaw.com
Email: jneeleman@ktslaw.com

Stephanie Bedard
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA 30309
Email:  sbedard@ktslaw.com

Adam Howard Charnes
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Email:  acharnes@ktslaw.com

Robert N. Hochman
Sidley Austin LLP
1 South Dearborn Street
Chicago, IL 60603
Email:  rhochman@sidley.com

Jeremy Rozansky
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Email:  jrozansky@sidley.com

*Counsel for Appellant*

  */s/ Joanne Roskey*
Joanne Roskey