No. 23-4331

# In the United States Court of Appeals for the Ninth Circuit

C.P., by and through his parents, PATRICIA PRITCHARD and NOLLE PRITCHARD; S.L., by and through her parents, S.R. and R.L.; EMMETT JONES, each individually and on behalf of similarly situated others; and PATRICIA PRITCHARD, individually,

*Plaintiffs-Appellees*,

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Western District of Washington, No. 3:20-cv-06145-RJB, Hon. Robert J. Bryan

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
111 K Street NE, 7th Floor
Washington, DC 20002
(202) 804-6245
kloewy@lambdalegal.org

Eleanor Hamburger
SIRIANNI YOUTZ SPOONEMOORE
HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
(206) 223-0303
ehamburger@sylaw.com

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

*Counsel for Plaintiffs-Appellees and the Class*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................I

TABLE OF AUTHORITIES ........................................................III

INTRODUCTION .........................................................................1

JURISDICTIONAL STATEMENT ...............................................3

COUNTERSTATEMENT OF THE ISSUES.................................3

STATUTORY AND REGULATORY AUTHORITIES .................4

STATEMENT OF THE CASE........................................................4

    I.   Treatment for Gender Dysphoria .......................................5

    II.  Plaintiffs Are Denied Coverage for their Medically Necessary Gender-Affirming Health Care. ................................9

    III. BCBSIL's Design, Administration, and Enforcement of the Exclusions as Third-Party Administrator.................................12

    IV. The District Court Certifies the Plaintiff Class, Holds that BCBSIL's Administration and Enforcement of the Exclusions Violates Section 1557, and Orders Class-wide Declaratory and Injunctive Relief. ...........................................14

SUMMARY OF ARGUMENT .....................................................18

STANDARD OF REVIEW ..........................................................19

ARGUMENT .................................................................................20

    I.   Coverage Exclusions of Gender-Affirming Health Care Are Discrimination Based on Sex in Violation of the ACA. ..........20

    II.  As a Covered Entity Under Section 1557, BCBSIL Engaged in Prohibited Discrimination When It Administered the Exclusions............................................................................27

        A.   Health Coverage and Health Insurance Are Health Programs or Activities. .......................................................30

B.   As a TPA, BCBSIL Is Liable for its Administration, Enforcement, and Role in the Design of the Exclusions. .................37

III.  ERISA Does Not Alter or Supersede BCBSIL's Independent Duty to Not Discriminate Under Section 1557. ........................42

IV.  BCBSIL Cannot Assert a Defense Under RFRA. ...................50

CONCLUSION ........................................................................................59

STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6 ......................................................61

CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................................62

# TABLE OF AUTHORITIES

## Cases

*A.C.L.U. of Nevada v. City of Las Vegas,*
466 F.3d 784 (9th Cir. 2006) ........................................................... 19

*ACA Connects v. Bonta,*
24 F.4th 1233 (9th Cir. 2022) ......................................................... 29

*Aloisi v. Lockheed Martin Energy Sys.,*
321 F.3d 551 (6th Cir. 2003) .......................................................... 44

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,*
821 F.3d 352 (2d Cir. 2016) ........................................................... 46

*AMA Multimedia, LLC v. Wanat,*
970 F.3d 1201 (9th Cir. 2020) ........................................................ 28

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ....................................................... 52

*Billard v. Charlotte Cath. High Sch.,*
101 F.4th 316 (4th Cir. 2024) .................................................... 54, 55

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ....................................................... 21, 22, 55, 56

*Boyden v. Conlin,*
341 F.Supp.3d 979 (W.D. Wis. 2018) ........................................ 21, 38

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993) ........................................................................ 25

*Briscoe v. Health Care Serv. Corp.,*
281 F.Supp.3d 725 (N.D. Ill. 2017) ................................................ 29

*Burwell v. Hobby Lobby Stores, Inc.,*
573 S. Ct. 682 (2014) ...................................................................... 59

*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
270 F.3d 863 (9th Cir. 2001) .......................................................... 52

*Castaneda v. Partida*,
430 U.S. 482 (1977).......................................................25

*Cedeno v. Sasson*,
100 F.4th 386 (2d Cir. 2024) .......................................44

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)................................................29, 39

*Christian Legal Soc'y Chapter of the Univ. of California,
Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010).......................................................26

*Civil Rights Cases*,
109 U.S. 3 (1883)...........................................................53

*Consol. Rail Corp. v. Darrone*,
465 U.S. 624 (1984).......................................................32

*Corrigan v. Haaland*,
12 F.4th 901 (9th Cir. 2021) .......................................29

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
142 S. Ct. 1562 (2022)..................................................27

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019) .......................................25

*Defs. of Wildlife v. Browner*,
191 F.3d 1159 (9th Cir. 1999) .....................................29

*Dekker v. Weida*,
679 F.Supp.3d 1271 (N.D. Fla. 2023) ...................21, 24

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
926 F.3d 235 (6th Cir. 2019) .......................................35

*Doe v. CVS Pharm., Inc.*,
982 F.3d 1204 (9th Cir. 2020) .....................................38

*Doe v. Mercy Catholic Med. Ctr.*,
850 F.3d 545 (3d Cir. 2017) .........................................31

*Doe v. Salvation Army in U.S.*,
685 F.3d 564 (6th Cir. 2012) ....................................................................34, 35

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ...............................................................................22

*Doe v. United Behav. Health*,
523 F.Supp.3d 1119 (N.D. Cal. 2021)..................................................42, 44, 49

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) ..............................................................................46

*Dorer v. Quest Diagnostics Inc.*,
20 F.Supp.2d 898 (D. Md. 1998)........................................................................31

*E.S. by & through R.S. v. Regence BlueShield*,
2024 WL 1173805 (W.D. Wash. Mar. 19, 2024),
*reconsideration denied*, 2024 WL 2250249 (W.D. Wash.
May 17, 2024)......................................................................................................26

*East v. Blue Cross and Blue Shield of La.*,
2014 WL 8332136 (M.D. La. Feb. 24, 2014)......................................................31

*EEOC v. Cath. Univ. of Am.*,
83 F.3d 455 (D.C. Cir. 1996)..............................................................................56

*EEOC v. Pac. Press Publ'g Ass'n*,
676 F.2d 1272 (9th Cir. 1982), *abrogation on other grounds
recognized by Am. Friends Serv. Comm. Corp. v.
Thornburgh*, 951 F.2d 957 (9th Cir. 1991).........................................................59

*Employment Division v. Smith*,
494 U.S. 872 (1990)............................................................................................52

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris
Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v.
Clayton Cnty.*, 590 U.S. 644 (2020) ....................................................56, 57, 59

*Fabian v. Hosp. of Cent. Conn.*,
172 F.Supp.3d 509 (D. Conn. 2016)...................................................................23

*Fain v. Crouch,*
    545 F.Supp.3d 338 (S.D. W. Va. 2021) ................................... 16, 25, 32, 34, 37

*Fernandez v. Wynn Oil Co.,*
    653 F.2d 1273 (9th Cir. 1981) ........................................................... 57

*Flack v. Wisconsin Dep't of Health* Servs.,
    395 F.Supp.3d 1001 (W.D. Wis. 2019) ..................................................... 21, 23

*Fletcher v. Alaska,*
    443 F.Supp.3d 1024 (D. Alaska 2020) ......................................................... 21

*Folkens v. Wyland Worldwide, LLC,*
    882 F.3d 768 (9th Cir. 2018) .......................................................... 19

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................ 33

*Fox v. Pittsburg State Univ.,*
    257 F.Supp.3d 1112 (D. Kan. 2017) ................................................... 35

*Franks v. Bowman Transp. Co.,*
    424 U.S. 747 (1976) ................................................................... 59

*Fresno Motors, LLC v. Mercedes Benz USA, LLC,*
    771 F.3d 1119 (9th Cir. 2014) .......................................................... 19

*Geduldig v. Aiello,*
    417 U.S. 484 (1974) ................................................................. 26

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill,*
    617 F.3d 402 (6th Cir. 2010) ........................................................ 55

*Gen. Elec. Co. v. Gilbert,*
    429 U.S. 125 (1976) ................................................................... 26

*Grabowski v. Ariz. Bd. of Regents,*
    69 F.4th 1110 (9th Cir. 2023) ........................................................ 22

*Grove City Coll. v. Bell,*
    465 U.S. 555 (1984) ................................................................ 35

*Guam v. Guerrero*,
290 F.3d 1210 (9th Cir. 2002) ................................................................. 56

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) ...................................................................... 55

*Harrison v. Envision Mgmt. Holding, Inc.*,
59 F.4th 1090 (10th Cir. 2023) ............................................................... 44

*Hartstein v. Hyatt Corp.*,
82 F.4th 825 (9th Cir. 2023) .................................................................... 19

*Henry v. Wilmington Tr., NA. Brian Sass*,
72 F.4th 499 (3d Cir. 2023) ..................................................................... 44

*Holt v. Hobbs*,
574 U.S. 352 (2015)................................................................................. 52

*In re Young*,
141 F.3d 854 (8th Cir. 1998) ................................................................... 56

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) ..................................... 21, 22, 23, 24, 25, 26, 27

*Karnoski v. Trump*,
2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ................................. 5, 48

*King v. Burwell*,
759 F.3d 358 (4th Cir. 2014), *aff'd*, 576 U.S. 473 (2015).............................. 29

*Kulwicki v. Aetna Life Ins. Co.*,
2024 WL 1069854 (D. Conn. Mar. 12, 2024) ....................................... 38

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .................................................................... 22

*Lange v. Houston Cnty.*,
101 F.4th 793 (11th Cir. 2024) .......................................................... 21, 25

*Lawrence v. Texas*,
539 U.S. 558 (2003)................................................................................. 26

*Listecki v. Off. Comm. of Unsecured Creditors,*
    780 F.3d 731 (7th Cir. 2015) ............................................................. 51, 52, 55

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ...................................................................................... 30

*Meagher v. Int'l Asso. of Machinists & Aerospace Workers*
    *Pension Plan,*
    856 F.2d 1418 (9th Cir. 1988) ...................................................................... 43

*N. Coast Women's Care Med. Grp., Inc. v. Super. Ct.,*
    189 P.3d 959 (Cal. 2008) .............................................................................. 59

*N. Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982) ...................................................................................... 32

*Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.,*
    421 F.3d 872 (9th Cir. 2005) ........................................................................ 40

*Nebraska v. U.S. Dep't of Health and Human Servs.,*
    877 F.Supp.2d 777 (D. Neb. 2012) .............................................................. 58

*Pac. Shores Props., LLC v. City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ...................................................................... 26

*Prescott v. Rady Children's Hospital-San Diego,*
    265 F.Supp.3d 1090 (S.D. Cal. 2017) .......................................................... 40

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ...................................................................................... 25

*Robertson v. U.S. ex rel. Watson,*
    560 U.S. 272 (2010) ...................................................................................... 52

*Rweyemamu v. Cote,*
    520 F.3d 198 (2d Cir. 2008) ......................................................................... 55

*Sandoz Inc. v. Amgen Inc.,*
    582 U.S. 1 (2017) ......................................................................................... 52

*Schmitt v. Kaiser Found. Health Plan of Wash.,*
    965 F.3d 945 (9th Cir. 2020) ......................................... 1, 20, 35, 36, 49, 50

*Schroer v. Billington*,
577 F.Supp.2d 293 (D.D.C. 2008) .................................................... 23

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) ................................................................. 43, 44

*Skidmore v. Swift & Co.*,
323 U.S. 134 1944) .................................................................... 39

*Stamford Bd. of Educ. v. Stamford Educ. Ass'n*,
697 F.2d 70 (2d Cir. 1982) ........................................................... 48

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ....................................... 4, 51, 53, 54

*T.S. v. Heart of Cardon LLC*,
43 F.4th 737 (7th Cir. 2022) ...................................... 2, 35, 37, 39

*Toomey v. Arizona*,
2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ................................ 25

*Tovar v. Essentia Health*,
342 F.Supp.3d 947 (D. Minn. 2018) ...................................... 38, 40

*Tovar v. Essentia Health*,
857 F.3d 771 (8th Cir. 2017) .......................................... 36, 37, 38

*United States v. Bauer*,
84 F.3d 1549 (9th Cir. 1996) ......................................................... 56

*United States v. Gonzales*,
520 U.S. 1 (1997) ...................................................................... 31

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) .................................................................... 29

*United States v. Tyson*,
242 F.Supp.2d 469 (E.D. Mich. 2003) ......................................... 44

*Vitale v. Latrobe Area Hosp.*,
420 F.3d 278 (3d Cir. 2005) ......................................................... 43

*Walker v. Azar*,
    2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020) ................................................ 28

*Warth v. Seldin*,
    422 U.S. 490 (1975).......................................................................... 58

*Werft v. Desert Sw. Ann. Conf. of United Methodist Church*,
    377 F.3d 1099 (9th Cir. 2004) .................................................... 59

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum.
    Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020)...................................................... 28

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ...................................................... 23

*Wit v. United Behav. Health*,
    79 F.4th 1068 (9th Cir. 2023) ...................................................... 17

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ...................................................... 54

*Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio*,
    34 F.Supp.2d 433 (W.D. Tex. 1998) ............................................ 31

## Statutes

28 U.S.C. § 2201(a) ............................................................................ 48

29 U.S.C. § 1104 ............................................................................ 45

29 U.S.C. § 1104(a)(1)(A) ............................................................ 46

29 U.S.C. § 1104(a)(1)(D) ............................................................ 42

29 U.S.C. § 1132(a)(3)...................................................................... 48

29 U.S.C. § 1144(d) ................................................................ 19, 43

29 U.S.C. § 1167(1) ...................................................................... 15

42 U.S.C. § 18051 .......................................................................... 32

42 U.S.C. § 18113 .......................................................................... 32

42 U.S.C. § 18116(a) ........................ 1, 19, 20, 27, 32, 35, 39

42 U.S.C. § 2000bb ............................................. 3, 53

42 U.S.C. § 2000bb-1(c) ............................ 52, 53, 57, 58

42 U.S.C. § 2000bb-2(1) ........................................ 53

42 U.S.C. § 300gg-1 ............................................. 33

42 U.S.C. § 300gg-2 ............................................. 33

42 U.S.C. § 300gg-3 ............................................. 33

42 U.S.C. § 300gg-4 ............................................. 33

## Regulations

45 C.F.R. § 84.3(h) .............................................. 32

45 C.F.R. § 92.207(b)(4) ........................................ 21

45 C.F.R. § 92.3(c) .............................................. 30

45 C.F.R. § 92.4 ................................................ 36

## Other Authorities

81 Fed. Reg. 31,379 ............................................ 18

85 Fed. Reg. 37,538 ............................................ 37

89 Fed. Reg. 37,538 ............................................ 36

89 Fed. Reg. 37,539 ............................................ 34

89 Fed. Reg. 37,541 ............................................ 40

89 Fed. Reg. 37,549 ............................................ 46

89 Fed. Reg. 37,625 ............................................ 40

89 Fed. Reg. 37,626 ............................................ 39

89 Fed. Reg. 37,627 ......................................... 40, 41

89 Fed. Reg. 37,666 ............................................................... 32

89 Fed. Reg. 37,694 ............................................................... 36

89 Fed. Reg. 37,701 ............................................................... 21

Civil Rights Restoration Act of 1987 ("CRRA"), Pub. L. No.
    100-259, 102 Stat. 28 (Mar. 22, 1988) ........................................ 34

Defs' Stay Mot., *BAGLY v. U.S. Dep't of Health and Human
    Servs.*, No. 20-cv-11297
    (D. Mass. filed Apr. 29, 2024) (ECF 151) ................................... 36

Health Care and Education Reconciliation Act of 2010, 156
    Cong. Rec. S. 1,821, 1,842 (daily ed. Mar. 23, 2010) ...................... 33

*Lawrence v. Off. Pers. Mgmt.*, Appeal No. 0120162065, at 9
    (E.E.O.C. May 30, 2024), https://tinyurl.com/LawrencevOPM ................. 21

Reply in Support of Defs' Stay Mot., *BAGLY v. U.S. Dep't of
    Health and Human Servs.*, No. 20-cv-11297
    (D. Mass. filed May 6, 2024) (ECF 157) .................................... 36

U.S. Dep't of Health and Human Servs., Nondisrimination in
    Health Programs and Activities,
    89 Fed. Reg. 37,522 (May 6, 2024) .......................................... 21

Valarie K. Blake, "An Opening for Civil Rights in Health
    Insurance After the Affordable Care Act,"
    36 B.C. J.L. & SOC. JUST. 235 (June 2016) ................................. 33

Webster's Third New Int'l Dictionary 97 (1976) ................................ 31

## INTRODUCTION

Congress took a momentous step to eliminate discrimination in health care when it enacted the Patient Protection and Affordable Care Act ("ACA"). Through Section 1557 of the ACA, Congress forbade "any health program or activity, any part of which is receiving federal financial assistance," from "subject[ing]" an individual to discrimination on the basis of race, sex, age, or disability. 42 U.S.C. § 18116(a). For the first time, federal law forbade discrimination in health coverage and health insurance, when those entities chose to accept federal financial assistance. The purpose of this historic reform was to protect people like Plaintiffs and other members of the Class. As this Court previously concluded, under the ACA, covered entities now have an "affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020).

Yet, notwithstanding its voluntary acceptance of federal funds and acknowledgement that discriminating based on sex in its own health insurance plans would violate Section 1557, Defendant Blue Cross Blue Shield of Illinois ("BCBSIL"), acting as a "third-party administrator" ("TPA"), designed, administered, and enforced exclusions of gender-affirming health care (the "Exclusions") in health plans for **hundreds** of employers, affecting thousands of enrollees. BCBSIL put its own commercial interests and the discriminatory

preferences of employer-customers before the health and wellbeing of Plaintiffs and the Class. By doing so, BCBSIL ignored its independent legal duty under Section 1557 to not discriminate in any of its operations.

As a health insurer that receives federal financial assistance, BCBSIL is a covered entity subject to Section 1557's nondiscrimination mandate in all of its operations. This includes its activities as a TPA. *See T.S. v. Heart of Cardon LLC*, 43 F.4th 737, 742-43 (7th Cir. 2022) (Section 1557 applies to "all operations" of a health program or activity, not just the operations for which it receives federal funding).

None of BCBSIL's defenses have merit. Categorical exclusions of gender-affirming health care are forms of unlawful sex discrimination, as precedent makes clear. There is no genuine question that BCBSIL is a covered entity subject to Section 1557. Health insurance and the administration of health coverage are "health programs or activities" under the ACA. After all, the fundamental purpose of the ACA was to regulate the provision of health insurance and health coverage so that all Americans may access the health care they need, without discrimination.

BCBSIL defends its actions by claiming the Employee Retirement Income Security Act of 1974 ("ERISA") and the religious beliefs of some its employer-customers permit it to administer the discriminatory Exclusions. But ERISA does not exempt BCBSIL from its legal duties under federal laws, including Section 1557.

And the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq.*, does not apply to litigation between private parties, particularly here, where BCBSIL, a non-religious entity, asserts no burden on its own religious beliefs (it has none).

This case thus poses a straightforward question: Is BCBSIL liable for discrimination based on sex when, acting as a TPA, it administers Exclusions of gender-affirming health care? The district court correctly answered yes. Because BCBSIL receives federal financial assistance such that it is a covered entity under Section 1557, BCBSIL cannot discriminate based on sex in any part of its operations, including its TPA activities.

The Court should affirm the district court's judgment.

## JURISDICTIONAL STATEMENT

Appellees agree with Appellant's jurisdictional statement.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the district court correctly held that the administration of categorical exclusions of gender-affirming health care constitute unlawful sex discrimination under Section 1557?

2.      Whether the district court correctly determined that BCBSIL, a health entity that receives federal financial assistance, is prohibited from engaging in sex discrimination in all of its operations, including its TPA activities?

3.     Whether the district court correctly held that ERISA does not exempt BCBSIL from its duty to comply with Section 1557?

4.     Whether the district court, consistent with *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 839 (9th Cir. 1999), properly held that BCBSIL has no RFRA defense to its liability under Section 1557?

## STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory and regulatory authorities appear in the Addendum to Appellant's brief and Exhibit A to Appellant's 28(j) letter.

## STATEMENT OF THE CASE

C.P., S.L., and Emmett Jones are transgender current or former enrollees in self-funded health plans administered by BCBSIL.  4-ER-895; 2-SER-223; 2-ER-249; 2-ER-246.  Each of them has been diagnosed with gender dysphoria.  5-ER-908; 5-ER-917–19; 2-ER-250; 2-ER-247.  Each was denied coverage for medically necessary gender-affirming medical care by BCBSIL through its administration of Exclusions of coverage for gender-affirming health care.  3-ER-402–04; 2-ER-250, 258, 264; 2-ER-247.  The Exclusions were not only administered by BCBSIL, but were also designed, in whole or in part, by BCBSIL.  8-ER-1717–19.

The denial of coverage for treatment for gender dysphoria (known as "gender-affirming health care") recommended by medical providers—has caused grave and continuing harms to Plaintiffs and Class members.  *See Karnoski v. Trump*, 2017

WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017) ("harms caused by the denial of timely health care" constitute irreparable harm).

## I.     Treatment for Gender Dysphoria

Gender identity is a person's core, internal sense of their sex.  3-ER-432; 3-ER-481; 3-ER-533.  Every person has a gender identity, and it does not always align with their sex assigned at birth.  3-ER-432; 3-ER-481.  People who have a gender identity that aligns with their sex assigned at birth are cisgender, while people who have a gender identity that does not align with their sex assigned at birth are transgender. 3-ER-432; 3-ER-481.  Being transgender is a well-recognized variation of human development.  3-ER-433; 3-ER-483.

Being transgender is not itself a disorder or condition to be cured.  3-ER-434; 3-ER-483.   However, the incongruence between a transgender person's gender identity and their sex assigned at birth can result in clinically significant distress or significant impairment in functioning. 3-ER-433–34; 3-ER-481–82; 3-ER-533.  The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria.  3-ER-433–34; 3-ER-481–82; 3-ER-533.  Gender dysphoria is a serious medical condition, the diagnosis of which is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition.  3-ER-433–34; 3-ER-481–82; 3-ER-533.

Gender dysphoria, if left untreated, may result in debilitating anxiety, severe depression, self-harm, and even suicidality. 3-ER-433–34, 436, 441; 3-ER-481–82; 3-ER-533.

Gender dysphoria is treatable. Since 1979, the World Professional Association for Transgender Health ("WPATH") has published clinical practice guidelines for the treatment of gender dysphoria ("WPATH Standards of Care"). 3-ER-436; 3-ER-482–83; 3-ER-534; *see also* 4-ER-610–870; 2-SER-41. The Endocrine Society has similarly published comprehensive practice guidelines, which are consistent with the WPATH Standards of Care. 3-ER-483; 3-ER-535; 2-SER-46–80. The goal of these generally accepted treatment protocols is to alleviate a patient's gender dysphoria by bringing their body into better alignment with their gender identity. 3-ER-445; 3-ER-484–85, 491; 3-ER-534–35.

Gender-affirming health care may include counseling, hormone therapy, surgery, and other medically necessary treatments. 3-ER-437–40; 3-ER-485–87; 3-ER-534–37. The precise treatments are determined by a healthcare team in collaboration with the patient, and, if the patient is an adolescent, with the patient's parents or guardians. 3-ER- 437; 3-ER-489. These treatment protocols are widely accepted by the nation's major medical and mental health organizations as reflecting the consensus on the appropriate treatment for gender dysphoria. 3-ER-436; 3-ER-483, 487. This includes BCBSIL. 7-ER-1501–22.

For adolescents with gender dysphoria who experience severe distress with the onset of puberty, puberty-delaying medications may be indicated. 3-ER- 438; 3-ER-486. Puberty-delaying medications pause endogenous puberty, limiting its effects on the body. 3-ER-438; 3-ER-486. Such interventions delay the development of secondary sex characteristics while affording the adolescent time to better understand their gender identity. 3-ER-438; 3-ER-486. They are also reversible. 3-ER-438; 3-ER-486. The medical and scientific literature, as well as clinical experience, have established that puberty-delaying medications are safe and effective to treat gender dysphoria. 3-ER-440–41.

For some adolescents with gender dysphoria, however, initiating puberty consistent with their gender identity through hormone therapy may be medically necessary. 3-ER-486. For adults, hormone therapy may also be medically necessary. *Id.* If a patient is assessed to have a medical need for hormone therapy, gender-affirming hormone therapy involves administering steroids of the experienced sex (i.e., their gender identity), such as testosterone in transgender male individuals and estrogen in transgender female individuals. 3-ER-438–39; 3-ER-486. The purpose of this treatment is to attain the appropriate masculinization or feminization of the transgender person to achieve a gender phenotype that matches as closely as possible to their gender identity. 3-ER-439; 3-ER-486. The medical and scientific literature, as well as clinical experience, have similarly established that

gender-affirming hormone therapy is safe and effective to treat gender dysphoria. 3-ER-441–42; 3-ER-488–89.

Some transgender individuals need surgical interventions to help bring their body into alignment with their gender. 3-ER-439–40; 3-ER-486–87; 3-ER-534–36. Though not all transgender people require gender-affirming surgery, such care is necessary when medically indicated. 3-ER-439; 3-ER-486; 3-ER-537–38. Surgical interventions may include vaginoplasty, breast implants, and orchiectomy for transgender female individuals and chest reconstruction, hysterectomy, or phalloplasty for transgender male individuals. 3-ER-440; 3-ER-486–87; 3-ER-536–37. The treatment protocols recognize that chest surgery may be indicated for transgender people under eighteen. 3-ER-487; 3-ER-536–37.

As with all medical care, gender-affirming health care is provided following a discussion of the risks and benefits of the treatment and obtaining informed consent. 3-ER-489. Consistent with all medical standards, the treatment protocols recommend that clinicians take a case-by-case approach to evaluate whether and when a procedure is medically necessary for a particular patient. 3-ER-437. The consequences of untreated gender dysphoria are serious, including irreversible and harmful physical changes and irreparable mental harm. 3-ER-437; 3-ER-491, 497. Denial of medically indicated gender-affirming health care to transgender people frustrates treatment goals, exacerbates gender dysphoria and its associated

depression and suicidality, imposes stigma, and has negative impacts on patients' mental health and well-being.  3-ER-445–47.

BCBSIL's own medical policy provides for coverage of gender-affirming health care as medically necessary, consistent with the WPATH Standards of Care. 7-ER-1473; 7-ER-1516–18; 4-ER-875–76; 3-SER-230; 3-SER-236.  BCBSIL's decision to cover gender-affirming health care was based upon scientific and medical evidence and a review of the medical literature.  7-ER-1466–67.  Based on the scientific and medical evidence and the requirements of the ACA, BCBSIL removed all gender-affirming health care exclusions from its insured plans, as well as health plans for which the employer did not request an express exclusion.  7-ER-1471; 7-ER-1546–47; 3-SER-236.

## II.  Plaintiffs Are Denied Coverage for their Medically Necessary Gender-Affirming Health Care.

### _C.P. and Patricia Pritchard_

Plaintiff C.P. is a young man who is transgender.  3-ER-448; 3-ER-494–95; 4-ER-897.  He has been diagnosed with gender dysphoria by his medical providers. 3-ER-418; 3-ER-420–21; 5-ER-908; 5-ER-917–19.  Through his mother Patricia Pritchard, he was enrolled in a BCBSIL-administered health plan that contains an Exclusion.  4-ER-895; 2-SER-223; 2-SER-147.

As treatment for his gender dysphoria, C.P.'s providers recommended and prescribed puberty-delaying medications, in the form of a Vantas implant.  3-ER-

449; 3-ER-494. BCBSIL initially covered and paid for C.P.'s first Vantas implant as medically necessary, consistent with its own medical policy. 3-ER-403–04; 5-ER-939, 942; 8-ER-1727–28. However, BCBSIL later claimed that the coverage was in error, not because the treatment was not medically necessary, but rather because BCBSIL claimed that the plan excluded such coverage. 8-ER-1730–31. Subsequently, BCBSIL denied coverage for a second Vantas implant based upon the Exclusion. 3-ER-403–04; 5-ER-997.

After undergoing medically necessary treatment for gender dysphoria (including hormone therapy), C.P.'s treatment team recommended he undergo gender-affirming chest surgery. 3-ER-418; 3-ER-420–21; 3-ER-423–24. When C.P. sought pre-authorization for his chest surgery, BCBSIL denied it based solely on the Exclusion. 8-ER-1753; 3-ER-402–03. BCBSIL agrees that the surgery was medically necessary under BCBSIL's own medical policy. 7-ER-1476–78.

As a result of BCBSIL's administration and enforcement of the Exclusion, C.P. and his parents spent $12,122.50 to pay for his second Vantas implant and chest surgery. 6-ER-993.

### *S.L.*

S.L. is a 12-year-old transgender girl, who has been diagnosed with gender dysphoria and precocious puberty. 2-ER-249. She is enrolled in a self-funded health benefit plan administered by BCBSIL offered through a non-religious employer. 2-

ER-250; 2-ER-231–35; 2-ER-236–40.  When she enrolled, her healthcare provider obtained pre-approval for her treatment with puberty-delaying medications, which are medically necessary to treat both conditions.  2-ER-250, 254–55.  Despite the pre-authorization, BCBSIL denied coverage for the puberty-delaying medication pursuant to an Exclusion.  2-ER-250, 258, 264.  On March 17, 2023, S.L.'s mother appealed the denial, and again BCBSIL denied all coverage for the treatment because BCBSIL considered the treatment "related to" gender dysphoria.  2-ER-250–51, 270–72.

As a result of BCBSIL's administration and enforcement of the Exclusion, S.L.'s parents face nearly $200,000 of medical bills related to BCBSIL's denial of coverage for S.L.'s gender-affirming health care.  2-ER-251.  S.L. needed a second puberty implant in Fall 2023 and will likely need gender-affirming hormone therapy in the future.  *Id.*

### ***Emmett Jones***

Emmett Jones is a transgender man who is enrolled in health coverage in the self-funded plan through his wife's employer.  2-ER-246.  His coverage is thus administered by BCBSIL and is subject to the same Exclusion as C.P.'s coverage. *Id.*  Jones has been diagnosed with gender dysphoria.  2-ER-247.  As part of the treatment for his gender dysphoria, Jones's medical providers recommended that he receive gender-affirming chest surgery as medically necessary.  *Id.*  Jones obtained

chest surgery on May 25, 2023, which he paid for out-of-pocket. *Id.* On June 5, 2023, Jones submitted to BCBSIL a claim for reimbursement for the surgical procedure and associated services, which BCBSIL denied on June 27, 2023. *Id.* Jones "may require additional gender-affirming care and surgery in the future" and "want[s] to have coverage for such treatment in the future if it is recommended as medically necessary by [his] treating providers." 2-ER-248.

### III. BCBSIL's Design, Administration, and Enforcement of the Exclusions as Third-Party Administrator.

BCBSIL is part of the Health Care Service Corporation ("HCSC"), which receives federal financial assistance for its health programs and activities. 7-ER-1454; 7-ER-1483, 1486–90. All of BCBSIL's activities are health related. 7-ER-1485–86. And because BCBSIL is a covered entity under Section 1557, BCBSIL, through HCSC, signed an assurance with the federal government, promising to comply with Section 1557. 7-ER-1500. Indeed, BCBSIL conceded that it is a "covered entity" under Section 1557. 7-ER-1495–96. Consistent with Section 1557, and its own medical necessity determination, BCBSIL removed its categorical exclusion of coverage for gender-affirming health care from its insured plans and has covered medically necessary gender-affirming care in its insured plans and self-funded plans without an express exclusion since 2015. 7-ER-1462, 1464–65, 1471; 7-ER-1502–22; 7-ER-1525; 7-ER-1546–47.

- 12 -

Nonetheless, when acting as a TPA, BCBSIL has agreed to administer exclusions of gender-affirming care when requested by its employer-customers. 7-ER-1496–97; 7-ER-1548; 8-ER-1810–11. BCBSIL has consistently administered the Exclusions for nearly 400 other employers, denying hundreds of claims for medically necessary gender-affirming care solely because the care was sought for gender dysphoria, a condition with which only transgender people are diagnosed. 8-ER-1812–13. When an employer asks to include an Exclusion in its plan, the overwhelming majority of the employers use the version of Exclusion drafted and proffered by BCBSIL. 7-ER-1528, 1530; 8-ER-1717–19 (378 plans use the BCBSIL standard language for the Exclusion, while a handful of variations of this standard Exclusion are "represented uniquely in one plan" each); 8-ER-1819–28.

BCBSIL never asks employers for a justification or reason when agreeing to administer the Exclusion. 7-ER-1536–37; 8-ER-1720. BCBSIL would administer the Exclusion even if the employer expressed overtly discriminatory reasons for it. 8-ER-1721. BCBSIL does not require employers to have a genuine medical, scientific, or even a religious basis before it will administer the Exclusions. 8-ER-1720–21. When administering the Exclusions, BCBSIL's actions are the same: It reviews claims to determine if the service is related to "gender dysphoria," based on the diagnostic and procedural codes used. 7-ER-1533–35; 8-ER-1725; *see also* 8-ER-1715–16. If so, the service is denied under the Exclusions. *Ibid.* At the same

time, BCBSIL covers most services prescribed as gender-affirming health care when sought for other conditions. 7-ER-1543-45; 7-ER-1479–80.

BCBSIL is not a religious entity. 8-ER-1830–31. It is also not an agent of any religious entity. 8-ER-1772. Nor, again, does it ask employers if they have a religious reason for applying the Exclusions, let alone require attestation of relevant, sincerely held religious beliefs. 8-ER-1720-21. BCBSIL does not ask employers to attest to any sincerely held religious belief before administering the Exclusions. *Id.*

## IV. The District Court Certifies the Plaintiff Class, Holds that BCBSIL's Administration and Enforcement of the Exclusions Violates Section 1557, and Orders Class-wide Declaratory and Injunctive Relief.

On November 23, 2020, Plaintiffs C.P. and Patricia Pritchard filed this lawsuit challenging BCBSIL's administration of the Exclusion under Section 1557, seeking declaratory and equitable relief. 8-ER-1870–87. On May 4, 2021, the district court denied BCBSIL's Rule 12(b)(6) motion to dismiss, holding that "[a] claim of discrimination in violation of Section 1557 does not depend on an HHS rule" and that "RFRA … does not bar Plaintiffs' claim" because, among other things, "the government is not a party to this action." 8-ER-1867–68.

On September 10, 2021, Plaintiffs moved to amend their complaint to convert it to a class action, adding no new claims or factual allegations. 8-ER-1855–59. The district court granted leave to amend on November 2, 2021. 8-ER-1847–52.

- 14 -

Following extensive discovery, Plaintiffs moved to certify the class on August 25, 2022, and the parties cross-moved for summary judgment on September 1 and October 24, 2022, respectively. 8-ER-1901–02. On November 9, 2022, the district court granted the motion to certify the class, which it later amended on December 12, 2022 and December 4, 2023. 8-ER-379–94; 1-SER-36–38; 2-ER-86–90. The certified Class consists of "all individuals who: (1) have been, are, or will be participants or beneficiaries in an ERISA self-funded "group health plan" (as defined in 29 U.S.C. § 1167(1)) administered by Blue Cross Blue Shield of Illinois during the Class Period and that contains a categorical exclusion of some or all Gender-Affirming Health Care services; and (2) were denied pre-authorization or coverage of treatment solely based on an exclusion of some or all Gender Affirming Health Care services; and/or (3) are or will be denied pre-authorization or coverage of treatment solely based on an exclusion of some or all Gender Affirming Health Care services." 2-ER-89. The class period run from November 23, 2016 to the present.

BCBSIL petitioned for permission to appeal the class certification order under Federal Rule of Civil Procedure 23(f), which was denied on January 27, 2023. 8-ER-1905; 8-ER-1908.

On December 19, 2022, the district court granted Plaintiffs' motion for summary judgment and denied BCBSIL's motion for the same. 1-ER-27–47. The

district court held that "Blue Cross, as a third party administrator is engaged in a 'health care program or activity' and receives federal financial assistance," that BCBSIL "is subject to Section 1557," and that "[i]ts denial of benefits under the Plaintiffs' plans based on their transgender status was discrimination on the basis of sex." 1-ER-38.

The district court rejected BCBSIL's argument that health insurance and administration of health coverage are not "health programs or activities" under Section 1557 holding that "'Congress clearly intended to prohibit discrimination by any entity acting within the health system,'" and that "[l]ogically, this includes third party administrators of health insurance plans." 1-ER-40 (quoting *Fain v. Crouch*, 545 F.Supp.3d 338, 342 (S.D. W. Va. 2021)). Ultimately, "[t]he statute, not the 2020 Rule, must be followed here." 1-ER-40. The district court also rejected BCBSIL's argument that only the health programs that receive federal financial assistance are covered by Section 1557, finding the argument "unpersuasive." *Id.*

The court similarly dismissed BCBSIL's argument that ERISA required it to follow a plan's terms, even if discriminatory, concluding that "ERISA specifically provides that its requirements are not to be construed to invalidate or impair laws like Section 1557 and so ERISA's requirement that Blue Cross follow the Exclusion's language is no defense." 1-ER-42–43. Finally, the court reiterated that "RFRA provides relief against the government and does not apply to disputes

between private parties." 1-ER-44. The court further noted that at oral argument, BCBSIL disclaimed that it was itself asserting a defense based on RFRA but rather argued that the statutes must be read together to protect the religious rights of employers. 1-ER-45; 1-SER-12. The court rejected this argument, noting BCBSIL did not have standing to assert another entity's religious beliefs. *Id.*

On February 9, 2023, Plaintiffs moved for entry of class-wide declaratory and permanent injunctive relief, as well as nominal damages for C.P. and Patricia Pritchard, and BCBSIL moved to decertify the class. 8-ER-1098. *Sua sponte*, the Court stayed the case until after this Court's resolution of *Wit v. United Behav. Health,* 79 F.4th 1068 (9th Cir. 2023). When the stay was lifted, Plaintiffs moved to add class members S.L. and Emmett Jones as class representatives to preserve their ability to secure class-wide prospective injunctive relief. 2-ER-277–90. The court granted the request on October 19, 2023. 2-ER-226–28.

In December 2023, the district court denied BCBSIL's motion to decertify the Class, issued a second amended order certifying the class, and granted Plaintiffs' motion for class-wide relief. 8-ER-1913; 2-ER-63–83; 2-ER-86–90; 1-ER-3–26.

On December 20, 2023, BCBSIL filed its notice of appeal. 8-ER-1913. BCBSIL does not appeal class certification, or the scope of the relief granted. BCBSIL's appeal is limited to its liability under Section 1557.

## SUMMARY OF ARGUMENT

Well-established precedent makes clear that the administration of categorical exclusions of coverage for gender-affirming health care constitutes sex discrimination. The administration and enforcement of such exclusions by a health program or activity, any part of which receives federal financial assistance, therefore violates the ACA's Section 1557. BCBSIL voluntarily accepted federal financial assistance such that it cannot discrimination based on sex in all of its operations.

Seeking to evade liability, BCBSIL argues that health insurance and the administration of health coverage are not "health programs or activities." This argument defies common sense and case law, as well as Section 1557's unambiguous statutory text. Section 1557 is an expansive, remedial civil rights statute, whose "fundamental purpose … is to ensure that health services are available broadly on a nondiscriminatory basis to individuals throughout the country." 81 Fed. Reg. 31,379. Section 1557 means what it says: it applies to "any health program or activity, any part of which is receiving federal financial assistance." 42 U.S.C. § 18116(a). There is no ambiguity there. All health-related programs, including BCBSIL's TPA activities, are subject to Section 1557's anti-discrimination requirements.

Nor can BCBSIL hide behind its employer-customers' preferences by relying on ERISA. ERISA cannot "be construed to alter, amend, modify, invalidate, impair,

or supersede any law of the United States." 29 U.S.C. § 1144(d). This includes Section 1557. At all times, BCBSIL has a legal duty not to discriminate.

Finally, BCBSIL cannot escape liability by relying on RFRA. The federal government is not a party here, and RFRA does not apply to lawsuits between private parties. Moreover, BCBSIL is not a religious entity, and it has no standing to assert the religious beliefs of others.

## STANDARD OF REVIEW

"The district court's ruling on cross-motions for summary judgment is reviewed *de novo*." *Hartstein v. Hyatt Corp.,* 82 F.4th 825, 828 (9th Cir. 2023). Each motion is evaluated separately. *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 790 (9th Cir. 2006). The Court "may affirm on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Summary judgment is appropriate where "there is no genuine dispute of material fact" after "viewing the evidence in the light most favorable to the nonmoving party." *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 773 (9th Cir. 2018).

## ARGUMENT

**I.**   **Coverage Exclusions of Gender-Affirming Health Care Are Discrimination Based on Sex in Violation of the ACA.**

The Affordable Care Act "attempts to provide adequate health care to as many individuals as possible by requiring insurers to provide essential health benefits." *Schmitt*, 965 F.3d at 955. More specifically, Section 1557 of the ACA requires, in relevant part, that "[a]n individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Stated differently, Section 1557 prohibits discrimination on the basis of sex in health programs or activities, any part of which receives federal funding.

As the district court correctly held, BCBSIL engaged in exactly this type of prohibited discrimination against Plaintiffs and the Class by categorically enforcing the Exclusions for coverage for gender-affirming health care. 1-ER-38. The BCBSIL-administered Exclusions facially discriminate on the basis of sex. By their plain terms, the Exclusions condition necessary medical care on a person's sex. Indeed, the Exclusions are administered and enforced as categorical prohibitions of coverage for medically necessary gender-affirming health care—or in some cases, for all medically necessary health services "for, or leading to, gender reassignment

surgery"—as treatment for gender dysphoria. 1-ER-29–30 (citing 6-ER-1229). This is sex discrimination.

Courts across the country have similarly held that categorical exclusions of coverage for gender-affirming health care illegally discriminate on the basis of sex. *See Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024); *Lange v. Houston Cnty.*, 101 F.4th 793, 798-99 (11th Cir. 2024); *Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-91 (N.D. Fla. 2023); *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1027, 1030 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health* Servs., 395 F.Supp.3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F.Supp.3d 979, 1002-03 (W.D. Wis. 2018).[1] This is so because the Exclusions "necessarily and intentionally appl[y] sex-based rules." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 667 (2020).

A transgender person, by definition, is someone whose sex assigned at birth is different from their gender identity. 3-ER-433. As the Supreme Court held, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. Taking adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," while not taking such action against "an

---

[1]  *See also Lawrence v. Off. Pers. Mgmt.*, Appeal No. 0120162065, at 9 (E.E.O.C. May 30, 2024), https://tinyurl.com/LawrencevOPM; U.S. Dep't of Health and Human Servs., Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,701 (May 6, 2024) (45 C.F.R. § 92.207(b)(4)).

otherwise identical [person] who was identified as female at birth," "intentionally penalizes" the transgender person based on their sex assigned at birth. *Id*. This analytical framework applies equally to Section 1557. *See Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII."); *see also Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).[2]

The district court's holding that BCBSIL's administration of the Exclusions was sex-based discrimination was firmly grounded in the record. For example, Plaintiffs C.P. and S.L. received denials of "transgender services." 1-ER-29; 2-ER-258, 264. Some plans, like that of C.P. and Jones, framed the Exclusion in terms of "transgender reassignment," prohibiting coverage "for treatment, drugs, therapy, counseling services and supplies for, or leading to, gender reassignment surgery," 6-ER-1229; 2-SER-147, while S.L.'s exclusion was framed in terms of "gender reassignment surgery ... including related services and supplies." 2-ER-231–35; 2-

---

[2] Defendants' reliance on *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), is misplaced. *L.W.*'s reasoning conflicts with this Court's own precedents. Rather this Court should look to the Fourth Circuit's decision in *Kadel*, which, like this Court, applies *Bostock*'s reasoning to Title IX and Section 1557 claims, holding that discrimination based on transgender status is sex discrimination in numerous contexts, including under Section 1557 and the Equal Protection Clause of the Fourteenth Amendment.

ER-236–40.  The discrimination is plain on the face of the denials and Exclusions themselves.

Moreover, discrimination based on gender transition is also necessarily facial discrimination based on sex.  *See Schroer v. Billington*, 577 F.Supp.2d 293, 306-08 (D.D.C. 2008) (refusal to hire person who "planned to … undergo[] sex reassignment surgery was literally discrimination because of … sex"); *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 527 (D. Conn. 2016).  As *Flack* concluded, discrimination "on the basis that an individual was going to, had, or was in the process of changing their sex … is still discrimination based on sex." *Flack*, 328 F.Supp.3d at 949.  Singling out "sex reassignment" for differential treatment should be understood as treating transgender people differently "as a class." *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022).

In practical terms, BCBSIL cannot administer the Exclusions without considering a person's sex assigned at birth.  As BCBSIL testified, it is the diagnostic code for gender dysphoria that "triggers" the application of the Exclusion.  7-ER-1533–35; 8-ER-1725.  For example, determining whether C.P.'s Vantas implant or chest surgery was a form of or "leading to gender reassignment surgery" "is impossible—literally cannot be done—without inquiring into [C.P.'s] sex assigned at birth and comparing it to [his] gender identity." *Kadel*, 100 F.4th at 147.  As the district court noted, BCBSIL generally covers medically necessary hormone

- 23 -

treatments and chest surgery, 1-ER-29–30; what determines whether the Exclusion applies is the diagnostic code for gender dysphoria, which necessitates consideration of the patient's sex assigned at birth. "If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex." *Dekker*, 679 F.Supp.3d at 1289-90.[3]

BCBSIL argues that, rather than sex discrimination, its administration of the Exclusions turns on a medical diagnosis of gender dysphoria. But discrimination based on gender dysphoria is a proxy for discrimination based on transgender status. As the district court explained, "[g]ender dysphoria is a feeling of clinically significant stress and discomfort that can result from being transgender, or, more specifically, from having an incongruence between one's gender identity and the sex assigned to that person at birth." 1-ER-29. Exclusions that "aim at addressing incongruity between sex assigned at birth and gender identity" go to "the very heart of transgender status," and facially target transgender people. *Kadel*, 100 F.4th at 146. An exclusion based on gender dysphoria is an exclusion based on transgender status because only transgender people experience and seek care for gender

---

[3] Some of BCBSIL's *amici* attempt to insert arguments regarding the medical acceptance of the excluded care. Such arguments have no place in this litigation. ***BCBSIL agrees that this care can be medically necessary*** and never raises this argument on appeal. *See*, *supra*, at 9. The only relevant inquiry in this Section 1557 case is whether sex-based discrimination has taken place.

dysphoria. *See Lange*, 101 F.4th at 799 ("Lange's sex is inextricably tied to the denial of coverage for gender-affirming surgery."); *Fain v. Crouch*, 618 F.Supp.3d 313, 324-25 (S.D.W.V. 2022) ("[I]nherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender."), *aff'd sub nom Kadel*, 100 F.4th 122; *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) ("[T]ransgender individuals are the only people who would ever seek gender reassignment surgery.").[4]

The inseparability of gender dysphoria from transgender status places the Exclusions in line with countless other "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (cleaned up). *See also Rice v. Cayetano*, 528 U.S. 495, 514-15 (2000) (law based on "ancestry [was] a proxy for race"); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("[a] tax on wearing yarmulkes is a tax on Jews,"); *Castaneda v. Partida*, 430 U.S. 482, 495 (1977)

---

[4]  BCBSIL argues that this conclusion by the district court is not supported by the record. Nonsense. Plaintiffs' experts provided testimony about how gender dysphoria is characterized by the distress that arises from the incongruence between a person's gender identity and their sex assigned at birth, and that what defines transgender people is that they have a gender identity that is incongruent with their assigned birth at sex. *See*, *e.g.*, 3-ER-433; 3-ER-481; 3-ER-533.

(exclusion of "Spanish surnames" was proxy for national origin discrimination); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (gray hair as proxy for age discrimination); *E.S. by & through R.S. v. Regence BlueShield*, 2024 WL 1173805, at *3-5 (W.D. Wash. Mar. 19, 2024) (use of hearing aids plausibly alleged to constitute proxy for hearing loss disability in Section 1557 case), *reconsideration denied*, 2024 WL 2250249 (W.D. Wash. May 17, 2024). The Supreme Court has "declined to distinguish between status and conduct" in analogous contexts. *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010); *see also Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (Where "the conduct targeted by th[e] law … is closely correlated" with the status of being gay, the law "is targeted at more than conduct," "[i]t is instead directed toward gay persons as a class.").

BCBSIL's reliance on *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976), and its discussion of *Geduldig v. Aiello*, 417 U.S. 484 (1974), does not alter this calculus. First, BCBSIL dramatically overreads *Geduldig*. "[W]hile *Geduldig* held that pregnancy is not a proxy for sex, it did not hold that a characteristic of a subset of a protected group cannot be a proxy for that group." *Kadel*, 100 F.4th at 146. While not all transgender people seek treatment for gender dysphoria, all people who seek such treatment are transgender. It is thus entirely appropriate to recognize

gender dysphoria as a proxy for transgender people given the centrality of gender transition to transgender identity.

> [G]ender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it. … In contrast to pregnancy— which is a condition that can be described entirely separately from a person's sex—gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status.

*Kadel*, 100 F.4th at 146. While pregnancy is not the defining characteristic of a woman, living in accord with one's gender identity rather than sex assigned at birth *is* the defining characteristic of a transgender person and the very thing the Exclusions target.

## II.    As a Covered Entity Under Section 1557, BCBSIL Engaged in Prohibited Discrimination When It Administered the Exclusions.

The ACA's healthcare nondiscrimination law prohibits "***any health*** program or activity, ***any part of which is receiving Federal financial assistance***," from "den[ying] the benefits of" the program or activity or "subject[ing] to discrimination" an individual on the basis of sex. 42 U.S.C. § 18116(a) (emphasis added). There is no ambiguity here. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022) (Section 1557 prohibits discrimination "by healthcare entities receiving federal funds"). While BCBSIL concedes it receives federal financial assistance (6-ER-1315) and that it is subject to Section 1557 for some of its activities (7-ER-1500), BCBSIL argues it is not liable for its administration and enforcement of the discriminatory Exclusions.

BCBSIL spills much ink arguing that Section 1557 prohibits only intentional discrimination (Appellant's Br. at 34-36) and that agency principles are not applicable to Section 1557 (*id.* at 36-38). These arguments, which BCBSIL did not make below,[5] are beside the point. Plaintiffs do not seek to hold BCBSIL liable for the actions of its employer-customers; rather, Plaintiffs seek to hold BCBSIL liable for its ***own*** actions as a TPA, which include designing, administering, and enforcing the Exclusions. This case is about BCBSIL's own conduct, not that of any employer.

BCBSIL further argues that its TPA activities are not covered by Section 1557, relying on the now repealed 2020 Rule.[6] BCBSIL's liability, however, comes from the statutory text of Section 1557, not any regulation. Resolving the question of what constitutes a "health program or activity" under Section 1557 thus "begins

---

5   Neither of BCBSIL's summary judgment briefs discuss agency principles or even make mention of the word "intentional" or any version thereof. 3-ER-351–378, 7-ER-1416–44. This Court "will not consider arguments raised for the first time on appeal," "[a]bsent exceptional circumstances." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1213 (9th Cir. 2020).

6   Not only was the 2020 Rule enjoined in several important and relevant respects, *see, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020); *Walker v. Azar*, 2020 WL 6363970, at *4 (E.D.N.Y. Oct. 29, 2020), but multiple iterations of the rule span the class period. More importantly, though, Section 1557's unambiguous statutory text has not varied over time.

where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

The task at hand is straightforward. "The first step is to determine whether a statute is ambiguous." *ACA Connects v. Bonta,* 24 F.4th 1233, 1243 (9th Cir. 2022); *see also King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) ("At *Chevron*'s first step, a court looks to the 'plain meaning' of the statute."), *aff'd*, 576 U.S. 473 (2015). The "traditional tools of statutory construction" are employed when interpreting a statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). This means "look[ing] first to the words that Congress used," *Defs. of Wildlife v. Browner*, 191 F.3d 1159, 1164 (9th Cir. 1999) (cleaned up), as well as "the structure of the statute, and (as appropriate) legislative history." *Corrigan v. Haaland*, 12 F.4th 901, 907 (9th Cir. 2021). Courts "look to the entire statute to determine Congressional intent," "[r]ather than focusing just on the word or phrase at issue." *Browner*, 191 F.3d at 1164 (cleaned up).

Under the unambiguous statutory text, BCBSIL is a "health program or activity" that receives Federal financial assistance such that all of its health-related operations are subject to Section 1557. *See Briscoe v. Health Care Serv. Corp.*, 281 F.Supp.3d 725, 730 (N.D. Ill. 2017) (BCBSIL health plans are "within the ACA's purview"). First, health insurance and the administration of health coverage is a "health program or activity." Second, BCBSIL admits that all of its business

- 29 -

involves health-related activities. 7-ER-1485–86 ("we sell insured health products and uninsured health products"). And third, BCBSIL concedes it receives federal financial assistance. 6-ER-1315 ("BCBSIL receives federal financial assistance for specific products, such as Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and Medicare/Medicaid dual eligibility."). Accordingly, all of BCBSIL's operations, including its TPA activities, are subject to Section 1557's nondiscrimination command.

### A.     Health Coverage and Health Insurance Are Health Programs or Activities.

Relying on the now superseded 2020 Rule, BCBSIL argues that "providing *health insurance*" is not being "principally engaged in the business of providing healthcare," such that it is not liable for discriminatory TPA activities. Appellant's Br. at 48 (citing former 45 C.F.R. § 92.3(c), emphasis by BCBSIL). This ludicrous proposition has been abandoned by the U.S. Department of Health and Human Services ("HHS") under the current Rule. It is also contrary to the record, the ACA's statutory text, and this Court's precedents. The district court correctly rejected BCBSIL's invitation to narrow the definition of "health program or activity" to exclude insurers because "only Congress can rewrite [a] statute." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986).

*First*, Section 1557 plainly covers "*any* health program or activity," not just the direct provision of health care. *Cf. Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d

545, 553-54 (3d Cir. 2017) (rejecting argument that "education programs or activities" should be read to apply to "educational institutions" only). This makes perfect sense: health insurance and health plan coverage clearly are a health program or activity.[7] It is what enables the vast majority of Americans to access health care.[8]

Congress deliberately chose broad language when it adopted Section 1557. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New Int'l Dictionary 97 (1976)). Absent "any language limiting the breadth of that word," this provision must be read as referring to all of the subject that it is describing. *Id*. Moreover, the statutory term "program or activity" is also generally given broad application, especially when interpreting the underlying civil rights laws that are constituent parts of Section 1557. *See*, *e.g.*,

---

[7] Courts applied Section 1557 to health insurance long before any HHS rulemaking. *See*, *e.g.*, *East v. Blue Cross and Blue Shield of La.*, 2014 WL 8332136, at *2 n.1 (M.D. La. Feb. 24, 2014).

[8] An entity need not provide direct patient care to be principally engaged in providing health care. *See*, *e.g.*, *Dorer v. Quest Diagnostics Inc.*, 20 F.Supp.2d 898, 900 (D. Md. 1998) (holding a laboratory which provided clinical diagnostic testing and received Medicare and Medicaid funds was principally engaged in providing health care); *Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio*, 34 F.Supp.2d 433, 444 (W.D. Tex. 1998) (Insurance company controlled the delivery of health care and caused the discrimination patients experienced).

*Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632-34 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520-35 (1982).[9]

That "health program or activity" includes health insurance and health plans is evident from other definitions of "health program" and "health care" contained within the ACA, which repeatedly refers to "health programs" and "health care entities" as including insurers and health plans in other provisions. *See Fain*, 545 F.Supp.3d at 342 (noting "[o]ther sections of the ACA provide further support"). For example, Section 1331 permits states flexibility to provide a "basic ***health program***" by offering "1 or more standard ***health plans*** providing at least the essential health benefits described in section 1302(b) to eligible individuals." 42 U.S.C. § 18051 (emphasis added). Similarly, Section 1553 defines "health care entity" to include "***a health maintenance organization***, ***a health insurance plan***, or ***any other kind of health care*** facility, organization, or ***plan***." 42 U.S.C. § 18113 (emphasis added). The Court therefore "must … interpret the statute as a

_____

9 By referencing "contracts of insurance," Congress explicitly included health coverage within the purview of Section 1557. 42 U.S.C. § 18116(a). This language was an intentional expansion over earlier civil rights statutes that exempted "contracts of insurance." *See*, *e.g.*, 45 C.F.R. § 84.3(h). BCBSIL argues that "contracts of insurance" is an example of "Federal financial assistance" and not of a "health program or activity." Appellant's Br. at 53-55. However, "[i]t is unclear to whom this clause would apply if not health insurance issuers." *Fain*, 545 F.Supp.3d at 342. To the extent it references Medicare Part B, which "once served as contracts of insurance for those who qualified," 89 Fed. Reg. 37,666, it is further evidence that Section 1557 applies to ***health coverage plans***.

symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up).

This understanding is also consistent with legislative history. For example, with regards to the healthcare nondiscrimination law, Senator Patrick Leahy explained that Section 1557's prohibition on discrimination was necessary to "remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and "ensure that all Americans are able to reap the benefits of *health insurance* reform equally, *without discrimination*." Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1,821, 1,842 (daily ed. Mar. 23, 2010) (emphasis added).

Indeed, the ACA is laser-focused on ending discrimination by health insurance companies like BCBSIL. *See* Valarie K. Blake, "An Opening for Civil Rights in Health Insurance After the Affordable Care Act," 36 B.C. J.L. & Soc. Just. 235, 237 (June 2016). In addition to Section 1557, the ACA prohibits health insurers from discrimination based upon health conditions in enrollment and reenrollment. *See* 42 U.S.C. §§ 300gg-1; 300gg-2; 300gg-4. It ends the use of discriminatory pre-existing condition limitations in ACA-regulated health insurance. 42 U.S.C. § 300gg-3. It prohibits insurers from using disability, health status and medical conditions as a basis of denying eligibility for coverage. 42 U.S.C. § 300gg-4(a).

- 33 -

"Given this context, … 'health program or activity' under Section 1557 necessarily includes health insurance issuers." *Fain*, 545 F.Supp.3d at 342.

**Second**, the Civil Rights Restoration Act of 1987 ("CRRA"), Pub. L. 100-259, 102 Stat. 28 (Mar. 22, 1988), provides no refuge to BCBSIL. BCBSIL is mistaken when it argues the now obsolete 2020 Rule reasonably looked to the CRRA when it narrowed the definition of "health program or activity."[10] The CRRA does not define "health care" or suggest that "being principally engaged in the business of providing healthcare" excludes health insurance companies. Nor do the four civil rights statutes referenced in the CRRA explicitly or implicitly exclude health insurance companies. Rather, the CRRA was enacted to amend the four civil rights statutes to make clear that if any part of a program or activity receives federal financial assistance, **the entire program must comply with the applicable civil rights laws**, not simply those aspects of covered entities directly receiving funding. *See* Pub. L. No. 100-259 §§ 2, 3, 4(2), 5(3), 6; *see also Doe v. Salvation Army in U.S.*, 685 F.3d 564, 571-72 (6th Cir. 2012) ("Congress passed the [CRRA] to restore the

---

10 To the extent BCBSIL argues that deference is owed to HHS's view on this issue (and again, Plaintiffs' arguments are based on the statutory text not any particular regulation), HHS agrees with Plaintiffs. *See* 89 Fed. Reg. 37,539.

previously broad scope of coverage of the four statutes that used the word 'program or activity[.]'").[11]

Since the CRRA's passage, courts have held that the term "program or activity" in all these civil rights statutes is not limited to just the operations for which federal assistance is received. *See T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 743 (7th Cir. 2022); *Salvation Army*, 685 F.3d at 571-72. This is true even in Title IX jurisprudence. *See*, *e.g.*, *Fox v. Pittsburg State Univ.*, 257 F.Supp.3d 1112, 1124 (D. Kan. 2017) (the term "program" in Title IX applies to all operations, not just those receiving federal funding).[12]

***Third***, binding circuit precedent has answered this question. In *Schmitt*, this Court observed that "Section 1557 incorporates by reference the grounds protected by four earlier nondiscrimination statutes and prohibits discrimination on those

---

[11] The CRRA was thus a congressional response to the prior narrow construction of "program or activity" by the Supreme Court. *See Grove City Coll. v. Bell*, 465 U.S. 555, 573-74 (1984). BCBSIL's distorted application of the CRRA seeks to resurrect *Grove City*, as if it were never abrogated by statute.

[12] BCBSIL tries to import the CRRA's definition of "program or activity" to Section 1557 (Appellant's Br. at 49-50), but this is contrary to Section 1557's statutory text. Although Section 1557 incorporates the grounds and enforcement mechanisms of the four civil rights statutes referenced in the CRRA, it does not generally incorporate other provisions of those statutes. 42 U.S.C. § 18116(a); *see also Schmitt*, 965 F.3d at 953; *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019). As the definition and scope of "program or activity" are neither a "ground prohibited" by or "enforcement mechanism provided for and available" under the statutes, they were not expressly incorporated into Section 1557.

grounds in the health care system—*as relevant here, in health insurance contracts*." *Schmitt*, 965 F.3d at 951. This is consistent with a plethora of other federal court decisions. *See*, *supra*, at 20-21 (collecting cases); *see also Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017) (reversing dismissal of Section 1557 claims against insurer).

*Fourth*, BCBSIL cannot rely on nor ask this Court to defer to an obsolete rescinded rule.[13] The current Rule defines "health program or activity" as "[a]ny project, enterprise, venture, or undertaking to: … [p]rovide or *administer* health-related services, *health insurance coverage*, or other *health-related coverage*," among other things. 89 Fed. Reg. 37,694 (45 C.F.R. § 92.4) (emphasis added). Restoring this approach,[14] and consistent with Plaintiffs' arguments, HHS has stated:

> OCR agrees with commenters' assessment that the Proposed Rule's approach to the inclusion of health insurance coverage and other health-related coverage in the definition of 'health program or activity' is *most consistent with section 1557's statutory text and Congressional intent. The statutory text demonstrates Congress's clear intent to apply section 1557 to health insurance coverage and other health-related*

---

13 The U.S. Department of Justice and HHS have taken the position that with its publication the new 2024 Rule has "replaced" and "superseded" the 2020 Rule. *See* Defs' Stay Mot., *BAGLY v. U.S. Dep't of Health and Human Servs.*, No. 20-cv-11297 (D. Mass. filed Apr. 29, 2024) (ECF 151); Reply in Support of Defs' Stay Mot., *BAGLY v. U.S. Dep't of Health and Human Servs.*, No. 20-cv-11297 (D. Mass. filed May 6, 2024) (ECF 157).

14 89 Fed. Reg. 37,538 ("This is in contrast to the 2016 Rule, which defined 'health program or activity' to include all the operations of entities principally engaged in health services, health insurance coverage, or other health-related coverage, including health insurance issuers, at former 45 C.F.R. § 92.4.").

> *coverage*. This statutory text does not support the 2020 Rule's limiting 'health program or activity' to encompass all of the operations of only those entities principally engaged in the business of providing 'healthcare.' Under the plain language of the statute, section 1557 applies to any 'health' program or activity not 'healthcare' program or activity. And the provision of health insurance coverage and other health-related coverage is plainly classified under the term 'health.'

85 Fed. Reg. 37,538 (emphasis).

BCBSIL's contention that "health program or activity" does not include health insurance and health plans has no basis in law, fact, or common sense. And given that BCBSIL's argument rests entirely on a rescinded rule, BCBSIL offers no authority in support of its argument.

## B. As a TPA, BCBSIL Is Liable for its Administration, Enforcement, and Role in the Design of the Exclusions.

Section 1557's statutory command is clear: BCBSIL may not discriminate on the basis of sex in *any* of its health-related operations. This includes BCBSIL's administration, enforcement, and any role in the design of the Exclusions. *See Fain*, 545 F.Supp.3d at 343 ("[B]y virtue of its acceptance of federal assistance under its Medicare Advantage program, The Health Plan must comply with Section 1557 under its entire portfolio"); *see also T.S.*, 43 F.4th at 743.

The district court is not alone in holding that a covered entity may be held liable for its TPA activities. In *Tovar*, the Eighth Circuit determined that a TPA that received "claims, complaints, and appeals of claim denials" for an enrollee's employer-sponsored health plan is a proper defendant in a Section 1557

discrimination suit. 857 F.3d at 778-79. In other words, as long as the TPA is involved "in the administration of the plan," it may be liable. *Id.*; *see also Tovar v. Essentia Health*, 342 F.Supp.3d 947, 956 (D. Minn. 2018) ("Nothing in Section 1557, explicitly or implicitly, suggests that TPAs are exempt from the statute's nondiscrimination requirements."). District courts in other circuits have similarly concluded that a TPA may be held for its ***administration*** of a plan's discriminatory terms. *See*, *e.g.*, *Kulwicki v. Aetna Life Ins. Co.*, 2024 WL 1069854, at *3-4 (D. Conn. Mar. 12, 2024); *Boyden*, 341 F.Supp.3d at 997. And this Court implicitly held as much, when it confirmed that a Section 1557 claim may be pursued against a covered entity that administers a benefit design that results in discrimination. *See Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1212 (9th Cir. 2020).

Ignoring Section 1557's statutory command, BCBSIL argues that TPAs cannot be held liable for the *design* of a plan it administers. Appellant's Br. at 39-40. But BCBSIL does not explain—indeed, it cannot—how its *administration* and *enforcement* of the Exclusions are not health-related operations. No rule can override the plain language and Congressional intent of Section 1557: to eliminate all discrimination based on race, age, sex, and national origin in health care, root and stem. The district court was thus correct in holding that "no *Chevron* deference owed here to the various iterations of the rules or proposed rules because the statutory text is clear as is Congressional intent—there is no exclusion for third party

administrators who did not draft the exclusion at issue." 1-ER-42. BCBSIL's "just following orders" defense must be rejected.

BCBSIL contends that Section 1557's lack of an "explicit exclusion for TPAs" does not resolve the question. But the statute is clear and unambiguous that a covered entity, "any part of which receives federal financial assistance," cannot discriminate based on sex in any of its health-related activities. Nothing more is needed. BCBSIL does not identify how the language of 42 U.S.C. § 18116(a) purportedly is ambiguous when applied to covered entities that perform TPA work for some of their business. It cannot because, as the Seventh Circuit concluded, Section 1557's plain language is clear and unambiguous on this score, applying to all activities of covered health care entities. *See T.S.*, 43 F.4th at 743.

BCBSIL argues that regulatory preamble language supports its claim that it cannot be responsible for its administration of the Exclusions. It argues (in a premature 28(j) letter) that "the 2024 Rule agrees that 'a [TPA] should not be held responsible for discriminatory plan design features over which the [TPA] exercised no control.'" Appellant's 28(j) Letter, at 1 (quoting 89 Fed. Reg. 37,626). But again, Plaintiffs seek to hold BCBSIL liable for its own activities, i.e., its discriminatory administration and enforcement of the Exclusions.

An agency's views are not entitled to deference, whether under *Chevron* or *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), when they are "directly at odds

- 39 -

with the text and purpose" of the statute. *Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.,* 421 F.3d 872, 879 (9th Cir. 2005). And here, the "plain, unambiguous language of the statute" does not excuse covered entities from liability when acting as a TPA. *Tovar*, 342 F.Supp.3d at 957; *see also Prescott v. Rady Children's Hospital-San Diego*, 265 F.Supp.3d 1090, 1105 (S.D. Cal. 2017).

In any event, the agency commentary with regards to the operative rule does not help BCBSIL. For example, it states that "recipient health insurance issuers may be covered under this rule when offering health insurance coverage to a fully-insured group health plan or ***when providing third party administrator services for a self-funded group health plan***." 89 Fed. Reg. 37,541 (emphasis added). It further states that "[t]he final rule applies to ***all the operations of a recipient principally engaged in the provision or administration of health insurance coverage or other health-related coverage, including its third party administrator activities***, as discussed in detail previously under the definition of 'health program or activity' under § 92.4." *Id.* at 37,625 (emphasis added). And "[w]here the alleged discrimination relates to the administration of the plan by a covered third party administrator, OCR will process the complaint against the covered third party administrator because it is the entity responsible for the decision or other action being challenged." 89 Fed. Reg. 37,627.

- 40 -

For all plans containing the Exclusion (including the CHI plan), BCBSIL controls the administration and enforcement of the Exclusions by scanning healthcare claims for the presence of "gender dysphoria," and then denying coverage on that basis. 7-ER-1533–35, 1539–40. In sum, BCBSIL is liable for its administration of the Exclusions.

BCBSIL is also liable based on its role designing the Exclusions. ***BCBSIL wrote the plan language for nearly all of the plans for which BCBSIL administered the Exclusions and the rest were based on the BCBSIL-drafted language***. 7-ER-1528; 8-ER-1717–19 (378 plans use the precise BCBSIL-authored standard language for the Exclusion, while all the other variations are "represented uniquely in one plan" each); 8-ER-1819–28.[15]  As HHS concluded, "if a covered third party administrator develops standard plan designs that it offers to employers, the covered third party administrator is liable for any discriminatory design feature in the plans because the plans originated with the third party administrator." 89 Fed. Reg. 37,627. It does not matter that BCBSIL considers these actions to be merely "assist[ing] with technical language." Appellant's Br. at 40-41. Designing the Exclusion and contracting with hundreds of employers to include it in their health

---

[15] BCBSIL claims there is a factual dispute about whether the CHI Plan's Exclusion originated with BCBSIL. Appellant's Br. at 40. There is no dispute, however, that the Exclusion is based upon BCBSIL's template language. *Compare* 2-SER-147, *with* 8-ER-1819 (Addendum A, Row 1).

plans renders a TPA liable for discriminatory plan design. And here, BCBSIL took an active role in the design of the discriminatory Exclusions.

Put simply, as a covered entity, BCBSIL has an independent statutory duty under Section 1557 to not discriminate, including in its design and administration of employer-sponsored health plans. That is the tradeoff BCBSIL made when it accepted federal financial assistance. A TPA "cannot hide behind the plan terms" by claiming that it is performing only a ministerial function—it must comply with federal law even if the plan's literal terms do not. *See Doe v. United Behav. Health*, 523 F.Supp.3d 1119, 1124-27 (N.D. Cal. 2021).

## III. ERISA Does Not Alter or Supersede BCBSIL's Independent Duty to Not Discriminate Under Section 1557.

BCBSIL argues that Section 1557 is unenforceable when it is acting as a TPA for an ERISA plan because a TPA "owes [fiduciary] duties to the plan" to administer claims "strictly" according to the written "documents and instruments governing the plan." Appellant's Br. at 29 (citing 29 U.S.C. § 1104(a)(1)(D)). BCBSIL is wrong: As an ERISA TPA, BCBSIL has a legal, contractual, and fiduciary duty to administer the plan *in compliance with federal law* to benefit its enrollees. This is so even if it means ignoring a particular plan term imposed by an employer, here the Exclusions.

***First***, BCBSIL ignores the precise ERISA statutory language it seeks to apply. *See* 29 U.S.C. § 1104(a)(1)(D). A fiduciary TPA is only obligated to administer the

plan according to its plain terms, "insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." *Id.* In other words, BCBSIL must administer the terms of the plan but only so long as those terms are consistent with ERISA's legal requirements. *Id.* And ERISA requires that nothing in it be construed to "alter, amend, modify, invalidate, impair or supercede" any federal law. 29 U.S.C. § 1144(d). *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 105 (1983) (holding it was "obvious" that 29 U.S.C. § 1144(d) "does not pre-empt federal law").[16]

Courts, including this one, have concluded that if administering plan language would be unlawful under federal law, then an ERISA fiduciary must follow federal law, not the plan terms. *See Meagher v. Int'l Asso. of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988) (fiduciaries must administer the plan consistently with its "documents and instruments" so long as the plan terms are not inconsistent with ERISA requirements); *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 284 (3d Cir. 2005) ("An administrator who strictly adheres to the ***lawful*** terms of an employee benefit plan may not be found to have acted

---

16 BCBSIL cites *Shaw* for the proposition that the district court read 29 U.S.C. §1144(d) "too expansively" and "dangerously." Appellant's Br. at 43. BCBSIL mischaracterizes *Shaw*, which urged caution only when interpreting whether ***state law*** is saved under 29 U.S.C. §1144(d). *See* 463 U.S. at 104. No such caution is warranted when courts consider whether federal law is subject to ERISA pre-emption. *Id.* at 105.

arbitrarily and capriciously.") (emphasis added). "Nothing in ERISA states that a plan document can override statutory remedies that were afforded to claimants by Congress." *Harrison v. Envision Mgmt. Holding, Inc.*, 59 F.4th 1090, 1109 (10th Cir. 2023) (plan document provision purporting to waive participants' statutory right to seek plan-wide relief is unenforceable); *Cedeno v. Sasson*, 100 F.4th 386, 406-07 (2d Cir. 2024) (same); *Henry v. Wilmington Tr., NA. Brian Sass*, 72 F.4th 499, 507 (3d Cir. 2023) (an ERISA plan "provision must give way to the [federal] statute."). Plaintiffs are unaware of any case in which a court concluded that an ERISA plan term overrides a federal statute, and BCBSIL points to no such example.

In fact, courts routinely conclude that the terms of an ERISA plan and ERISA provisions are subservient to federal statutes. *See*, *e.g.*, *Shaw*, 463 U.S. at 103 (ERISA does not preempt federal discrimination laws such as Title VII); *United States v. Tyson*, 242 F.Supp.2d 469, 471-72 (E.D. Mich. 2003) (federal Fair Debt Collections Practices Act is not pre-empted by ERISA); *Aloisi v. Lockheed Martin Energy Sys.*, 321 F.3d 551, 556 (6th Cir. 2003) ("ERISA explicitly provides that it does not 'supersede' any federal law" including the federal Labor Management Relations Act); *see also Doe*, 523 F.Supp.3d at 1127.

Nonetheless, BCBSIL claims that the district court should have applied an "axiom of statutory construction" to allow both 29 U.S.C. § 1104 and Section 1557 to "coexist." Appellant's Br. at 44. But BCBSIL ignores the key part of 29 U.S.C.

§ 1104, which limits the administration of plan terms to only those that are consistent with and legally enforceable under ERISA and other federal law.  There is no conflict here to which BCBSIL's "axiom of statutory construction" applies because, even under 29 U.S.C. § 1104, an ERISA plan's terms cannot be administered in a manner that conflicts with other federal law requirements.

*Second*, BCBSIL has no "contractual duty" to administer the plan terms when those terms conflict with federal law.  Appellant's Br. at 29.  The contract between BCBSIL and its employer-customers includes provisions that require BCBSIL to comply with applicable state and federal laws in its administration of benefits.  *See*, *e.g.*, 7-ER-1529; 7-ER-1767 (Administrative Services Agreement, § 4.2: "Claims Administrator shall have the responsibility for and bear the cost of compliance with any federal, state or local laws as may apply to the Claim Administrator in connection with the performance of its obligations under this Agreement"); 7-ER-1774 (Administrative Services Agreement, § 19: the agreement between BCBSIL and its employer-customer is "governed by and shall be construed in accordance with … any applicable federal law").  By the very terms of the contract between BCBSIL and its employer-customers, BCBSIL must construe and apply plan terms in a manner that complies with federal law.  In short, BCBSIL is contractually obligated to ensure that its administration of the Exclusion does not result in illegal discrimination.

**Third**, BCBSIL has no "fiduciary duty" to its employer-customers to administer the plan as written, if administering the literal written term violates federal law. Appellant's Br. at 29.[17] BCBSIL has no fiduciary duties to its employer-customers at all. An ERISA TPA has a fiduciary duty to "discharge [its] duties … **solely** in the interests of the participants and beneficiaries" and not of the employers. 29 U.S.C. § 1104(a)(1)(A) (emphasis added). The fiduciary duties owed by TPAs to their enrollees are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). TPAs have no ERISA "fiduciary duty" owed to the plan document or to an ERISA employer. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 357 n.2 (2d Cir. 2016) (ERISA fiduciary duties are not triggered by corporate business decisions). All ERISA fiduciary duties are aimed at protecting the rights and health benefits of participants and beneficiaries, and not the preferences or profits of employers. Accordingly, BCBSIL violates no "fiduciary duty" if it administers health plan terms in a manner that complies with federal anti-discrimination law to the benefit of plan participants and beneficiaries. Thus, where a plan term conflicts with federal law, the TPA's

---

17      "[W]hile we acknowledge that ERISA requires plans to be administered consistent with the documents and instruments governing the plan, ERISA further provides that it is not to be construed to impair or supersede other Federal laws, including regulations issued under such laws." 89 Fed. Reg. 37,549.

fiduciary duties to plan participants, together with ERISA, dictate that the federal law, not the plan document, controls. The district court got this exactly right.

BCBSIL argues that the district court's order places it in an untenable position, in which it is obligated to follow the terms of the plans' discriminatory Exclusions, and, at the same time, refrain from engaging in discrimination. But BCBSIL is not forced to administer any health plans at all.[18] BCBSIL made a voluntary, intentional choice to administer the Exclusion in these health plans. At all relevant times, BCBSIL had an array of legal, non-discriminatory choices to avoid engaging in illegal discrimination:

(1) It could refuse to administer the Exclusions because administering them would be illegal discrimination. Employers using BCBSIL as a TPA to administer a plan with such an Exclusion would then either have to abandon the Exclusions in order to contract with BCBSIL or find other TPAs that are not subject to Section 1557;

(2) BCBSIL could administer the plans without the Exclusions, consistent with Section 1557's requirements, just as the district court ordered in its injunction. BCBSIL could then ask each employer to pay for the cost of the excluded treatment, or, as

---

18 It is also not forced to receive any federal financial assistance.

BCBSIL did with C.P.'s first Vantas implant, it could pay the cost of the treatment on its own, thus avoiding any illegal discrimination;[19] or

(3)   BCBSIL could seek judicial guidance as to whether or how it could administer the Exclusions, pursuant to 29 U.S.C. § 1132(a)(3) and/or under 28 U.S.C. § 2201(a), the Declaratory Judgment Act.

BCBSIL took *none* of these non-discriminatory actions.  Instead, BCBSIL *chose* to administer the discriminatory Exclusions for nearly 400 employers, improperly placing its corporate, financial interests above the fiduciary and legal obligations it owed to Plaintiffs and other class members.  This Court should not countenance such discrimination.[20]  TPAs cannot "hide behind the plan terms" when

---

[19]  Economically speaking, the cost for BCBSIL covering these gender-affirming health care services, even if not passed-through to its employer-customers, is negligible.  *See* 3-ER-490–91 ("[T]he cost of providing gender-affirming care is generally very low, particularly in the context coverage through group health plans."); *Karnoski*, 2017 WL 6311305, at *8 (noting "these costs are exceedingly minimal").

[20]  While employer-customers are responsible for approving plan designs (Appellant's Br. at 24), TPAs are responsible for administering them.  BCBSIL must evaluate the health plans it is asked to administer to ensure that it will not violate federal law when implementing the plans as written.  Indeed, BCBSIL was concerned enough about administering the Exclusions, that it insisted on a special indemnification from every employer that sought to include the Exclusion.  3-ER-406–08.  *But see*, *e.g.*, *Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 74 (2d Cir. 1982) ("[A] party may not indemnify himself against his own willful, reckless or criminal misconduct").

they have independent legal and fiduciary obligations to comply with federal anti-discrimination law. *Doe*, 523 F.Supp.3d at 1127.

BCBSIL claims that administering a health plan's unlawful terms is not an "intentional act." Appellant's Br. at 34.[21] This claim is risible. BCBSIL does not "accidentally" administer benefits. Just as designing discriminatory exclusions is a form of "intentional" discrimination, so too is the administration and enforcement of such exclusions. *See Schmitt*, 965 F.3d at 954.

Moreover, there is undisputed evidence that BCBSIL knew it was engaging in illegal discrimination when it administered the Exclusion. After Section 1557 was enacted, BCBSIL removed the Exclusion from all of its insured plans in order to comply with the anti-discrimination law. 7-ER-1472. This action resulted from the activities of a company workgroup created to ensure compliance with Section 1557. *Id.* ("[T]he charge of the workgroup was to make sure that HCSC was in compliance with any regulatory requirements under 1557."). Of particular relevance here, the Section 1557 workgroup reviewed relevant medical policies, such as the one governing coverage of gender-affirming surgery, to ensure compliance with Section 1557. *See, e.g.*, 7-ER-1521 (As of November 6, 2015, "[m]ultiple coverage changes from experimental, investigational and/or unproven to medically necessary

---

21 As noted, this argument has been waived. *See, supra*, 28, n.5.

for primary and secondary gender reassignment surgeries and related services."); 3-SER-236. The effect of this change was to eliminate the Exclusions in all of BCBSIL's insured plans, as well as in its self-funded employer plans that did not explicitly exclude gender-affirming care. 7-ER-1464–65.

Despite concluding that the Exclusion was illegal under Section 1557, BCBSIL chose to administer the Exclusions when requested to do so by employer-customers. Appellant's Br. at 41, n.3. The overwhelming majority of employers for whom BCBSIL administers the Exclusions use the standard language for the Exclusions drafted and provided by BCBSIL. *See*, *supra*, Section II.B, at 12-13. And knowing that the Exclusions it was asked to implement were illegal, BCBSIL demanded indemnifications before administering the Exclusions. *See*, *supra*, note 14.

In sum, BCBSIL knowingly and intentionally drafted the standard language used, made it available to its employer-customers, and administered the Exclusions. BCBSIL cannot now claim that its decision to design and administer the Exclusions was somehow not "intentional." *Schmitt*, 965 F.3d at 954.

## IV. BCBSIL Cannot Assert a Defense Under RFRA.

RFRA, 42 U.S.C. § 2000bb *et seq*., has no bearing on Plaintiffs' claims against BCBSIL. RFRA applies to the actions of two specific entities—someone with a sincerely held religious belief, and the federal government. *See* 42 U.S.C. §

2000bb-1(c); *see City of Boerne v. Flores*, 521 U.S. 507 (1997) (RFRA only provides a claim or defense against federal government action). Here, BCBSIL cannot invoke RFRA as a defense because no government entity is party to this suit and because BCBSIL has not and cannot assert any substantial burden to its own religious exercise.[22]

**First**, as the District Court held, "RFRA provides relief against the government and does not apply to disputes between private parties." 1-ER-44 (citing *Sutton*, 192 F.3d at 839; *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015) ("Based on RFRA's plain language [and] its legislative history … RFRA is not applicable in cases where the government is not a party.")).

Under RFRA's plain terms, 42 U.S.C. § 2000bb-1(b), if a party alleges that the federal government is substantially burdening that party's exercise of its religion, it is the government's job to demonstrate a compelling governmental interest being furthered by the least restrictive means. A "private party cannot step

---

[22] BCBSIL never presented any evidence that enforcement of Section 1557 would burden anyone's religious beliefs. 3-ER-409–12 (the CHI Plan in which Plaintiffs C.P. and Jones are enrolled is part of CHI's "for profit" secular arm); 1-ER-37 (CHI voluntarily removed the Exclusion in July 2023). Many of the hundreds of BCBSIL-administered health plans with Exclusions belong to non-religious employers, as with S.L. Thus, BCBSIL's farfetched RFRA defense is inapplicable even if it were permissible to consider the religious beliefs of their customers.

- 51 -

into the shoes of the 'government'" to make this showing. *Listecki*, 780 F.3d at 736. Moreover, the remedy available to a person asserting a RFRA defense is the ability to "obtain appropriate relief ***against a government***." 42 U.S.C. § 2000bb-1(c) (emphasis added). The plain language of the statute is the "primary guide" that Congress intended RFRA to apply only in matters in which the government is a party. *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 21 (2017) ("the statute's plain language … is our 'primary guide' to Congress' preferred policy"); *see also Holt v. Hobbs*, 574 U.S. 352, 357 (2015).

This understanding of Congress's intent is bolstered by RFRA's "object and policy." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001). As this Court just addressed in *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc), RFRA was a response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), intended to restore the level of scrutiny applicable to government action that substantially burdens individuals' free exercise of religion to that which applied prior to *Smith*. *Apache*, 101 F.4th at 1058. RFRA's "net effect is that the government may substantially burden a person's exercise of religion if and only if the government's action can survive 'strict scrutiny.'" *Id*. RFRA's purpose was to effectively reinstate constitutional protections, which only apply as against the government. *See Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 276-77 (2010) (Roberts, C.J.,

dissenting) (constitutional protections "apply only against the government; '[i]ndividual invasion of individual rights' is not covered.") (quoting *Civil Rights Cases*, 109 U.S. 3, 11 (1883)). By the same token, RFRA cannot be involved in the context of a private party's invasion of another's individual rights.

This is settled law in this Circuit. This Court held in *Sutton* that RFRA cannot be invoked against private entities, noting that RFRA's plain text bars the government—"a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States"—from substantially burdening a person's exercise of religion. 192 F.3d at 834 (quoting 42 U.S.C. § 2000bb-2(1)). The Court noted further that Congress did not specify that RFRA applies to nongovernmental actors, as is typical when regulating private parties, and, applying traditional principles of statutory interpretation, concluded that RFRA explicitly does not include purely private entities whose conduct cannot be fairly attributable to the government within its reach. *Id*. at 834-35.

BCBSIL's portrayal of *Sutton* as somehow limited to RFRA as a cause of action is disingenuous. RFRA's text makes no distinction between its assertion as a cause of action or a defense. *See* 42 U.S.C. § 2000bb (purpose of RFRA is "to provide a ***claim or defense*** to persons whose religious exercise is substantially burdened by government"); 2000bb-1(c) (person alleging religious exercise has been burdened by the government "may assert that violation as a ***claim or defense***.")

(emphasis added). Nothing about *Sutton*'s analysis of RFRA's text suggests that its holding is so limited. The Court's conclusion is plain: In the absence of a nexus between the government and a private party against which RFRA is invoked, RFRA cannot apply. *Sutton*, 192 F.3d at 834-35; *see also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000) (describing RFRA as protecting against government action and noting the unlikelihood that enforcement of statutory protections by one private party against another was among the government actions Congress envisioned in adopting RFRA).

This understanding of RFRA is also supported by authority across the country. *See, e.g.*, *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 323 (4th Cir. 2024) ("Neither the Supreme Court nor this court has applied RFRA, which by

its terms purports to limit government action, to a suit between private parties.");[23] *Listecki*, 780 F.3d at 737 ("Congress did not mean for RFRA to be applicable when the government is absent, and we will not read into the statute what neither the plain language nor legislative history has included."); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("Congress intended RFRA to apply only to suits in which the government is a party.").

Bostock's reference to RFRA as a "super statute," 590 U.S. at 682, does not demand otherwise. How RFRA may interact with generally applicable federal statutes does not alter the circumstances under which it can be invoked. While the Supreme Court recognized that religious employers might be able to claim a RFRA defense "in appropriate cases," its description of how RFRA operates underscores

---

23 As the Fourth Circuit recently noted, "only one federal court of appeals has held that RFRA applies to a lawsuit between private parties, while all others to consider the question disagree." *Billard*, 101 F.4th at 328. But *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), "has proven controversial even within its own court; it issued over a dissent from then-Judge Sotomayor, and a later panel expressed 'doubts' about its holding on this front." *Billard*, 101 F.4th at 328, n.7 (citations omitted). In *Rweyemamu v. Cote*, 520 F.3d 198, 203 (2d Cir. 2008), a subsequent Second Circuit panel expressed its doubts regarding *Hankins*, noting that *Hankins*'s conclusion conflicts with the plain text of RFRA, which "requires ***the government*** to demonstrate that application of a burden to a person is justified by a compelling governmental interest." *Rweyemamu*, 520 F.3d at 203, n.2 (emphasis added). The court "d[id] not understand how [RFRA] can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue." *Id.* See also *Hankins*, 441 F.3d at 115 (Sotomayor, J., dissenting) ("The plain language of the statute, its legislative history, and its interpretation by courts … demonstrate that RFRA does not apply to suits between private parties.").

- 55 -

the role of the federal government, both in what RFRA prohibits and in the need to demonstrate compelling interest and least restrictive means. *See Bostock*, 590 U.S. at 682 ("That statute prohibits the ***federal government*** from substantially burdening a person's exercise of religion … .") (emphasis added).[24]

The extent of BCBSIL's reliance on cases involving a federal government actor for its discussion of RFRA's impact on other federal laws simply reinforces this point. *See*, *e.g.*, *United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) (RFRA as defense to federal prosecution); *In re Young*, 141 F.3d 854 (8th Cir. 1998) (RFRA invoked against bankruptcy trustee); *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 457 (D.C. Cir. 1996) (RFRA invoked against EEOC).[25] As no government entity is involved in this case, BCBSIL is precluded from asserting a RFRA defense.

---

[24] *Bostock*'s discussion of RFRA noted the assertion of a RFRA defense by one of the employers. *Bostock*, 590 U.S. at 682. Harris Funeral Homes asserted that defense ***against the EEOC***, and the Sixth Circuit conducted RFRA's "two-step burden-shifting analysis." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 583 (6th Cir. 2018), *aff'd sub nom. Bostock*, 590 U.S. 644. The court held that enforcing Title VII to bar the employer from firing a transgender employee did not substantially burden its owner's religious exercise and that even if it did, "requiring the Funeral Home to comply with Title VII constitutes the least restrictive means of furthering the government's compelling interest in eradicating discrimination against Stephens on the basis of sex." *Id*. at 597.

[25] BCBSIL's reliance on *Guam v. Guerrero*, 290 F.3d 1210, 1220 (9th Cir. 2002), Appellant's Br. at 61, ignores that the language quoted did not describe RFRA itself, but Congressional authority to add explicit religious exemptions to otherwise neutral, generally applicable laws. In fact, *Guerrero* reaffirms RFRA's applicability in the context of litigation involving a federal government entity. *See id*. at 1221-23.

*Second*, BCBSIL cannot rely on any alleged burden of the religious exercise of the employers whose plans it administers to evade its own obligations under Section 1557.  Under RFRA's plain language, RFRA permits only "[a] *person whose religious exercise has been burdened* … [to] assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c) (emphasis added).  BCBSIL is neither a religious organization nor one closely held by religious individuals, such that it could have religious beliefs capable of being burdened.  8-ER-1830–31.  BCBSIL simply does not fall within the statutory protection of RFRA.

Nor can BCBSIL somehow acquire CHI's alleged religious interests through a general business interest in pleasing others.   "[C]ustomer preference … cannot justify discriminatory conduct." *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1277 (9th Cir. 1981); *cf. Harris Funeral Homes, Inc.*, 884 F.3d at 586 ("[W]e hold as a matter of law that a religious claimant cannot rely on customers' presumed biases to establish a substantial burden under RFRA.").  Nor may BCBSIL "borrow" a defense under RFRA that a contracting employer might have because Congress specifically limited the parties that can assert a claim or defense under RFRA to

persons with sincerely held religious beliefs, something BCBSIL cannot claim to have.[26]

RFRA itself invokes the established principle that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C. § 2000bb-1(c). Those general rules include that a party can only assert its own injury. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). BCBSIL asserts no such injury.

Finally, BCBSIL misrepresents the impact of the district court's ruling on the employer-customers on whose alleged injuries it seeks to rely, describing it as "requiring those customers to fund gender-affirming treatments." Appellant's Br. at 56. The district court did not address or impose any obligation on BCBSIL's employer-customers. The court simply held that BCBSIL violated its own obligations under Section 1557 and ordered BCBSIL to remedy that discrimination. 1-ER-24–25 (holding that BCBSIL violated Section 1557 by discriminating based on sex against the Class "when it administered and enforced categorical exclusions of some or all gender-affirming health care services as they are defined in the class definitions"; enjoining BCBSIL from "administering or enforcing exclusions and any policies or practices that wholly exclude or limit coverage of 'gender-affirming

---

26 Not even states may borrow third parties' rights under RFRA. *See Nebraska v. U.S. Dep't of Health and Human Servs.*, 877 F.Supp.2d 777, 800 (D. Neb. 2012).

health care,' so long as it is a 'health program or activity' under the ACA's Section 1557"; and ordering that BCBSIL "accept and process these claims consistent with the remaining terms of the plans, the Administrative Services Agreements, other contracts, and indemnification agreements, subject to this Order and without administering the exclusions"). Who ultimately pays for the care that results from the Court's order is between BCBSIL and its employer-customers. *See*, *supra*, at 47-48. What the district court ordered below is simply the ordinary "make whole" relief to which the Class was entitled as victims of discrimination. 1-ER-18 (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976)).

Thus, RFRA has no bearing on this case.[27]

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

---

27 Even if RFRA applied here (it does not), Section 1557 serves the compelling interest of eradicating invidious discrimination in health care. *Cf. EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991). It "is a compelling state interest of the highest order" and exempting organizations would impede it. *Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004); *see also Harris Funeral Homes*, 884 F.3d at 591. Moreover, there is no way to fulfill this compelling interest other than by enforcing the statute against those who discriminate. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014); *N. Coast Women's Care Med. Grp., Inc. v. Super. Ct.*, 189 P.3d 959, 968 (Cal. 2008).

Dated this 12th day of June 2024.

Respectfully submitted,

/s/ Omar Gonzalez-Pagan

Eleanor Hamburger
SIRIANNI YOUTZ SPOONEMOORE
HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
(206) 223-0303
ehamburger@sylaw.com

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Jennifer C. Pizer
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 S. Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
jpizer@lambdalegal.org

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
111 K Street NE, 7th Floor
Washington, DC 20002
(202) 804-6245
kloewy@lambdalegal.org

*Counsel for Plaintiffs-Appellees and the Class*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s): 23-4331**

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  */s/ Omar Gonzalez-Pagan*        **Date** June 12, 2024
              *Counsel for Plaintiffs-Appellees*

- 61 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate Of Compliance For Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s): 23-4331**

I am the attorney or self-represented party.

**This brief contains <u>13,992</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** * /s/ Omar Gonzalez-Pagan*       **Date** June 12, 2024
          *Counsel for Plaintiffs-Appellees*