**No. 23-4331**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

C.P., by and through his parents, Patricia Pritchard and Nolle
Pritchard; and PATRICIA PRITCHARD, et al.,

*Plaintiff-Appellee,*

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:20-cv-06145-RJB | Hon. Robert J. Bryan

## BRIEF OF THE NATIONAL HEALTH LAW PROGRAM, ET AL., AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Caroline E. Reynolds,
    *Counsel of Record*
David A. Reiser
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W.
Suite 1000
Washington, D.C. 20036
(202) 778-1800

Abigail K. Coursolle
Elizabeth Edwards*
*Not admitted in this jurisdiction
**NATIONAL HEALTH LAW PROGRAM**
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
(310) 736-1652

Attorneys for *Amici Curiae* The National Health Law Program, et al.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

CORPORATE DISCLOSURE STATEMENT ........................................ viii

INTEREST OF THE *AMICI CURIAE* ........................................ viii

SUMMARY OF ARGUMENT ...................................................... 1

ARGUMENT .................................................................. 4

I.    Section 1557 Is An Essential Part Of The Affordable Care Act's Remedial Scheme. ................................................. 4

    A.    Before the ACA, Members Of Disfavored Groups Faced Barriers Limiting Their Access To Adequate Health Insurance. ................................................... 5

    B.    Congress Passed The ACA To Increase Americans' Access To Meaningful Health Coverage, In Part By Prohibiting Discriminatory Practices. ........................ 9

II.    Section 1557 Prohibits Third Party Administrators Like BCBSIL From Discriminating When They Administer Health Plans. ................................................... 11

III.    ERISA Does Not Exempt Third-Party Administrators Like BCBSIL from Liability Under Section 1557. ...................... 14

    A.    Congress Passed ERISA To Protect American Workers' Access To The Benefits Promised By Their Employers, Including Health Benefits. ....................... 15

    B.    ERISA's Fiduciary Duty Provisions Do Not Authorize, Let Alone Require, Illegal Acts ................................. 17

    C.    Discriminatory ERISA Plan Exclusions Are Void And Unenforceable Because They Violate Public Policy ......... 21

i

D.    Endorsing The Defense BCBSIL Asserts Would Drastically Undermine Both The ACA And ERISA. ................25

CONCLUSION ..................................................................................28

CERTIFICATE OF COMPLIANCE........................................................30

CERTIFICATE OF SERVICE................................................................31

ii

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Berton v. Aetna Inc.*,
  No. 23-CV-01849-HSG, 2024 WL 869651
  (N.D. Cal. Feb. 29, 2024)......................................................................26

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)...............................................................................24

*Carr v. United Healthcare Servs.*,
  No. C15-1105-MJP, 2016 WL 7716060
  (W.D. Wash. May 31, 2016) .................................................................26

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
  472 U.S. 559 (1985)...............................................................................17

*CSA 401(k) Plan v. Pension Pros., Inc.*,
  195 F.3d 1135 (9th Cir. 1999) ..............................................................18

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022)...............................................................................14

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) .................................................................24

*Evans v. Jeff D.*,
  475 U.S. 717 (1986)...............................................................................24

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014).................................................................. 19, 20, 21

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989)...............................................................................18

*Hurd v. Hodge*,
  334 U.S. 24 (1948).................................................................................22

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982).................................................................................22

*Kulwicki v. Aetna Life Ins. Co.*,
  No. 3:22-CV-00229 (VDO), 2024 WL 1069854
  (D. Conn. Mar. 12, 2024) ............................................................ 19, 26

*McMullen v. Hoffman*,
  174 U.S. 639 (1899) ........................................................................ 22

*T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*,
  43 F.4th 737 (7th Cir. 2022) ......................................................... 14

*US Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013) ................................................................... 17, 24

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ........................................................................ 16

*Zebrowski v. Evonik Degussa Corp. Admin. Comm.*,
  578 F. App'x 89 (3d Cir. 2014) ..................................................... 18

## **Statutes**

20 U.S.C. § 1400 ............................................................................... 23

20 U.S.C. § 1681 ......................................................... 4, 22, 23, 24

20 U.S.C. § 1703 ............................................................................... 23

29 U.S.C. § 621 ................................................................................ 23

29 U.S.C. § 794 ............................................................... 4, 22, 24

29 U.S.C. § 1001(a) ........................................................................ 15

29 U.S.C. § 1001(b) ........................................................................ 15

29 U.S.C. § 1002(21)(A) .............................................................. 16

29 U.S.C. § 1104(a) ........................................................................ 19

29 U.S.C. § 1104(a)(1)(A) ............................................................ 16

29 U.S.C. § 1104(a)(1)(B) ............................................................ 16

29 U.S.C. § 1104(a)(1)(D) ..................................................... 16, 19, 20

iv

29 U.S.C. § 1144(d) .................................................................. 19

42 U.S.C. § 300gg(a) .................................................................. 9

42 U.S.C. § 300gg(a)(1)(A) ....................................................... 10

42 U.S.C. § 300gg-3 ................................................................... 9

42 U.S.C. § 300gg-4 ................................................................... 9

42 U.S.C. § 300gg-6 ............................................................... 9, 10

42 U.S.C. § 2000c ...................................................................... 23

42 U.S.C. § 2000d ........................................................ 4, 22, 23, 24

42 U.S.C. § 2000e(k) ............................................................ 22, 23

42 U.S.C. § 2000e-2 ................................................................... 23

42 U.S.C. § 3601 ....................................................................... 23

42 U.S.C. § 6101 ............................................................... 4, 22, 24

42 U.S.C. § 12111 ..................................................................... 23

42 U.S.C. § 12131 ..................................................................... 23

42 U.S.C. § 18022(c) ................................................................. 10

42 U.S.C. § 18116(a) .......................................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 17, 18, 19, 21, 22, 23, 24, 25, 26, 28

42 U.S.C. § 18116(b) ................................................................. 24

42 U.S.C.A. § 18091(2)(G) ......................................................... 6

## Regulations

45 C.F.R. § 156.125 .................................................................. 10

## Other Authorities

1 Williston on Contracts §1:20 (4th ed.) ................................... 25

v

17A Am. Jur. 2d Contracts § 9 ............................................................... 25

85 Fed. Reg. 37,160 (June 19, 2020) ...................................................... 11

89 Fed. Reg. 37,522 (May 6, 2024) ......................................................... 11

BlueCross BlueShield of Illinois, *The Smart Choice for Your Health Insurance Coverage*, https://www.bcbsil.com/ ...................................... 12

Cathy Schoen & Sara R. Collins, *The Big Five Health Insurers' Membership and Revenue Trends: Implications for Public Policy*, 36:12 Health Affairs 2185 (2017) https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2017.0858 .... 27

Chris Kissel, *Largest Health Insurance Companies 2024*, Forbes Advisor (Feb. 26, 2024), https://www.forbes.com/advisor/health-insurance/largest-health-insurance-companies/ ................................. 27

Christine Monahan, Q*uestionable Conduct: Allegations Against Insurers Acting as Third-Party Administrators*, CHIRblog (Mar. 24, 2023) https://chirblog.org/questionable-conduct-allegations-insurers-acting-third-party-administrators/ ................................................................. 27

Gary Claxton, et al., KFF Employer Health Benefits Report, 2023 Annual Survey (Oct. 2023), https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2023-Annual-Survey.pdf ............................. 26

Gary J. Gates, *In U.S., LGBT More Likely Than Non-LGBT to Be Uninsured*, Gallup Inc., at 2 (Aug. 26, 2014), https://news.gallup.com/poll/175445/lgbt-likely-non-lgbt-uninsured.aspx?version=print ................................................................. 7

Health Care Service Corporation, *2022 Annual Report* (2022), https://www.hcsc.com/documents/hcsc-annual-report-2022.pdf ... 12, 13

Institute of Medicine, Committee on the Consequences of Uninsurance, *Care Without Coverage: Too Little, Too Late*, Nat'l Academy Press (2002) ................................................................................................ 5, 6

Institute of Medicine, Committee on the Consequences of Uninsurance, *Coverage Matters: Insurance and Health Care*, Nat'l Academy Press (2001) ...................................................................................... 5, 6, 7, 9

Institute of Medicine, Committee on the Consequences of Uninsurance, *Health Insurance is a Family Matter*, Nat'l Academy Press (2002) ..... 6

Kathleen Rowan, et al., *Access and Cost Barriers to Mental Health Care, By Insurance Status, 1999-2010*, 32:10 Health Affairs 1723 (2013) ............................................................ 7, 8

Nat'l Women's Law Center, *Fact Sheet: Reproductive Rights & Health, Case Against the Affordable Care Act Threatens to Devastate Women's Health and Economic Security* (May 2021) https://nwlc.org/wp-content/uploads/2020/11/ACA-2020-11-09-1.pdf .................................. 8

Sara Rosenbaum et al., *Crossing the Rubicon: The Impact of the Affordable Care Act on the Content of Insurance Coverage for Persons with Disabilities*, 25 Notre Dame J. L. Ethics & Pub. Pol'y 527 (2011) ................................................................................................... 6, 7

Sara Rosenbaum, *The Affordable Care Act and Civil Rights: The Challenge of Section 1557 of the Affordable Care Act*, 94:3 Milbank Q. 464 (2016) ............................................................... 10

Valarie K. Blake, *An Opening for Civil Rights in Health Insurance After the Affordable Care Act*, 36 B.C. J. L. & Soc. Just. 235 (2016) ......... 6, 7

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel certifies that *amici curiae* the National Health Law Program; Arizona Center for Law in the Public Interest; Bazelon Center for Mental Health Law; Disability Rights California; Disability Rights Montana; Families USA Foundation, Inc.; Inseparable; Legal Action Center; Legal Council for Health Justice; National Alliance on Mental Illness (NAMI); National Autism Law Center; The Kennedy Forum; Western Center on Law and Poverty; and William E. Morris Institute for Justice are not subsidiaries of any other corporation and no publicly held corporation owns 10 percent or more of any *amici curiae* organization's stock.

June 20, 2024                    /s/ Abigail K. Coursolle

                                 Abigail K. Coursolle
                                 (CA Bar # 266646)
                                 Attorney for *Amici Curiae*
                                 National Health Law Program, et al.


## INTEREST OF THE *AMICI CURIAE*

Fourteen non-profit patient advocacy organizations have come together to submit this *amicus curiae* brief in support of the Plaintiffs-

Appellees and affirmance. Fed. R. App. P. 29(b).[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

*Amici curiae* are the National Health Law Program; Arizona Center for Law in the Public Interest; Bazelon Center for Mental Health Law; Disability Rights California; Disability Rights Montana; Families USA Foundation, Inc.; Inseparable; Legal Action Center; Legal Council for Health Justice; National Alliance on Mental Illness (NAMI); National Autism Law Center; The Kennedy Forum; Western Center on Law and Poverty; and William E. Morris Institute for Justice. While each *amicus* has particular interests, together they share the goal of eliminating disparities in access to health care and advancing access to health services for underserved individuals. *Amici* all work throughout the country to remove barriers to care using tools such as direct legal services, policy advocacy, education, and litigation. Their *amicus* brief will provide the Court with additional information about the importance of this case.

---

[1] Pursuant to Fed. R. App. P. 29(b)(4) and 29(a)(4)(E), counsel for *amici curiae* states that no counsel for a party authored the brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

Section 1557 of the Patient Protection and Affordable Care Act ("ACA") forbids discrimination in health programs and activities on the grounds of race, color, national origin, sex, age, or disability. Nevertheless, Appellant Blue Cross Blue Shield of Illinois ("BCBSIL") drafted a facially-discriminatory coverage exclusion, offered that exclusion as an option for its self-funded plan sponsor customers, agreed to administer plans containing the exclusion, and then used the exclusion to deny hundreds of transgender plan members benefits for otherwise-covered medical care. Yet BCBSIL claims to be exempt from liability under Section 1557 for any of this misconduct, on the remarkable and entirely unsupported theory that the Employee Retirement Income Security Act of 1974 ("ERISA") *requires* plan administrators to illegally discriminate if the written plan terms say to do so.

BCBSIL's deeply-flawed legal theory strikes at the heart of Section 1557, which extended federal nondiscrimination requirements to the content and operation of the vast majority of public and private health insurance plans throughout the country, for the overt purpose of increasing Americans' access to meaningful health coverage. The logic of

1

BCBSIL's argument would immunize ERISA plan administrators from suits under Section 1557 for knowingly deciding to deny benefit claims pursuant to all sorts of openly discriminatory plan terms, not just exclusions for gender dysphoria treatment. Consider the following plan provisions:

- Discriminating on the basis of age by excluding coverage of autism treatment for adults;

- Discriminating on the basis of sex by imposing a higher co-pay for gynecologist visits than for other specialists; or

- Discriminating on the basis of race by excluding coverage for screening and treatment of sickle-cell disease.

BCBSIL would be free to enforce this type of facially-discriminatory plan term, even if it knew the only reason for the limitation on coverage was the plan sponsor's animus for a given group.

BCBSIL's argument has no support in either Section 1557 or in ERISA. First, the ACA's plain statutory language leaves no doubt that BCBSIL, a company engaged solely in the business of healthcare, which receives federal financial assistance for some of that business, must adhere to Section 1557 in *all* of its activities. Second, BCBSIL's theory that ERISA not only required it to violate Section 1557, but also exempts it from responsibility for its own illegal actions in administering the

plans, ignores the basic fact that ERISA does not supersede any other federal statute. ERISA's statutory language clearly requires plan fiduciaries to follow plan terms—but *only* if the terms comply with ERISA *and* any other applicable federal statutes. The Supreme Court long ago confirmed that ERISA's fiduciary duty provision does not require plan administrators to perform any illegal act. And in any case, the facially-discriminatory exclusions at issue here were void and unenforceable from the start, because they violate the deeply-rooted public policy of the United States against invidious discrimination.

No matter how clearly an ERISA plan's written terms call for an illegal act, a plan fiduciary may not break the law. Nor does ERISA provide sanctuary for a fiduciary who chooses to do so. The protections of Section 1557 were enacted specifically to ensure that health insurance—including employer-sponsored health coverage—would be free from discrimination. Still, BCBSIL chose to discriminate against hundreds of plan members, and it can, and should, be required to face the legal consequences of its actions.

# ARGUMENT

## I. SECTION 1557 IS AN ESSENTIAL PART OF THE AFFORDABLE CARE ACT'S REMEDIAL SCHEME.

The Affordable Care Act includes a sweeping prohibition against discrimination, generally referred to in this case as "Section 1557." *See* 42 U.S.C. § 18116(a). Section 1557 creates a healthcare-specific civil right against discrimination and provides an enforcement mechanism for that right. The provision references four previously-existing civil-rights statutes, which collectively prohibit discrimination on the basis of race, color, national origin, age, sex, and disability,[2] and states that "an individual shall not," on any of those suspect grounds, "be excluded from participation in, be denied the benefits of, or be subjected to

---

[2] The four civil rights statutes referenced in Section 1557 are: Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq. (prohibiting discrimination based on race, color or national origin in programs that receives federal financial assistance); Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.* (prohibiting discrimination based on sex in education programs and activities that receive federal financial assistance); the Age Discrimination Act of 1975, 42 U.S.C. § 6101 *et seq.* (the "Age Discrimination Act") (prohibiting discrimination on the basis of age in programs and activities receiving federal financial assistance); and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 (prohibiting discrimination against people with disabilities in programs that receive federal financial assistance).

discrimination under, any health program or activity, any part of which is receiving" federal funding. *Id*.

Section 1557's importance and function can only be understood in light of the larger purposes of the ACA.

## A. Before the ACA, Members Of Disfavored Groups Faced Barriers Limiting Their Access To Adequate Health Insurance.

In the modern American healthcare system, access to healthcare depends heavily on access to either private or public insurance—and meaningful access to care requires *comprehensive* coverage. Study after study shows that the cost (or anticipated cost) of medical care inhibits people from seeking care, to their detriment.[3] Not surprisingly, a lack of health insurance is associated with higher mortality rates, poorer health outcomes, and greater financial insecurity.[4]

---

[3] *See*, *e.g.*, Institute of Medicine, Committee on the Consequences of Uninsurance, *Coverage Matters: Insurance and Health Care*, Nat'l Academy Press (2001) (hereafter "*Coverage Matters*"), at 22 (citing studies demonstrating that "[t]he uninsured are much more likely to forgo needed care," including preventive services and regular treatment of chronic conditions).

[4] *See*, *e.g.*, Institute of Medicine, Committee on the Consequences of Uninsurance, *Care Without Coverage: Too Little, Too Late*, Nat'l Academy Press (2002), at 52-71 (discussing studies demonstrating that uninsured cancer patients and uninsured patients with chronic conditions have

The business model of private health insurance, however, strongly incentivizes insurers to design their health plans to minimize reimbursement of medical expenses. Before the ACA, insurers used a variety of methods to discourage (or outright preclude) people with greater expected health care needs from enrolling in their plans, and to deny needed care even if such individuals were enrolled.[5] Those practices contributed to higher rates of uninsurance among racial and ethnic

---

worse clinical outcomes than patients with insurance); *id.* at 161-62 (finding that studies support an estimate of a 25 percent "higher overall mortality risk for uninsured adults"); Valarie K. Blake, *An Opening for Civil Rights in Health Insurance After the Affordable Care Act*, 36 B.C. J. L. & Soc. Just. 235, 250 (2016) (explaining that uninsured individuals have higher rates of mortality than the underinsured); Institute of Medicine, Committee on the Consequences of Uninsurance*, Health Insurance is a Family Matter*, Nat'l Academy Press (2002) at 69-73 (although uninsured families "use fewer health services on average" than insured families, they "are more likely to have higher health expenditures as a proportion of family income than are insured families"); 42 U.S.C.A. § 18091(2)(G) (Congressional findings in connection with passing the ACA that "62 percent of all personal bankruptcies are caused in part by medical expenses").

[5] *See, e.g.*, Sara Rosenbaum et al., *Crossing the Rubicon: The Impact of the Affordable Care Act on the Content of Insurance Coverage for Persons with Disabilities*, 25 Notre Dame J. L. Ethics & Pub. Pol'y 527, 532-33 (2011) (describing "techniques for discriminating among and against higher health risks" that were permitted before the ACA); *Coverage Matters*, *supra* n.3, at 50.

minorities;[6] people with disabilities;[7] people with chronic conditions, including mental illness;[8] and members of the LGBTQ+ community.[9] Even when insurance was available, it was often riddled with gaps in coverage because of categorical exclusions of coverage for certain

---

[6] *See*, *e.g.*, Blake, *supra* n.4, at 250 & n.107 ("Minorities and lower income people are most likely to be uninsured or underinsured."); *id.* ("in 2004 and 2008, two in five Hispanics and one in five African Americans were uninsured."); *Coverage Matters*, *supra* n.3, at 12 ("African Americans are twice as likely as non-Hispanic whites to be uninsured, and Hispanics are three times as likely to be uninsured"); *id.* at 83-89 (discussing evidence of racial and ethnic disparities in insurance coverage).

[7] *See*, *e.g.*, Rosenbaum, *supra* n.5, at 531 ("[D]iscrimination against persons with disabilities in the context of health insurance coverage, through practices that utilize disability status to determine financial risk, has long been normative practice in the health insurance industry.").

[8] *See*, *e.g.*, Kathleen Rowan, et al., *Access and Cost Barriers to Mental Health Care, By Insurance Status, 1999-2010*, 32:10 Health Affairs 1723, 1723 (2013) (citing studies showing that "[p]eople with mental illnesses are less likely to have health insurance than those without mental health problems"); *id.* (reporting that, in 2004-06, "37 percent of working-age adults with severe mental illnesses were uninsured for at least part of the year, compared to about 28 percent of people without severe mental illnesses.").

[9] *See, e.g.,* Gary J. Gates, *In U.S., LGBT More Likely Than Non-LGBT to Be Uninsured*, Gallup Inc., at 2 (Aug. 26, 2014), https://news.gallup.com/poll/175445/lgbt-likely-non-lgbt-uninsured.aspx?version=print (reporting polling data showing that just before ACA took effect, 24.2% of individuals identifying as LGBT were uninsured, compared with 17.2% of non-LGBT individuals).

conditions (like pre-existing conditions) or specific treatments,[10] effectively leaving some medical needs uninsured. Private insurance was also often much more expensive for certain groups because of insurer practices, like using gender and age rating to set premiums[11] or imposing higher cost-sharing obligations on treatments for certain conditions.[12] As one report observed, before the ACA, "the voluntary, employment-based approach to insurance coverage in the United States function[ed] less like

---

[10] *See, e.g.*, Nat'l Women's Law Center*, Fact Sheet: Reproductive Rights & Health, Case Against the Affordable Care Act Threatens to Devastate Women's Health and Economic Security,* at 1 (May 2021) ("NWLC Fact Sheet") https://nwlc.org/wp-content/uploads/2020/11/ACA-2020-11-09-1.pdf (reporting that before the ACA, insurance companies' pre-existing condition exclusions denied insurance to women based on "having had a cesarean delivery, a prior pregnancy, or receiving medical treatment for domestic or sexual violence").

[11] *See, e.g.*, NWLC Fact Sheet, *supra* n.10, at 1 (reporting that before the ACA, insurance companies often engaged in "gender rating" to charge women "significantly more than men for health insurance").

[12] Rowan, *supra* n.8, at 1724 (citing studies indicating "[c]ost sharing may disproportionately affect people with mental illnesses"); *id.* at 1728 (citing evidence that between 1999-2000 and 2009-2010, "cost barriers increased" for people with moderate and serious mental illnesses who had private insurance); *id.* at 1729 (citing evidence that in 2009-10, 30% of people with serious mental illness who had private insurance "reported that costs were a barrier to getting needed mental health care.").

a system and more like a sieve."[13]

### B. Congress Passed The ACA To Increase Americans' Access To Meaningful Health Coverage, In Part By Prohibiting Discriminatory Practices.

In passing the ACA, Congress sought to combat unfair practices that made adequate health insurance unaffordable or unavailable to so many. The Act includes significant protections for individuals with respect to enrollment, cost-sharing, premium rates, and benefit design, many of which expressly target previously-widespread discriminatory practices. *See*, *e.g.*, 42 U.S.C. § 300gg-3 ("Prohibition of Preexisting Condition Exclusions or Other Discrimination Based on Health Status"); *id.* § 300gg(a) ("Prohibiting Discriminatory Premium Rates"); *id.* § 300gg-4 ("Prohibiting Discrimination Against Individual Participants and Beneficiaries Based on Health Status"). The Act also affirmatively requires health plans to provide comprehensive coverage by mandating coverage of preventive services and specific "essential health benefits," or "EHBs." *See* 42 U.S.C. § 300gg-6.

At the same time, the ACA did not eliminate *all* mechanisms by

---

[13] *Coverage Matters*, *supra* n.3, at 59.

9

which health plans can limit the benefits they offer. For example, while plans may not base premium rates on health status, disability, gender, or other factors, they can vary premium rates on coverage of an individual or family, rating area, age (with limitations), and tobacco use. *Id.* § 300gg(a)(1)(A). Plans may use clinically indicated, reasonable medical management techniques when approving or denying coverage of a particular service for a patient. *See* 45 C.F.R. § 156.125. Plans are also allowed to shift costs back to the plan participants through uniform copays and deductibles, subject to limitations to ensure affordability. *See* 42 U.S.C. §§ 18022(c), 300gg-6 (limiting cost-sharing and setting annual out-of-pocket limits).

While health insurers and plans are allowed to use these and other practices to limit costs, Section 1557 prohibits them from discriminating on suspect grounds when they do so. By thus "extend[ing] the principle of nondiscrimination to the content of health insurance" throughout "the entire health insurance market,"[14] Section 1557 provides essential

---

[14] Sara Rosenbaum, *The Affordable Care Act and Civil Rights: The Challenge of Section 1557 of the Affordable Care Act*, 94:3 Milbank Q. 464, 464-65 (2016).

scaffolding for ACA's overarching purpose of making comprehensive health insurance as widely available as possible.

## II. SECTION 1557 PROHIBITS THIRD PARTY ADMINISTRATORS LIKE BCBSIL FROM DISCRIMINATING WHEN THEY ADMINISTER HEALTH PLANS.

Section 1557 protects individuals from being "subjected to discrimination under[] any health program or activity, **any part** of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a) (emphasis added). BCBSIL's business is exclusively devoted to "health program[s] and activit[ies]" within the meaning of Section 1557.[15] As BCBSIL

---

[15] BCBSIL's argument that its activities as an issuer and administrator of health benefit plans are not covered by Section 1557 relies entirely on a now-superseded regulation purporting to exempt health insurers from being considered to be "principally engaged in the business of providing health care." Appellant's Br. at 16 (citing Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 at 37,244-45 (June 19, 2020)); *compare* (Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522 at 37,694 (May 6, 2024) (definition of "health program or activity," effective as of July 6, 2024). Section 1557, however, is not limited to the direct provision of "health care," instead broadly covering "***any*** health program or activity." 42 U.S.C. § 18116(a) (emphasis added). Congress, further, enacted Section 1557 within Title I of the ACA, which focuses on reforming the health coverage options available to Americans. The district court correctly declined to defer to the 2020 rule, which conflicts with the plain language of the governing statutes and is directly contrary to the central purpose of the ACA. 1-ER-69-70.

admits, it is a "health insurer" that also provides TPA services to employer-sponsored health benefit plans. Appellant's Br. at 7. On its website, BCBSIL advertises that it offers "so much more" than "health insurance," including "a large, statewide network of trusted doctors, hospitals and pharmacies," "health management tools," and "discounts on wellness services."[16] BCBSIL is a "division" of Health Care Service Corporation ("HCSC"), *id.*, which claims in its latest annual report that "[s]upporting access to quality, cost-effective care is at the heart of everything" the corporation does.[17] HCSC says it "employ[s] about 3,400 clinicians — including doctors, nurses, social workers, and pharmacists — who help members get the care they need,"[18] and touts its "strong networks of community providers in our states" as "[o]ne of the main reasons we can help our members access high-quality, affordable health

---

[16] BlueCross BlueShield of Illinois, *The Smart Choice for Your Health Insurance Coverage*, https://www.bcbsil.com/ (last visited June 17, 2024).

[17] Health Care Service Corporation, *2022 Annual Report*, at 8 (2022) ("HCSC Annual Report"), https://www.hcsc.com/documents/hcsc-annual-report-2022.pdf.

[18] HCSC Annual Report, *supra* n. 17, at 8.

care."[19] And HCSC proudly highlights programs through which its subsidiaries deliver medical services directly to patients, including through "mobile health programs" that "deliver no-cost immunizations, screenings, dental care, chronic disease education and other services."[20]

HCSC, through BCBSIL and other subsidiaries, offers fully-insured individual and small group health plans on the healthcare exchange markets created by the ACA, 7-ER-1486-1487, for which it receives federal funding to subsidize consumers' premiums. 7-ER-1489-1490. As a condition of its participation in those ACA markets, HCSC signed an "Assurance of Compliance," promising to comply with Section 1557 and the four referenced civil rights statutes "in consideration of and for the purpose of obtaining . . . Federal financial assistance." 7-ER-1500; *see also* 7-ER-1492-1493. BCBSIL's corporate designee testified that the Assurance of Compliance also binds BCBSIL. 7-ER-1493.

BCBSIL admits that it receives federal financial assistance for portions of its business. Appellant's Br. at 7, 48-49; 7-ER-1486-1490. Therefore, **all** of BCBSIL's operations are health "programs or activities"

---

[19] HCSC Annual Report, *supra* n. 17, at 14.

[20] HCSC Annual Report, *supra* n. 17, at 10.

to which Section 1557 applies—including BCBSIL's administration of employer-sponsored health plans. *See e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 217 (2022) (Section 1557 applies to non-Medicare/Medicaid activities of an entity that "receives reimbursement through Medicare and Medicaid for the provision of ***some of*** its services.") (emphasis added); *T.S. ex. rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742 (7th Cir. 2022) (as defined in the antidiscrimination statutes referenced in Section 1557, term "program or activity" is "not limited to the discrete portion of [an entity's] operations that receives [federal] reimbursements").

Section 1557, therefore, prohibits BCBSIL from subjecting individuals to discrimination on the grounds of race, color, national origin, age, disability, or sex when it administers employer-sponsored health plans in its role as a TPA.

## III. ERISA DOES NOT EXEMPT THIRD-PARTY ADMINISTRATORS LIKE BCBSIL FROM LIABILITY UNDER SECTION 1557.

Even if Section 1557 protects individuals from being subjected to discrimination under their employer-sponsored health plans, BCBSIL contends that the *administrators* of those plans have an absolute defense

to Section 1557 liability if their actions were consistent with the plan's written terms. Despite the statute's plain language, BCBSIL argues that a right of action under 1557 "does not lie" against a third-party administrator of an employer-sponsored health plan for "merely discharging its limited fiduciary duties under ERISA" to "administer the plan as written," including by enforcing facially discriminatory exclusions. Appellant's Br. at 24, 33-41. There is no legal support for the exemption BCBSIL proposes.

### A. Congress Passed ERISA To Protect American Workers' Access To Their Employee Benefits, Including Health Benefits.

In 1974, Congress found that "the continued well-being and security of millions of employees and their dependents" were increasingly being "directly affected" by employee benefit plans, and that inadequate safeguards were causing plan participants to be "deprived of anticipated benefits." 29 U.S.C. § 1001(a). Congress, therefore, passed ERISA to protect the interests of American workers and their families by, among other things, "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," including health plans. *Id.* § 1001(b).

Congress furthered this central purpose of ERISA by imposing strict fiduciary duties on **anyone** who "exercises any authority or control respecting management or disposition of [a plan's] assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). ERISA fiduciaries must carry out **all** of their duties with respect to a plan "solely in the interest of benefit plan participants and beneficiaries," and for the "exclusive purpose" of providing benefits to plan participants and beneficiaries while defraying reasonable administrative expenses. 29 U.S.C. § 1104(a)(1)(A). In doing so, they must act with "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B), and "in accordance with" plan terms, but only "insofar as" those terms comply with ERISA itself. 29 U.S.C. § 1104(a)(1)(D).

In imposing these fiduciary duties on ERISA plan administrators, Congress drew on the common law of trusts, but it also expected courts to "develop a federal common law of rights and obligation under ERISA-regulated plans" while "bearing in mind the special nature and purpose of employee benefit plans." *Varity Corp. v. Howe*, 516 U.S. 489, 496–97 (1996) (cleaned up). Thus, while the written plan terms are "at the center

16

of ERISA," *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013), those terms "must generally be construed in light of ERISA's policies," and they "cannot excuse trustees from their" duties under the statute. *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985).

### B.    ERISA's Fiduciary Duty Provisions Do Not Authorize, Let Alone Require, Illegal Acts.

BCBSIL claims that it cannot be held liable for violating Section 1557 because it was constrained by the written plan terms to apply the discriminatory exclusion, Appellant's Br. at 34, and could not "decline to the apply" the exclusion "without breaching its fiduciary duties under ERISA." *Id.* at 36. In other words, since BCBSIL acted consistently with the plans, BCBSIL says, ERISA provides it with an absolute defense to liability under Section 1557. But BCBSIL has no fiduciary duty under ERISA to discriminate.

First, BCBSIL's attempt to portray its benefit determinations as purely ministerial actions that do not involve any "intent," Appellant's Br. at 24-25, is wholly inconsistent with its role as a TPA for ERISA plans. A TPA that interprets and applies the plan terms in making

17

benefit determinations necessarily exercises discretion, which is why benefit determinations are considered "fiduciary acts" in the first place. *See, e.g., Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) (benefits administrator acts as a fiduciary when exercising discretionary authority to interpret plan terms); *CSA 401(k) Plan v. Pension Pros., Inc.,* 195 F.3d 1135, 1140 (9th Cir. 1999) (fiduciary responsibilities under ERISA include "interpretation of employee benefit plans . . ."); *Zebrowski v. Evonik Degussa Corp. Admin. Comm.,* 578 F. App'x 89, 96 (3d Cir. 2014) ("As a general matter, the administration and interpretation of an ERISA plan are 'fiduciary acts.'") (citation omitted). Even if the plan terms are unambiguous, the TPA still must decide which terms to apply to the facts of each member's case. BCBSIL's decisions to deny benefits to the class members based on the exclusion, therefore, were *necessarily* intentional.

The mere fact that the illegal exclusion was enshrined in the plan terms did not relieve BCBSIL of its duty under Section 1557 to ensure that its own actions were nondiscriminatory.[21] ERISA itself provides that

---

[21] BCBSIL claims it had "no control" over "the allegedly discriminatory plan design." Appellant's Br. at 36. That assertion is misleading, at best, when BCBSIL's corporate designee admitted that BCBSIL offered the

"[n]othing" in the statute "shall be construed to alter, amend, modify, invalidate, impair, or supersede any" other federal laws. 29 U.S.C. § 1144(d). An ERISA fiduciary's statutory duty to comply with plan terms, *id*. § 1104(a)(1)(D), therefore, *cannot* supersede Section 1557's prohibition on discrimination to create a "just following plan terms" defense for ERISA fiduciaries.

Nor does Section 1104(a)(1)(D) itself mandate strict adherence to plan terms, if they require an illegal act. The Supreme Court confirmed a decade ago that ERISA's fiduciary duty provision, 29 U.S.C. § 1104(a), does not "require a fiduciary to break the law." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 428 (2014). *Dudenhoeffer* involved breach of fiduciary duty claims against the administrators of an employee stock ownership plan ("ESOP"), who continued to purchase company stock—as

---

gender dysphoria exclusion to its plan sponsor customers as part of its standard menu of plan design options. *See, e.g.*, 7-ER-1528, 1530; 8-ER-1717–19. But even if BCBSIL were truly uninvolved in a plan's benefit design decisions, it could still be liable for its own actions in *applying* the discriminatory plan term to deny benefits. *See also, e.g.*, *Kulwicki v. Aetna Life Ins. Co.*, No. 3:22-CV-00229 (VDO), 2024 WL 1069854, at *6 (D. Conn. Mar. 12, 2024) (denying motion to dismiss for failure to join plan sponsor and holding "Aetna can provide complete relief for **its own violations of the ACA** without involvement of any other (absent) party.") (emphasis added).

instructed in the ESOP plan documents—even though public and insider information suggested the purchases were imprudent. *Id.* at 413. The Supreme Court refused to create a special presumption of prudence for ESOP administrators, holding that Section 1104(a)(1)(D)'s caveat requiring compliance with plan terms only "insofar as" they are consistent with ERISA "makes clear that the duty of prudence trumps the instructions of a plan document." *Dudenhoeffer, 573 U.S.* at 421. Indeed, the duty of prudence wins out *even if* the plan attempts to "reduce or waive the prudent man standard of care by specific language in the trust instrument," because "trust documents cannot excuse trustees from their duties under ERISA." *Id.* at 422-23 (cleaned up).

The ESOP plan administrators in *Dudenhoeffer* also made an argument just like the one BCBSIL advances here, contending that, without a defense-friendly presumption, ESOP plan administrators could be sued for failing to engage in insider trading when such an action might be considered prudent. *Id.* at 428-29; *compare* Appellant's Br. at 36 (arguing BCBSIL would be subject to "private enforcement actions and potential civil penalties" if it declined to apply the discriminatory exclusion). The Supreme Court rejected that argument, holding that

20

"ERISA's duty of prudence cannot require an ESOP fiduciary to perform an action—such as divesting the fund's holdings of the employer's stock on the basis of inside information—that would violate the securities laws." *Dudenhoeffer, 573 U.S.* at 428. By the same token, ERISA's duty to comply with plan terms cannot require a fiduciary to perform an action that would violate Section 1557.

Since ERISA fiduciaries—like common-law trustees—have no duty to break the law, ERISA's fiduciary duty provision provides no defense to a claim that a plan administrator's action was illegal. Construing that provision as creating an absolute defense—tantamount to an immunity from suit—for TPAs who follow written plan terms, therefore, would be entirely unjustified.

### C. Discriminatory ERISA Plan Exclusions Are Void And Unenforceable Because They Violate Public Policy.

BCBSIL's "just following plan terms" defense fails for an additional reason: the exclusions on which BCBSIL relies to justify its discriminatory denials were (and are) void and unenforceable as a matter of law.

Federal courts must "refrain from enforcing" contracts that violate

21

the "public policy of the United States as manifested in . . . federal statutes . . . ." *Hurd v. Hodge*, 334 U.S. 24, 34–35 (1948); *see also*, *e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) ("[O]ur cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."); *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899) (citing "authorities from the earliest time to the present unanimously hold[ing] that no court will lend its assistance in any way towards carrying out the terms of an illegal contract.").

The public policy of the United States prohibits discrimination on the basis of race, color, national origin, age, disability, or sex, as the statutes referenced in Section 1557 reflect. *See* Title VI, 42 U.S.C. §§ 2000d, 2000e(k); Title IX, 20 U.S.C. § 1681 *et seq.*; the Age Discrimination Act, 42 U.S.C. § 6101 *et seq.*; and Section 504, 29 U.S.C. § 794. Those statutes, along with a host of others, outlaw discrimination on the protected grounds with respect to public services and federally-

assisted programs,[22] education,[23] employment,[24] housing,[25] lending,[26]

public accommodations,[27] law enforcement,[28] and voting.[29] Section 1557,

---

[22] *See* Title VI, 42 U.S.C. § 2000d; Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131 *et seq.*;

[23] *See, e.g.*, Title IX, 20 U.S.C. § 1681 *et seq.* ; Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c *et seq.*; Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1703 *et seq.*; Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.*

[24] *See, e.g.*, Title VII of the Civil Rights Act of 1964, at 42 U.S.C. §§ 2000e(k), 2000e-2; Title I of the ADA, 42 U.S.C. § 12111 *et seq.*; Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).

[25] Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*

[26] Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

[27] *See, e.g.*, Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*; Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

[28] *See, e.g.*, Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, codified at 18 U.S.C. § 249(a)(2) (criminalizing acts of violence that cause injury if they are motivated by a person's actual or perceived sexual orientation, gender identity, or disability); Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601 (prohibiting a pattern or practice of conduct by law enforcement officers that deprives people of their rights under the Constitution or federal law).

[29] *See, e.g.*, Title I of the Civil Rights Act of 1964, 52 U.S.C. § 10101 et seq,; the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301 et seq.; the Voting Accessibility for the Elderly and Handicapped Act of 1984, 52 U.S.C. § 20101 *et seq.*

likewise, "manifests" this well-established public policy against discrimination by expressly invoking Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act and outlawing discrimination in health programs based on the same suspect grounds as those statutes identify. *See* 42 U.S.C. §§ 18116(a)–(b).

The facially-discriminatory plan exclusion at issue here thus violates clearly established United States public policy.[30] As such, the exclusion was void *ab initio. See, e.g., Evans v. Jeff D.*, 475 U.S. 717, 759 (1986) (Brennan, J., dissenting) (citing authorities for "the well-established principle that an agreement which is contrary to public policy is void and unenforceable"); *see also McCutchen*, 569 U.S. at 102 (applying "[o]rdinary principles of contract interpretation" to ERISA plan). "A void contract is not a contract at all, and is without legal effect;

---

[30] Specifically, the exclusion of coverage for otherwise-covered services based solely on the patient's diagnosis of gender dysphoria—a condition that, by definition, only affects transgender people—discriminates on the basis of sex. *See, e.g. Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020) (holding in context of Title VII that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (holding *Bostock* reasoning applies to claims under section 1557 for discrimination based on transgender status).

it binds no one and is a mere nullity." 17A Am. Jur. 2d Contracts § 9; *see also*, *e.g.*, 1 Williston on Contracts §1:20 (4th ed.) ("When a bargain is void, it is as if it never existed.").[31] The facially discriminatory exclusion is thus a nullity, and BCBSIL should have administered the plans as though that term never existed—because, as a matter of law, it did not.

### D. Endorsing The Defense BCBSIL Asserts Would Drastically Undermine Both The ACA And ERISA.

At a minimum, the black-letter law discussed above—of contracts, trusts, and ERISA—demonstrates that BCBSIL cannot be effectively immune from a suit under Section 1557 merely because it followed a written plan term. As the entity tasked with administering the plans and interpreting and enforcing their terms, BCBSIL is plainly a proper defendant for a Section 1557 lawsuit seeking to establish that the exclusion is discriminatory and to enjoin its enforcement (especially since BCBSIL administers identical exclusions under hundreds of plans), along with other remedies aimed at holding BCBSIL to account for its own conduct. The mere fact that the plans themselves might *also* be

---

[31] Because the exclusion is void, the plans do not need to be reformed or amended to preclude the illegal term from being effective. 17A Am. Jur. 2d Contracts § 9.

subject to suit does not make the claims against BCBSIL any less valid.[32]

Exempting TPAs from liability for their own otherwise-illegal actions merely because they acted consistently with written plan terms, moreover, disregards the dominant role TPAs actually play in the American healthcare and health insurance system. In 2023, some sixty-five percent of American workers and their families—nearly 100 million people—received their health coverage under a self-funded employer-sponsored plan,[33] and the vast majority of those plans were administered by a TPA.[34]

---

[32] Indeed, several courts have rejected TPA motions arguing that the plan sponsor is an indispensable party such that a plaintiff's failure to join the plan sponsor requires dismissal of the claims against the TPA. *See*, *e.g.*, *Kulwicki*, 2024 WL 1069854, at *6 (sponsor of a self-funded plan was not a necessary party in Section 1557 suit against TPA); *Berton v. Aetna Inc.*, No. 23-CV-01849-HSG, 2024 WL 869651, at *5-6 (N.D. Cal. Feb. 29, 2024) (same); *Carr v. United Healthcare Servs.*, No. C15-1105-MJP, 2016 WL 7716060, at *1, *3 (W.D. Wash. May 31, 2016) (same in case alleging violations of ERISA and Mental Health Parity and Addiction Equity Act).

[33] Gary Claxton, et al., KFF Employer Health Benefits Report, 2023 Annual Survey, at 6 (Oct. 2023), https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2023-Annual-Survey.pdf (as of 2023, employer-sponsored health plans covered nearly 153 million non-elderly Americans); *id.* at 168 (as of 2023, 65% of employees were in a self-funded plan).

[34] *See*, *e.g.*, Christine Monahan, Q*uestionable Conduct: Allegations Against Insurers Acting as Third-Party Administrators*, CHIRblog, at 1 (Mar. 24, 2023) https://chirblog.org/questionable-conduct-allegations-

The country's largest TPAs, including BCBSIL and its affiliates, are also health insurance companies that design and issue their own fully-insured health plans.[35] Large TPAs like BCBSIL do not simply passively agree to administer whatever plan design their self-funded plan customers come up with. Instead, they offer a menu of plan design options from which the plan sponsors can choose, 7-ER-1527-1528, 1530, and each is subject to carefully drafted, standard plan language, from which the plan sponsors rarely depart. *See, e.g.*, 7-ER-1531-1532, 8-ER-1718-

---

insurers-acting-third-party-administrators/ (last visited June 17, 2024) ("Because employers typically do not have the capacity and resources to administer a health insurance plan themselves, they usually contract with an array of third parties who help build provider networks and negotiate reimbursement rates, design benefit packages, and adjudicate claims, among other responsibilities.").

[35] *See*, *e.g.*, Monahan, *supra* n.33, at 1; Cathy Schoen & Sara R. Collins, *The Big Five Health Insurers' Membership and Revenue Trends: Implications for Public Policy*, 36:12 Health Affairs 2185, 2188 (2017) https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2017.0858 (setting forth data reflecting that, as of 2016, the nation's five largest commercial health insurance companies served as TPAs under "administrative services only" contracts with self-funded plans, collectively covering a total of 74.7 million members); Chris Kissel, *Largest Health Insurance Companies 2024*, Forbes Advisor (Feb. 26, 2024), https://www.forbes.com/advisor/health-insurance/largest-health-insurance-companies/ (listing HCSC as the fourth-largest health insurance company in the nationwide group health insurance market as of 2024).

1719.[36] Granting a TPA like BCBSIL an absolute defense to liability merely because a plan sponsor ratified plan terms the TPA itself designed would only encourage more efforts to craft plan terms designed to evade Section 1557. There is no justification for undermining the purpose of both the ACA and ERISA in this way.

## CONCLUSION

The Court should clearly and explicitly reject BCBSIL's claim that third-party administrators of ERISA plans are exempt from liability for violating federal law whenever their illegal actions were consistent with a plan's written terms. The judgment of the district court should be affirmed.

June 20, 2024

Respectfully Submitted,

/s/ *Caroline E. Reynolds*
Caroline E. Reynolds,
    *Counsel of Record*
David A. Reiser
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800

---

[36] In other words, it is no coincidence that nearly all the class members in this case were subjected to identical gender dysphoria exclusions, even though they were members of many different plans. *See*, *e.g.*, 8-ER-1718 (378 plans contain identical gender dysphoria exclusion).

Fax: (202) 822-8106
Email: creynolds@zuckerman.com
Email: dreiser@zuckerman.com

Abigail K. Coursolle
Elizabeth Edwards*
*Not admitted in this jurisdiction
**NATIONAL HEALTH LAW PROGRAM**
3701 Wilshire Boulevard
Suite 315
Los Angeles, CA 90010
Tel: (310) 736-1652
Email: coursolle@healthlaw.org
Email: edwards@healthlaw.org

*Counsel for Amici Curiae The National
Health Law Program, et al.*

## CERTIFICATE OF COMPLIANCE

The foregoing document complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1(a) because it contains 6,112 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The foregoing document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Caroline E. Reynolds*
Caroline E. Reynolds

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System ("ACMS"). I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ *Caroline E. Reynolds*
Caroline E. Reynolds