No. 23-4331

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

C. P., by and through his parents, Patricia Pritchard and
Nolle Pritchard; and PATRICIA PRITCHARD, *et al.*,

*Plaintiff-Appellee,*

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:20-cv-06145-RJB
Hon. Robert J. Bryan

_____

## APPELLANT'S REPLY BRIEF

_____

Robert N. Hochman
Sam Gorsche
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, WA 98101
(206) 626-7714
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Attorneys for Appellant Blue Cross Blue Shield of Illinois*
[Additional Counsel Listed on Inside Cover]

Adam H. Charnes
Kilpatrick Townsend &
  Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

Stephanie Bedard
Kilpatrick Townsend &
  Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6039
sbedard@ktslaw.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

I. Plaintiffs' Section 1557 Claim Cannot Be Brought Against BCBSIL Because BCBSIL Did Not Design The Exclusion At Issue .......................................................................................... 4

II. BCBSIL Is Not A Unified "Health Program Or Activity" ............ 14

    A. A Health Insurance Company Offers Multiple Health Programs Or Activities ......................................................... 14

    B. Plaintiffs Point To No Statutory Basis For The Contrary Conclusion That BCBSIL Is A Single "Health Program or Activity." .................................................................. 16

    C. Because Federal Rules Have Clearly Exempted BCBSIL From Liability, BCBSIL Cannot Be Held Liable While Such Rules Were In Effect ................................................... 21

III. Section 1557 Must Be Applied In Accordance With RFRA's Rule of Construction ........................................................................ 24

IV. An ERISA Health Plan That Covers A Treatment For One Medical Diagnosis But Not For A Different Medical Diagnosis Does Not Discriminate "On The Basis Of Sex." ............................ 29

CONCLUSION ............................................................................... 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache Stronghold v. United States*,
  101 F.4th 1036 (9th Cir. 2024) ........................................................ 25

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ........................................................................ 22

*Bose v. Bea*,
  947 F.3d 983 (6th Cir. 2020) ...................................................... 7, 32

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) .......................................................... 3, 24, 29, 31

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) .................................................................. 32, 33

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ........................................................................ 28

*Cedeno v. Sasson*,
  100 F.4th 386 (2d Cir. 2024) ......................................................... 10

*Cummings v. Premier Rehab Keller, PLLC*,
  596 U.S. 212 (2022) .................................................. 3, 14, 21, 22, 23

*Doe One v. CVS Pharmacy, Inc.*,
  348 F.Supp.3d 967 (N.D. Cal. 2018) .............................................. 12

*Doe v. CVS Pharmacy, Inc.*,
  982 F.3d 1204 (9th Cir. 2020) .................................................. 11, 20

*Doe v. Mercy Cath. Med. Ctr.*,
  850 F.3d 545 (3d Cir. 2017) ........................................................... 17

*Doe v. Salvation Army in U.S.*,
  685 F.3d 564 (6th Cir. 2012) ......................................................... 17

*Dorer v. Quest Diagnostics Inc.,*
20 F.Supp.2d 898 (D. Md. 1998) ........................................................ 17

*East v. Blue Cross & Blue Shield of La.,*
2014 WL 8332136 (M.D. La. Feb. 24, 2014) .................................... 17

*EEOC v. Cath. Univ. of Am.,*
83 F.3d 455 (D.C. Cir. 1996) ............................................................. 26

*Fabian v. Hosp. of Cent. Conn.,*
172 F.Supp.3d 509 (D. Conn. 2016) .................................................. 31

*Fifth Third Bancorp v. Dudenhoeffer,*
573 U.S. 409 (2014) ........................................................................... 10

*Geduldig v. Aiello,*
417 U.S. 494 (1974) .................................................................... 33, 34

*Gonzales v. O Centro ESpirita Benficente Uniao do Vegetal,*
546 U.S. 418 (2006) ........................................................................... 28

*Grove City Coll. v. Bell,*
465 U.S. 555 (1984) ........................................................................... 15

*Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors,*
59 F.4th 1090 (10th Cir. 2023) .......................................................... 10

*Henry v. Wilmington Tr. NA,*
72 F.4th 499 (3d Cir. 2023) ............................................................... 10

*Intermountain Fair Hous. Council v. Boise Rescue Mission
Ministries,*
717 F.Supp.2d 1101 (D. Idaho 2010), *aff'd on other
grounds,* 657 F.3d 988 (9th Cir. 2011) ............................................. 27

*Jackson v. Birmingham Bd. of Educ.,*
544 U.S. 167 (2005) ........................................................................... 23

*Kadel v. Folwell,*
100 F.4th 122 (4th Cir. 2024), *petition for cert. filed* (U.S.
July 30, 2024) (No. 24-99) ................................................................. 30

iv

*Kulwicki v. Aetna Life Ins. Co.*,
   2024 WL 1069854 (D. Conn. Mar. 12, 2024) ...................................... 21

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ...................................................................... 20

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ............................................................ 30

*Maner v. Dignity Health*,
   9 F.4th 1114 (9th Cir. 2021) ........................................................... 20

*Meagher v. Int'l Ass'n of Machinists & Aerospace Workers*
   *Pension Plan*,
   856 F.2d 1418 (9th Cir. 1988) ......................................................... 10

*Meese v. Keene*,
   481 U.S. 465 (1987) .......................................................................... 7

*Morton v. Mancari*,
   417 U.S. 535 (1974) .......................................................................... 9

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
   819 F.2d 875 (9th Cir. 1987) ........................................................... 25

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ...................................................................... 22, 23

*Rweyemamu v. Cote*,
   520 F.3d 198 (2d Cir. 2008) ....................................................... 25, 26

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
   584 F.3d 253 (6th Cir. 2009) ........................................................... 23

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
   965 F.3d 945 (9th Cir. 2020) ....................................................... 12, 19

*Schroer v. Billington*,
   577 F.Supp.2d 293 (D.D.C. 2008) ................................................... 31

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999) ........................................................... 27

*T.S. v. Heart of Cardon, LLC,*
43 F.4th 737 (7th Cir. 2022) ............................................................ 17

*Tennessee v. Becerra,*
2024 WL 3283887 (S.D. Miss. July 3, 2024) ...................................... 4

*Texas v. Becerra,*
2024 WL 3297147 (E.D. Tex. July 3, 2024) ........................................ 4

*Tovar v. Essentia Health,*
857 F.3d 771 (8th Cir. 2017) ............................................................ 12

*United States v. Pallares-Galan,*
359 F.3d 1088 (9th Cir. 2004) ............................................................ 6

*United States v. Skrmetti,*
No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024) ........................... 1

*Wakefield v. ViSalus, Inc.,*
51 F.4th 1109 (9th Cir. 2022) .......................................................... 25

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ........................................................................ 13

*Wright v. Or. Metallurgical Corp.,*
360 F.3d 1090 (9th Cir. 2004) ............................................................ 8

*Yee v. City of Escondido,*
503 U.S. 519 (1992) .......................................................................... 6

*Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio,*
34 F.Supp.2d 433 (W.D. Tex. 1998) .................................................. 17

**Statutes and Regulations**

20 U.S.C. § 1681(a) ............................................................................ 15

20 U.S.C. § 1687(3)(A) ................................................................. 16, 17

20 U.S.C. § 1687(3)(B) ................................................................. 16, 18

29 U.S.C. § 1104(a) ............................................................................. 8

29 U.S.C. § 1104(a)(1)(D) ............................................... 8, 10

29 U.S.C. § 1185e .............................................................. 11

42 U.S.C. §§ 1395j–1395w ............................................... 19

42 U.S.C. § 4051 ................................................................ 20

42 U.S.C. § 4071 ................................................................ 20

42 U.S.C. § 18113(b) ......................................................... 18

42 U.S.C. § 18116(a) ..................................................... 2, 14

42 U.S.C. § 2000bb(b)(1) .................................................. 24

42 U.S.C. § 2000bb(b)(2) .................................................. 24

42 U.S.C. § 2000bb-1(c) .................................................... 25

42 U.S.C. § 2000bb-3(a) .................................................... 24

42 U.S.C. § 2000bb-3(b) .................................................... 25

42 U.S.C. § 2000e(k) ......................................................... 34

Mental Health Parity and Addiction Equity Act of 2008, Pub.
L. No. 110-343, 122 Stat. 3765 ........................................ 10

No Surprises Act, Pub. L. No. 116-260, 134 Stat. 1182 (2020) ............. 11

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259,
102 Stat. 28 (1988) ........................................................ 16

41 Fed. Reg. 20,296 (May 17, 1976) .................................. 20

81 Fed. Reg. 31,375 (May 18, 2016) .............................. 4, 23

85 Fed. Reg. 37,160 (June 19, 2020) ................................. 22

87 Fed. Reg. 47824 (Aug. 4, 2022) .................................... 20

89 Fed. Reg. 37,522 (May 6, 2024) .......................... 4, 7, 13, 23

## INTRODUCTION

Plaintiffs' brief focuses primarily on a question the Supreme Court will address in its upcoming term: whether a restriction on health insurance coverage of treatments when prescribed for gender dysphoria (but not for other diagnoses) is discrimination on the basis of sex. *See United States v. Skrmetti*, No. 23-477, 2024 WL 3089532, at *1 (U.S. June 24, 2024) (granting writ of certiorari). But this appeal is not primarily about that question, and this Court need not and should preempt the Supreme Court's answer to that question. This appeal is fundamentally about a set of legal conclusions concerning the proper construction of the Affordable Care Act's anti-discrimination provision, as applied to third-party administrators (TPAs) who are following the clear terms of self-funded health plans. Plaintiffs are in a rush to establish that health insurance policy exclusions for treatments for gender dysphoria are sex discrimination. But this Court should not accept their invitation to jettison settled and sensible law distinguishing the roles of TPAs and those who design self-funded plans just to reach that issue.

First, Plaintiffs say that a TPA adhering to ERISA's command to administer a self-funded plan according to its terms can, nonetheless, be

1

deemed to have discriminated against the plaintiff when it applied those terms. The Department of Health and Human Services has sensibly and consistently taken the opposite view, which is suggested by the language of the relevant statutes. The *designer* of the exclusion at issue is the discriminator in such a case, and so a TPA cannot be liable where it exercised no control over the design of the allegedly discriminatory exclusion. Plaintiffs' view makes no effort to strike a balance among the relevant competing congressional policies reflected in ERISA, the Affordable Care Act, and the Religious Freedom Restoration Act. Indeed, Plaintiffs ignore the well-established legal principles requiring proof of *intentional* discrimination (which is entirely absent here) and recognizing that agents are not liable for their principal's discrimination.

Second, Section 1557 applies only to a "health program or activity" that receives federal funds. 42 U.S.C. § 18116(a). Plaintiffs say that Blue Cross Blue Shield of Illinois ("BCBSIL") is a single, unified "program or activity." But, in fact, BCBSIL offers many distinct programs and engages in numerous separate activities. Only BCBSIL's TPA activities are at issue here. Plaintiff needs to blow past the distinction between BCBSIL's TPA and other activities because BCBSIL receives no federal

2

funds for its TPA activities, which makes Section 1557 inapplicable. Equally important, the Supreme Court has said that the scope of conditions on federal funds must be so clear that BCBSIL "would clearly understand … the obligations." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (citation omitted). That is most certainly not true here in light of the fact that HHS reversed its interpretation of Section 1557 twice during the class period. Even if the law collapses BCBSIL's TPA activities into all of its other distinct activities, there has never been clear notice of that.

Finally, Plaintiffs say that RFRA does nothing to protect BCBSIL's religious customers from the substantial free-exercise burdens the district court's injunction will place on them. They say their tactical decision to sue the TPA rather than the plan designer evades RFRA's protections, and, in any event, RFRA does not apply here because the government is not a party. But that is not how RFRA works. RFRA is a "super statute" that creates a rule of construction applicable to *all* federal laws. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020). The law does not permit the kind of facile evasions Plaintiffs propose.

3

For these reasons, even if the exclusions at issue are discrimination on the basis of sex (which they are not because they turn on medical diagnosis), this Court should reverse the district court and order entry of summary judgment in favor of BCBSIL.

## I. Plaintiffs' Section 1557 Claim Cannot Be Brought Against BCBSIL Because BCBSIL Did Not Design The Exclusion At Issue.

HHS's 2016 and 2024 Rules each exclude from the reach of Section 1557 those TPAs that did not design the exclusion.[1] "[A] third party administrator should not be held responsible for discriminatory plan design features over which the third party administrator exercised no control." Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,626 (May 6, 2024); *see also* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,432 (May 18, 2016) ("[T]hird party administrators are generally not responsible for the benefit design of the self-insured plans they administer.").[2]  Both rules—

---

[1] The 2020 Rule also exempted TPAs but did not need to consider the question of whether TPAs are liable for plan design because the Rule's construction of Section 1557's federal-funding requirement effectively excluded TPA operations from liability.  *See infra* Part II.

[2] An unrelated portion of the 2024 Rule has been preliminarily enjoined. *Tennessee v. Becerra*, 2024 WL 3283887, at *14 (S.D. Miss. July 3, 2024); *see also Texas v. Becerra,* 2024 WL 3297147, at *12 (E.D. Tex.

including the above language—have been in effect during parts of the class period.

The district court believed that there was a genuine issue of material fact as to who designed the challenged exclusions. 1-ER-73. Ultimately, however, the district court departed from HHS's construction in the 2016 Rule and the (then only proposed) 2024 Rule and decided that the identity of the plan designer was not relevant under Section 1557. *Id.*

That was error. HHS has always exempted TPAs who did not design the plan because a TPA executing a plan designed by the plan sponsor lacks the required intent to discriminate, BCBSIL Br. 34-36; because Section 1557 does not authorize a cause of action against mere agents, *id.* 36-38; and because such limitations ensure no conflict with ERISA obligations, *id.* 28-32, 44-45. Any of these reasons alone justifies HHS's approach, and all three together compel it.

Plaintiffs try to overcome all of this by first offering a frivolous waiver argument. But BCBSIL's summary judgment briefing argued

---

July 3, 2024) (staying all portions of the Rule as to entities in Texas and Montana).

5

BCBSIL cannot be liable because it did not design the plans, and the district court devoted an entire section of its summary judgment opinion to BCBSIL's "Plan Design Defense." 1-ER-71-73; 7-ER-1424-27. In any event, "parties are not limited to the precise arguments they made below," *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) (citations omitted), because "it is claims that are deemed waived or forfeited, not arguments," *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004).

Plaintiffs also reject the HHS rules on the merits and assert that Section 1557 applies not just to plan design but to a TPA's "own actions" of "administering" and "enforcing" the exclusions, even if the TPA is just an agent of the plan. Plaintiffs' Br. 28. This is wordplay that assumes the conclusion. The law prohibits only intentional discrimination. And Plaintiffs never explain how faithful administration of a plan designed by another entity—which is to say, acting with the intent to follow the plan designer's instructions—amounts to intentional "discrimination" *by the administrator*. Plaintiffs have not, for example, suggested that BCBSIL did anything different with respect to administering these plan terms than it does with respect to any other plan terms. No doubt, if

BCBSIL had applied the same term differently for women than it did for men, it would have administered the plan in a discriminatory fashion. *See* BCBSIL Br. 41 n.3. But BCBSIL does not do that.

This common-sense understanding of what it means to "intentionally discriminate" finds confirmation in cases holding that Title IX and Section 1557 do not allow plaintiffs to impute sex discrimination to a mere "conduit" like BCBSIL. *Bose v. Bea*, 947 F.3d 983, 991 (6th Cir. 2020); *see also* BCBSIL Br. 36-38. Plaintiffs ignore these authorities.

Plaintiffs next emphasize the undeniable but also unilluminating fact that Section 1557 does not itself explicitly "excuse covered entities from liability when acting as a TPA." Plaintiffs' Br. 40. Statutes need not expressly exclude that which is not included. *See Meese v. Keene*, 481 U.S. 465, 484 (1987). Section 1557 prohibits intentional discrimination and, as HHS has reaffirmed, a TPA merely administering an ERISA plan is not a discriminator so long as the TPA "exercised no control" over the allegedly discriminatory exclusion. 89 Fed. Reg. at 37,626.

Plaintiffs are not shy about what their misreading of Section 1557 entails. Their reading unsettles ERISA's careful delineation of responsibilities between plan sponsors, fiduciaries, and TPAs. *See* ERIC Br. 4-

7

11. TPAs owe significant legal duties to the plan. They are required to "comply with a plan as written unless it is inconsistent with ERISA." *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (discussing 29 U.S.C. § 1104(a)).[3]

Plaintiffs believe that Section 1557 compels TPAs, as administrators, to act as arbiters of the lawfulness of a plan sponsor's plan design choices, potentially spending plan assets in a manner the plan expressly prohibits. That is, Plaintiffs believe Section 1557 *requires* TPAs to breach their contractual and other ERISA-based responsibilities to administer plans as written. ERIC Br. 9-10 (collecting cases). And, as Plaintiffs would have it, this would be true even if the plan sponsor had the right to exclude certain treatment for gender dysphoria because, for example, the plan sponsor has a religious objection or is not a health program or activity covered by Section 1557. Plaintiffs' reading of Section 1557 thus

---

[3] Plaintiffs argue (at 46-47) that TPAs "have no ERISA 'fiduciary duty' owed to the plan document" but rather have a duty "solely in the interests of the participants and beneficiaries." Not true. TPAs performing a fiduciary function have coexisting duties to *both* the plan (as designed by the employer) and to the beneficiaries. *See* 29 U.S.C. § 1104(a) (duty to beneficiaries), *id.* § 1104(a)(1)(D) (duty to plan). Moreover, "[t]he duty to act in accordance with the plan document does not ... require a fiduciary to resolve every issue of interpretation in favor of plan beneficiaries." *Wright*, 360 F.3d at 1100 (internal quotation marks omitted).

puts a TPA at significant risk. If it obeys the plan's terms and a court later finds those terms unlawful, it faces substantial liability to participants. But if it violates plan terms that it believes are unlawful and a court later disagrees, it faces substantial liability to the plan sponsor. Congress did not place TPAs in this trap.

Plaintiffs contend that such consequences are justified because ERISA cannot "be construed to … supersede" Section 1557. Plaintiffs' Br. 18-19 (quoting 29 U.S.C. § 1144(d)); *see also id.* 42-43. But that is not what BCBSIL asks this Court to hold. Plaintiffs *insist* that the two statutes conflict. BCBSIL offers a path to reconcile them. Section 1557 can fully apply and achieve its salutary purposes while applying only to the designer of a discriminatory plan feature. When sensibly interpreted that way, Section 1557 and ERISA do not conflict. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). That is all BCBSIL seeks.

Plaintiffs claim that Congress exempted ERISA from the rule favoring harmonization of statutes. They point to § 1104(a)(1)(D), which

requires TPAs to administer the plan in accordance with its terms "insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." *Id.* To Plaintiffs, this provision means that "an ERISA plan's terms cannot be administered in a manner that conflicts with other federal law requirements." Plaintiffs' Br. 45. But that is not what Section 1104(a)(1)(D) says.

Section 1104(a)(1)(D) requires TPAs to ensure that the terms of the plan are consistent with "subchapter [I] and subchapter III," both parts of ERISA. Those two subchapters include statutory requirements that override contrary plan terms. Plaintiffs' cases nullifying plan terms pursuant to § 1104(a)(1)(D) all raised a conflict with subchapter I and subchapter III.[4] Section 1104(a)(1)(D) thus refers to Congress's decision to impose non-negotiable terms on administrators in the text of ERISA itself. *See, e.g.*, Mental Health Parity and Addiction Equity Act of 2008,

---

[4] *See, e.g.*, *Meagher v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 856 F.2d 1418, 1422-23 (9th Cir. 1988) (conflict with 29 U.S.C. §§ 1054, 1082); *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Dirs.*, 59 F.4th 1090, 1109 (10th Cir. 2023) (conflict with 29 U.S.C. §§ 1109, 1132); *Cedeno v. Sasson*, 100 F.4th 386, 401 (2d Cir. 2024) (same); *Henry v. Wilmington Tr. NA*, 72 F.4th 499, 507 (3d Cir. 2023) (same); *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 422-23 (2014) (alleged conflict between plan terms and 29 U.S.C. § 1104(a)(1)(B) duties).

10

Pub. L. No. 110-343, 112 Stat. 3765, 3881, *codified* at 29 U.S.C. § 1185a; No Surprises Act, Pub. L. No. 116-260, 134 Stat. 1182, 2772 (2020), *codified* at 29 U.S.C. § 1185e.

Put simply, Congress knows how to use ERISA to require administrators to privilege Congress's choices over the plan's terms. Congress did not do so here. Plaintiffs can identify no case in which a court has done what they ask: demand TPAs ignore plan terms because of an asserted conflict with a law *other than* ERISA.

Contrary to Plaintiffs' representations, *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020), does not hold "that a Section 1557 claim may be pursued against a covered entity that administers a benefit design that results in discrimination." Plaintiffs' Br. 38. That case concerned a suit against a jointly-owned pharmacy and pharmacy benefits manager for discriminatorily administering a "facially neutral" benefit. 982 F.3d at 1211. Here, Plaintiffs assert the opposite: a TPA loyally administering an allegedly discriminatory benefit. Moreover, the plaintiffs in *CVS Pharmacy* alleged that the pharmacy and pharmacy benefits manager created the allegedly discriminatory network restrictions and then offered "financial inducements to health plan sponsors" to subject

11

employees to those network restrictions. *Doe One v. CVS Pharmacy, Inc.*, 348 F.Supp.3d 967, 977 (N.D. Cal. 2018). The plaintiffs in *CVS Pharmacy* were therefore responsible for designing the allegedly discriminatory plan features.

Plaintiffs' reliance on *Tovar v. Essentia Health*, 857 F.3d 771 (8th Cir. 2017), is similarly misplaced. At the pleading stage, the Eighth Circuit found that the allegation that "discriminatory terms originated with" the TPA was enough to render the injury fairly traceable to the TPA. *Id.* at 778; *see also Kulwicki v. Aetna Life Ins. Co.*, 2024 WL 1069854, at *4 (D. Conn. Mar. 12, 2024) (denying motion to dismiss because TPA "allegedly designed the Plan"). The Eighth Circuit thus relied on the very premise that the district court here rejected—namely, that a TPA's liability depends on it having designed the plan.

Nor are Plaintiffs correct to say that *Schmitt v. Kaiser Foundation Health Plan of Washington*, 965 F.3d 945 (9th Cir. 2020), decided that mere "administration and enforcement of such exclusions" renders a TPA liable. Plaintiffs' Br. 49. *Schmitt* involved a suit against an insurer (and not a TPA) alleged to have "designed its plan benefits in a discriminatory way." *Schmitt*, 965 F.3d at 954.

12

Finally, Plaintiffs shift gears and argue that BCBSIL *did* design the challenged exclusions. See Plaintiffs' Br. 41-42. The district court thought that was a disputed question of fact. But the record demonstrates that BCBSIL did not even draft the exclusion in C.P.'s plan.[5] As the relevant account executive testified, "Catholic Health Initiatives"—not BCBSIL—drafted the exclusion language at issue. 3-ER-401; 5-ER-1110. Moreover, even if BCBSIL had "drafted" the language, that would still not suffice to prove it "designed" the exclusion. A scrivener is not a designer. The designer exercises choice in the substance of a plan. And both the record and the law are clear: BCBSIL "exercised no control" over the plan design. 89 Fed. Reg. at 37,626. The record indicates that the standard plan BCBSIL offers sponsors does not contain an exclusion of gender-dysphoria treatments. 7-ER-1531-32; *e.g.*, 7-ER-1550-1709 (standard plan); *cf.* 89 Fed. Reg. at 37,627 (tying TPA liability to whether TPA introduces discriminatory provision in the "standard plan designs").

---

[5] If there is a triable question of fact as to whether BCBSIL is the plan designer, then not only is the district court's summary judgment decision in error but so is the class certification ruling. The factual question whether, among a variety of plans, BCBSIL designed a given plan provision is not amenable to class treatment. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011).

13

Instead, plan sponsors must request such an exclusion. 5-ER-1118; 7-ER-1527-28.

## II. BCBSIL Is Not A Unified "Health Program Or Activity."

Section 1557's nondiscrimination obligations apply only to a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Plaintiffs insist that BCBSIL is a single, unified "health program or activity" whose acceptance of federal funding for Medicare and Medicaid operations renders its TPA operations subject to Section 1557. But the plain language of Section 1557, in addition to the statute's legal backdrop, says otherwise: BCBSIL offers multiple distinct health "programs" or "activities." Further, the recent regulatory flip-flop on the meaning of "health program or activity" confirms that Section 1557 does not provide the kind of clear statement necessary to condition federal spending on acceptance of its obligations. *Cummings*, 596 U.S. at 216.

### A. A Health Insurance Company Offers Multiple Health Programs Or Activities.

The phrase "health program or activity" is a legal term of art with a long history. Plaintiffs reference the history, Plaintiffs' Br. 34-35, but mischaracterize it. That history indicates that, consistent with the 2020

14

Rule, health insurers like BCBSIL are not a single, unified "health program or activity" but rather offer multiple health programs and activities.

Similar to Section 1557, Title IX prohibits sex discrimination in "any education program or activity" receiving federal funds. 20 U.S.C. § 1681(a). Early on, the Department of Education took the view that each entire university was an "education program or activity," so that federal funds flowing to one operation of the university (such as student financial aid) would subject the whole university to Title IX. In *Grove City College v. Bell*, 465 U.S. 555 (1984), the Supreme Court disagreed. Citing "Title IX's program-specific language"—*i.e.*, the phrase "educational program or activity"—the Court concluded that federal funding for a school's financial aid program "does not trigger institution-wide coverage under Title IX." *Id.* at 571, 573. Under the law as written, a university offers numerous discrete programs and engages in numerous discrete activities. *See id.* at 571, 574.

In response to *Grove City*, Congress expanded the reach of existing antidiscrimination laws. It enacted the Civil Rights Restoration Act of 1987 ("CRRA"), which provided a new definition of "program or activity"

to ensure that some institutions would be subject to the antidiscrimination law institution-wide, even if just one part of it takes federal funds. Pub. L. No. 100-259, 102 Stat. 28 (1988), *codified* at 20 U.S.C. § 1687. Importantly, the CRRA was a *limited* adoption of the government's pre-*Grove City* view. It did not say that *all* institutions receiving federal funds in *any* capacity would be subject to Title IX and other civil rights laws in all of its activities. The law changed only for certain institutions, namely those "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 20 U.S.C. § 1687(3)(A)(ii). The rest remained subject to the *Grove City* rule. *Id.* § 1687(3)(B).

Plaintiffs are thus wrong to claim, without qualification, that "the term 'program or activity' … is not limited to just the operations for which federal assistance is received." Plaintiffs' Br. 35. That is true only for the five types of businesses listed in the CRRA. 20 U.S.C. § 1687(3)(A)(ii).

## B. Plaintiffs Point To No Statutory Basis For The Contrary Conclusion That BCBSIL Is A Single "Health Program or Activity."

Plaintiffs argue that BCBSIL is "principally engaged in the business of providing healthcare." Plaintiffs' Br. 30. Plaintiffs are wrong.

BCBSIL provides health insurance, a financial product.  Congress did not include "insurance" in the CRRA's list of five businesses.  The CRRA includes "housing" in its list. But homeowner's insurers are not "principally engaged in the business of providing … housing."  20 U.S.C. § 1687(3)(A)(ii); *see Doe v. Salvation Army in U.S.*, 685 F.3d 564, 571 (6th Cir. 2012) (defining "principally engaged").  Likewise, health insurers are not "principally engaged in the business of providing … health care."  20 U.S.C. § 1687(3)(A)(ii).

Plaintiffs assert the contrary based on a handful of cases that applied the statute to a health care provider, not an insurer.  *See, e.g.*, *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 743 (7th Cir. 2022) (nursing home); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 553-54 (3d Cir. 2017) (hospital); *Dorer v. Quest Diagnostics Inc.*, 20 F.Supp.2d 898, 900 (D. Md. 1998) (outpatient laboratory).  It goes without saying that health care providers provide health care.  The same truism could not be said about insurers.  In the two "insurers" cases cited by Plaintiffs—*Zamora-Quezada v. HealthTexas Medical Group of San Antonio*, 34 F.Supp.2d 433 (W.D. Tex. 1998), and *East v. Blue Cross & Blue Shield of Louisiana*, 2014 WL 8332136, (M.D. La. Feb. 24, 2014)—the plaintiffs alleged

17

discrimination in discrete insurance programs *that received federal funds*: Medicare HMOs and the Ryan White Program, respectively. Thus, consistent with BCBSIL's arguments and the *Grove City* rule, insurers have been subject Section 1557 only as far as "Federal financial assistance is extended." 20 U.S.C. § 1687(3)(B).

Plaintiffs then argue that Section 1557's use of the word "'any' … has an expansive meaning." Plaintiffs' Br. 31. True, but expansive is not transformative. The question is whether BCBSIL is a single "health program or activity." Placing "any" before a term does not change the definitional boundaries of the term.

Plaintiffs next point to a section of the ACA that refers to a "health plan[]" as a type of "health program." Plaintiffs' Br. 32 (citing 42 U.S.C. § 18051). But that cuts in BCBSIL's favor. That provision suggests only that an *individual plan* is a "health program," not that the *entire insurer* is. Thus, federal funding for one plan would not subject the entire insurer to Section 1557. Similarly, Plaintiffs point to a section of the ACA that defines "health care entity" as everything from an "individual physician" to "a hospital" to a "health care plan." 42 U.S.C. § 18113(b). But that

18

sheds light only on what it means to be a "health care entity" not a "health program," which is the term used by Section 1557.

Plaintiffs also claim *Schmitt* decided this issue in their favor. Plaintiffs' Br. 35-36. But *Schmitt* did not reach the issue of whether a health insurer is a single "health program or activity." This Court assumed, based on the parties' arguments, that the since-vacated 2016 Rule's interpretation was controlling, and ultimately dismissed the discrimination claims on other grounds. *Schmitt*, 965 F.3d at 955.

The district court concluded that an insurer is a health program or activity so long as it receives any federal funds because the district court misread Section 1557's reference to "contracts of insurance" as a type of "health program or activity" when Section 1557 actually referred to "contracts of insurance" as a type of federal funding. BCBSIL Br. 53-54 (discussing 1-ER-70-71). Plaintiffs do not dispute that the district court misread "contracts of insurance" in this way. Plaintiffs' Br. 32 n.9. Rather, Plaintiffs say that insurers are the only possible recipients of federal contracts of insurance. But that is not true. Numerous health care entities—including outpatient centers—receive federally-backed contracts of insurance through programs like Medicare Part B, 42 U.S.C. §§ 1395j–

19

1395w-6,[6] or the National Flood Insurance Program, 42 U.S.C. §§ 4051, 4071.

Lastly, Plaintiffs argue that Section 1557 uses "program or activity" to mean something other than the CRRA's definition. But that flies in the face of numerous principles of statutory interpretation, including the "presumption of consistent usage," *Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021), and the way Section 1557 has been interpreted to incorporate the substantive standards of Title VI, Title IX, and the Rehabilitation Act, *CVS Pharmacy*, 982 F.3d at 1209-10. In any event, were Section 1557 not to incorporate the CRRA's definition of "program or activity," we would be left with the plain meaning of the term, which, as the Supreme Court determined in *Grove City*, excludes the "institution-wide" application that Plaintiffs seek.

---

[6] When Section 1557 was enacted, Medicare Part B funding was understood to be a contract of insurance. *See, e.g.*, 41 Fed. Reg. 20,296, 20,298 (May 17, 1976). HHS recently reversed that interpretation. 87 Fed. Reg. 47,824, 47,890 (Aug. 4, 2022).

### C. Because Federal Rules Have Clearly Exempted BCBSIL From Liability, BCBSIL Cannot Be Held Liable While Such Rules Were In Effect.

Plaintiffs also fault BCBSIL for "rely[ing] on … an obsolete rescinded rule," the 2020 Rule, which codified BCBSIL's view of "health program or activity" in federal regulations. Plaintiffs' Br. 36. But BCBSIL advocates that this Court "exercise independent judgment in construing" Section 1557, with "due respect for the views of the Executive Branch" where it has been persuasive. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267, 2269 (2024). The 2024 Rule's determination that a health insurer is a unified "health program or activity" relied on the same unpersuasive rationale as the Plaintiffs and should be rejected in favor of the 2020 interpretation.

Moreover, as BCBSIL explained in its May 8, 2024, Rule 28(j) letter, the latest regulatory U-turn provides another reason why BCBSIL's TPA activities cannot be subject to Section 1557 liability. An act of the Spending Power (including Section 1557) "is much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Cummings*, 596 U.S. at 216 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). As with a

contract, "[r]ecipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand ... the obligations' that would come along with doing so." *Id.* (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17. And a law is sufficiently unambiguous only if the recipient "would clearly understand" the scope and nature of the obligations. *Arlington Cent.*, 548 U.S. at 296; *see also Cummings*, 596 U.S. at 219 (Courts should "construe the reach of Spending Clause conditions with an eye toward ensuring that the receiving entity of federal funds had notice that it will be liable.") (cleaned up).

If Section 1557 means what Plaintiffs say it means, BCBSIL lacked the requisite notice. For much of the class period (*i.e.*, from 2020 to 2024), BCBSIL accepted federal funds while the federal government told BCBSIL that it would be subject to Section 1557 only for its operations that receive federal funds. Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,172-73, 37,244-45 (June 19, 2020). For the rest of the class period (which began in 2016),

22

the government promised that its funding of BCBSIL's government programs business would not affect BCBSIL's TPA activities. 6-ER-1318; 81 Fed. Reg. at 31,432; 89 Fed. Reg. at 37,626; *see* 2-ER-321 (CHI informing BCBSIL of "good faith determination" that exclusions were lawful).

In addition, the regulatory about-face is itself evidence that Section 1557 fails to "clearly" apply its provisions to BCBSIL's TPA operations. *Pennhurst*, 451 U.S. at 24. Courts have found that a history of shifting agency interpretations strongly suggests the underlying statute lacks the clear statement necessary to make the recipient liable. *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 277 (6th Cir. 2009) (en banc). And the converse is also true. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (finding clear statement because, unlike here, regulations "have been on the books for 30 years").

BCBSIL was never "on notice that, by accepting federal funding, it expose[d]" its TPA activities to Section 1557 liability because Section 1557 does not "unambiguously" subject TPA activities to liability. *Cummings*, 596 U.S. at 219-20. BCBSIL thus cannot be held liable here.

23

## III. Section 1557 Must Be Applied In Accordance With RFRA's Rule of Construction.

Plaintiffs urge upon this Court the district court's view that RFRA has "no bearing" on this case. Plaintiffs' Br. 50. But like the district court, Plaintiffs ignore that RFRA is a "super statute" that creates a rule of construction applicable to all federal laws. *Bostock*, 590 U.S. at 682.

RFRA has two distinct and complementary purposes. First, RFRA seeks "to restore the compelling interest test … and to guarantee its application in *all cases* where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (emphasis added). Second, RFRA "provide[s] a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* § 2000bb(b)(2).

Plaintiffs focus solely on the latter purpose, while entirely ignoring RFRA's equally important purpose of restoring the compelling interest test "in all cases" where free exercise is burdened. RFRA declares that its provisions "appl[y] to all Federal law, and the implementation of that law, whether statutory or otherwise" and whether adopted before or after RFRA. *Id.* § 2000bb-3(a). RFRA also creates a clear-statement "rule of construction" for all laws enacted after it: such laws are "subject to" RFRA's limitations "unless such law explicitly excludes" those

24

limitations by making "reference to this chapter." *Id.* § 2000bb-3(b). By creating a rule for how all statutes must be construed, Congress "made clear its intent that RFRA operate as a framework statute, 'displacing the normal operation of other federal laws.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1058 (9th Cir. 2024) (en banc) (quoting *Bostock*, 590 U.S. at 682). RFRA thus "amends the entire United States Code" and "every federal law and regulation in the land." *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008) (internal quotation marks omitted). Plaintiffs simply ignore this critical feature of RFRA.

As Plaintiffs readily acknowledge, "RFRA's purpose was to effectively reinstate constitutional protections." Plaintiffs' Br. 52. No doubt it does so by ensuring that the compelling interest test applies in cases where the government is the defendant. 42 U.S.C. § 2000bb-1(c). But if that were all, RFRA would fail to achieve that overarching purpose. Free exercise and other constitutional concerns remain present in litigation between private parties too. For instance, constitutional protections limit the kind of statutory liability the government can create and limit the kinds of funding conditions it can impose. *See, e.g.*, *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120-25 (9th Cir. 2022); *Paul v. Watchtower Bible*

25

& *Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987). RFRA thus works the same way. Absent a clear indication to the contrary, RFRA does not permit a statute to apply in a way that substantially burdens religious exercise. And RFRA places a limit on the government's ability to condition federal funds on taking action that burdens religion—including the conditions that Plaintiffs say HHS imposed when it offered BCBSIL funding for Medicare or Medicaid.

By ignoring RFRA's rule of construction, and focusing solely on RFRA's cause of action and affirmative defense, Plaintiffs and amici incorrectly read RFRA's protections out of this case. In doing so, Plaintiffs attempt to paint the Second Circuit's decision in *Hankins* as an outlier. But the Second Circuit has held firm in its correct view that RFRA operates as a super-statute, even as it has it criticized some aspects of *Hankins*. *See Rweyemamu*, 520 F.3d at 202.

Plaintiffs also incorrectly characterize the D.C. Circuit's decision in *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996), as concerning only government litigation. Instead, the case combined two different lawsuits—one brought by the EEOC and one brought by a private plaintiff—and the court applied RFRA to *both* cases. *Id.* at 457, 470.

26

Plaintiffs and Religion-Law Scholars amici also misread this Court's decision in *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999). In *Sutton*, the plaintiff brought a RFRA claim against a private hospital, alleging that the hospital's identity-verification requirement violated his religious beliefs. *Id.* at 829-30. This Court held that RFRA's *cause of action* did not enable suits against private parties not acting under color of federal law. *Id.* at 834-36; *see also id.* at 831 ("[W]e agree that Plaintiff cannot *state a RFRA claim* against Defendant, a private employer, in the circumstances presented.") (emphasis added). This Court "did not, however, address whether the RFRA could be used in a private action as a defense to enforcement of a federal statute." *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717 F.Supp.2d 1101, 1115 (D. Idaho 2010) (emphasis omitted), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011). *Sutton* did not, and could not, reject RFRA's rule of construction.

As a fallback position, Plaintiffs contend that RFRA cannot be applied as a rule of construction because courts may lack sufficient information to identify the burden and the state interest required for a strict scrutiny analysis. Plaintiffs' Br. 57-58. But, even if true in some cases,

27

that is no reason to treat RFRA as inapplicable. It merely raises a burden of proof question.

Here, however, there is no dispute regarding the fact of the burden and the state interest. Plaintiffs conceded the point below, *see* 5-ER-1062-63, acknowledging that applying Section 1557 here would burden BCBSIL's customers' free-exercise right not to provide coverage. Even accepting that the state has a compelling interest in ensuring access to gender-affirming care, forcing BCBSIL and other TPAs to override policy exclusions over the objection of religious customers cannot satisfy the "exceptionally demanding" least-restrictive-means standard. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

Plaintiffs engage with the RFRA analysis solely in a footnote, contending that "Section 1557 serves the compelling interest of eradicating invidious discrimination in health care." Plaintiffs' Br. 59 n.27. But as BCBSIL has explained, Supreme Court precedent forecloses casting the compelling interest at such a high level of abstraction. *See Hobby Lobby*, 573 U.S. at 727; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); BCBSIL Br. 59-60. Plaintiffs can neither evade nor satisfy RFRA.

28

## IV. An ERISA Health Plan That Covers A Treatment For One Medical Diagnosis But Not For A Different Medical Diagnosis Does Not Discriminate "On The Basis Of Sex."

The district court found that, despite differences in plan language, for all class members, the "trigger for application of the [e]xclusion and a denial of coverage was a diagnosis of 'gender dysphoria.'" 1-ER-67. That fundamentally distinguishes this case from *Bostock v. Clayton County*. In *Bostock*, the Supreme Court determined that an employer's discrimination based on transgender status is sex discrimination because such discrimination invariably tolerates the same "traits or actions" from individuals of one natal sex but not from the other. 590 U.S. at 660. Here, by contrast, BCBSIL administers the exclusions by looking only at the treatment code and the medical diagnosis. BCBSIL does not look at the patient's natal sex or gender identity, and cisgender and transgender patients are equally eligible for the same treatments of particular medical diagnoses. That is not sex discrimination.

In arguing otherwise, Plaintiffs point to several cases (from other circuits) on one side of a circuit split. *See* Plaintiffs' Br. 21. That circuit split concerns whether a state law that restricts gender-affirming care for individuals with gender dysphoria is a sex-based classification subject

29

to heightened scrutiny under the Equal Protection Clause. *Compare, e.g., Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *petition for cert. filed* (U.S. July 30, 2024) (No. 24-99), *with, e.g., L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023). The Supreme Court recently granted certiorari to resolve that question. *Skrmetti*, 2024 WL 3089532, at \*1. Of course, this Court need not consider the related question in this case unless it rejects *all* of BCBSIL's arguments above.

On the merits of the issue, Plaintiffs acknowledge *Bostock*'s essential premise, which is that one discriminates on the basis of sex by "'necessarily and intentionally appl[ying] sex-based rules.'" Plaintiffs' Br. 21 (quoting *Bostock*, 590 U.S. at 667). In arguing that BCBSIL discriminated on the basis of sex, Plaintiffs try three times to articulate a sex-based rule applied by BCBSIL. Each effort fails.

First, Plaintiffs note that some class members' plans refer to the exclusion as one for "transgender services." Plaintiffs' Br. 22. Such language mandates no sex-based rules. In practice, BCBSIL implements any such language by excluding certain treatments only when the claim is tagged with the diagnostic code for gender dysphoria. 1-ER-67; 7-ER-1533-35, 1538-40. Thus, whether the patient is transgender or cisgender,

male or female, the plans will cover the same treatments for the same conditions. Any person can receive coverage for a hormone treatment prescribed for central precocious puberty, but will not if prescribed only for gender dysphoria.

Trying again, Plaintiffs assert that "discrimination based on gender transition is also necessarily facial discrimination based on sex," but they do not explain their reasoning. Plaintiffs' Br. 23. Instead, Plaintiffs cite cases that, in line with *Bostock*, held that an employer who takes an adverse action against a transgender employee undergoing sex-reassignment surgery is discriminating based on sex, because the employee necessarily displays "traits or actions" tolerated only in the other natal sex. *Bostock*, 590 U.S. at 660; *see also Schroer v. Billington*, 577 F.Supp.2d 293, 305 (D.D.C. 2008); *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 527 (D. Conn. 2016). By contrast, an objection to paying for a particular treatment need not depend on a view of the patient's status, traits, or actions.

Plaintiffs finally claim the exclusions discriminate on the basis of sex because "BCBSIL cannot administer the Exclusions without considering a person's sex assigned at birth." Plaintiffs' Br 23. The district

31

court, however, reached the opposite (and correct) factual conclusion, which is that BCBSIL considers only medical diagnosis, not sex, when administering the exclusions. 1-ER-67. Nor is it relevant that the physician who diagnoses gender dysphoria in a patient considers that patient's sex assigned at birth; BCBSIL does not consider sex, and BCBSIL cannot be held liable as the "cat's paw" of someone else. *Bose*, 947 F.3d at 989.

As a fallback, Plaintiffs claim that varying coverage based on the gender dysphoria diagnosis is not a sex-based rule itself but rather is facially a "proxy" for discrimination based on transgender status. Plaintiffs' Br. 24.

But the overlap between gender dysphoria and transgender persons is not enough to support a claim of proxy discrimination. A proxy-based discrimination theory applies only when the purported proxy activities are "such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

No such presumption can be justified here. Gender-affirming care—especially irreversible and costly treatments like surgery—are not "such an irrational object of disfavor" for employers that only a discriminatory motive can be "readily presumed." *Bray*, 506 U.S. at 270. As amicus Catholic Benefits Association shows, there are genuine religious objections to such treatments. CBA Br. 8-10. And as amicus Ethics & Public Policy Center shows, there are numerous contested questions about the medical propriety of these treatments. EPPC Br. 7-30; *see also* 6-ER-1343-95.

*Geduldig v. Aiello*, 417 U.S. 484 (1974), demonstrates that proxy-based discrimination theories require more than Plaintiffs' argument that the exclusions discriminate based on transgender status "because only transgender people experience and seek care for gender dysphoria." Plaintiffs' Br. 24-25. In *Geduldig*, the Supreme Court rejected an Equal Protection challenge to California's disability-insurance system's exclusion of pregnancy-related coverage. "While it is true that only women can become pregnant," the Court explained, "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." 417 U.S. at 496 n.20. Rather, "[a]bsent a showing that distinctions

involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other," such exclusions would be lawful as long as they had a "reasonable basis"—and, in *Geduldig*, the exclusion's "fiscal and actuarial benefits" for the system as a whole was one such reasonable basis. *Id.*

Plaintiffs attempt to distinguish *Geduldig* because "pregnancy is not the defining characteristic of a woman" while gender dysphoria "*is* the defining characteristic of a transgender person." Plaintiffs' Br. 27 (emphasis in original). That distinction has no basis in *Geduldig*. *Geduldig* said nothing about defining characteristics versus incidental characteristics, and it certainly did not label pregnancy as incidental. Rather, as in *Bray*, *Geduldig* rejected the proxy discrimination argument because the exclusion of pregnancy-related disability-insurance coverage was not so irrational as to cause a presumption of discriminatory intent, but rather had a colorable justification given the purposes of the policy.[7]

---

[7] Amicus ACLU also argues that *Geduldig* does not apply because Congress later amended Title VII to define sex discrimination as including distinctions "on the basis of pregnancy." 42 U.S.C. § 2000e(k); ACLU Br. 12-15. But Congress has not amended Title VII (or Section 1557) to say the same about gender dysphoria, so *Geduldig*'s threshold for proxy-based theories applies here.

34

This Court should reject Plaintiffs' claim of proxy-based discrimination for analogous reasons. Simply put, costly and controversial gender-dysphoria treatments are not an "irrational object of disfavor" from which the employer's (and certainly not BCBSIL's) discriminatory intent toward transgender individuals "can readily be presumed."

## CONCLUSION

The judgment of the district court should be reversed with instructions to enter summary judgment for the Defendant.

Date: August 2, 2024

/s/ *Robert N. Hochman*
Robert N. Hochman

Robert N. Hochman
Sam Gorsche
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
rhochman@sidley.com

Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
jrozansky@sidley.com

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, WA 98101
(206) 626-7714
gpayton@ktslaw.com
jneeleman@ktslaw.com

Adam H. Charnes
KILPATRICK TOWNSEND &
 STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

Stephanie Bedard
KILPATRICK TOWNSEND &
 STOCKTON LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
(404) 815-6039
sbedard@ktslaw.com

*Attorneys for Appellant Blue Cross Blue Shield of Illinois*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Circuit Rule 32-1(b) because it contains 6998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 365 word processing system in 14-point Century Schoolbook font.

Date: August 2, 2024

*/s/ Robert N. Hochman*
Robert N. Hochman

*Attorney for Appellant Blue Cross Blue Shield of Illinois*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Date: August 2, 2024

>                                        */s/ Robert N. Hochman*
>                                        Robert N. Hochman
>
>                                        *Attorney for Appellant Blue Cross Blue Shield of Illinois*