**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PATRICIA PRITCHARD, as parent on behalf of minor C.P.; NOLLE PRITCHARD, as parent on behalf of minor C.P.; S.R.; R.L., as parent on behalf of minor S.L.; EMMETT JONES, | No. 23-4331 <br><br> D.C. No. 3:20-cv-06145-RJB |
| *Plaintiffs - Appellees*, | OPINION |
| v. | |
| BLUE CROSS BLUE SHIELD OF ILLINOIS, | |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted January 15, 2025
Pasadena, California

Filed November 17, 2025

2      PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL

Before: JOHNNIE B. RAWLINSON and MILAN D. SMITH, JR., Circuit Judges, and JED S. RAKOFF, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.; Concurrence by Judge Johnnie B. Rawlinson

## SUMMARY[**]

### Affordable Care Act / Sex-Based Discrimination

The panel vacated the district court's summary judgment against Blue Cross Blue Shield of Illinois (BCBSIL), and remanded, in a class action alleging that BCBSIL, a third-party administrator for certain employer-sponsored health insurance plans, violated Section 1557 of the Affordable Care Act by refusing to cover treatment for gender dysphoria, citing plan exclusions put in place at the insistence of the employer sponsors.

The panel joined the district court in rejecting BCBSIL's arguments that it was not liable pursuant to Section 1557, which bars sex-based discrimination, because (1) its plans were not funded by the federal government, (2) it was acting at the direction of the employers, and (3) it was shielded by the Religious Freedom Restoration Act (RFRA). First,

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

employing an entity-level analysis, rather than a plan-level analysis, BCBSIL's provision of health insurance was a health program or activity, part of which was receiving Federal financial assistance. BCBSIL waived its argument that it had insufficient notice, as required by the Spending Clause, that it would be subject to Section 1557 for its third-party administrator activities. Second, a third-party administrator such as BCBSIL can be liable for violating Section 1557, even when implementing plan terms drafted by a plan sponsor. The Employee Retirement Income Security Act does not require third-party administrators to implement unlawful plan terms. BCBSIL forfeited its argument regarding intent, and even absent forfeiture, its argument failed because intentional discrimination based on sex violates Section 1557, even if intended only to comply with the terms selected by the plan sponsor. Third, RFRA does not apply because BCBSIL's religious exercise was not burdened. And even if RFRA provides a defense to those whose religious exercise is not burdened, it does not provide a defense against claims brought by a private party.

The district court also rejected BCBSIL's argument that its exclusions did not discriminate based on sex. The panel concluded, however, that the district court's analysis was undercut by intervening Supreme Court authority in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). The panel therefore vacated the district court's summary judgment against BCBSIL and remanded for the district court to consider the implications of *Skrmetti*. The panel explained that, although the district court's reasoning failed in light of *Skrmetti*, this case is potentially different from *Skrmetti* in two respects. First, some Plaintiffs allegedly had diagnoses other than gender dysphoria that entitled them to hormones or other treatment, but BCBSIL still would not treat

4         PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL

them.   Second, *Skrmetti* left open the argument that
BCBSIL's justifications for its actions were a pretext for
invidious discrimination.   The panel expressed no view
about the appropriate outcome on remand.

Concurring in the judgment, Judge Rawlinson wrote that
she agreed in large part with the majority opinion but wrote
separately because it was improvident to opine on issues that
the panel was remanding to the district court in light of
intervening Supreme Court precedent—specifically, how
the district court could potentially distinguish *Skrmetti*.

## COUNSEL

Omar Gonzalez-Pagan (argued), Lambda Legal Defense & Education Fund Inc., New York, New York; Karen L. Loewy, Lambda Legal Defense & Education Fund Inc., Washington, D.C.; Jennifer C. Pizer, Lambda Legal Defense & Education Fund Inc., Los Angeles, California; Eleanor Hamburger, Sirianni Youtz Spoonemore Hamburger PLLC, Seattle, Washington; for Plaintiffs-Appellees.

Robert N. Hochman (argued) and Sam Gorsche, Sidley Austin LLP, Chicago, Illinois; Jeremy D. Rozansky and Kwaku A. Akowuah, Sidley Austin LLP, Washington, D.C.; Gwendolyn C. Payton and John R. Neeleman, Kilpatrick Townsend & Stockton LLP, Seattle, Washington; Stephanie Bedard, Kilpatrick Townsend & Stockton LLP, Atlanta, Georgia; Adam H. Charnes, Kilpatrick Townsend & Stockton LLP, Dallas, Texas; for Defendant-Appellant.

Jonathan A. Scruggs, Alliance Defending Freedom, Scottsdale, Arizona; John J. Bursch and Andrea Dill, Alliance Defending Freedom, Washington, D.C.; for Amicus Curiae Christian Employers Alliance.

Andrew Nussbaum and L. Martin Nussbaum, First & Fourteenth PLLC, Colorado Springs, Colorado, for Amicus Curiae the Catholic Benefits Association.

Joanne Roskey and Anthony F. Shelley, Miller & Chevalier Chartered, Washington, D.C., for Amici Curiae the ERISA Industry Committee and America's Health Insurance Plans Inc..

Eric N. Kniffin and Mary R. Hasson, Ethics & Public Policy Center, Washington, D.C., for Amicus Curiae Ethics and Public Policy Center.

6       PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL

Joshua A. Block, American Civil Liberties Union Foundation, Washington, D.C.; Susannah P. Lake, American Civil Liberties Union of Washington Foundation, Seattle, Washington; for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Washington Foundation.

Richard B. Katskee, Joshua Britt, Margaret K. Kruzner, and Jake Sherman, Duke University School of Law, Durham, North Carolina, for Amici Curiae Religion-Law Scholars.

Caroline E. Reynolds and David A. Reiser, Zuckerman Spaeder LLP, Washington, D.C.; Abigail K. Coursolle and Elizabeth Edwards, National Health Law Program, Los Angeles, California; for Amici Curiae The National Health Law Program, et al..

Barbara J. Chisholm, Connie K. Chan, and Robin S. Tholin, Altshuler Berzon LLP, San Francisco, California; Alison Tanner and Michelle Banker, National Women's Law Center, Washington, D.C.; for Amici Curiae National Women's Law Center, Autistic Self Advocacy Network, Autistic Women & Nonbinary Network, Campaign for Southern Equality, Disability Rights Education & Defense Fund, Equality California, GLBTQ Legal Advocates & Defenders, National Partnership for Women & Families, Positive Women's Network-USA, Service Employees International Union, and Transgender Legal Defense & Education Fund.

PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL        7

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs, who represent a similarly situated class, sued Defendant Blue Cross Blue Shield of Illinois (BCBSIL), for its actions as a third-party administrator for certain employer-sponsored health insurance plans. BCBSIL refuses to cover treatment for gender dysphoria, citing plan exclusions put in place at the insistence of the employer sponsors. Plaintiffs sued pursuant to Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, which bars sex-based discrimination, to compel BCBSIL to cover this treatment. BCBSIL counters with four arguments, arguing it is not liable pursuant to Section 1557 because: its plans are not funded by the federal government; it was acting at the direction of the employers; it is shielded by the Religious Freedom Restoration Act (RFRA); and its exclusions do not discriminate based on sex.

The district court rejected each of BCBSIL's arguments, awarding summary judgment to the class. We join the district court in rejecting BCBSIL's first three arguments. But the district court's analysis of the fourth argument is undercut by intervening Supreme Court authority in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). We therefore vacate the summary judgment against BCBSIL and remand so the district court may consider the implications of that authority.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Gender Dysphoria

Someone's gender identity is their "inner sense of belonging to a particular sex, like male or female." Most

people are cisgender, and their "actual sex" matches the sex they "are assigned . . . based solely on the appearance of their external genitalia." For transgender people, however, their gender identity and sex do not match.

As the American Psychiatric Association has recognized, this "gender incongruence, in and of itself, does not constitute a mental disorder." However, a transgender person can suffer from gender dysphoria if the "marked incongruence between [their] experienced/expressed gender and assigned gender" causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Without treatment, gender dysphoria can lead to anxiety, depression, suicide, and other mental health problems.

Healthcare providers can treat gender dysphoria using counseling, hormone therapy, surgery, and other forms of gender-affirming care. Providers adapt the treatments used to the medical needs of each patient; not all patients need each treatment. When doctors provide gender-affirming hormone therapy, they seek to decrease hormones associated with the person's birth sex and increase hormones associated with their actual sex. Likewise, when transgender women receive surgery, they undergo procedures like chest reconstruction, hysterectomy, or phalloplasty to eliminate or reduce the physical features reflecting their birth sex. Transgender men, when they receive surgery, undergo procedures like vaginoplasty, breast reduction, and orchiectomy for the same purpose. Sometimes, doctors give transgender adolescents medication to delay puberty and prevent the development of characteristics associated with the individual's sex at birth.

## II. Third-Party Administrators

Most people obtain health insurance on the group market from their employer or a family member's employer. Employers sponsor plans for their workers in two ways. First, "fully insured" employers purchase insurance on their employees' behalf from an insurer. Second, "self-insured" employers assume responsibility for their employees' healthcare costs but retain a third-party administrator to perform tasks like assembling a provider network, billing those providers, and processing claims. This group of plan sponsors decides which healthcare costs they will cover for employees.

These employer-sponsored plans can exclude services for many reasons. Plans generally exclude services that are not medically necessary. Plan sponsors often exclude certain classes of treatment, like dental coverage, Lasik eye surgery, and weight loss prescription drugs. Sometimes, sponsors exclude treatments like contraceptives for religious reasons.

Some plans exclude services to treat gender dysphoria. These plans may exclude all such services, exclude only some forms of gender-affirming care, or exclude gender-affirming care only in specific situations. Others exclude from coverage only the reversal of gender reassignment surgery.

## III. Blue Cross Blue Shield of Illinois

BCBSIL is a health care services company that sells health insurance coverage and operates as a third-party administrator for various health plans. BCBSIL is not a religious entity.

BCBSIL receives federal funds for several products, including Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and Medicare/Medicaid dual eligibility. It does not receive assistance for acting as a third-party administrator. To receive these funds, BCBSIL promised to comply with Section 1557's non-discrimination obligations.[1]

For fully insured plans, BCBSIL covers gender-affirming care. BCBSIL considers these treatments to be medically necessary for treating adolescents with gender dysphoria.

When BCBSIL is a third-party administrator, it permits its employer-clients to "add or remove any benefits that they wish." Thus, it lets plan sponsors exclude gender-affirming care. 398 of its sponsors have chosen to do so. BCBSIL offers "standard language" to employers who want to exclude gender-affirming care. 378 of the 398 sponsors use that language.

BCBSIL never asks employers for a justification or reason when they exclude gender-affirming care. It does not require a medical, scientific, or religious reason for the exclusions. It would administer the exclusion even if the employer wanted the exclusion for discriminatory purposes.

The plans here have gender-affirming care exclusions, which exclude treatment for gender dysphoria. For these

---

[1] BCBSIL's parent, Health Care Services Corporation (HCSC), signed an agreement stating it would abide by Section 1557. Neither party argues that only HCSC is bound by Section 1557. Indeed, BCBSIL says it, not just HCSC, "receives Federal financial assistance for" various insurance plans.

plans, BCBSIL determines whether to approve or deny claims based on the patient's diagnosis and the procedure at issue.

## IV.   Plaintiffs and Their Treatment

C.P. is a young transgender man diagnosed with gender dysphoria. He was enrolled in a BCBSIL-administered health plan. That plan excluded "[b]enefits . . . for treatment, drugs, medicines, therapy, counseling services and supplies for, or leading to, gender reassignment surgery." The plan sponsor, Catholic Health Initiatives ("CHI"), requested that exclusion for religious reasons.

C.P.'s doctor prescribed puberty-delaying medication, distributed through a Vantas implant. BCBSIL initially covered the implant. BCBSIL later said its coverage decision was erroneous because of the plan exclusion. C.P.'s family appealed, and the appeal was denied. Later, when C.P. was prescribed a second Vantas implant, BCBSIL denied coverage.

C.P.'s doctor also recommended gender-affirming chest surgery. BCBSIL denied coverage based on the exclusion. A BCBSIL representative stated that the surgery was necessary.

S.L. is a transgender girl who has been diagnosed with gender dysphoria and precocious puberty.[2] She is enrolled in a self-funded health benefit plan administered by BCBSIL. Her healthcare provider prescribed puberty-delaying hormones. BCBSIL denied coverage, citing an exclusion in the plan. That provision excludes "[g]ender

---

[2] Precocious puberty is a condition where puberty begins at an abnormally young age.

reassignment surgery (also referred to as transsexual
Surgery, sex reassignment Surgery or intersex Surgery),
including related services and supplies." S.L.'s mother
appealed, but BCBSIL denied the appeal.

Emmett Jones is a transgender man diagnosed with
gender dysphoria. He is enrolled in the same plan as
C.P. Jones's providers recommended gender-affirming
chest surgery. Jones paid out-of-pocket and sought
reimbursement, which BCBSIL denied.

## V. This Action

C.P. and his mother, Patricia Pritchard, filed this lawsuit
on November 23, 2020. They alleged that BCBSIL violated
Section 1557 by administering the exclusion in their policy.
BCBSIL moved to dismiss, but the district court denied that
motion. On September 10, 2021, C.P. and Patricia Pritchard
moved to file an amended complaint on behalf of a class.
The district court granted this motion.

After discovery, Plaintiffs moved to certify the class, and
both sides moved for summary judgment. On November 9,
2022, the district court certified the class, with later
amendments in December 2022 and December 2023. Now,
the class consists of:

> [A]ll individuals who: (1) have been, are, or
> will be participants or beneficiaries in an
> ERISA self-funded 'group health plan' (as
> defined in 29 U.S.C. § 1167(1)) administered
> by Blue Cross Blue Shield of Illinois during
> the Class Period and that contains a
> categorical exclusion of some or all Gender-
> Affirming Health Care services; and (2) were
> denied pre-authorization or coverage of

> treatment solely based on an exclusion of some or all Gender Affirming Health Care services; and/or (3) are or will be denied pre-authorization or coverage of treatment solely based on an exclusion of some or all Gender Affirming Health Care services.

The class period is November 23, 2016, to the present.

On December 19, 2022, the district court granted Plaintiffs' motion for summary judgment and denied BCBSIL's analogous motion. In doing so, the district court made four principal rulings. First, it rejected the argument that BCBSIL was exempt from Section 1557 because its third-party administrator activities were "not 'healthcare activities'" and because it "does not receive any federal financial assistance for [those] activities." The district court also held that "ERISA's requirement that Blue Cross follow the Exclusion's language is no defense." Next, the district court rejected BCBSIL's RFRA arguments because this is an action between private parties. Finally, the district court held that BCBSIL's "denial of benefits under the Plaintiffs' plans based on their transgender status was discrimination on the basis of sex."

After the summary-judgment ruling, Plaintiffs sought class-wide relief. While that motion was pending, Plaintiffs added S.L. and Emmett Jones. The district court prohibited BCBSIL from administering or enforcing exclusions for gender-affirming health care and required it to re-process class members' claims if denied during the class period. BCBSIL timely appealed. The district court stayed its injunction pending this appeal.

14      PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL

## JURISDICTION AND STANDARD OF REVIEW

Because Plaintiffs raise claims pursuant to Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, the district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. In turn, we have subject-matter jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

"The district court's ruling on cross-motions for summary judgment is reviewed de novo." *Hartstein v. Hyatt Corp.*, 82 F.4th 825, 828 (9th Cir. 2023).

## ANALYSIS

We reject BCBSIL's first three defenses. BCBSIL is bound by Section 1557 because its provision of health insurance is a health program or activity, part of which is receiving Federal financial assistance. BCBSIL can be liable for violating Section 1557 even when implementing plan terms drafted by a plan sponsor. BCBSIL also has no RFRA defense here.

BCBSIL's fourth defense, however, presents a far more difficult question. The district court's application of *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), cannot stand in light of *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). Even so, there is some possibility that *Skrmetti* may not necessarily foreclose Plaintiffs' Section 1557 claim. Thus, we vacate the summary judgment against BCBSIL and remand for the district court to reconsider this issue in light of *Skrmetti*.

**I.   The district court reached the correct result in concluding that BCBSIL's provision of health**

**insurance is a health program or activity, part of which is receiving Federal financial assistance.**

Pursuant to Section 1557 of the Affordable Care Act, "an individual shall not [on certain grounds] be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116(a). BCBSIL does not deny that "health program or activity" includes health insurance,[3] but it argues Section 1557 only governs the plans receiving funding, not its entire health insurance program.

## A. The district court's analysis of "health program or activity" was erroneous.

The district court concluded that providing contracts of insurance is a single "health program or activity" because Section 1557 covers "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116(a). The district court, and Plaintiffs, read providing "credits, subsidies, or contracts of insurance" as examples of health programs or activities, while BCBSIL reads them as forms of financial assistance.

We agree with BCBSIL. Typically, "qualifying phrases are to be applied to the words or phrase immediately preceding the qualifier and are not to be construed as

---

[3] Even if BCBSIL had disputed this point, we have held that "Section 1557 . . . prohibits discrimination on th[e enumerated] grounds . . . in health insurance contracts." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 951 (9th Cir. 2020). Indeed, Section 1557 was part of the Affordable Care Act, and it would be anomalous to read it to exclude health insurance.

modifying more remote phrases." *Am. Fed'n of Gov't Emps., AFL-CIO Loc. 2152 v. Principi*, 464 F.3d 1049, 1055 (9th Cir. 2006). Thus, "credits, subsidies, and contracts of insurance" modifies "Federal financial assistance."

Moreover, "[w]hen a word appears in a list of similar terms, each term should be read in light of characteristics shared by the entire list[.]" *Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021). "Credits" and "subsidies" are always forms of financial assistance, but they need not have anything to do with health. Because the statute treats "contracts of insurance" like "credits" and "subsidies," it treats "contracts of insurance" as a form of financial assistance.

Plaintiffs respond that the statute includes "contracts of insurance" to distinguish other civil rights statutes that exempted "contracts of insurance.". Even in the other context Plaintiffs cite, however, contracts of insurance are a form of federal financial assistance, not a type of health program or activity. *See* 45 C.F.R. § 84.10 (defining "Federal financial assistance [as] any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement" meeting certain conditions).

Nor would reading "contracts of insurance" as a form of financial assistance render this part of the statute a nullity. Health programs and activities sometimes receive government aid via contracts of insurance. For example, pursuant to the National Flood Insurance Program, the government organizes a pool of insurers to provide flood coverage to businesses. *See* 42 U.S.C. §§ 4051, 4071; *see also* 42 U.S.C. § 4012(a) (making insurance available to

cover business properties). Some of those businesses are
presumably engaged in health programs or activities.

The district court responds that the ACA was enacted "to
increase access to services and insurance coverage."
However, that purpose describes the entire ACA and not
Section 1557. It does not illuminate whether "contracts of
insurance" are a form of financial assistance or whether
"health program or activity" is defined at the entity or plan
level.[4] We turn to that question now.

### B. Notwithstanding the district court's error, BCBSIL is subject to Section 1557 because courts must analyze "health program or activity" at the entity level, not the plan level.

BCBSIL claims it is not subject to Section 1557 based
on a plan-level analysis: BCBSIL received no federal
funding for the plans that exclude gender-affirming care, so
those plans are not "health program[s] or activit[ies], any
part of which is receiving Federal financial assistance" and
therefore are not covered by Section 1557. Plaintiffs
disagree, employing an entity-level analysis: BCBSIL
received federal funding, so all of its operations are covered.

Section 1557's text forecloses BCBSIL's position that
"insurers have been subject [to] Section 1557 only as far as
'Federal financial assistance is extended.'" Section 1557
only requires that some "part" of the health program or

---

[4] In the same vein, Plaintiffs also rely on the legislative history of Section
1557. That section's sponsors expressed a desire "that all Americans
[be] able to reap the benefits of health insurance reform equally, without
discrimination." 156 Cong. Rec. S1821, 1842 (daily ed. Mar. 23, 2010).
Although that statement underscores Section 1557's importance, it does
not help understand the appropriate level of analysis for "health program
or activity."

activity receive funding. 42 U.S.C. § 18116(a). If "health program or activity" was already limited to the part receiving funding, it would not make sense to say that only part of the "health program or activity" needed to receive funding.

Additionally, the structure of the Affordable Care Act undercuts the view that "health program or activity" refers to the individual insurance plan, rather than the entity providing health insurance. The Affordable Care Act uses "health program" again in 42 U.S.C. § 18051, where it authorizes states to establish "basic health programs." In one of those "health programs," "a State may enter into contracts to offer 1 or more standard health plans," which is inconsistent with the position that each plan is its own separate health program. *See* 42 U.S.C. § 18051(a)(1). BCBSIL argues that each health plan is just a type of health program. The statute does not treat health plans that way. For example, 42 U.S.C. § 18051(c)(1) states that "[a] State basic health program shall establish a competitive process for entering into contracts with standard health plans[.]" As before, there is only one health program, and it offers multiple health plans. This section suggests "health program or activity" is not defined at the plan level.

The related term "program or activity,"[5] as used in other statutes, often requires an entity-level analysis, and it is never limited to the specific operation receiving federal funds. The Civil Rights Restoration Act (CRRA), for

[5] When interpreting a term, it is appropriate to consider related terms used in similar contexts. After all, "'statutes addressing the same subject matter' generally should be interpreted consistently with each other," especially when "the language in an earlier act is the same as, or similar to, the language in the later act." *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006)).

PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL        19

example, provides that "program or activity" means, among
other things, "all of the operations of . . . (A) an entire
corporation, partnership, or other private organization, or an
entire sole proprietorship—(i) if assistance is extended to
such corporation, partnership, private organization, or sole
proprietorship as a whole; or (ii) which is principally
engaged in the business of providing education, health care,
housing, social services, or parks and recreation; or (B) the
entire plant or other comparable, geographically separate
facility to which Federal financial assistance is extended, in
the case of any other corporation, partnership, private
organization, or sole proprietorship; . . . any part of which is
extended Federal financial assistance[.]"        20 U.S.C.
§ 1687(3).[6] Under this definition, "program or activity" is
either defined with respect to an entire entity or, at the
smallest, a "geographically separate facility to which Federal
financial assistance is extended."

This definition of "program or activity" provides further
support for our conclusion that Congress generally treats that
phrase as directing an entity-level analysis. Indeed, the only
instance in which that definition reaches a unit smaller than
an "entire corporation" is in the case of a "geographically
separate facility." Even in that instance, the entire facility
constitutes a "program or activity" without regard to the
different operations or activities provided therein.
Accordingly, both parts of the definition of "program or
activity" set forth entity-level tests, suggesting that "health
program or activity," as used in Section 1557, directs the
same. And because the funding BCBSIL received cannot be
cabined to a single "plant or other comparable,

---

[6] Other statutes use the same definition. *See, e.g.*, 42 U.S.C. § 6107(4);
42 U.S.C. § 2000d-4a(3).

geographically separate facility," even the narrower of these two tests provides no basis for treating "health program or activity" as referring solely to a subset of BCBSIL's operations, no less to a specific insurance plan.

Applying an entity-level test is also consistent with Supreme Court precedent. The Supreme Court noted that Section 1557 "outlaws discrimination on [various] grounds . . . by healthcare *entities* receiving federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022), *reh'g denied*, 142 S. Ct. 2853 (2022) (emphasis added); *see id.* at 217 (Section 1557 "appl[ies] to *entities* that receive federal financial assistance" (emphasis added)). To be sure, *Cummings* did not consider BCBSIL's argument. But if BCBSIL were right, we think the Supreme Court would have written that Section 1557 applies to healthcare plans or healthcare options, not "healthcare entities." *Id.* at 218.

To avoid this conclusion, BCBSIL relies on the 2020 Rule, a regulation that defined "health program or activity" for the purposes of Section 1557. *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020). However, the 2020 Rule does not control. Even if Section 1557 were ambiguous, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). It is true that an agency interpretation may have "power to persuade" "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and" other factors. *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). All the

same, we find that the 2020 Rule used invalid reasoning.[7]
We also note that the 2020 Rule is inconsistent with at least
one later pronouncement.[8] Accordingly, we do not decide

---

[7] The 2020 Rule defined "health program or activity" to include "all the operations of entities principally engaged in the business of providing healthcare," and, for any other entity, to include "such entity's operations only to the extent that any such operation received Federal financial assistance." 85 Fed. Reg. at 37, 244. The 2020 Rule further provided that an entity "principally engaged in the business of providing healthcare" does not include an entity "engaged in the business of providing health insurance." *Id.* at 37, 244-45. This definition is inconsistent with the statutory text for two reasons. First, it introduces a distinction between entities that provide "healthcare" and those performing other health functions, even though the language of Section 1557 refers to "health" programs or activities in general. Second, to the extent the 2020 Rule extends "health program or activity" to entities other than "healthcare" entities, it does so only "to the extent" of the federal financial assistance received. But, as explained above, the text of Section 1557 expressly forecloses this interpretation as it requires only that "any part" of the health program or activity receive funding for Section 1557 to apply. Finally, the fact that the 2020 Rule purported to adopt a definition "align[ed] . . . with the standard articulated in the [Civil Rights Restoration Act]" does not save the Rule because the CRRA does not support the definition adopted. *Id.* at 37,171. As discussed above, the CRRA defined "program or activity" to require an entity-level or geographically-separate-facility-level analysis. It provides no support for the portion of the 2020 Rule extending Section 1557 "only to the extent [an individual] operation receives Federal financial assistance." *Id.* at 37,244. Likewise, nothing in the CRRA, which defines "program or activity," not "health program or activity," explains or requires the 2020 Rule's further limitation to "healthcare" entities.

[8] The 2020 Rule has now been superseded by the 2024 Rule. Pursuant to the 2024 Rule, "health program or activity" includes "[a]ny project, enterprise, venture, or undertaking to: . . . [p]rovide or administer health-related services, health insurance coverage, or other health-related coverage[,]" as well as "[a]ll of the operations of any entity principally engaged in the provision or administration of" the aforementioned projects, enterprises, ventures, or undertakings, "including, but not

whether BCBSIL is "principally engaged in the business of providing healthcare," as the 2020 Rule would require. Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,244 (June 19, 2020).

We also do not decide whether Section 1557 always requires an entity-level analysis. The related term "program or activity" suggests that a geographically-separate-facility-level analysis might be appropriate in some cases. Here, however, the assistance was not tied to a particular facility, yielding the same result as an entity-level analysis. Because BCBSIL receives federal financial assistance, it is subject to Section 1557 for all of its operations.

## C. BCBSIL did not preserve its Spending Clause argument.

For the first time in its reply brief, BCBSIL argues that it had insufficient notice, as required by the Spending Clause, that it would be subject to Section 1557 for its third-party administrator activities.    BCBSIL waived this argument by failing to raise it in its opening brief. BCBSIL also forfeited this argument by failing to make it to the district court.

BCBSIL could have raised this argument before. BCBSIL knew Plaintiffs were arguing that Section 1557 covered its activities, and the regulation that allegedly provided insufficient notice was promulgated years ago. *See* Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,172–73, 37,244–45 (June 19, 2020).  Although the 2020 Rule was

---

limited to, a . . . health insurance issuer[.]" Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,694 (May 6, 2024).

superseded by the 2024 Rule, which was finalized after
BCBSIL filed its opening brief, a proposed rule making the
same change was promulgated two years ago. *See*
Nondiscrimination in Health Programs and Activities, 89
Fed. Reg. 37,522, 37,694 (May 6, 2024); Nondiscrimination
in Health Programs and Activities, 87 Fed. Reg. 47,824,
47,912 (Aug. 4, 2022). Moreover, BCBSIL's Spending
Clause argument only relies on the 2020 Rule, not the new
one. We see nothing that precluded BCBSIL from raising
the Spending Clause before now.

## II. The district court correctly held that third-party administrators can be liable for violating Section 1557, even when implementing plan terms drafted by a plan sponsor.

BCBSIL concedes that it is not immune from Section
1557 liability if it discriminates "without instruction from
the plan." However, it contends that it cannot be liable for
administering and enforcing a discriminatory plan term
designed by the plan sponsor.

### A. ERISA does not require third-party administrators to implement unlawful plan terms.

BCBSIL claims two aspects of ERISA permit it to
administer discriminatory plan terms without incurring
Section 1557 liability. First, ERISA requires third-party
administrators and other fiduciaries to "discharge [their]
duties with respect to a plan . . . in accordance with the
documents and instruments governing the plan." 29 U.S.C.
§ 1104(a)(1)(D). This rule means "that contractual
limitations provisions *ordinarily* should be enforced as
written," which "is especially appropriate when enforcing an
ERISA plan." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*,

571 U.S. 99, 108 (2013) (emphasis added). Second, "[e]mployers have large leeway to design disability and other welfare plans as they see fit." *Id.* (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003)). They, "are generally free . . . for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

However, neither of these authorities suggests that BCBSIL must, or can, administer unlawful plan terms. First, contractual provisions are *ordinarily* enforced (but not always), and plan sponsors have *large leeway* to design their plans (but not absolute discretion). Second, even Section 1104(a)(1)(D) only requires administrators to enforce the plan "insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D). Thus, Section 1104(a)(1)(D) recognizes that plan terms conflicting with at least some laws may not be enforced.

BCBSIL responds that Section 1557 is in neither of the subchapters mentioned in Section 1104(a)(1)(D). We do not think Section 1104(a)(1)(D) licenses third-party administrators to violate any federal law other than those listed, just because a plan sponsor commanded it. Fiduciary duties, such as "the duty of prudence, under ERISA as under the common law of trusts, do[] not require a fiduciary to break the law." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 428 (2014). If Congress intended a different result for the fiduciary duty to follow the plan terms, it would be clear about that result. Section 1104(a)(1)(D) is not.

The statutory structure confirms this intuition. Elsewhere in the same subchapter, ERISA states that "[n]othing in this subchapter shall be construed to alter,

amend, modify, invalidate, impair, or supersede any law of
the United States . . . or any rule or regulation issued under
any such law." 29 U.S.C. § 1144(d). Thus, a third-party
administrator's duties under ERISA cannot entitle it to
violate another federal law; to hold otherwise would "alter,"
"impair," or "supersede" that other law.

BCBSIL criticizes the district court's reading of Section
1144(d), contending it makes ERISA "a sort of second-class
federal policy, one that yields at the first sign of conflict with
any other federal statutory requirement." Hyperbole aside,
the district court was correct that, if a plan sponsor tells a
third-party administrator to discriminate, the law prohibiting
discrimination and the law requiring administrators to obey
plan sponsors conflict. When two laws conflict, one must
yield. And Section 1144(d) shows that ERISA is the law that
yields. The district court did not err by ruling accordingly.

BCBSIL argues that ERISA cannot yield because
ERISA's commands are express, and Plaintiffs' Section
1557 right of action is implied. This is fallacious. The
conflict is not between ERISA and Section 1557's implied
right of action but between ERISA and Section 1557's
express prohibition against discrimination. And Section
1144(d)'s express command that ERISA does not supersede
other federal law provides a clear outcome in the face of this
conflict.

Nor does BCBSIL point to any cases supporting its
position. To the contrary, although no circuit has expressly
addressed a third-party administrator's duties when ERISA
and another federal law conflict, the Third Circuit has held
that "[a]n administrator who strictly adheres to the *lawful*
terms of an employee benefit plan may not be found to have
acted arbitrarily and capriciously." *Vitale v. Latrobe Area*

*Hosp.*, 420 F.3d 278, 284 (3d Cir. 2005) (emphasis added) (quoting *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 286 (3d Cir. 1988)). If administrators could violate the law at the command of a plan sponsor, the limitation to "lawful" terms in *Vitale* would make little sense.

BCBSIL does rely on regulations promulgated by the Department of Health and Human Services (HHS). But the regulations make clear that ERISA "explicitly preserves the independent operation of civil rights laws" and therefore "the fact that third party administrators are governed by . . . ERISA is not a reason to exempt them from Section 1557." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,432 (May 18, 2016); *see also* Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,549 (May 6, 2024) (similar). The final rule did "not exclude[e]" third party administrators," but merely "adopt[ed] specific procedures to govern the processing of complaints against [them]." 81 Fed. Reg. at 31,432. Specifically, HHS decided to "adjust[] the way in which it will process claims that involve alleged discrimination in self-insured group health plans administered by third party administrators that are covered entities." *Id.* "Where . . . the alleged discrimination relates to the benefit design of a self-insured plan—for example, where a plan excludes coverage for all health services related to gender transition . . . [HHS] will *typically* address the complaint against that employer." *Id.* (emphasis added). HHS did not suggest that third-party administrators were not liable for implementing plans with discriminatory benefit designs. Instead, it explained how it would use its enforcement discretion to target the party most responsible

for the discrimination.[9]   The 2016 and 2024 Rules are consistent with our holding and do not support BCBSIL's position.[10]

As BCBSIL observes, our holding leaves it in a dilemma when there is doubt about whether a plan exclusion is unlawful. If it enforces an unlawful term, it faces liability to participants whose care was denied; but if it ignores a lawful term, it faces liability to the plan sponsor. This is a risk BCBSIL accepted when it assumed fiduciary duties to the plan. Every fiduciary faces the same dilemma when there is doubt about the legality of an action it feels compelled to take. BCBSIL could have refused to administer plans for employers requesting potentially illegal plan exclusions, or it could have paid for the excluded care out of its own pocket, which would satisfy its potential duty to the participant without risking an ERISA violation by using the plan's money. BCBSIL may also have been able to seek a declaratory judgment to avoid the tension it now faces. *See* 28 U.S.C. § 2201(a). BCBSIL's policy argument gives us no reason to depart from the text and structure of ERISA,

---

[9] The other cited regulation followed the same approach. HHS agreed "that a third party administrator should not be held responsible for discriminatory plan design features over which the third party administrator exercised no control." Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,626 (May 6, 2024). It did so to explain why it "will take into account the party responsible for the alleged discriminatory conduct" and why it did "not intend to enforce this rule against a third party administrator for a plan design that it did not design and over which it has no control." *Id.*

[10] To the extent these regulations suggest third-party administrators are immune from Section 1557 liability when acting at the direction of a plan sponsor, we disagree.

which do not allow third-party administrators to flout the law on behalf of their employer-customers.

## B. BCBSIL's remaining arguments are unpersuasive.

According to BCBSIL, even if the plan terms violate Section 1557, there is no conflict with its duty to follow the plan terms because Section 1557 penalizes only intentional discrimination, and it had no discriminatory intent in administering those plan terms. These arguments do not persuade.

At the outset, BCBSIL failed to preserve its position that Plaintiffs' claims fail because they have not shown discriminatory intent. *See In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so."). In its summary-judgment briefing, BCBSIL denied that a third-party administrator could be liable for plan features it did not design, but it never raised its present defense that Plaintiffs failed to show it acted with discriminatory intent. BCBSIL cites our prior holding (in a different context) that "it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004). Although BCBSIL is right that parties have leeway to present their appeals, "[f]ailure to argue a point in a motion for summary judgment qualifies as failing to raise that issue below" when "the argument was not raised sufficiently for the trial court to rule on it." *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021) (quoting *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010)). There is considerable daylight between whether BCBSIL intended to

discriminate and whether the policy exclusions at issue originated with BCBSIL. Accordingly, we find BCBSIL forfeited its intent argument.

Even absent forfeiture, Plaintiffs' claim is that BCBSIL facially discriminated. "[B]y its very terms, facial discrimination is 'intentional.'" *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). If Plaintiffs succeed in proving facial discrimination, "no greater proof of mental state [is] necessary" because "intentional discrimination" is "synonymous with discrimination resulting in 'disparate treatment,'" as opposed to "disparate impact." *Id.* (quoting *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994)). The contrary authorities BCBSIL relies on involve various types of non-facial discrimination. *See, e.g.*, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020).[11]

BCBSIL's response that its intention was to comply with the plan terms, not discriminate, does not alter the analysis. "[I]ntentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the

---

[11] This part of our analysis is unchanged by *Skrmetti*. As we explain below, on remand, the district court will consider two arguments: whether BCBSIL adopted a policy that looked to class members' transgender status rather than their gender-dysphoria diagnoses and whether BCBSIL discriminated based on gender-dysphoria treatment as a pretext/proxy for anti-transgender discrimination. *See infra* Section IV. The former is arguably a facial-discrimination theory. Arguably, the latter is also because "[p]roxy discrimination is a form of facial discrimination." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013); *see also Skrmetti*, 145 S. Ct. at 182 (requiring a showing of "invidious discriminatory purpose" only "where a law's classifications are neither covertly nor overtly based on" a protected characteristic).

employer's ultimate goal of discriminating against homosexual or transgender employees." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 661 (2020). This is because "[r]eframing the additional causes" for the employer's decision does nothing "to insulate the employers from liability." *Id.* After all, "[i]ntentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view." *Id.* For the same reason, intentional discrimination based on sex violates Section 1557, even if intended only to comply with the terms selected by the plan sponsor.

As a backup, BCBSIL argues that there is no conflict between Section 1557 and ERISA because Plaintiffs are seeking to use "agency principles" to hold it liable rather than seeking to hold it liable for its own actions. BCBSIL's agency argument suffers from the same forfeiture problem as its intent argument. Setting that aside, BCBSIL's position is unpersuasive. If Plaintiffs only sought to hold BCBSIL liable because plan sponsors insisted on the exclusions at issue, BCBSIL might have a point about agency.

Instead, BCBSIL's own undisputed conduct [12] — agreeing to apply the exclusions at issue and applying them to deny coverage to Plaintiffs—is the kind of conduct that could violate Section 1557. "[A]ll Title VII has ever demanded to establish liability" is that the defendant "necessarily and intentionally discriminates against [the

---

[12] BCBSIL is correct that the district court found there was a genuine dispute of material fact as to whether BCBSIL designed the exclusions at issue, which Plaintiffs have not challenged. Thus, we do not affirm on the basis that BCBSIL is liable for designing the exclusions. If Plaintiffs do not succeed on their present theory, the district court may need to revisit this issue. It will have the opportunity to do so on remand.

plaintiff] in part because of sex." *Bostock*, 590 U.S. at 665.[13]
In turn, someone "intentionally discriminate[s] based on
sex" who "necessarily and intentionally applies sex-based
rules." *Id.* at 667 (emphasis omitted). The key word is
"applies."

Here, BCBSIL applied the allegedly sex-based rules.
BCBSIL's corporate representative testified that BCBSIL is
responsible for "determin[ing] whether [the care] falls under
that particular exclusion." BCBSIL had a "standard
practice" for these claims: "look at the diagnosis and service
code to determine if it's gender reassignment, and if it is then
it is denied[.]" It is BCBSIL that "looks at the diagnostic
code and the service code to figure out if [the claim is] for
gender reassignment" and "then looks at the service code in
particular to figure out if it is related to surgery." The
excluded claims are "denied within [BCBSIL's] system and
the member receives an Explanation of Benefits with that
denial." This was no mechanical task: BCBSIL had to
review the claims, including the diagnosis and procedure
codes, and assess whether the claim fell within the exclusion.
Although plan sponsors chose the rules, BCBSIL applied
them.[14]

---

[13] We interpret Title VII and Title IX consistently, *Doe v. Snyder*, 28
F.4th 103, 114 (9th Cir. 2022), and the "grounds" of discrimination
prohibited by Title IX are incorporated into Section 1557. Thus, the legal
standard for Title VII and Section 1557 claims is the same.

[14] The parties argue about whether *Tovar v. Essentia Health*, 857 F.3d
771, 778–79 (8th Cir. 2017), suggests that third party administrators can
be liable under Section 1557 for administering discriminatory plan
terms. However, *Tovar* is not binding, and *Tovar* merely decided the
plaintiff had Article III standing. It expressly declined to decide Section
1557's scope.

### III.   The district court correctly concluded that BCBSIL could not invoke a RFRA defense.

The Religious Freedom Restoration Act (RFRA) requires that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]" 42 U.S.C. § 2000bb-1(a). However, the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c).

BCBSIL contends that enforcing Section 1557 here would infringe the religious exercise of its employer-customers. However, the district court rejected this argument, primarily because "RFRA provides relief against the government and does not apply to disputes between private parties" and also because BCBSIL "is not an entity with a 'sincerely-held religious belief.'" The district court was correct on both counts.

### A. RFRA does not provide a defense to those whose religious exercise is not burdened.

RFRA has a judicial-relief provision stating that it provides a claim or defense to "[a] person whose religious exercise has been burdened in violation" of that statute. 42 U.S.C. § 2000bb-1(c). That provision would be superfluous if RFRA's other provisions implicitly created a defense for everyone, whether their religious exercise has been burdened

or not. Thus, only people whose religious exercise has been burdened can raise a defense under RFRA.

BCBSIL responds that it is not seeking to raise a defense. It argues that "RFRA informs the interpretation and application of existing laws even when no party invokes the RFRA" in support of a claim or defense. Yet this view would render RFRA's judicial-relief provision equally superfluous. If RFRA already "requires an exception" to laws like Section 1557 as a matter of statutory construction, no person whose religious exercise has been burdened would ever need to go further and assert a RFRA defense.

BCBSIL has not argued that its religious exercise, or that of its employees, officers, or shareholders, was affected by providing the care at issue. Although RFRA sometimes protects "a for-profit closely held corporation," BCBSIL does not meet that criterion, nor does this case implicate "the religious liberty of the humans who own and control" BCBSIL. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707, 719 (2014). Indeed, BCBSIL is a secular company. Moreover, BCBSIL does provide gender-affirming care for non-self-funded plans.

**B. Even if RFRA provides a defense to those whose religious exercise is not burdened, it does not provide a defense against claims brought by a private party.**

Our sister circuits are divided over whether RFRA applies in actions where the government is not a party. The Second Circuit has held that "RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion," at least with respect to federal laws also enforceable by the

government. *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). On the other hand, the Sixth and Seventh Circuits have held that "RFRA is not applicable in cases where the government is not a party." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015); *accord Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410–12 (6th Cir. 2010).[15]

We have not squarely addressed the question. First, in dicta, we found it "seems unlikely that the government action Congress envisioned in adopting RFRA included" private suits for copyright infringement. *Worldwide Church of God v. Phil. Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000). Second, we held that RFRA claims generally require a government defendant because the statute on its face applies only to government actors, and "governmental compulsion in the form of a general statute, without more, is [in]sufficient to transform every private entity that follows the statute into a governmental actor." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 839 (9th Cir. 1999). When RFRA claims against a private defendant were permitted, "there was some additional nexus that made it fair to deem the private entity a governmental

---

[15] The parties have cited several other cases allegedly bearing on this issue. However, none of them considered whether RFRA affects actions between private parties, and many involved a governmental party. *See United States v. Bauer*, 84 F.3d 1549, 1558–59 (9th Cir. 1996) (criminal prosecution); *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996) (EEOC); *In re Young*, 141 F.3d 854, 861 (8th Cir. 1998) (bankruptcy trustee); *In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 835 (3d Cir. 1999) (grand jury subpoena); *cf. Whole Woman's Health v. Smith*, 896 F.3d 362, 371 (5th Cir. 2018), *as revised* (July 17, 2018) (addressing court-ordered discovery in a private dispute, but without addressing RFRA's "government" burden requirement).

actor in the circumstances." *Id.* However, *Sutton* addressed RFRA claims, not RFRA defenses.

We now extend *Sutton* to RFRA defenses because no part of *Sutton*'s reasoning is affected by the distinction between claims and defenses. Whenever RFRA discusses "claims," it discusses "defenses" in the same breath. *See* 42 U.S.C. § 2000bb(b)(2); 42 U.S.C. § 2000bb-1(c). Next, *Sutton* decided RFRA claims could not target private defendants because, "[w]hen Congress has intended to regulate private employers . . . it has done so explicitly," but "Congress chose not to include similar wording in RFRA." *Sutton*, 192 F.3d at 834. This logic applies to both claims and defenses: if Congress intended to shield private parties from federal law, it would do so explicitly, and it has not done so here. Finally, *Sutton* noted that RFRA applies when the "government" acts, and RFRA defines the "government" to "include[] parts of government and agents acting on behalf of government, not purely private entities." *Id.* This definition applies to both RFRA claims and RFRA defenses because the statute draws no distinction between the two.

In addition, the arguments considered by some of our sister circuits persuade us that RFRA does not apply to suits between private parties.

First, RFRA's main provisions describe a process of burden shifting between a government and a person whose religious exercise is substantially burdened. Even assuming a substantial burden, the government "may substantially burden [that] person's exercise of religion . . . if it demonstrates that application of the burden" is justified by strict scrutiny. 42 U.S.C. § 2000bb-1(b). RFRA defines "demonstrates" to mean "meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C.

§ 2000bb-2(3). Because the statute requires the government to present evidence and meet a burden of proof, it suggests the government must be a party. If the government was not part of the case, it would not be able to present evidence, and it would make little sense to speak of the government's burden of proof. Likewise, even if a private party presented evidence about the government's interest, it would not be the *government* that demonstrated that interest.[16]

Second, RFRA's judicial-relief provision states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Thus, the only form of relief provided by RFRA is "against a government." Conversely, absent a governmental party, RFRA provides no relief.

The drafting history of the judicial-relief provision supports this view. Earlier drafts authorized relief from both governments and private parties, stating that "[a] party aggrieved by a violation of this section may obtain appropriate relief (including relief against a government) in a civil action." Religious Freedom Restoration Act, H.R. 5377, 101st Cong. § 2(c) (1990). Ultimately, Congress

---

[16] BCBSIL responds to this argument by framing it as an argument that courts sometimes lack sufficient information to identify the state interest that may justify the law. This misunderstands Plaintiffs' argument. Plaintiffs are pointing out not only the practical difficulties of obtaining information about the relevant state interest without the government's participation but also the statute's requirement that the *government* demonstrate the state interest, not a private party.

chose to enact a narrower provision, providing relief only against a government.[17]

The legislative history suggests RFRA requires a governmental party. As then-Judge Sotomayor noted, "[a]ll of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party." *Hankins*, 441 F.3d at 115 n.9 (Sotomayor, J., dissenting) (citing S. Rep. No. 103-111 (1993); H.R. Rep. 103-88 (1993)).[18]

BCBSIL points to RFRA's purposes section, which explains RFRA was intended "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened."

---

[17] At least one author contends that the clause authorizing relief against a government was introduced to abrogate sovereign immunity and signifies "an additional right upon which a litigant may rely," rather than "limit[ing] the set of cases in which a 'claim or defense' may be raised in a judicial proceeding[.]" Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343, 344, 348–55 (2013).    This author contends that the "ambiguity" leading courts to believe RFRA requires the government to be a party "arose incidentally as a result of the restructuring of the section." *Id.* at 353.    Perhaps that is a plausible reading of the drafting history, but in cases of doubt, courts are bound to implement the text Congress enacted, not the one it might have enacted.

[18] A footnote in each committee report cited the testimony of Prof. Douglas Laycock, part of which mentioned lawsuits between private parties.    However, the cited portion of the testimony covered only lawsuits to which the government was a party.    *Compare* H.R. Rep. No. 103-88 at 2 n.2, *and* S. Rep. No. 103-111 at 4 n.3, *with* Douglas    Laycock,    Statement    to    House    Civil    and Constitutional    Rights    Subcommittee    2–5    (May    14,    1992), https://www.justice.gov/sites/default/files/jmd/legacy/2014/07/13/hear-99-1992.pdf at 331–34.

42 U.S.C. § 2000bb(b)(1). BCBSIL argues that the free exercise of religion may be substantially burdened in cases where the government is not a party. But though purpose may help us interpret text, we cannot adopt atextual interpretations simply because they advance a statute's purpose. We do not think BCBSIL's argument outweighs the textual considerations we have discussed.

BCBSIL also observes that some statutes can be enforced by the government or a private party. If RFRA only applies when the government is involved, it creates an inconsistency, limiting claims by the government but not by private parties. This is a reasonable policy concern, but ultimately, we must follow the text Congress enacted, even if there is some reason to believe that text is inconsistent or unwise.

Next, BCBSIL notes that RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise[.]" 42 U.S.C. § 2000bb-3(a). Although RFRA certainly applies to all laws, that does not mean it applies in all cases. The provision cited by BCBSIL only addresses the former. 42 U.S.C. § 2000bb(a)(5), which finds that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances," is irrelevant because it defines the test courts use when RFRA applies, not when RFRA applies.

BCBSIL argues that, even if RFRA cannot provide a claim or defense in a suit between private parties, it governs Section 1557's interpretation to provide BCBSIL with an exception to liability. This is simply a defense by another name. Also, the authorities BCBSIL relies on do not stretch that far. The Supreme Court has held that "RFRA operates as a kind of super statute, displacing the normal operation of

other federal laws, [and] might supersede Title VII's commands in appropriate cases." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020); *accord Apache Stronghold v. United States*, 101 F.4th 1036, 1058 (9th Cir. 2024) (quoting *Bostock* and calling RFRA a "framework statute"). That is certainly true. But *Bostock* explained the effect RFRA has when it applies—namely, it precludes liability for a defendant who would otherwise be in violation of federal law—and not the circumstances when it applies. Indeed, *Bostock* expressly declined to decide when, or even whether, RFRA would permit a business to violate the statute at issue. 590 U.S. at 682 (noting that RFRA "might" supersede Title VII "in appropriate cases" and that "how these doctrines protecting religious liberty interact with Title VII are questions for future cases"). Even if RFRA might supersede Section 1557 in appropriate cases, this is not one of them: the plaintiff is not a governmental party, and the defendant's religious exercise was not burdened.

## IV. When the district court found that BCBSIL's gender-dysphoria exclusion discriminated based on sex, it ran afoul of *Skrmetti*.

Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity[.]" 42 U.S.C. § 18116(a). The "ground" prohibited by Title IX is "sex." 20 U.S.C. § 1681(a).

Certainly, "discrimination based on . . . transgender status necessarily entails discrimination based on sex." *Bostock*, 590 U.S. at 669. For example, "[a]n employer who fires an individual for being . . . transgender fires that person

for traits or actions it would not have questioned in members of a different sex." *Id.* at 651–52. That is still true. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1834 (2025).

Here, BCBSIL acknowledges that it excludes treatment for "gender dysphoria" and "transgender services." However, BCBSIL denies violating Section 1557 because the exclusions it administers only cover health care "administered or prescribed for the treatment of gender dysphoria," and discrimination against treatment for gender dysphoria is not discrimination based on transgender status or discrimination based on sex. The district court rejected this defense, holding "[g]ender dysphoria cannot be understood without referencing sex or a synonym."

The district court's reasoning fails, but there are arguably two potential avenues for relief that remain open to Plaintiffs. We remand for the district court to consider those issues.

## A. The district court's reasoning fails in light of *Skrmetti*.

First, *Skrmetti* rejected the district court's reasoning. The statute in *Skrmetti* "remove[d] one set of diagnoses," including "gender dysphoria," "from the range of treatable conditions." 145 S. Ct. at 1833. Even so, "sex is simply not a but-for cause of [the] operation" of that statute. *Id.* at 1835. Thus, *Bostock* did not apply. *Id.* at 1834. Likewise, by excluding treatment for gender dysphoria, BCBSIL removed that diagnosis from the range of conditions its insurance plans cover. Without more, sex is not a but-for cause of the exclusions' operation, and *Bostock* does not apply.

Second, the district court erred in focusing on whether the plans referenced sex or a synonym. The Supreme Court

"has never suggested that [a statute's] mere reference to sex is sufficient to trigger heightened scrutiny" by showing that the statute discriminates based on sex. *Id.* at 1829. Particularly "[i]n the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny." *Id.* at 1830. Here, we are in the medical context. Though BCBSIL's exclusions reference sex, and though that reference may be relevant, it is not sufficient to trigger *Bostock*'s application.

Third, the district court relied on the district court's vacated decision in *Kadel v. Folwell*. No. 1:19CV272, 2022 WL 11166311, at \*4 (M.D.N.C. Oct. 19, 2022). Similarly, Plaintiffs rely repeatedly on the Fourth Circuit's affirmance in *Kadel*. 100 F.4th 122 (4th Cir. 2024). But when the Supreme Court handed down *Skrmetti*, it held *Kadel* was no longer good law. *See Folwell v. Kadel*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025).

Plaintiffs try to distinguish *Skrmetti*, cabining it to the constitutional context. Though *Skrmetti* was a constitutional case, its logic reaches more broadly. *Skrmetti* applied the *Bostock* test, which arose in "the Title VII context," not the constitutional context. 145 S. Ct. at 1834. *Skrmetti* did not decide "whether *Bostock*'s reasoning reaches" constitutional claims. *Id.* Even "[u]nder the reasoning of *Bostock*," however, the statute did not discriminate based on sex. *Id.* Thus, Plaintiffs may be right that sex discrimination works differently in constitutional and statutory cases. But because *Skrmetti* assumed without deciding that the standards were identical, *Skrmetti*'s gloss on *Bostock* applies to statutory cases like this one.

In the same vein, Plaintiffs argue that *Skrmetti* does not apply to Section 1557 cases because *Skrmetti* relied on

*Geduldig v. Aiello*, 417 U.S. 484 (1974). *Skrmetti* did rely on *Geduldig*, but that does not make *Skrmetti* distinguishable. In *Geduldig*, the Supreme Court interpreted the Constitution not to bar discrimination based on pregnancy. 417 U.S. at 492, 494, 496 n.20. The Supreme Court later expanded that rule into Title VII. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976). Congress amended Title VII to "unambiguously" reject "the holding and the reasoning" of *Gilbert*. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983). Because this court "construe[s] Title IX's protections consistently with those of Title VII," *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022), that rule flows into Title IX and thus into Section 1557. But when Congress amended Title VII, it created a rule that does not help Plaintiffs. Congress defined "because of sex" to incorporate "pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), but it changed nothing about gender dysphoria or gender reassignment. Thus, Section 1557 bars discrimination against treatment for pregnancy and childbirth but not treatment for gender dysphoria.

Plaintiffs also argue that *Skrmetti* is different because the exclusions here make "direct references to transgender status." But as noted, *Skrmetti* does not focus on whether anyone refers to transgender status or, equivalently, sex. 145 S. Ct. at 1829–30. Indeed, the statute in *Skrmetti* bristled with references to sex. *See, e.g.*, Tenn. Code Ann. §§ 68-33-101(b), (c), (m), (n), 68-33-102(1), (9), 68-33-103(a)(1), (b)(4), (c)(2).

Next, Plaintiffs argue that BCBSIL does not just discriminate against "a particular medical condition but rather whether the care leads to 'gender reassignment' which, of course, equates with transgender status." But the

statute in *Skrmetti* also targets care leading to gender reassignment. It bars "a medical procedure if the performance or administration of the procedure is for the purpose of," among other things, "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex." Tenn. Code Ann. § 68-33-103(a)(1). We cannot distinguish *Skrmetti* this way.

## B. This case is potentially different from *Skrmetti* in two respects.

First, some of these Plaintiffs allegedly had diagnoses (other than gender dysphoria) that entitled them to hormones or other treatment—but BCBSIL still would not treat them. In *Skrmetti*, "changing a minor's sex or transgender status d[id] not alter the application of" the statute. 145 S. Ct. at 1834. As an example, the Supreme Court envisioned "a transgender boy seek[ing] testosterone to treat his gender dysphoria." *Id.* "The transgender boy could receive testosterone only if he had" "a qualifying diagnosis for the testosterone" like "a congenital defect, precocious puberty, disease, or physical injury." *Id.* "And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status." *Id.* It was for this reason that the Supreme Court distinguished *Bostock*. *See id.*

Here, one of the Plaintiffs has a different story to tell. S.L. was diagnosed with both gender dysphoria and precocious puberty. She sought puberty blockers to block her precocious puberty. BCBSIL denied coverage. During the appeal process, her mother "was told by BCBSIL membership services that, had S.L. been diagnosed *only* with early-onset puberty (i.e., not gender dysphoria AND early-onset puberty), BCBSIL would have likely covered the puberty blocker." Unlike the example patient from *Skrmetti*,

S.L. has a qualifying diagnosis other than gender dysphoria, but she still cannot get the puberty blocker. If S.L. had been born a girl instead of a boy, she would not be transgender and would not have gender dysphoria—because only transgender people can have gender dysphoria. But she would still have precocious puberty, and she could have gotten puberty blockers. Because changing her sex, and thus her transgender status, does "alter the application of" BCBSIL's exclusion, sex is a but-for cause of the exclusion's operation. For S.L. and those like her, *Skrmetti* is arguably distinguishable.

Second, *Skrmetti* left Plaintiffs another potential opportunity. It noted that no party had "argued that [the statute's] prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals." 145 S. Ct. at 1833. It "decline[d] to find" that the statute discriminated against transgender individuals for that reason. *Id.* at 1833–34. Here, however, Plaintiffs argue that BCBSIL's justifications for its actions "are a pretext for 'invidious discrimination.'" Their argument is based on a proxy-discrimination theory. *Cf. Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 886 (4th Cir. 2023) (identifying "proxies" as a way to prove "an invidious discriminatory intent"), *cert. denied*, No. 23-170, 2024 WL 674659 (U.S. Feb. 20, 2024); *Hearne v. Bd. of Educ.*, 185 F.3d 770, 776 (7th Cir. 1999) (distinguishing a case where an "ostensibly neutral classification" was "such a good proxy for [the protected characteristic] that [it] is 'an obvious pretext for . . . discrimination.'" (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979))).

BCBSIL responds that *Skrmetti* forecloses Plaintiffs' proxy theory because it held "there is a 'lack of identity' between transgender status and the excluded medical

diagnoses." 145 S. Ct. at 1833. But while a "lack of identity" weakens a proxy-discrimination theory, it is not fatal. "Notably, proxy discrimination does not require an exact match between the proxy category and the racial classification for which it is a proxy." *Davis v. Guam*, 932 F.3d 822, 838 (9th Cir. 2019). Instead, "the crucial question is whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quoting *Davis*, 932 F.3d at 838).

BCBSIL counters that no such inference is plausible. At this stage, we do not necessarily agree. The fit between transgender people and people suffering from gender dysphoria is strong. Only transgender people can suffer from gender dysphoria: gender dysphoria comes from "marked incongruence between [the patient's] experienced/expressed gender and assigned gender." Also, BCBSIL made a key concession that strengthens Plaintiffs' pretext/proxy argument. BCBSIL's policy admits that the treatments Plaintiffs seek can be medically necessary for treating adolescents with gender dysphoria. Even so, in many of the health plans at issue, BCBSIL categorically excludes those treatments. Because BCBSIL admits those treatments are sometimes necessary, it cannot justify its categorical exclusion by citing medical necessity. Something else may be afoot, and that something may be invidious discrimination against transgender people.

Make no mistake: we are not holding that *Skrmetti* favors Plaintiffs. We are explaining which questions *Skrmetti* potentially left open and, thus, why remand would not be futile. We express no view about the appropriate outcome on remand.

### C. The appropriate course is to remand.

For several reasons, we remand for the district court to reconsider its ruling in light of *Skrmetti*.

First, we are "a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). The district court did not rely on the discrimination allegedly suffered by S.L. or Plaintiffs' pretext/proxy argument. It should have the first opportunity to assess those arguments. Also, the parties did not have the opportunity to fully brief those arguments. The case would benefit from further development before the district court.

Second, the district court is familiar with the full record. It may be necessary to decide whether Plaintiffs or BCBSIL forfeited any of their arguments (or whether any forfeiture should be excused by *Skrmetti*). It may also be necessary to decide whether either party should be allowed to take additional discovery and, if so, what additional discovery is appropriate. And it may be necessary to decide whether the pretext/proxy issue can be addressed class-wide. All of these issues are best resolved by a district court, not an appellate court.

Third, it may not be possible to decide whether S.L. and others suffered anti-transgender discrimination, or whether BCBSIL's exclusions are a pretext or proxy for invidious discrimination, at summary judgment. If so, the district court will need to hold a trial.

### CONCLUSION

For the foregoing reasons, the district court's summary-judgment decision cannot stand. Although we agree that BCBSIL is bound by Section 1557 and cannot use the employers' instructions or RFRA as defenses, we cannot

square the summary-judgment ruling against BCBSIL with
*Skrmetti*. We therefore vacate that ruling. On remand, the
district court will have the opportunity to consider the issues
potentially left open by *Skrmetti* and to conduct further
proceedings consistent with our opinion.

## VACATED AND REMANDED.

Each side to bear its own costs on appeal.

---

Rawlinson, Circuit Judge, concurring in the judgment:

I agree in large part with the majority opinion. I write
separately only because of my perspective that it is
improvident to opine on issues that we have remanded to the
district court to consider in light of intervening Supreme
Court precedent. As the majority acknowledges in the
portion of the opinion stating that "[t]he appropriate course
is to remand," we are not a court of "first view." *Majority
Opinion*, p. 46. Rather, "we are a court of review." *Id.*
(quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).
Nevertheless, the majority goes on to articulate its "first
view," *id.*, of how the district could potentially distinguish
the intervening Supreme Court case of *United States v.
Skrmetti*, 145 S. Ct. 1816 (2025). *See Majority Opinion*, pp.
43-45.

In discussing one of the plaintiffs, the majority theorizes
that *Skrmetti* is "arguably distinguishable" because
"changing [the plaintiff's] sex, and thus her transgender
status does alter the application of [Blue Cross/Blue
Shield's] exclusion, [and] sex is a but-for cause of the
exclusion's operation." *Majority Opinion*, p. 44 (internal
quotation marks omitted). But in *Skrmetti*, the Supreme

Court discussed its prior decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), and concluded that its analysis in *Skrmetti* of the statute prohibiting gender-affirming medical treatment was not altered by its prior decision in *Bostock*. *See Skrmetti*, 145 S. Ct. at 1834.

In *Bostock*, the Supreme Court "held that an employer who fires an employee for being gay or transgender violates Title VII's prohibition on discharging an individual because of their sex." *Id.* (citing *Bostock*, 590 U.S. at 650-52, 654-59) (internal quotation marks omitted). However, the logic underpinning *Bostock* was not followed by the Supreme Court in *Skrmetti*. Rather, the Supreme Court explained that the application of the statute in *Skrmetti* prohibiting gender-affirming care was not altered by changing the sex or transgender status of the minor seeking gender-affirming treatment. *See id.*

The Supreme Court provided the following example:

> If a transgender boy seeks testosterone to treat his gender dysphoria, [the statute] prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, [the statute] would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone — such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. *Under the*

> *reasoning of Bostock, neither his sex nor his*
> *transgender status is the but-for cause of his*
> *inability to obtain testosterone.*

*Id.* (emphasis added).

The same reasoning could be applied to this case. Some Blue Cross/Blue Shield plan exclusions preclude coverage for "Gender [R]eassignment Surgery," "treatment of gender identity disorders," and "Gender Identity Disorder Treatment." Using the example provided by the Supreme Court, if a transgender boy or man seeks coverage for gender reassignment surgery, treatment of a gender identity disorder or gender identity disorder treatment, the exclusion precludes coverage for that treatment. If "you change his biological sex from female to male, [the exclusion] would still not permit" coverage for the treatment. *Skrmetti*, 145 S. Ct. at 1834. According to the Supreme Court's apparent reading of *Bostock*, "neither [the] sex nor [the] transgender status" of the individual "is the but-for cause of [the] inability" to obtain coverage for the treatment. *Id.*

In my view, the majority's conclusion that "[b]ecause changing [the plaintiff's] sex, and thus her transgender status does alter the application of [Blue Cross/Blue Shield's] exclusion, sex is a but-for cause of the exclusion's operation," *Majority Opinion*, p. 44, is in direct conflict with the Supreme Court's discussion of its holding in *Bostock*, which included an example that almost mirrors the facts of this case. *See Skrmetti*, 145 S. Ct. at 1834. It would be unfortunate if the district court adopted an erroneous interpretation of *Skrmetti* as suggested by the majority when we could easily leave the district court to reach its own conclusions regarding how *Skrmetti* affects its prior ruling.

The same can be said of the majority's foray into what conduct by Blue Cross/Blue Shield "is the kind of conduct that could violate Section 1557." *Majority Opinion*, p. 30. The majority recounts that Blue Cross/Blue Shield is "responsible for determining whether the care falls under [one of the gender affirming treatment exclusions]." *Id.*, p. 31 (alterations and internal quotation marks omitted). According to the majority, Blue Cross/Blue Shield has developed a "standard practice for these claims: look at the diagnosis and service code to determine if it's gender reassignment, and if it is then it is denied." *Id.* (alteration and internal quotation marks omitted). The majority observes that Blue Cross/Blue Shield "looks at the diagnostic code and the service code to figure out if the claim is for gender reassignment and then looks at the service code in particular to figure out if it is related to surgery." *Id.* (alteration and internal quotation marks omitted). The majority notes that "[t]he excluded claims are denied within [Blue Cross/Blue Shield's] system and the member receives an Explanation of Benefits with that denial." *Id.* (internal quotation marks omitted). The majority characterizes this processing by Blue Cross/Blue Shield as "no mechanical task [because Blue Cross/Blue Shield] had to review the claims, including the diagnosis and procedure codes, and assess whether the claim fell within the [gender-affirming care] exclusion. Although plan sponsors chose the rules [Blue Cross/Blue Shield] applied them." *Id.* The majority acknowledges that the district court relied on these described procedures to conclude that Blue Cross/Blue Shield applied "sex-based rules" in violation of Section 1557 of the Affordable Care Act, *see id.*, *see also id.* pp. 40-41. The majority also recognizes, as it must, that the district court's "sex-based rules" analysis "ran afoul of *Skrmetti*." *Id.* pp.

30-31, 39. Curiously, in the majority's suggestion to the district court that the district court distinguish "*Skrmetti* in two respects," *id.* p. 43, the majority does not explain how the district court will pivot from its analysis that Blue Cross/Blue Shield violated § 1557 through its application of "sex-based rules" to a different theory of liability that was not developed during the prior proceedings in the district court.

At a minimum, surely the majority should not continue to insist that Blue Cross/Blue Shield failed to "preserve its Spending Clause argument." *Id.* p. 22. In its Reply Brief, Blue Cross/Blue Shield made the argument that it "lacked the requisite notice" of the "scope and nature of the obligations" incurred by accepting the federal funds for other activities engaged in by Blue Cross/Blue Shield. Blue Cross/Blue Shield relied on several Supreme Court cases in support of its argument that it "lacked the requisite notice" of the "scope and nature of the obligations" incurred by accepting federal funds for activities other than its actions in the role of a third-party administrator of health insurance plans.

In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022), the United States Supreme Court discussed Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." Legislation enacted under Congress's Spending Clause authority "is much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions. *Id.* (alteration omitted) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). There is no dispute that Section 1157 was enacted pursuant to Congress's Spending

Clause authority. *See Majority Opinion*, p. 20 (discussing Blue Cross/Blue Shield's Spending Clause argument).

In *Pennhurst*, the Supreme Court addressed Congress's "power under the Spending Clause to place conditions on the grant of federal funds." 451 U.S. at 15. Noting, as it did in *Cummings*, that "legislation enacted pursuant to the spending power is much in the nature of a contract," *id.* at 17, the Court reasoned that due to the contractual nature of legislation enacted under the Spending Clause, "[t]he legitimacy of Congress's power to legislate under the spending power . . . rests on whether [the recipient of the federal funds] voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* (citations omitted). The Court explained that "[t]here can, of course, be no knowing acceptance if a [recipient of federal funds] is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Therefore, "if Congress intends to impose a condition on the grant of federal moneys, *it must do so unambiguously*." *Id.* (citations and footnote reference omitted) (emphasis added).

This same reasoning is articulated in *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006). That case involved the Individuals with Disabilities Education Act (IDEA). The parents of a disabled student brought an action to require the school district to pay for their son's private school tuition. *See id.* at 294. After prevailing, the parents sought "fees for the services of an educational consultant . . . who assisted [them] throughout the IDEA proceedings." *Id.* The Supreme Court "granted certiorari to resolve the conflict among the Circuits with respect to whether Congress authorized the compensation of expert fees to prevailing parents in IDEA actions." *Id.* at 295 (citations omitted).

The Supreme Court began its analysis with the observation that its "resolution of the question presented . . . is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause." *Id.* (citations omitted). Importantly, "the IDEA provides federal funds to assist state and local agencies in educating children with disabilities," but "conditions such funding upon a State's compliance with extensive goals and procedures." *Id.* (citations omitted). The Court determined that when deciding whether a recipient of federal funds had adequate notice of the conditions attached to the federal funding, a court must view the legislative enactment "from the perspective of" the recipient of federal funding. *Id.* at 296. The question a court must ask itself is whether the recipient of the federal funds "would clearly understand . . . the obligations of" the funding legislation. The Supreme Court stated, "[i]n other words, [a court] must ask whether the [legislative enactment] furnishes clear notice regarding the liability at issue." *Id.*

Applied to the facts of this case, Blue Cross/Blue Shield asserts that as the "recipient[] of federal funding," Section 1557 did not "furnish[] clear notice" to it that, as a third-party administrator it would be liable for discrimination based on its application of exclusion decisions made by insurers whose policies Blue Cross/Blue Shield administered. *Id.* It is undisputed that the text of Section 1557 does not address third-party administrators. *See id.* (confirming that when deciding whether a statute "provides clear notice, we begin with the text"). Indeed, a considerable portion of the majority opinion is devoted to the question of whether Blue Cross/Blue Shield as a third-party administrator is covered under Section 1557. *See Majority Opinion*, pp. 14-22.

54          PRITCHARD V. BLUE CROSS BLUE SHIELD OF IL

In the absence of express language in the statute applying
the discrimination provisions to it, Blue Cross/Blue Shield
contends that it lacked "clear notice regarding the liability"
for discrimination in administering health insurance
contracts. *Arlington Cent. Sch. Dist.*, 548 U.S. at 296.

Notably, Blue Cross/Blue Shield points to the varying
regulations promulgated by the federal government
addressing this issue. *Compare Nondiscrimination in
Health and Health Education Programs or Activities,
Delegation of Authority*, 85 Fed. Reg. 37,160, 37,244 (June
19, 2020) ("[T]his part applies to (1) Any health program or
activity . . . principally engaged in the business of providing
healthcare that receive Federal financial assistance . . .); *with
Nondiscrimination in Health Programs and Activities*, 81
Fed. Reg. 31,376, 31,432 (May 18, 2016) ("[I]f an issuer that
receives Federal financial assistance is principally engaged
in providing health insurance and also provides third party
administrator services, there is no principled basis on which
to exclude the law's application to the third party
administrator services . . ."); and *Nondiscrimination in
Health Programs and Activities*, 89 Fed. Reg. 37,522,
37,627 (May 6, 2024) ("[The Office for Civil Rights] does
not intend to enforce this rule against a third party
administrator for a plan design that it did not design and over
which it has no control. . . .").

Blue Cross/Blue Shield contends that the vagaries in the
various regulations promulgated over different
administrations resulted in a lack of the "unambiguous[]"
notice of a "condition on the grant of federal moneys"
required by the Supreme Court. *Pennhurst*, 451 U.S. at 17,
*see also Arlington*, 548 U.S. at 296 (noting that, considering
the perspective of the recipient of federal funding, a court
must inquire whether the recipient of the federal funds

"would clearly understand . . . the obligations" set forth in the conditions of the legislation).

I am not prepared to say that Blue Cross/Blue Shield's argument is a winning one. I am prepared to say that Blue Cross/Blue Shield should have the opportunity to present this argument to the district court in light of the majority's suggested arguments to the plaintiff on remand that were not previously made to the district court. *See Majority Opinion*, pp. 43-48. Allowing Blue Cross/Blue Shield to also make its arguments that were not previously made to the district court would level the playing field, a fundamental tenet of our justice system. *See Yamada v. Nobel Biocare Hldg. AG*, 825 F.3d 536, 544 (9th Cir. 2016), *as amended*, (stating that [o]ur adversarial system of justice is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question) (citation and internal quotation marks omitted).

To summarize, I concur only in the judgment because I part company with the majority's analysis that goes beyond a discussion of the Supreme Court's holding in *Skrmetti* and a remand for the district court to apply *Skrmetti* in the first instance. I see the majority's analysis as exceeding a remand and conducting a "first view" rather than a "review." *Cutter*, 544 U.S. at 718 n.7. But, as the majority has ventured to suggest its "first view" of the case for the plaintiffs to pursue on remand, it certainly should not preclude Blue Cross/Blue Shield from pursuing any available defenses on remand. *See Majority Opinion*, p. 22 (concluding that Blue Cross/Blue Shield "did not preserve its Spending Clause argument."). *See Yamada*, 825 F.3d at 544.